UNITED STATES DISTRICT COURT
SOUTHERN DIVISION OF FLORIDA
MIAMI DIVISION

**03 - 22283**

CIV - ALTONAGA

MAGISTRATE JUDGE
BANDSTRA

EFG PRIVATE BANK, S.A.,
a bank organized under the laws of
Switzerland,

      Plaintiff,

  vs.

BANKEST RECEIVABLES USA LLC,
a Florida limited liability corporation,

BANKEST CAPITAL CORPORATION,
a Florida corporation,

E.S. BANKEST, L.C.,
a Florida limited liability corporation,

EDUARDO ORLANSKY,
an individual,

    and

HECTOR ORLANSKY,
an individual,

      Defendants.

---

### VERIFIED COMPLAINT FOR
### RESTITUTION AND CONSTRUCTIVE TRUST,
### SPECIFIC PERFORMANCE, RESCISSION, DAMAGES,
### AND THE APPOINTMENT OF A RECEIVER

Plaintiff, EFG Private Bank, S.A. ("Private Bank"), sues defendants, Bankest

Receivables USA LLC ("Receivables USA"), Bankest Capital Corporation

("Capital"), E.S. Bankest, L.C. ("E.S. Bankest"), Eduardo Orlansky ("E. Orlansky"),



and Hector Orlansky ("H. Orlansky") (E. and H. Orlansky are collectively "the Orlanskys") and states:

## JURISDICTION, VENUE AND PARTIES

1.  This Court has original jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2), as the amount in controversy exceeds $75,000, exclusive of interest and costs, and the dispute is between a subject of a foreign country and corporations whose principal place of business is in this state.

2.  Venue is proper in this Court pursuant to 28 U.S.C. §1391(a), as the Defendants reside within this district.

3.  Plaintiff Private Bank is a bank organized under the laws of Switzerland with its principal place of business in Switzerland. Defendant Receivables USA is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida. Defendant Capital is a Florida corporation with its principal place of business in Miami-Dade County, Florida. Defendant E.S. Bankest is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida. E.S. Bankest is an affiliate of Receivables USA, as both E.S. Bankest and Receivables USA are wholly owned by Capital (Receivables USA, Capital and E.S. Bankest are collectively referred to as the "Bankest Entities"). Defendant E. Orlansky is an individual resident in Miami-Dade County, Florida. Defendant H. Orlansky is an individual resident in Miami-Dade County, Florida.

4.   This is an action with respect to four promissory note participations that have a combined unpaid principal balance of $4 million issued by Receivables USA between July 31st and August 5, 2003.  For the reasons set forth below, Private Bank variously seeks the remedies of restitution and constructive trust, specific performance, rescission, damages, and the appointment of a receiver over Receivables USA.

5.   Between July 31 and August 5, 2003, four clients of Private Bank invested a total of $4 million in promissory note participations ("Notes") issued by Receivables USA.  (Copies of the Notes are included in Exhibit A hereto)

6.   Private Bank is designated as the "Holder's Agent" under the Notes.  As "Holder's Agent," Private Bank has "the right on behalf of all Holders to take any and all actions it shall deem necessary or appropriate in connection with" the Notes.  Private Bank brings this action to protect the interests of the Note Holders.

7.   Offering materials were disseminated by the Orlanskys, Capital and Receivables USA to induce the investments in the Notes.  (Exhibit A)  These materials represented that a principal purpose of Receivables USA was "to own and manage a segregated portfolio of accounts receivable …."

8.   Under the Master Credit Agreement, which was a part of these offering materials, Receivables USA was authorized to purchase accounts receivable from Capital and from E.S. Bankest.  The resulting portfolio of accounts receivable was to serve as security for the Notes.  At the time Private Bank's

Note Holders invested $4 million, they did not know that any affiliate of Receivables USA was in default to any creditor.  In fact, E.S. Bankest was in default of $160 million in debt owed Bank Espirito Santo International, Ltd. ("Espirito Santo") pursuant to earlier transactions nearly identical to the present transaction between Private Bank and Receivables USA.  The Orlanskys and Receivables USA concealed such defaults from Private Bank.

9.     As such, Private Bank's Note Holders brought new value to Receivables USA (and any entity to which their funds were transferred).  The Note Holders were therefore to acquire a purchase money security interest in all accounts receivable purchased by Receivables USA, and in any accounts receivable held by Capital or E.S. Bankest and identified, or intended for transfer, to Receivables USA.  Such accounts receivable either have been identified by the Orlanskys or can be identified by them.  However, the Orlanskys have been prevented from further identifying these accounts receivable or from transferring these accounts receivable to the books of Receivables USA by the receiver of E.S. Bankest.

## THE ESPIRITO SANTO RECEIVERSHIP

10.    On August 6, 2003, Espirito Santo filed suit against ESB.  Espirito Santo had a lending relationship with E.S. Bankest only, and did not have recourse against Receivables USA.  From at least March 1998 up to September 2002, Espirito Santo was a joint venture partner in E.S. Bankest, with all management rights and responsibilities attendant thereto; Espirito Santo

benefited substantially from its joint venture in E.S. Bankest.  On August 13, 2003, at the behest of Espirito Santo, the Court appointed Lewis B. Freeman as receiver of E.S. Bankest.  On August 25, 2003, receiver Freeman filed a Verified Emergency Motion with the Court seeking to expand the scope of his receivership to include both Receivables USA and Capital ("Receiver's Expansion Motion").

11.  The Receiver's Expansion Motion concedes that $1.4 million of Private Bank's Note Holders' funds are presently frozen in Receivables USA's bank account at Mellon United.  The motion also concedes that "[f]unds invested by third parties [i.e., Private Bank's Note Holder's] in Receivables USA were ... upstreamed to Capital ...."

12.  Thus, the receiver has conceded that the Private Bank Note Holder's funds are being held by both Receivables USA and Capital.

## THE AUGUST 16, 2003 AGREEMENT

13.  Directly or indirectly, the Orlanskys controlled Receivables USA, Capital and E.S. Bankest.

14.  On Saturday, August 16, 2003, Defendants E. Orlansky, H. Orlansky and Receivables USA entered a Memorandum of Agreement (Exhibit B) with Private Bank.  In the agreement, the Orlanskys and Receivables USA agreed to identify all funds invested by Private Bank's Note Holders and all assets (including accounts receivable) purchased with such funds by the close of business August 21, 2003, and then to transfer such funds and assets to

Private Bank or its Escrow Agent for the sole and exclusive benefit of Private Bank's Note Holders.   The parties to the agreement further agreed that Lewis B. Freeman was a mutually agreeable Escrow Agent, and that the agreement could be specifically enforced in the event of default.   Receiver Freeman and his legal counsel were provided with a copy of this Memorandum of Agreement on Monday morning, August 18, 2003.

15.   All conditions precedent to the relief demanded have occurred or have been performed, waived or excused.

<div align="center">

**COUNT I**

**UNJUST ENRICHMENT AND CONSTRUCTIVE TRUST**
**(Against the Bankest Entities)**

</div>

16.   Private Bank repeats the allegations of paragraphs 1-15 as if fully set forth.

17.   The Receiver's Expansion Motion contends that Receivables USA, Capital, and E.S. Bankest are "alter egos."   It appears that receiver Freeman will argue to the Court that these alleged alter egos should be treated as one common fund from which Espirito Santo's claims should be satisfied.

18.   If the receiver's alter ego contention has merit, then it is clear that Espirito Santo will be unjustly enriched by the recent, new value investment of Private Bank's Note Holders.

19.   Private Bank's Note Holders brought new value to the Bankest Entities. Private Bank's Note Holders innocently invested later than any transfer of investment funds from E.S. Bankest to any other Bankest Entity.   If the receiver succeeds in expanding the receivership over Capital, E.S. Bankest

will be unjustly enriched at the expense of Receivables USA and Private Bank's Note Holders.

**WHEREFORE**, plaintiff, Private Bank demands judgment against Receivables USA and E.S. Bankest for $4 million, and imposing a constructive trust on Receivables USA's Mellon Bank account and on all property identified or to be identified for the benefit of Private Bank's Note Holders, together with such other relief as may be appropriate.

## COUNT II

### SPECIFIC PERFORMANCE
### (Against the Orlanskys and Receivables USA)

20.     Private Bank repeats the allegations of paragraphs 1-15 as if fully set forth.

21.     The Orlanskys and Receivables USA have failed to identify funds or assets before the close of business on August 21, 2003, and transfer them promptly thereafter, as required by the August 16, 2003 Memorandum of Agreement.

22.     Private Bank has demanded that the Orlanskys perform the agreement; the Orlanskys have failed to do so.

**WHEREFORE**, plaintiff, Private Bank demands judgment compelling the Orlanskys and Receivables USA to specifically perform the August 16, 2003 Memorandum of Agreement by (1) immediately identifying (a) the amount and location (including bank location and account numbers) of all funds invested by the Note Holders in promissory note participations issued by Receivables USA between July 31 and August 5, 2003 and (b) the specific accounts receivable or other assets that have been purchased with such funds and the identity of the obligors of each

- 7 -

such account receivable, (2) promptly transferring all such funds and other assets to Private Bank or to an Escrow Agent for the sole and exclusive benefit of Private Bank, as agent of the Note Holders, and (3) fulfilling all other agreements set forth in the Memorandum of Agreement, together with such other relief as may be appropriate.

### COUNT III

### RESCISSION UNDER FL. STATUTE 517.211 and 517.301
### (Against Orlanskys and Receivables USA)

23.    Private Bank repeats the allegations of paragraphs 1-15 as if fully set forth.

24.    The Orlanskys, as principals and control persons of Receivables USA, are legally responsible for the representations contained in the offering materials for the Notes.

25.    The Master Credit Agreement, a part of the offering materials, the terms of which were incorporated into the Notes, provided as follows:

1.04.  Use of Proceeds of Loan.  At all times during which any of the Promissory Notes evidencing the Loan are outstanding, Borrower covenants and agrees to limit the use of proceeds from the Loan for the following: (i) the payment of the purchase price of accounts receivables, including the purchase of accounts receivable of new clients, accounts receivable which may be assigned by or purchased from Bankest Capital Corp., E.S. Bankest LC, Bankest Finance LLC, or any other third party factor which such accounts receivable may or may not be insured and to make advances and/or other loans to factoring clients; (ii) to purchase participation interests and otherwise participate in the factoring operations of other factors and the business arrangements with their clients; (iii) to acquire accounts receivable factoring contracts and other assets from various sources; and/or (iv) to engage in the refactoring of any accounts receivable which may be acquired.

26. This "Use of Proceeds of Loan" provision was material to Private Bank and the Note Holders.

27. Private Bank and the Note Holders justifiably relied on the representations contained in the "Use of Proceeds of Loan" provision, and they would not have invested in Receivables USA's Notes if they did not believe that their proceeds would be used only as specified by this provision.

28. Although *all* of the proceeds from the sales of the Notes were supposed to be used to purchase accounts receivable, the Receiver's Expansion Motion states that only "a *portion* of the $2.6 million missing funds [the $4 million invested by Private Bank's Note Holders, less the $1.4 million frozen at Mellon United] *may* have been used to factor receivables ...."

29. In connection with the sale of the Notes, the Orlanskys and Receivables USA violated Fla. Statute § 517.301 because they either never intended to comply with this Use of Proceeds provision or were reckless or negligent in representing that the Note proceeds would be used as specified in this provision.

30. Private Bank's Note Holders still own and hold the Notes.

**WHEREFORE**, plaintiff, Private Bank demands judgment holding the Orlanskys and Receivables USA liable in rescission, ordering them to pay the sum of $4 million to Private Bank, plus attorney's fees, for the benefit of the Note Holders upon their tender of the Notes to these defendants, together with such other relief as may be appropriate.

- 9 -

<center>**COUNT IV**

**COMMON LAW FRAUD**
**(Against the Orlanskys and the Bankest Entities)**</center>

31.     Private Bank repeats the allegations of paragraphs 1-15 and 24-30 as if fully set forth.

32.     The Orlanskys and Receivables USA committed common law fraud against Private Bank and the Note Holders.  These defendants falsely represented that the proceeds from the sales of Notes would be used only to purchase accounts receivable to secure the Notes.  This representation was material; was made with the intention that Private Bank and the Note Holders rely on it; the Orlanskys and Receivables USA never intended to comply with this representation or were reckless in making it; and Private Bank and the Note Holders did justifiably rely on this representation to their damage in excess of $4 million.

33.     Private Bank's Note Holders brought new value to the Bankest Entities. Private Bank's Note Holders innocently invested later than any transfer of investment funds from E.S. Bankest to any other Bankest entity.   E.S. Bankest will be unjustly enriched at the expense of Receivables USA and Private Bank's Note Holders unless the Court imposes a constructive trust on Receivables USA's  Mellon Bank account and on all property identified or to be identified for the benefit of Private Bank's Note Holders.

        **WHEREFORE**, plaintiff, Private Bank demands judgment against the Orlanskys, Receivables USA, Capital and E.S. Bankest for $4 million, and imposing

<center>- 10 -</center>

a constructive trust on Receivables USA's Mellon Bank account and on all property

identified or to be identified for the benefit of Private Bank's Note Holders, together

with such other relief as may be appropriate.

## COUNT V

### DEFAULT UNDER THE CREDIT DOCUMENTS
### (Against Receivables USA)

34.     Private Bank repeats the allegations in paragraphs 1-15 as if fully set forth.

35.     Section 5.01 of the Master Credit Agreement (a part of the offering materials,

whose terms were incorporated into the Notes), entitled "Events of Default"

provides, in pertinent part, as follows:

"If any one of the following events ... shall occur:
            ...

            (b) default shall be made in the due observance or
                performance of any term, covenant or condition
                contained in Section 4.01 or 4.02 [of the Master Credit
                Agreement];
            ...

            then upon the happening of any one or more of the
            foregoing events of default which shall be continuing, ...
            all sums payable by [Receivables USA under this
            Agreement] and under the Promissory Notes shall become
            and be immediately due and payable upon declaration to
            such effect delivered by [B.F. Security Holdings, Ltd.
            ("Collateral Agent")] to [Receivables USA] (which
            declaration the Collateral Agent shall deliver if requested
            to do so by [Plaintiffs]); and the Promissory Notes then
            outstanding shall be accelerated and immediately mature
            and become due and payable without declaration or other
            notice to [Receivables USA]."

36.     Section 4.01 of the Master Credit Agreement provides, in

pertinent part, the following:

- 11 -

"At all times prior to payment in full of all of the Promissory Notes and the performance of all of its other obligations [under this Agreement] and under the Loan Documents, unless excused in writing by the Collateral Agent or [Plaintiffs, Receivables USA] will:

...

(b) Duly and punctually perform each and every obligation of [Receivables USA] under [the] Master Credit Agreement, the Promissory Notes and each of the Credit Documents and execute and deliver all such other and further instruments, and do and perform all such other further acts and things, as [Plaintiffs] or the Collateral Agent <u>may reasonably request to protect or further protect and assure to [Plaintiffs] the rights and benefits intended to be afforded</u>.

(c) Keep adequate records and books of account in which complete and correct entries will be made in accordance with sound accounting practice, reflecting <u>all financial transactions of these credit arrangements</u>."

37. Section 4.02 of the Master Credit Agreement provides, in pertinent part, the following:

"... [Receivables USA] will not ... take any action, fail to take any action, do any thing or cause another to do any thing or take any act which shall <u>diminish the value of the undertaking</u> [under the Master Credit Agreement] by [Plaintiffs] or repudiate the obligations [under the Master Credit Agreement] or under the Promissory Notes."

38. Receivables USA has breached the terms of Section 4.01(b) of the Master Credit Agreement by failing, after reasonably requested by plaintiff, to (1) identify the accounts receivable purchased with the $4 million invested by the Note Holders with Receivables USA, and, to the extent Receivables USA failed to purchase accounts receivable, the bank accounts where the invested funds currently sit; (2) provide written confirmation from the appropriate

financial institutions that the entire $4 million was invested in permitted accounts receivable, and, to the extent Receivables USA failed to purchase accounts receivable, the bank accounts where the invested funds currently sit; (3) provide assurances that the accounts receivable and adequate cash reserves exist, and were dedicated, segregated and pledged for the benefit of the Note Holders; and (4) create a UCC Article 9 security interest in the accounts receivable in favor of the Collateral Agent, as agent for the Note Holders. As a result of this breach of Section 4.01(b), Receivables USA is in immediate default under Section 5.01(b).

39.    Although plaintiff is required under Section 5.01 of the Master Credit Agreement to request the Collateral Agent to declare the entire $4 million immediately due and payable, plaintiff is excused from making this request to the Collateral Agent because plaintiff has already made this demand to the Orlanskys who are the principals of the Collateral Agent. Furthermore, it is clear that Receivables USA and the Orlanskys are either unwilling to comply with the terms of Section 4.01(b) or are prevented from doing so because of the actions of Espirito Santo's receiver, Freeman. Therefore, plaintiff is hereby declaring the promissory notes immediately due and payable in the amount of $4 million.

40.    Additionally, Receivables USA has breached Section 4.01(c) ("Records and Books of Account") of the Master Credit Agreement by failing to keep adequate records of all financial transactions relating to Receivables USA's

investment of the $4 million in accounts receivable.  In addition, Receivables USA has failed to keep records indicating that purchased accounts receivable were dedicated, segregated and pledged to the Collateral Agent for their benefit of the Note Holders.  As a result of this breach of Section 4.01(c) of the Master Credit Agreement, Receivables USA is in default under Section 5.01(b) thereof.  Plaintiff is excused from making a demand to the Collateral Agent because plaintiff has already made the same demand to the Orlanskys who are the principals of the Collateral Agent, and making another demand to the Collateral Agent under these circumstances would be useless and futile.  Therefore, plaintiff declares the promissory notes immediately due and payable in the amount of $4 million.

41.   Finally, Receivables USA has breached Section 4.02 of the Master Credit Agreement by taking actions that have diminished the value of the promissory note transactions, including but not limited to, (1) failing to invest the entire $4 million in appropriate, insured accounts receivable and (2) commingling the $4 million with the assets of two entities affiliated with Receivables USA, one of which is now in receivership.  Receivables USA's deliberate and willful misuse of the invested funds creates a risk that the invested funds will be dissipated and lost.  As a result of this breach of Section 4.02 of the Master Credit Agreement, Receivables USA is in default under Section 5.01(b) thereof.  Again, plaintiff is excused from making a

demand to the Collateral Agent to declare the $4 million owed under the promissory notes immediately due and payable.

**WHEREFORE**, plaintiff, Private Bank demands a judgment against Receivables USA for $4 million in damages for breach of the transaction documents, together with such other relief as may be appropriate.

## COUNT VI

### RECEIVERSHIP
### (Over Receivables USA)

42. Private Bank repeats the allegations of paragraphs 1-15 as if fully set forth.

43. The Receiver's Expansion Motion concedes that $1.4 million of Private Bank's Note Holders' funds are presently frozen in Receivables USA's bank account at Mellon United and that "[f]unds invested by third parties [i.e., Private Bank's Note Holder's] in Receivables USA were ... upstreamed to Capital ...."

44. At the same time that the receiver concedes that the Private Bank's Note Holders' funds are being held by both Receivables USA and Capital, Espirito Santo's receiver proposes collapsing all of the Bankest Entities into a common pool for the evident purpose of satisfying the claims of Espirito Santo.

45. Additionally, Espirito Santo's receiver is tortiously interfering with Private Bank's contractual relationships with the Orlanskys and Receivables USA, and with Receivables USA's contracts with Capital, preventing the return of the Note Holders' funds and assets.

46.    Private Bank's Note Holders' interests are threatened by the actions of Espirito Santo's receiver, and they will suffer immediate and irreparable harm unless a separate receiver is appointed over Receivables USA to protect their interests.

**WHEREFORE,** Plaintiff Private Bank respectfully requests the appointment of a Receiver for Receivables USA, with powers equal to that of the receiver for E.S. Bankest.

August 27, 2003                                  Respectfully submitted,

                                                 James D. Wing
                                                    Fla. Bar No. 0195537
                                                 Mitchell E. Herr
                                                    Fla. Bar No. 0473642
                                                 HOLLAND & KNIGHT LLP
                                                 *Attorneys for EFG Private Bank,*
                                                 *S.A.*
                                                 *Fla. Bar No. 0473642*
                                                 701 Brickell Avenue, Suite 3000
                                                 Miami, Florida 33131
                                                 Telephone:  (305) 374-8500
                                                 Facsimile:   (305) 789-7799

## **VERIFICATION**

The undersigned, after being duly sworn, states that his name is Ricardo J. Ventura, that he is over the age of majority, that he has read the foregoing Complaint verifies on the basis of his personal knowledge that the factual allegations contained therein are true.

_____
Ricardo Ventura

State of Florida
County of Miami-Dade

SUBSCRIBED AND SWORN TO before me by Ricardo Ventura, this 27th day of August, 2003.

_____
Notary Public

My Commission Expires: _____



JACQUELINE MONTANO
MY COMMISSION # DD 179939
EXPIRES: January 26, 2007
Bonded Thru Notary Public Underwriters

- 17 -

No. 2003-IA-_____

*CONFIDENTIAL MEMORANDUM*

# BANKEST RECEIVABLES USA LLC
### (the "Company")
### Factored Accounts Receivable-Backed Promissory Notes
### (the "Notes")

#### Minimum Purchase $100,000.00

#### Series A Notes:
#### Six (6) Month London Inter-Bank Offered Rate ("LIBOR"),
#### plus One and One-Half Percent (1.5%), per annum* 185-Day Maturity Notes

#### Series B Notes:
#### Twelve (12) Month London Inter-Bank Offered Rate ("LIBOR"),
#### plus One and Three-Quarters Percent (1.75%), per annum** 365-Day Maturity Notes
#### Including Series A and Series B Master Promissory Note Participations

*Accrued interest, to the extent of the respective Stated Interest Rates, will be distributed to Series A Noteholders on the Maturity Date of Note(s) if such Date is a Business Day and if not a Business Day, then on the first Business Day subsequent to the Maturity Date of said Series A Notes. Accrued interest to Noteholders of Series B Notes, will be distributed on those Dates which are: (i) one hundred eighty five (185) days and, (ii) three hundred and sixty five (365) days, subsequent to the Date of Issuance of said Notes. If said Series B Interest Payment Date(s) are not Business Days, then on the first Business Day, immediately subsequent to said Series B Interest Payment Date(s). Payments of the Principal Amount of the Notes will be distributed to Noteholders on the scheduled Maturity Dates, if such Date is a Business Day and if not a Business Day, then on the first Business Day subsequent to the Maturity Date, subject to the Maturity Date Extension Options, as described herein.*

*The Notes are secured and/or collateralized via the receipt by the Collateral Agent of a Security Interest/Lien (the "Collateral Lien") on accounts receivable ("Accounts Receivable") purchased or to be purchased by the Company from Clients of the Company. The Accounts Receivable are created by Company Clients as a result of the sale by the Clients of merchandise, goods, products and/or services to Customers of the Clients ("Account Debtors")*

**Investment in the Company involves a high degree of risk. For a discussion of risks relating to this Offering, see "Risk Factors."**

**THE NOTES OFFERED IN THE CONFIDENTIAL MEMORANDUM ARE NOT AND WILL NOT BE APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, THE FLORIDA DIVISION OF SECURITIES, OR ANY OTHER STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY NOR HAS NOR WILL THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION PASS UPON THE ACCURACY OR ADEQUACY OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THE NOTES HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, UNDER THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, NOR UNDER THE SECURITIES LAWS OF ANY OTHER JURISDICTION. THE NOTES HAVE NOT BEEN AND ARE NOT BEING OFFERED FOR SALE IN THE UNITED STATES (OR ANY OF ITS TERRITORIES, POSSESSIONS OR AREAS SUBJECT TO ITS JURISDICTION), OR TO ANY PERSON WHO IS A U.S. PERSON (AS DEFINED HEREIN). THE NOTES ARE SUBJECT TO SUBSTANTIAL RESTRICTIONS ON RESALE.**

The Notes will be offered only to Non U.S. Persons who are *Accredited Investors*, as defined by applicable Federal securities laws, and in reliance on certain exemptions as promulgated by the United States Securities and Exchange Commission.

#### BANKEST RECEIVABLES USA LLC
#### 999 Brickell Avenue, Penthouse, Miami, Florida 33131
#### The date of this Memorandum is March 17, 2003, as amended June 30, 2003

(Rev. 6/03)

MIAMI 351604.12

-i-

**EXHIBIT**

tabbies

A

# BANKEST RECEIVABLES USA LLC

## CONFIDENTIAL MEMORANDUM

## IMPORTANT NOTICES

THIS CONFIDENTIAL MEMORANDUM (THE "MEMORANDUM") IS BASED UPON INFORMATION SUPPLIED BY THE COMPANY, SOLELY FOR USE BY PROSPECTIVE ACCREDITED INVESTORS TO DETERMINE THEIR INTEREST IN CONSIDERING MAKING THE LOAN TO THE COMPANY.

**PROSPECTIVE LENDERS/INVESTORS SHOULD BE AWARE THAT ANY INVESTMENT IN THE NOTES WILL BE AN ILLIQUID INVESTMENT WITH SUBSTANTIAL FINANCIAL RISK. THE NOTES OFFERED HEREBY SHOULD BE PURCHASED ONLY BY PERSONS OF SUBSTANTIAL MEANS WHO: (A) HAVE NO NEED FOR LIQUIDITY WITH RESPECT TO THIS INVESTMENT; (B) CAN BEAR THE ECONOMIC RISK OF A TOTAL LOSS OF THEIR INVESTMENT; AND (C) UNDERSTAND OR HAVE BEEN ADVISED WITH RESPECT TO THE LONG-TERM NATURE AND TAX CONSEQUENCES OF, AND RISK FACTORS ASSOCIATED WITH, THIS INVESTMENT. IN MAKING A DECISION TO PURCHASE NOTES, INVESTORS MUST RELY UPON THEIR OWN EXAMINATION OF THE COMPANY, THE NOTES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. PROSPECTIVE INVESTORS SHOULD CAREFULLY REVIEW THE "RISK FACTORS" SECTION OF THE MEMORANDUM BEFORE DECIDING WHETHER OR NOT TO PURCHASE NOTES.**

THE NOTES WHICH ARE DESCRIBED IN THIS MEMORANDUM HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), THE UNITED STATES INVESTMENT COMPANY ACT OF 1940, AS AMENDED, NOR THE SECURITIES LAWS OF THE STATE OF FLORIDA OR ANY OF THE OTHER STATES OF THE UNITED STATES OR ANY OTHER JURISDICTION. THE OFFERING CONTEMPLATED BY THIS MEMORANDUM WILL BE MADE IN RELIANCE UPON (I) A SAFE HARBOR FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT FOR OFFERS AND SALES OF SECURITIES WHICH OCCUR OUTSIDE OF THE UNITED STATES, AND (II) AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT FOR OFFERS AND SALES OF SECURITIES WHICH DO NOT INVOLVE ANY PUBLIC OFFERING, AND (III) ANALOGOUS EXEMPTIONS UNDER STATE SECURITIES LAWS. AS SUCH, THE NOTES MAY NOT BE OFFERED, SOLD, TRANSFERRED, ACCEPTED OR DELIVERED, DIRECTLY OR INDIRECTLY, IN THE UNITED STATES (OR ANY OF ITS TERRITORIES, POSSESSIONS OR AREAS SUBJECT TO ITS JURISDICTION), TO U.S. PERSONS, OR OTHERWISE IN CONTRAVENTION OF REGULATION S UNDER THE SECURITIES ACT.

**THIS MEMORANDUM SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY NOR SHALL THERE BE ANY SALE OF NOTES IN ANY JURISDICTION IN WHICH SUCH OFFER, SOLICITATION OR SALE IS NOT AUTHORIZED OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER, SOLICITATION OR SALE. NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATIONS CONCERNING THE COMPANY WHICH ARE INCONSISTENT WITH**

(Rev. 6/03)

MIAMI 351604.12

THOSE CONTAINED IN THIS MEMORANDUM.  PROSPECTIVE INVESTORS SHOULD NOT RELY ON ANY INFORMATION NOT CONTAINED IN THIS MEMORANDUM OR DOCUMENTS REFERENCED HEREIN.

IN MAKING AN INVESTMENT DECISION PROSPECTIVE INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE COMPANY, WHICH PROPOSES TO ISSUE THE NOTES, AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED.  THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY SECURITIES COMMISSIONS OR REGULATORY AUTHORITY OF ANY JURISDICTION, INCLUDING ANY FEDERAL, FLORIDA OR OTHER STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS MEMORANDUM.  ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

THE NOTES ARE SUBJECT TO SUBSTANTIAL RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND THE APPLICABLE STATE SECURITIES LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM, AND THE APPLICABLE SECURITIES LAWS OF ANY OTHER JURISDICTION (INCLUDING THE FLORIDA SECURITIES ACT), AND MAY NOT BE SOLD OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REQUIREMENTS AND CONDITIONS SET FORTH IN THIS MEMORANDUM AND THE SUBSCRIPTION AGREEMENT.

THE NOTES SHALL BE OFFERED AND SOLD BY THE COMPANY ONLY TO NON-U.S. PERSONS IN ACCORDANCE WITH REGULATION S AND SECTION 4(2) UNDER THE SECURITIES ACT.  ACCORDINGLY, ALL OFFERS AND SALES WILL BE CONDUCTED IN "OFFSHORE TRANSACTIONS," WITHOUT ANY "DIRECTED SELLING EFFORTS," AND IN ACCORDANCE WITH "OFFERING RESTRICTIONS," AS SUCH TERMS ARE DEFINED IN REGULATION S, AND PURSUANT TO OTHER REQUIREMENTS SET FORTH IN RULE 903 OF REGULATION S.  EACH PROSPECTIVE INVESTOR MUST QUALIFY UNDER THE SUITABILITY STANDARDS SET FORTH IN THIS MEMORANDUM, AND THE INVESTOR'S NOTES WILL BE SUBJECT TO SUBSTANTIAL RESTRICTIONS ON RESALE.

EACH PROSPECTIVE INVESTOR WILL BE REQUIRED TO EXECUTE AND DELIVER TO THE COMPANY THE DOCUMENTS CONTAINED IN A SEPARATE SUBJECTION BOOKLET, INCLUDING A PROSPECTIVE INVESTOR QUESTIONNAIRE, AND A SUBSCRIPTION AGREEMENT BETWEEN THE INVESTOR AND THE COMPANY.

(Rev. 6/03)

# BANKEST RECEIVABLES USA LLC

**THIS MEMORANDUM IS INTENDED SOLELY FOR THE USE OF THE PERSON TO WHOM IT IS PRESENTED. THE DISCLOSURE OF ANY OF THE INFORMATION CONTAINED HEREIN OR THE USE OF THIS MEMORANDUM FOR ANY OTHER PURPOSE WITHOUT THE WRITTEN CONSENT OF THE COMPANY IS SPECIFICALLY PROHIBITED. THIS MEMORANDUM MAY NOT BE REPRODUCED IN WHOLE OR IN PART, AND IT IS ACCEPTED WITH THE UNDERSTANDING THAT IT WILL BE RETURNED UPON REQUEST.**

PROSPECTIVE INVESTORS SHOULD NOT CONSTRUE THE CONTENTS OF THIS MEMORANDUM OR ANY COMMUNICATION, WHETHER WRITTEN OR ORAL, AS LEGAL, TAX, ACCOUNTING, OR OTHER EXPERT ADVICE. EACH PROSPECTIVE INVESTOR SHOULD CONSULT HIS OWN ADVISORS REGARDING THE LEGAL, TAX, ACCOUNTING AND RELATED MATTERS CONCERNING AN INVESTMENT IN THE COMPANY.

**PRIOR TO ISSUANCE OF THE NOTES AND ACCEPTANCE OF THE LOANS BY THE COMPANY CONTEMPLATED HEREBY, THE COMPANY WILL PROVIDE EACH PROSPECTIVE LENDER WITH THE OPPORTUNITY TO ASK QUESTIONS OF AND RECEIVE ANSWERS FROM THE COMPANY CONCERNING THE TERMS AND CONDITIONS OF THE LOAN, AND TO OBTAIN ANY ADDITIONAL INFORMATION WHICH THE COMPANY POSSESSES OR CAN ACQUIRE WITHOUT UNREASONABLE EFFORT OR EXPENSE THAT IS NECESSARY TO VERIFY THE ACCURACY OR INFORMATION CONTAINED IN THIS MEMORANDUM OR WHICH OTHERWISE IS FURNISHED TO PROSPECTIVE LENDERS. QUESTIONS FROM LENDERS CONCERNING THE TERMS AND CONDITIONS OF THE LOAN AND INQUIRIES FOR ADDITIONAL INFORMATION SHOULD BE DIRECTED TO:**

<table>
<tr><td>Eduardo Orlansky<br>Chairman of the Board</td><td>Hector Orlansky<br>President, Manager</td></tr>
</table>

Dominick C. Parlapiano
Senior Vice President, Manager

BANKEST RECEIVABLES USA LLC
999 Brickell Avenue
11th Floor
Miami, Florida 33131
Telephone: (305) 358-5610
Telecopier (305) 372-2816

(Rev. 6/03)

# BANKEST RECEIVABLES USA LLC
### (the "Company")
## Factored Accounts Receivable-Backed Promissory Notes
### (the "Notes")

**Minimum Purchase $100,000.00**

**Series A Notes:**
Six (6) Month London Inter-Bank Offered Rate ("LIBOR"),
plus One and One-Half Percent (1.5%), per annum*  185-Day Maturity Notes

**Series B Notes:**
Twelve (12) Month London Inter-Bank Offered Rate ("LIBOR"),
plus One and Three-Quarters Percent (1.75%), per annum**  365-Day Maturity Notes
**Including Series A and Series B Master Promissory Note Participations**

## CONFIDENTIAL MEMORANDUM
## TABLE OF CONTENTS

| | |
|---|---|
| Introduction | 3 |
| Access to Corporate Information | 3 |
| Executive Summary | 3 |
| Interests Being Offered | 4 |
| The Company | 4 |
| Company Location and Facilities | 4 |
| Business Summary | 4 |
| Description of the Loan | 5 |
|     Master Credit Agreement | 5 |
|     Promissory Notes | 6 |
|     Collateral and Security Interest | 7 |
|     Omnibus First Amendment | 7 |
|     Credit Insurance/Credit Indemnity | 7 |
| Risk Factors | 8 |
|     Company History and Business Operations | 8 |
|     No Securities Registration or Trading Market | 9 |
|     Cash Flow Risks | 9 |
|     Collateral Liquidation Risks | 9 |
|     Interest Rate Risks | 9 |
|     Customer Defaults and Defalcation Risks | 9 |
|     Conflicts of Interest; Competing Business of Member | 10 |
|     Control of Collateral Agent | 10 |
|     Competition and General Business Risks | 10 |

| | |
|---|---|
| **Other Matters** | **11** |
| **United States Tax Matters** | **11** |
| **No Registration/Exempt Offering** | **12** |
| **Modification of Terms** | **13** |
| **Sole Member** | **13** |
| **Management Team** | **14** |
| **Professionals and Advisors** | **15** |
| **Investor's Suitability Standards** | **17** |

## EXHIBITS

| | |
|---|---|
| I. | Master Credit Agreement |
| II. | Form of Promissory Notes |
| III. | Master Security Agreement |
| IV. | Omnibus First Amendment |
| V. | Form of Factoring Agreement |
| VI. | Form of Acknowledgment of Receipt of Memorandum |
| VII. | Form of Subscription Agreement |
| VIII. | Form of Purchaser Representative Questionnaire |
| IX. | Subscription Instructions |

## INTRODUCTION

This Confidential Memorandum (the "Memorandum") describes the proposed loan transaction pursuant to which BANKEST RECEIVABLES USA LLC (the "Company") shall issue 185-day and 365-day Notes and Note Participations under Master Promissory Notes (respectively, the "Series A Notes," the "Series B Notes" and Note Participations in Series A Master Notes and Series B Master Notes are referred to herein collectively as the "Notes"). Such Notes will be issued pursuant to a Master Credit Agreement and related documents to be entered into by the Company. Each holder of a debenture would be required to execute and deliver a joinder agreement binding the holder to the terms of the Master Credit Agreement and other agreements.

### THIS MEMORANDUM SUPERSEDES ALL PRIOR INFORMATION PROVIDED TO PROSPECTIVE LENDERS.

The information contained in this Memorandum is intended to provide prospective Lenders with a brief summary of the relevant terms and conditions of the various agreement and documents which will evidence the Loan (as hereinafter defined). This Memorandum is qualified in its entirety by the Master Credit Agreement and related documents and each prospective Lender should carefully and fully review each of those documents.

### Access to Corporate Information

The Company extends to each prospective Lender and their representatives, if any, the opportunity prior to the extension of any credit to the Company under the Master Credit Agreement and issuance by the Company of its Notes, to ask questions of and receive answers from Management concerning the Company and the terms and conditions of this Loan and to obtain any additional information which the Company possesses or can acquire without unreasonable effort or expense and which is necessary or helpful to verify the accuracy of information contained in this Memorandum or which otherwise is furnished to other prospective lenders. Requests for such additional information should be directed to the Company, Attention: Hector Orlansky, President, 999 Brickell Avenue, Miami, Florida 33131.

### I.    Executive Summary

BANKEST RECEIVABLES USA LLC (referred to as the "Company"), is a Florida limited liability company formed on March 10, 2003 pursuant to the Florida Limited Liability Companies Act. The Company is a wholly owned subsidiary of Bankest Capital Corp., a Florida corporation. The principal purpose of the Company is to own and manage a segregated portfolio of accounts receivables purchased by the Company from new and existing clients, and to otherwise (i) engage in the operation of a non-regulated commercial factoring business, and (ii) acquire through purchase certain accounts receivable, existing factoring contracts, and other assets.

As a start-up company with no prior operating history, the information contained herein with respect to financial performance and returns are projections and predictions about the Company's proposed future business performance. As such, the anticipated financial performance estimates are necessarily subject to a high degree of uncertainty, and no warranty of such projections is expressed or implied herein. Further, much of the information contained in this Memorandum is based upon trends and forecasts derived from third parties. While the Company believes such information to be reliable, the forward looking nature of such trends and projections is by its nature subject to errors and inaccuracies.

This Memorandum does not purport to contain all of the information that may be required to fully evaluate the Company and the credit risks of lending to it. Any recipient thereof should conduct its own independent analysis and due diligence process.

The Company will use the proceeds derived from the issuance of Notes to finance the purchases of accounts receivable in connection with the Company's business and to make advances in the operation of its commercial factoring business. While certain financial covenants will be observed, including covenants requiring the Company to maintain Insured Accounts Receivable in an amount not less than the aggregate amount of the outstanding Notes, the Company will not be limited in the use of proceeds from this issuance. A portion of the accounts receivable

purchased by the Company may be generated under factoring agreements entered into by other parties, including affiliates of the Company, which accounts receivable have been assigned to the Company. The Company intends to obtain credit insurance and/or use other methods to minimize risk from financial exposures relating to purchased receivables.

As security for the payment of the Notes, the Company will execute and deliver a security agreement in favor of the Noteholders granting a lien on the Company's interest in accounts receivable purchased. That security agreement will be in the name of B.F. Security Holdings Ltd., an Anguilla corporation ("Collateral Agent"), the shares of which are owned by an affiliate of the Company. The Collateral Agent will have the right under the security agreement to modify or subordinate the security interest. Additionally, upon payment of the notes, or in connection with a restructuring and refinancing of the notes, the Collateral Agent will have the right to release the security interest in the accounts receivable.

## II.   Interests Being Offered

The Company is offering to interested investors the opportunity to purchase the Company's debentures and note participations in minimum denominations of $100,000. The rights and privileges of the debenture holders, as well as other material terms and conditions of the debentures, are more particularly described in Section VII herein.

## III.   The Company

The Company was formed on March 10, 2003 as a Florida limited liability company. Copies of the Articles of Organization are attached to this memorandum. The Articles of Organization provide that the Company will be managed by a board of managers. There are presently five managers, all of whom are also employees of the Company's sole member, Bankest Capital Corp. Some or all of the managers are also managers of E.S. Bankest LC and Bankest Finance LC, affiliates of the Company which are also engaged in commercial factoring operations. Biographical background information on business is contained in Section V hereof and on the managers and officers of the Company is contained in Section XII hereof.

## IV.   Company Location and Facilities

The Company operates from a single office location located at:

> 999 Brickell Avenue
> 11th Floor
> Miami, Florida 33131
> Business offices phone: (305) 358-5610      Fax: (305) 372-2816

The Company's offices are shared with its affiliates Bankest Capital Corp., E.S. Bankest LC and Bankest Finance LLC.

## V.   Business Summary

The Company's principal business will be to provide what it considers to be traditional factoring. The Company's method of factoring is designed for the client whose cash needs are greater than the amount of funds that the client can borrow on an unsecured basis from a bank. Generally, the Company will enter into a factoring agreement with a client whereby the client agrees to sell to the Company, and the Company agrees to purchase, "eligible" accounts receivable. Under the Company's standard factoring agreement, a copy of which accompanies this memorandum, eligible accounts receivable include accounts receivable for which the Company can purchase credit insurance and/or other forms of credit guaranties ('insured receivables") or are receivables due from the U.S. government or a government agency. The Company may, however, purchase uninsured accounts receivable in its sole discretion. Subject to the specific terms of each factoring agreement, the Company will generally agree to pay the client for the purchased account receivables upon the earlier of (i) the Company's collection from the customer (the person who the client sells goods to) or (ii) the agreed upon payment date (usually 120 days after the purchase). The purchase

price for each account receivable is generally equal to the face amount of the client's invoice to its customer less commissions and other charges provided for in the factoring agreement ("factoring commissions"). At any time before payment of the purchase price to a client, the client may be eligible to borrow from the Company against the purchase price (i.e., obtain an "advance" from the Company). In general, the Company's standard factoring agreement usually limits advances to no more than 80% of the net purchase price due to the client. From time to time, and subject to the Company's sole discretion, the Company may vary the amount it agrees to advance to a client. Clients are generally required to maintain certain reserve balances with the Company (generally to be not less than 20% of unpaid accounts receivable purchased by the Company) as additional security for advances by the Company to clients. Advances incur interest by the client typically at the rate of not less than 3.00% above the Base Rate as announced from time to time by Citibank, N.A., New York. By using the traditional form of factoring, the Client can obtain the needed cash as an advance against accounts receivable purchased by the Company. The Company also provides certain bookkeeping (related to accounts receivable and sales only) and receivables services, as well as credit protection.

As noted, most accounts receivable will be protected against credit risks of the customer either by a Credit Insurer, pursuant to the terms and conditions of the Company's credit risk insurance policy (described below), or other form of credit indemnity or guaranty obtained by the Company. **Subject to the Company's covenants to maintain accounts receivable which are credit insured (as defined) in an amount at least equal to the aggregate outstanding amount of the Notes, the Company reserves the right to acquire any and all types of insured and uninsured accounts receivable.** The Company may also loan funds to its clients (i.e., make advances). Under the Company's standard factoring agreements, upon the Company's collection of the accounts receivable purchased from its clients, the principal amount of loans or advances plus interest and other fees and charges due from clients will be debited from the purchase price of the accounts receivable and, after retaining certain required reserve balances, the balance is available for payment to the client. The Company derives revenue from its factoring commissions, certain other factoring charges and interest charged clients on advances.

The Company may purchase accounts receivable from the same clients or from new or different clients in accordance with the terms of its factoring agreements with clients. The Company may also take assignments of existing accounts receivable generated by other factoring companies, including affiliated factoring companies, or agree to participate with other factoring companies with respect to customer/client accounts. The Company anticipates that the spread between its purchase price for accounts receivable and the collections of those accounts receivable, together with interest paid to the Company on advances and other fees and income related to the factoring business, should provide adequate funds from which interest on the notes may be paid.

## VI.    Description of the Loan

The Company intends to enter into a Master Credit Agreement, together with a Security Agreement and related Security Documents, with B.F. Security Holdings, Ltd. pursuant to which B.F. Security Holdings Ltd. will agree to serve as collateral agent for Noteholders. **The Master Credit Agreement does not provide for a maximum ceiling on total loans to the Company.** The Notes will be issued pursuant to the Master Credit Agreement and will be fully registered on the books of the Company as to interest and principal and the transfer of Notes and Note Participations will be limited so as to require the surrender of the Notes to the Company and the replacement or exchange of the Notes to any new holder or registration of transfers of Note Participations, as applicable. In the case of direct Noteholders, the Company will make all payments of interest and principal directly to the Noteholders. In the case of Note Participants under Master Promissory Notes, unless otherwise instructed by a Note Participant, the Company will make all payments of interest and principal to or for the benefit of each Note Participant to the Lenders' Agent under the specified Master Promissory Note.

Master Credit Agreement. The Master Credit Agreement sets forth the basis upon which the Company intends to borrow amounts through the issuance of the Company's Promissory Notes and/or the issuance of Note Participations under Master Notes (either herein sometimes referred to simply as the "Debentures"). Each Note and Note Participation issued by the Company will represent a fractional undivided interest in the total Loan to the Company under the Master Credit Agreement and that Agreement shall serve as the participation agreement amongst all Lenders in connection with the Loan and the Collateral.

For ease of administration of the Master Credit Agreement and the Loan thereunder, the Company anticipates that Notes will be issued by the Company in minimum denominations of $100,000.00 and multiples thereof. In addition and as described below, the Omnibus First Amendment permits the Company to issue one or more 185-Day and 365-Day Master Notes intended to facilitate multiple advances ("Note Participations") by different Lenders under the same Note which is to be held and administered by an agent or representative of a group of Lenders ("Lenders' Agent"). The Company has also reserved the right under the Master Credit Agreement to increase the total amount of Notes outstanding and to make subsequent offerings of Notes similar, though not identical, to those offered herein. Additional Notes may be issued by the Company under the Master Credit Agreement from time to time, subject to certain restrictions contained in that Agreement. All Notes issued under the Master Credit Agreement will rank pari passu with each other with respect to priority to the Collateral, regardless of the date of issuance of each Notes, though based on the individual maturity dates of each Note, not all Notes will be payable at the same time.

Promissory Notes. Notes will be issued (i) as individual Notes in two forms, Series A and Series B and (ii) as Notes created under the Series A and Series B Master Notes, which will have with the same payment and interest terms as the Series A and Series B Notes, but shall include the additional terms and conditions related to the role of the agent or representative of a particular lender group. The Master Notes will be used for specific Note transactions under the Master Notes when advances are made under the Master Notes to the Company (i.e., Note Participations) and will be evidences by the relevant Master Note and by an authenticated facsimile confirmation (to be confirmed) issued by the Company to the Lenders' Agent containing the principal amount, issuance date, maturity date, duration and interest rate and/or master grid note formats. The combination of the relevant Master Note and an individual authenticated facsimile confirmation shall be deemed to constitute a Note under the custody and control of the Lenders' Agent.

The differences in the two forms of individual Notes relate to the scheduled maturity and interest rates formulas under the Notes:

Maturity Dates: Series A Notes will have a scheduled maturity date of 185 days after the date of issue of each Series A Note. Series B Notes will have a scheduled maturity date of 365 days after the date of issue of each Series B Note. Notes which are issued under the Master Credit Agreement, regardless of whether they are Series A, Series B, or under one or more Master Notes may and will have different dates of issue. The Company reserves the right to issue Notes of shorter or longer duration depending on market conditions.

Interest Rates: Each Note will have a differing interest rate depending on the then applicable rate on the date of issue and the rate of interest paid on Notes within the same Series and between the separate Series may and will probably not be equal. The Series A Notes will accrue interest based on a rate equal to one and one half percent (1.50%) over the Six (6) Month London Inter-Bank Offered Rate ("LIBOR") on the date of issue. The Series B Notes will accrue interest at a rate equal to one and three quarters percent (1.75%) over the Twelve (12) Month LIBOR rate on the date of issue. The interest rate on Notes created under a Master Note shall be determined on the date of issuance in the same manner that interest rates are determined for the Series A and Series B Notes. In the event the Company issues notes of other Series, the Company reserves the right to determine interest rates which vary in both amount and reference rates from the Series A and B notes. The respective stated interest rate on each of the Notes, or each Note Participation created under a Master Note, will be fixed on the date of issuance of each Note and shall remain in effect until the Maturity Date of each Note. Interest on each Series A and on each Note Participation created under the Series A Master Note will accrue and will be paid, along with outstanding principal, on the Maturity Date of such Series A Note. Interest on each Series B Note and on each Note Participation created under the Series B Master Note will accrue and will be paid on: (i) the day one hundred eighty five (185) days after the date of issuance and (ii) on the Maturity Date, at which time all outstanding principal on each Series B Note shall likewise be paid. If interest or principal are due on any day which is not a Business Days, then such interest will be paid on the next Business Day. Interest will accrue on a per diem basis based on a three hundred sixty (360) day year.

Maturity Date Extension Option. Each Note shall mature on the stated Maturity Date of each such Note unless the Maturity Dates are extended under the procedures described in the Master Credit Agreement and in each Note. The Master Credit Agreement and each Note will provide that the original Maturity Date of each Note may be extended upon notice sent by the Company to any Holder and, unless the Holder notifies the Company in writing at least 10 days prior to the applicable Maturity Date of its request to be repaid on such Maturity Date, the Maturity Date shall be automatically extended. In the event that the Maturity Date is extended, the new maturity date of each such Note shall in the case of a Series A Note be 185 days from the original Maturity Date and in the case of a Series B Note, such extended maturity date shall be 365 days from the original Maturity Date of such Series B Note. With respect to advances made under any Master Note, Maturity Dates of each Note Participation are subject to extensions in the same manner. Interest on any Note or Note Participation during such extension period shall be adjusted in accordance with the then applicable interest rates for such Note or Note Participation, and such readjusted rate shall be the interest rate during the extended term. The Company shall not be obligated to accept any extension request and may accept these in its sole and complete discretion.

For the avoidance of doubt, it is hereby expressly stated that all provisions relating to Notes shall, except to the extent that it is expressly provided otherwise, be applicable in exactly the same manner to both Series A and B Notes and to Notes Participations created under the Series A and Series B Master Notes.

The Company expressly reserves the right under the Master Credit Agreement and other documents to issue additional notes which are different, in maturity, interest and other features from the notes issued in connection with this Memorandum. In such case, the Company shall not be required to obtain the prior consent of the Noteholders to such issuance so long as the issuance is in conformity with the terms of the Master Credit Agreement.

Collateral and Security Interest. Pursuant to the Master Credit Agreement and the Security Agreement, the Collateral Agent will be vested with a lien and security interest in the Collateral for the Loan. The Collateral will consist of: (i) factored accounts receivable (both insured and uninsured); and (ii) the reserve balances in the underlying clients' factoring accounts with the Company. The Security Agreement will set forth the terms upon which the Collateral Agent will act as agent for the Lenders in connection with any enforcement actions against the Company with respect to the Collateral. The Collateral Agent will have the exclusive authority in the enforcement of the security interests under the Master Credit Agreement and Security Agreement together with the authority to modify, release or otherwise deal with the Collateral, including the right to agree to subordinate the interests of the Noteholders in the Collateral to third party lenders. The holders of the Notes may, by 66⅔% majority vote, require the Collateral Agent to take certain actions with respect to the Collateral or may replace the Collateral Agent.

First Amendment to Master Credit Agreement and Master Security Agreement and Appointment of Collateral Agreement ("Omnibus First Amendment"). On June 30, 2003, the Company and the Collateral Agent entered into the Omnibus First Amendment amending both the Master Credit Agreement and the Security Agreement. The Omnibus First Amendment clarifies certain terms and conditions in the Master Credit Agreement and Security Agreement as well as amends certain provisions of both documents to, among other things, (a) provide for the issuance of Master Notes and administration of those notes by a representation of each lender group (the "Lenders' Agent"), (b) clarify the standard of care to be used by the Collateral Agent, (c) require the Company to maintain accounts receivable which are credit insured in an amount not less than the outstanding amount of the Notes as part of the collateral securing the Notes, and (d) provides certain limitations on the authority of the Collateral Agent to consent to modifications or releases of Collateral, as further described in the Omnibus First Amendment.

Credit Insurance/Credit Indemnity. The Notes will be secured by accounts receivable of the Company which are in large part "insured." The Company believes that the quality of the accounts receivable as collateral for the notes is enhanced by the existence of credit insurance and/or other credit protection mechanisms the Company shall use. The Company initially intends to insure accounts receivable under a policy issued by the *Euler American Credit Indemnity Company* ("ACI" or "the Credit Insurer"). ACI is the world's oldest business credit insurer. Pursuant to the terms of the Company's current credit risk insurance policy, ACI insures the Company against loss due to "insolvency," as defined in the Policy, of customers of clients ("debtors"). Subject to the specific terms, definitions, deductibles, conditions and limitations contained in the Policy, a copy of which is available for inspection by noteholders at the Company's offices, the policy insures the Company against "losses" consisting of a percentage

(Rev. 6/03)

(usually between 80-90%) of the unpaid invoice price of bona fide sales to debtors and actually delivered in the usual course of business to individuals, firms, partnerships or corporations located in the United States of America or Canada. The policy covers only losses sustained against debtors specifically approved for coverage under the policy and coverage on any loss is limited to that portion of the indebtedness of a debtor which consists of the unpaid invoice price of shipments. Further limitations under the policy establish specific credit insurance limits for each particular debtor and an aggregate limitation on claims under the policy. The existence of a credit insurance policy does not guaranty full collection of all accounts receivable. For purposes of the Credit Agreement, the Notes and all other documents, the term "credit insured" also includes accounts receivables which are due from a state or federal government department, agency or instrumentality even though such accounts receivable may not be covered by any credit insurance policy

The Company expressly reserves the right to change credit insurers and/or to undertake other types of arrangements which have the effect of minimizing credit risks on factored accounts (i.e., other forms of credit indemnity which are not traditional insurance methods). Other potential sources of credit insurance which the Company may consider include General Electric Credit Corporation ("GECC"), CIT Commercial, CNA Credit Corporation and others. Also, the Company has had discussions with companies which provide "refactoring" services. Refactoring can operate in the same manner as credit insurance in that the Company resells certain credit risks associated with a receivables portfolio to another factoring company which agrees to pay for such receivables in the event the account debtor fails to pay due to financial defaults. Refactoring companies contacted by the Company include General Motors Acceptance Corporation (GMAC), Fleet Capital, Foothill Capital, GE Capital and others.

**Although the accounts receivable purchased by the Company will for the most part be insured and/or refactored, or will be accounts receivable due from the United States government, state governments and/or their agencies and municipalities, the Notes are neither insured by any commercial insurance company nor any governmental agency, as are certain investments in financial institutions such as banks, savings and loan associations or credit unions, nor are they guaranteed by any public agency or private entity. Also, the Company is not subject to any generally applicable governmental limitations on its own borrowing which are designed to protect investors.**

## VII.   Risk Factors

In addition to the various risks ordinarily attendant upon investments of the nature described herein, certain unique factors relating to the Company and its business make a prospective Lender's decision to advance monies to the Company under the Master Credit Agreement, and thus to receive the Notes hereunder, subject to a high degree of risk. Prospective Lenders are cautioned that the Company's business is speculative and involves significant risks and, as such, the Loan to the Company is likewise speculative and it is not possible to foresee and describe all of the business, economic and financial risk factors that may affect the Company.

Company History and Business Operations. **As a newly formed company, the Company has no prior operating history.** While the Company has no previous operating history, Bankest Capital Corp., the Company's parent, and E.S. Bankest LC, an affiliate of the Company and another wholly-owned subsidiary of BCC, have been engaged in commercial factoring operations for many years and both have demonstrated profitable operations from their respective commercial factoring businesses.

While Bankest Capital Corp., as the sole member, has agreed to an initial capital contribution of up to $2,000,000, the Company has no operating history and no retained earnings. The Company will have significant short term liabilities in the form of its outstanding Series-A, Series-B and other Lender group Debentures. The Company will be entirely dependent on the proceeds of the issuance of notes outlined in this Memorandum, any borrowings from commercial banks or other lenders or the future sale of equity or debt for working capital. The Company intends to finance operations through borrowings. Accordingly, the Company has not obtained commitments for alternative sources of funding for its operations nor are there any assurances that it may do so in the future. **There can be no assurances that subsequent efforts to raise additional working capital will be successful, and thus the Company's ability to meet its obligations under the Notes will be entirely dependent upon the immediate success or failure of its business operations.**

(Rev. 6/03)

The Company has no prior operating history and may incur operating losses during its initial years of operations. Investors must be prepared to assume the risks and uncertainties inherent in a new business enterprise. No assurance can be given as to the ultimate success of the Company. Accordingly, investors could lose all or a substantial portion of their investment.

No Securities Registration and No Trading Market. No trading market for the Notes currently exists, nor shall such a trading market for any of the Notes develop. No transfer of Notes may take place without registration under applicable securities laws. Noteholders have no rights to require the Notes to be registered under applicable securities laws.

Cash Flow Risks. The Company has and will have significant and substantial short term liabilities in the form of outstanding Notes issued and anticipated to be issued thereafter. The Company intends to finance operations through the proceeds of the Master Credit Agreement and the Notes as well as subsequent borrowings under similar additional notes and from other lending sources. The Company has no commitments for alternative sources of funding for its operations nor are there any assurances that it may do so in the future. **The failure of the Company to maintain available credit to fund operations could result in default under the Notes.** While the Company anticipates that cash flow from normal operations will be adequate to pay interest on Notes as interest become due, operational cash flow alone will be insufficient to repay maturities on all Notes. Rather, the Company is relying on rollover or replacement funding to pay maturities. **There can be no assurances that subsequent efforts to raise additional funding will be successful. The Company's ability to meet its obligations under all of the Notes is dependent upon the immediate success or failure of its business operations and ability to locate additional funding sources.**

The Company's sole member, Bankest Capital Corp., may, but is not obligated to, make additional capital contributions and funds available to the Company.

Collateral Liquidation Risks. In the event of a default under the Notes, the liquidation of the Company's accounts receivable which serve as collateral for the Notes may be inadequate to satisfy all obligations under the Notes. **While the Company intends to maintain a pool of accounts receivable with a face value in excess of the amounts of the Notes, in the event that the Company were forced to liquidate that pool of receivables to pay all of the Notes, it is possible that substantially less money would be realized from such liquidation than could otherwise be realized from the orderly management of the Company's business and the collection of the accounts receivable in the ordinary course of business.** While this risk is mitigated by the existence of credit insurance and/or other credit indemnity procedures the Company will undertake, there can be no assurance that on default there would be adequate funds to pay all Notes.

Interest Rate Risks. A substantial portion of the Company's cost of operations and cash flow requirements include interest expense and principal repayment of its Notes. The Company incurs interest expense under the Notes at annual rates of between Six (6) Month LIBOR plus one and one half percent (1.50%) and twelve (12) month LIBOR plus one and three quarter percent (1.75%). Under its standard factoring agreements with clients, the Company receives interest income from advances to clients at an average of 300 basis points above Citibank's announced Base Rate, as well as commissions, fees and other income. **There can be no assurance that the principal amounts accruing interest from clients, together with factoring commissions and other fees, will equal or exceed interest due under the Notes issued by the Company.** Since a material portion of the Company's working capital consist of borrowed funds, the interest expenses the Company will incur will be higher than similar businesses which have more long-term debt and equity capital.

Customer Default and Defalcation Risks. The success of the Company will also materially depend upon the creditworthiness of the Company's clients. While the Company will use credit insurance and other forms of credit indemnity to protect against losses due to customer defaults, the Company is subject to risk of financial defalcation and intentional or unintentional fraud by its clients. Whereas the credit risk of the customer (the obligor of an account receivable) is intended to be insured under the credit insurance policy or other credit indemnity method, the customer's payment of its obligations and legal liability emanate and initiate from receipt and acceptance of goods and/or services from the Company's clients. The assessment of each client's ability to deliver goods and/or services

-9-                                    (Rev. 6/03)

to its customers in compliance with the terms and conditions of the underlying transactions which give rise to an account receivable will have an integral and material impact on the singular and aggregate collateral value and repayment experience of the accounts receivable. This risk, the "non-credit risk," will be retained by the Company with full recourse against its clients. The Company's credit policies will seek to assess the probability of exposing the Company to the non-credit risks which are present and related to a particular client's inability or failure to satisfy the recourse provisions in the event any account receivable or any portion thereof becomes uncollectible as a result of events or circumstances which are not covered by one of the Company's credit insurance or credit indemnity methods. The Company intends to maintain as part of its documentation comprehensive information related to the credit and business character of its proposed clients. The Company also intends to assign an account officer to each client account who will have the primary responsibility for developing the necessary client business credit and character information in compliance with Company policies. Company policies will generally include such items as requiring the account officer to visit and inspect each client's business operation so as to determine location, general neighborhood area, physical conditions, maintenance, occupancy, future plans, prospects, etc. The scope of information necessary to substantiate the business reputation and character of a client will vary from case-to-case and will depend on the collective judgment of the account officer and other officers approving the client. **The Company can provide no assurance that clients will not engage in activities which result in false, fraudulent or generally uncollectible accounts receivable for which there is no credit protection.**

The Company also intends to use an ongoing process after completion of the initial credit and business background investigation of a client by periodically updating the client's business and credit data. The Company will seek to identify historical experience related to the manner in which a client deals with business customers, creditors (past and present), employees and competitors. The primary objective of the Company's credit policies will be to determine each client's general business standing as a responsible provider of its particular goods and/or services to its customers and the client's financial ability to meet its obligations pursuant to the recourse provision as stated in the factoring agreement. **While the objectives of the Company's credit policies will be to maintain careful review of each client's particular financial status and business practices, the Company has no assurance, and can not assure Note holders that such procedures will be sufficient to prevent accounts defalcations and other failures of clients. In the event of such defalcations, the Company's ability to successfully collect accounts receivable may be impaired.**

<u>Conflicts of Interest; Competing Businesses of Sole Member and Affiliate</u>. Bankest Capital Corp. and its wholly owned subsidiaries E.S. Bankest LC and Bankest Finance are presently engaged in a factoring business which will be substantially similar to that of the Company. E.S. Bankest LC has pledged its pool of accounts receivable to Bank Espirito Santo International Limited as collateral for repayment of outstanding obligations due under a credit facility with the Espirito Santo Group, a former joint venture partner with Bankest Capital Corp in the ownership of E.S. Bankest LC.

<u>Collateral Agent Risks</u>.  **The Collateral Agent is an affiliate of the Company**. In order to facilitate administration of the collateral, and avoid the need for continual and multiple filings with the Florida Secretary of State regarding the noteholders' security interest in the collateral, the Collateral Agent was formed as an Anguilla corporation. The Collateral Agent has no other assets and no other business purpose other than to serve as collateral agent under the documents. The Collateral Agent may also be directly or indirectly under the control of the Company. While the Company will be obligated to reimburse the Collateral Agent for all costs and expenses incurred by Collateral Agent in connection with its duties under the agreements, the Collateral Agent may have no separate assets from which to pay such expenses in the event that the Company fails or refuses to advance funds to it or otherwise reimburse it. The Collateral Agent will be the sole listed secured party with the Florida Secretary of State's office. Noteholders have the right, by 66 ⅔rds vote, to cause the Collateral Agent to take action with respect to the collateral, including declaring a default, or to change the Collateral Agent.

The Collateral Agent has full authority to deal with the Company with respect to the collateral subject to the terms and conditions set forth in the Master Credit Agreement and the Security Agreement. **The Collateral Agent's authority includes, but is not limited to, the ability, under certain circumstances, to modify, in whole or in part, the security interest in the collateral, to release the lien on the collateral or to substitute other forms of collateral.** Subject to limitations in the Master Credit Agreement and Security Agreement, the Collateral Agent is entitled to exercise its authority to release all or any part of the Collateral from the lien created pursuant to the

Security Agreement and/or subordinate the interests of the Lenders in the Collateral to third party lenders. Notwithstanding any limitations placed on the Collateral Agent's authority to deal with the Collateral, the Collateral Agent has full authority to agree to the release and/or subordination of security interests in the Collateral in connection with arrangements which are structured and intended to mitigate various credit risks of the Company, including, but not limited to, refactoring arrangements, provided such risk management techniques are considered by the Collateral Agent to be in the best interests of the Company and the Lenders.

In general, the terms of the Master Credit Agreement and the Security Agreement provide that neither the Collateral Agent nor its officers, directors, shareholders or agents, will be liable to the Noteholders for any action taken or omitted to be taken by it or them under or in connection with the agreements provided that the Collateral Agent and its directors, officers, employees or agents, as applicable, act with what they believe in good faith to be in the reasonable best interests of the Lenders.

<u>Competition and General Business Risks.</u>  The Company will encounter significant competition from a number of other organizations in its markets, any of which will be substantially larger and have substantially greater resources that the Company.  Factoring and the financing of factoring operation businesses are highly competitive.  A number of concerns are engaged in the same or similar types of business as the Company:  (1) banks or their affiliates, (2) other factoring and finance companies, (3) independently formed partnerships operating for the specific purpose of funding factoring businesses and (4) finance divisions, affiliates or subsidiaries of suppliers which sell products to the Company's Clients.  Many of these organizations have greater financial or other resources than the Company and, therefore, may be able to obtain funds on terms more favorable than those available to the Company.  This may permit such organizations to offer factoring funding terms which the Company could not match.  The Company's ability to provide competitive factoring programs is impacted by the competition.  Also, such organizations may have competitive advantages for reasons unknown to the Company.

The Company makes no representation or guarantee that it can compete effectively so as to achieve the Company's business objectives.  A decline in the Florida economy may result because of a reduced rate of growth or other factors.  Such conditions, which are beyond the control of the Company, may have an adverse impact upon the factoring business.

## VIII.   <u>Other Matters</u>

<u>United States Tax Matters</u>.  **EACH PROSPECTIVE LENDER SHOULD CONSULT THEIR TAX ADVISOR BEFORE MAKING ANY LOAN HEREUNDER.**

<u>Interest Withholding Taxes</u>.  The Internal Revenue Code of 1986, as amended (the "Code"), generally provides that interest paid by a United States borrower to a foreign lender is subject to a 30% tax which the borrower is required to withhold from each interest payment and remit to the United States Internal Revenue Service.  The rate of tax may be reduced under certain United States Income Tax Treaties.  Interest paid on obligations which qualify under provisions applicable to the *Repeal of Tax on Interest of Nonresident Alien Individuals and Corporations Received from Portfolio Debt Investments* are exempt from the 30% withholding tax on interest.  The Notes are intended to qualify as portfolio debt under these provisions.  As such, each Note will be issued in accordance with the provisions applicable to "fully registered obligations" as defined in the Code and regulations issued thereunder.  Each Lender shall be required to make certain representations relating to qualification under the portfolio debt rules and will be required to provide the Company with certain certifications (IRS Form W-8BEN) relating to the Lender's foreign status for U.S. tax purposes and that such Lender is neither a related party to the Company or a bank making a loan in the ordinary course of its banking business, as defined under relevant provisions of the Code.  Lenders who can not satisfy those requirements may be subject to withholding taxes on interest.

<u>Back-Up Withholding</u>.  Provisions of the Code require reporting and inclusion of interest as income to certain security holders.  In general, the Company is required to file annually with the Internal Revenue Service an information return (Form 1099) reporting the amount of interest which is paid or which is considered earned by the Noteholders during each calendar year period and to provide a copy of such information return to the Noteholder (such reporting may not be required for qualified holders of portfolio debt instruments).  Noteholders are required to

(Rev. 6/03)

include such amount as income in his/her Federal Income Tax Return for that year. In certain instances, depending on the status of the Noteholder, applicable provisions of the Code may require backup withholding by the payor of interest of 30% of all interest payments (or amounts equivalent thereto) on and after December 31, 1984. Under the backup withholding provisions, withholding on interest or dividends may be imposed either:

(1)   after the Secretary of the Treasury has mailed four notices to the taxpayer stating that the taxpayer has under-reported his income, and, if the taxpayer has filed a return for the taxable year in which he under-reported income, the Secretary has made a deficiency assessment against the taxpayer;

(2)   if the taxpayer fails to furnish a taxpayer identification number when required to do so;

(3)   if the Secretary notifies the payor that the taxpayer furnished an incorrect taxpayer identification number; or

(4)   with respect to instruments acquired after 1983, the taxpayer fails to certify under penalty of perjury that he is not subject to backup withholding as a consequence of having under-reported his income.

Any payor required to withhold from interest or dividend payments on the basis of taxpayer under-reporting of income is required to notify the payee at the time the withholding begins.

## IX.   No Registration/Exempt Offering

The offer and sale of Notes and Note Participations will be made privately to a limited number of accredited investors ("Accredited Investors") who are not U.S. Persons, as such term is defined in Regulation S under the Securities Act: (i) in reliance upon a safe harbor from the registration requirement of the Securities Act for offers and sales of Securities which occur outside of the United States; (ii) in reliance upon exemptions from registration provided in Section 4(2) of the Securities Act, and Rule 506 of Regulation D promulgated under the Securities Act and, where available, upon appropriate exemptions from state registration or qualification requirements; and (iii) pursuant to registration or qualification under state securities laws. To assure compliance with the requirements for such exemptions, Notes and Note Participations will be offered and sold only to persons who meet the qualifications set forth herein and who comply with the requirements set forth below.

The Company has reserved the right under the Master Credit Agreement to make additional offerings of Notes to persons who would not otherwise meet the suitability standards of this Offering.

Acceptance of Subscriptions. The Company must accept, limit or reject a subscription within 30 days from the date of receipt. The Company will notify any prospective investor whose subscription is rejected and will promptly return any proceeds from subscriptions delivered to the Company by such prospective investor. Upon acceptance of any subscription, the Company will duly execute and deliver a counterpart of a subscription agreement to the investor.

Subscription Method Persons who satisfy the Lender's Suitability Standards set forth in this Memorandum and described in the Subscription Agreement and who wish to subscribe for Notes must deliver all of the following to the Company, duly completed and executed, prior to the termination date of the Offering:

(i)   the Acknowledgment of Receipt of Confidential Memorandum in the form attached as Exhibit V to this Memorandum;

(ii)   one (1) Subscription Agreement in the form attached as Exhibit VI to this Memorandum;

(iii)   a check, or bank to bank wire transfer of available U.S. funds, payable to "BANKEST RECEIVABLES USA LLC" for the face amount of the Notes subscribed for;

(iv)   Joinder, Appointment of Collateral Agent and Consent;

(v)   if applicable, a Purchaser Representative Questionnaire in the form attached as Exhibit VII to this Memorandum.

(Rev. 6/03)

Execution copies of the above documents and subscription instructions in the form attached as Exhibits to this Memorandum are also provided as a separate booklet with this Memorandum.

## X.    Modification of Terms

The Company reserves the right, by written notice, to withdraw, cancel, modify or terminate the transactions contemplated hereby at any time if, in the opinion of counsel to the Company, there exists any actual or threatened legal impediment to the Loan, including any material legal action or administrative proceeding instituted or threatened against the Company with respect to the Loan.  No such impediments are presently known by the Company to exist.  Upon any such termination the Company will, at its option, either accept the subscriptions and cash payments previously tendered or return all subscriptions and cash payments, without interest thereon or

deduction therefrom, and, in either case, the Company will have no further obligation or liability with respect to the Loan and the transactions contemplated hereby.

## XI.    Sole Member

All of the membership interests of the Company presently outstanding are owned one hundred percent (100%) by Bankest Capital Corp.

Bankest Capital Corp. is the 100% parent corporation of the Company.  All of the common stock of Bankest Capital Corp. is owned by Bankest International, Inc., a Florida corporation.  Bankest International, Inc., which is privately owned by the Orlansky family, was organized in 1972 and serves primarily as a holding company for a number of subsidiaries engaged in unrelated business.  Bankest Capital Corp. was organized in 1986 to engage primarily in the business of factoring and account receivable financing.  Presently, Bankest Capital Corp.'s business has evolved to include a domestic commercial factoring division and separate domestic and international corporate finance divisions, as well as separate domestic and international lending, investing and advisory services divisions.

In 1994, Bankest Capital Corp. formed a wholly-owned subsidiary, Bankest Receivables Finance and Factoring Corp. to separately engage in commercial factoring operations.  From 1994 to 1998, Bankest Receivables Finance and Factoring Corp. conducted operations and in connection therewith undertook the placement of debenture notes similar to those issued under this memorandum.  Placement of notes was arranged with Espirito Santo Bank of Florida, an affiliate of Banco Espirito Santo S.A. of Portugal.

In 1998, at the request of Espirito Santo, Bankest Capital Corp. agreed to the formation of E.S. Bankest Corp., a Florida joint venture corporation, owned equally by Bankest Capital Corp. and Espirito Santo Bank of Florida.  In 1998, E.S. Bankest Corp. was reorganized to form E.S. Bankest LC, a Florida limited liability company, owned equally by Bankest Capital Corp. and Espirito Santo Bank.  Pursuant to the agreements between the parties, Bankest Capital Corp., though its designated managers, was responsible for day-to-day management of the business activities of E.S. Bankest LC.  Espirito Santo Bank, directly and through other affiliate members of the Espirito Santo Group, were responsible for funding activities of E.S. Bankest LC.  E.S. Bankest LC issued notes in similar to those as offered under this Memorandum.  From 1998 through September 2002, debenture note placements and profits of E.S. Bankest LC were as follows:

| Operating Year | Debenture Placements (Year End) |
|---|---|
| 1998 | $ 36,000,000 |
| 1999 | $ 51,000.000 |
| 2000 | $ 87,050.000 |
| 2001 | $137,500.000 |
| 2002 (ending 9/18/02) | $172,250.000 |

-13-                        (Rev. 6/03)

| Operating Year | Net Profits from Operations |
|---|---|
| 1998 | $1,296,000 |
| 1999 | $4,600,000 |
| 2000 | $7,040,000 |
| 2001 | $6,900,000 |
| 2002 (ending 9/18/02) | $7,400,000 (unaudited) |

In 2002, after discussions with Espirito Santo Bank, the parties agreed to terminate the joint venture arrangement constituting E.S. Bankest LC. On September 18, 2002, Bankest Capital Corp. purchased all of Espirito Santo Bank's membership interest and became the sole owner of E.S. Bankest LC. Bankest Capital Corp. continues to own 100% of E.S. Bankest LC. In November 2002, E.S. Bankest LC restructured its outstanding notes to consolidate them as obligations owed to an Espirito Santo affiliate. Bankest Capital Corp. has given its limited collection guarantee to Espirito Santo.

Consistent with the restructuring of E.S. Bankest LC's notes, the Company formed Bankest Finance and the Company to undertake new financing and factoring business in a manner which is intended to minimize issues otherwise arising from a shared collateral pool. Bankest Finance will principally operate as a factoring company in which activities are funded under one or more refactoring agreements or asset based loan arrangements with commercial lending institutions. Due to concentration issues as well as requirements relating to, among other things, first priority security positions, the Company has been formed to permit the continued operations of factoring businesses for which debenture placements may be used to fund operations and permit noteholders to maintain secured collateral positions in such transactions.

## XII.   Management

### Managers and Executive Officers

The following table identifies the members of the Company's Board of Managers and the Officers of the Company.

| Name | Position with the Company |
|---|---|
| Eduardo Orlansky | Chairman & Manager |
| Hector Orlansky | President, CEO & Manager |
| Dominick C. Parlapiano | Senior Vice President & Manager |
| Carlos Mendez | Senior Vice President  & Manager |
| Ed Dubner | Senior Vice President, Factoring |
| Edgar W. Tatman | Senior Vice President |

### Management Profiles

Following is selected information regarding the business and professional backgrounds of the Company's Management:

**Eduardo Orlansky, Chairman of the Board of Managers.** -Since 1986, Mr. Eduardo Orlansky has been a Director and President of Bankest Capital Corp., whose primary businesses are its Commercial Finance/Factoring Division and its Domestic and International Corporate Finance Investment, Lending and Advisory Division. Mr.

(Rev. 6/03)

Orlansky is also Chairman of Bankest Capital's other wholly-owned factoring company, E.S. Bankest LC. Since 1972, Mr. Orlansky has also been President and Director of Bankest International, Inc. Prior to 1972, Mr. Orlansky was with the Wall Street firm Loeb Rhoades & Co., an international and domestic investment banking firm, as a Vice President and Director, Mr. Orlansky directed all the operations of the Latin American division of Loeb Rhoades & Co.

**Hector Orlansky, President, Chief Executive Officer and Manager of the Company.** -In 1967, Mr. H. Orlansky established the offices of Bankest International S.A., Ltd. in Nassau, Bahamas. Mr. Orlansky is also a Director of Bankest International, Inc., Bankest Trading, Inc., Orler Travel and Cruises, Inc., and Bankest Capital Corp., the sole Member of the Company. Mr. Orlansky is also a member of the Board of Managers of E.S. Bankest LC.

**Dominick C. Parlapiano, Senior Vice President, Manager.** -Mr. Parlapiano joined Bankest Capital Corp. in February 1991, where he currently serves as Senior Vice President, Director. He is also Senior Vice President, and a member of the Board of Managers of E.S. Bankest LC. He is also head of Bankest Capital's Domestic Corporate Finance Division. Mr. Parlapiano is also a Director of Bankest Capital's Commercial Finance/Factoring Division. Mr. Parlapiano also heads Bankest's Structured Finance Group, which specializes in asset securitization advisory services. Prior to joining the Bankest Companies, Mr. Parlapiano was President of Corporate Finance Group Inc. and co-founder and Managing Director of Capital Resources Financial Group, Inc., both firms being traditional investment banking boutiques, serving mostly small to mid-size corporate clients.

**Carlos Mendez, Senior Vice President, Manager.** – Mr. Mendez joined Bankest Capital Corp. in May 1989, where he currently serves as a Senior Vice President and General Manager of Bankest Capital's Commercial Finance Division. His responsibilities have included the development of new client relationships and daily portfolio management. Mr. Mendez is also a Senior Vice President of E.S. Bankest, LLC where he is also responsible for new client development and client account management. He is responsible for developing strategies to enhance overall growth and profitability and finance domestic and foreign receivables. Mr. Mendez is a graduate of the University of Miami where he received his B.S. degree in Business Administration and an M.B.A with a major in finance.

**Ed Dubner, Senior Vice President.** -Mr. Dubner joined E.S. Bankest LC in April 2000, where he currently serves as Senior Vice President, Factoring. Prior to joining E.S. Bankest, Mr. Dubner was involved as a manager and business development officer for over 30 years with various factoring companies enjoying national and international presence. Mr. Dubner is active in various factoring industry groups and trade associations.

**Edgar W. Tatman, Senior Vice President.** – Mr. Tatman has recently joined BANKEST RECEIVABLES USA as Senior Vice President in charge of finance and investor relations. Mr. Tatman will be the principal officer of BANKEST RECEIVABLES USA in charge of administering the debenture note program and other non-institutional investor financing of the Company. Prior to joining BANKEST RECEIVABLES USA, Mr. Tatman was Vice President and Senior International Investment Consultant at BNP Paribas, Miami Agency from 1999 until 2002, and previously with Bank Boston where he held the same title from 1997-1999. Prior to that time, Mr. Tatman was Vice President of the International Banking Division of Espirito Santo Bank of Florida from 1991-1997. Mr. Tatman has more than 20 years experience as a private banker.

**Professionals and Advisors** - In addition to the company's Management, the Company has retained, or intends to retain, the following professionals and advisors:

<u>BDO Seidman – Company Auditors</u>

Since the Company is a newly formed entity, it has not prepared its first audited financial statements. However, affiliates of the Company have engaged BDO Seidman, LLP ("BDO Seidman") as their auditors for many years and the Company intends to use and rely upon BDO Seidman as its auditors. It should be noted that this Memorandum does not contain any financial statements or projections concerning which BDO Seidman has issued any opinions. BDO Seidman is an internationally recognized accounting auditing firm.

<u>Gunster, Yoakley & Stewart P.A. – Legal Counsel</u>

The Company has retained the law firm of Gunster, Yoakley & Stewart, P.A. as its outside General Counsel and to assist in the preparation of this Memorandum and underlying documents.  As with its accountants, affiliates of the Company have worked with Gunster, Yoakley for many years and have an ongoing relationship with that law firm. Gunster, Yoakley & Stewart P.A. is one of Florida oldest and largest law firms specializing in representing financial institutions and international business matters.

BANKEST RECEIVABLES USA LLC

INVESTOR'S SUITABILITY STANDARDS

**PURCHASE OF THE NOTES AND NOTE PARTICIPATIONS IS SPECULATIVE AND INVOLVES A HIGH DEGREE OF RISK.   THIS OFFERING IS NOT A SUITABLE INVESTMENT FOR ALL INVESTORS AND WILL BE SOLD ON A SELECTED PRIVATE BASIS TO A LIMITED NUMBER OF INVESTORS WHO MEET THE STANDARDS DESCRIBED BELOW.** *SEE "RISK FACTORS AND OTHER SPECIAL CONSIDERATIONS"* **FOR MORE DETAILED INFORMATION.**

There is no established market for the Notes or Note Participations.  Furthermore, there are only a limited number of investors and given the restrictions on the transferability of Notes and Note Participations, a market in the Notes and Note Participations will not exist.  The Notes and Note Participations have not been registered under the Act or the securities laws of any state or other jurisdiction ("Other Securities Law").  The Notes and Note Participations cannot be resold unless: (i) they are subsequently registered under the Act and/or Other Securities Laws; and/or (ii) an exemption from such registration is available.  The Company does not intend to register the Notes or Note Participations under the Act or any Other Securities Laws.  It is not anticipated that any exemption from registration will be available to investors in connection with any sales.  Accordingly, a purchaser of Notes and Note Participations must bear the economic risk of investment in the Notes and Note Participations.

The offering contemplated under this Memorandum will be made in reliance upon (i) a safe harbor from the registration requirements of the Securities Act for offers and sales of securities which occur outside of the United States, (ii) an exemption from the registration requirements of the Securities Act for offers and sales of securities which do not involve any public offering, (iii) analogous exemptions under State securities laws where available, and (iv) pursuant to registration or qualification under State securities laws.  As such, the Notes and Note Participations may not be offered, sold, transferred, accepted or delivered, directly or indirectly, in the United States (or any of its territories, possessions or areas subject to its jurisdiction) or to "U.S. Persons" (as such term is defined herein).  Pursuant to this Offering, the Company will only sell Notes to Non-U.S. Persons and Accredited Investors as defined by Regulation D promulgated pursuant to the Securities Act ("Accredited Investor(s)").

All offers and sales of Notes or Note Participations to eligible non-U.S. Persons under this Offering will be conducted in accordance with Rule 903 of Regulation S, including without limitation, pursuant to "offshore transactions" and without any "directed selling efforts" by any person in the United States (as such terms are defined in Regulation S).  No solicitation to purchase the Notes or Note Participations will be made to U.S. Persons and non-U.S. Persons in the United States, no offering material or subscription documents will be delivered to such persons, and no subscription agreements will be accepted from such persons in the United States.

For purposes hereof, a "U.S. Person" is a person who is (i) a natural person resident in the Untied States; (ii) a partnership, corporation or other entity organized or incorporated under the laws of the United States; (iii) an estate of which an executor or administrator is a U.S. person; (iv) a trust of which any trustee is a U.S. person; (v) an agency or branch of a foreign entity located in the United States; (vi) a non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a U.S. person; (vii) a discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident in the United States; or (viii) a partnership or corporation (A) organized or incorporated under the laws of any foreign jurisdiction and (B) formed by a U.S. person principally for the purpose of (1) investing in the Company or (2) investing in securities not registered under the Securities Act.

Pursuant to Regulation D promulgated under the Securities Act, an Accredited Investor is:

(a)      any natural person who had individual income in excess of $200,000 in each of the last two (2) most recent years, or joint income with the person's spouse in excess of $300,000 in each of those years, and reasonably expects to reach the same income level in the current year;

Rev. 6/03

(b)      any natural person who individually, or together with a spouse, has a net worth, at the time of purchase, in excess of $1,000,000;

(c)      any director or executive officer of the Company;

(d)      any bank as defined in Section 3(a)(2) of the Securities Act, whether acting in an individual or fiduciary capacity;

(e)      any savings and loan association or similar institution as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in an individual or fiduciary capacity;

(f)      any insurance company as defined in Section 2(13) of the Securities Act;

(g)      any investment company registered under the Investment Company Act of 1940;

(h)      a business development company as defined under (2)(a)(48) of the Investment Company Act of 1940;

(i)      any small business development company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958;

(j)      any employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974, if the decision to purchase Notes is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, insurance company, or registered investment advisor, or if the employee benefit plan has total assets in excess of $5,000,000, or, if a self directed plan, with investment decisions made solely by persons that are accredited investors;

(k)      any plan established and maintained by a state, its political subdivision or any agency or instrumentality of a state or its political subdivisions, for the benefit of the employees of such plan having total assets in excess of $5,000,000;

(l)      any private business development company as defined in Section 202(a)(22) of the Investment Advisors Act of 1940;

(m)      any organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, not formed for the specific purpose of acquiring the Notes offered hereby, with total assets in excess of $5,000,000;

(n)      any trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Notes offered hereby, whose purchase is directed by a sophisticated person as described in Rule 506(B)(2)(1) of Regulation D promulgated pursuant to the Securities Act;

(o)      any broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended; and

(p)      any entity in which all of the equity owners meet one of  the requirements of the above subsections.


## Transfers

The Notes and Note Participations are "restricted securities," as such term is used in the Securities Act. Each prospective investor must represent and warrant in the Subscription Agreement to be completed by each

Rev. 6/03

investor that he is purchasing the Notes or Note Participations for his own account, and not with a view to the assignment, transfer or disposition of such Notes or Note Participations. An investor may not assign, transfer or otherwise dispose of, by gift or otherwise, any of his Notes (or any participation or beneficial interest therein) to any person or entity (a) except as specifically permitted by the Memorandum and the Subscription Agreement, and (b) provided that (i) the proposed transferee has made written representations and warranties similar to those contained in the Subscription Agreement; and (ii) the investor either registers the proposed transfer under the Securities Act and the applicable state and non-U.S. securities laws or furnishes the Company with an opinion or opinions of legal counsel(s) experienced in matters of U.S. securities laws and the securities laws of other applicable jurisdictions (which securities counsel(s) shall be satisfactory to the Company and its legal counsel(s)) confirming that the proposed transfer (x) is exempt from the registration requirements of the Securities Act, any state securities laws and any non-U.S. securities laws, citing to the section of each such act upon which the exemption is based, and (y) will not otherwise violate any such securities laws.  Any attempted transfer without complying with the above requirements shall be null and void, and the Company shall refuse to register, confirm or recognize any such transfer.  The notice to the Company must include evidence satisfactory to the Company that the proposed assignee meets any requirements imposed by the Company with respect to investor and/or transferee eligibility and suitability.  If an assignment, transfer or disposition occurs by reason of the death of a shareholder or assignee, the notice may be given by the duly authorized representative of the estate of the shareholder or assignee.  The notice must be supported by proof of legal authority and valid assignment acceptable to the Company.

Investors shall not transfer directly or indirectly any of the Investor's Notes or Note Participations (or any participation or beneficial interest therein) except in accordance with the provisions of Regulation S, pursuant to registration under the Securities Act and applicable State securities laws and any non-U.S. securities laws, or pursuant to an available exemption from the registration provisions of the Securities Act and applicable State securities laws and non-U.S. securities laws.  Investors are advised that they are subject to the same restrictions on offers and sales of Notes and Note Participations that apply under Regulation S to a "distributor" of such securities, as such term is defined in Regulation S.

MASTER CREDIT AGREEMENT

Dated as of March 11, 2003

BANKEST RECEIVABLES USA LLC,
as Borrower

and

B.F. SECURITY HOLDINGS LTD.,
as Collateral Agent

This Document Prepared By:

Gunster, Yoakley & Stewart, P.A.
One Biscayne Tower
Two South Biscayne Boulevard
Suite 3400
Miami, Florida, USA 33131

TABLE OF CONTENTS

Page

ARTICLE I - THE LOAN

    1.01.   Defined Terms    -1-
    1.02.   The Loan    -1-
    1.03.   Ranking of Promissory Notes    -3-
    1.04.   Use of Proceeds of Loan    -3-
    1.05.   Registration and Transfer of Promissory Notes    -3-
    1.06.   Aggregate Loan    -4-
    1.07.   Participant Lenders    -4-
    1.08.   Prepayments    -5-
    1.09.   Prepayment of Closing and Other Costs    -5-
    1.10.   Payments Generally    -5-
    1.11.   Specified Currency    -5-
    1.12.   Maximum Interest Rate    -6-

ARTICLE II - REPRESENTATIONS AND WARRANTIES

    2.01.   Organization    -6-
    2.02.   Performance    -6-
    2.03.   Validity of Documents    -6-
    2.04   Litigation    -7-

ARTICLE III - PORTFOLIO INTEREST QUALIFICATION

    3.01.   Portfolio Interest Qualification    -7-
    3.02.   Registration    -7-
    3.03   Certification    -7-
    3.04.   Additional Notes to United States Persons    -7-

ARTICLE IV - COVENANTS OF BORROWER

    4.01.   Affirmative Covenants    -8-
    4.02.   Negative Covenants    -8-

ARTICLE V - EVENTS OF DEFAULT

    5.01.   Events of Default    -8-

ARTICLE VI - THE COLLATERAL AGENT

    6.01.   Appointment and Authorization    -9-

6.02.   Duties and Obligations                                    -10-
6.03.   Independent Credit Decision                               -10-
6.04.   Indemnification                                           -11-
6.05.   Successor Collateral Agent                                -11-

ARTICLE VII - ARRANGEMENT AMONGST LENDERS

7.01.   Participation in Credit Agreement                         -12-
7.02.   Receipt of Payments                                       -12-
7.03.   Borrower Failure to Pay Expenses                          -12-
7.04.   Sharing of Expenses and Losses                            -13-
7.05.   No Joint Venture or Loan                                  -13-

ARTICLE VIII - MISCELLANEOUS

8.01.   No Waiver; Cumulative Remedies                            -13-
8.02.   Amendments, Etc.                                          -14-
8.03.   Addresses for Notices, Etc.                               -14-
8.04.   Applicable Law, Jurisdiction, Etc.                        -15-
8.05.   Execution in Counterparts                                 -15-
8.06.   Binding Effect; Assignment                                -15-
8.07.   Severability of Provisions                                -15-
8.08.   Captions                                                  -15-
8.09.   Schedules                                                 -16-
8.10.   Waiver of Jury Trial                                      -16-

SCHEDULES:

A -   Lenders' Names, Addresses and Facsimile Numbers

EXHIBITS:

A -   Defined Terms
B -   Forms of Promissory Note
      B-1   Six-Month Promissory Note
      B-2   Twelve-Month Promissory Note
C -   Master Security Agreement
D -   Joinder, Appointment of Collateral Agent and Consent

- iii -

THE PROMISSORY NOTES HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, UNDER THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, NOR UNDER THE SECURITIES LAWS OF ANY OTHER JURISDICTION. THE PROMISSORY NOTES ARE SUBJECT TO SUBSTANTIAL RESTRICTIONS ON TRANSFER AND RESALE.

## MASTER CREDIT AGREEMENT

THIS MASTER CREDIT AGREEMENT dated as of March 11, 2003, by and among BANKEST RECEIVABLES USA LLC, a Florida limited liability company with its principal business address at 999 Brickell Avenue, 11th Floor, Miami, Florida, USA 33131 (herein "Borrower"), the individuals and entities identified on Schedule A hereto and as such Schedule may be amended from time to time as provided herein (each individually a "Lender" and collectively the "Lenders"), and B.F. SECURITY HOLDINGS LTD., an Anguilla corporation, as escrow agent for the Lenders (herein "Collateral Agent").

### Preliminary Statement

Borrower is a newly formed entity which desires to engage in the business of operating a non-regulated commercial factoring business.  In order to finance the conduct Borrower's factoring business, Borrower desires to create and issue the Promissory Notes (as hereinafter defined), the issuance of which is provided for by this Master Credit Agreement ("Master Credit Agreement"), and to secure such Notes pursuant to a valid and subsisting security interest in the accounts receivables and other assets acquired by Borrower pursuant to its factoring business, which security interest shall be administered for the benefit of the Lenders by the Collateral Agent.

NOW, THEREFORE, in consideration of the premises and intending to be legally bound hereby, the parties hereto agree as follows:

### ARTICLE I

### The Loan

1.01.  <u>Defined Terms</u>.  All capitalized terms used in this Agreement shall have the meanings set forth in Exhibit "A" hereto.

1.02.  <u>The Loan</u>.  Subject to the terms and conditions herein set forth in this Master Credit Agreement, the Borrower shall borrow an unlimited principal amount from the Lenders (hereinafter referred to as the "Loan"), which Loan shall be evidenced by separate promissory notes (the "Promissory Notes"), with varying maturities, subject to the following additional terms and conditions:

(a)  <u>Six-Month Promissory Notes</u>.  Six-Month Promissory Notes shall be substantially in the form attached as Exhibit "B-1" hereto, and shall provide for maturity

of the obligation on a date which is 185 days from its issue date. The outstanding principal amount of each Six-Month Promissory Note shall bear interest, after as well as before maturity, default and judgment, at a fixed rate per annum equal to the Six-Month London Inter-Bank Offering Rate ("LIBOR") existing on the date which such Promissory Note is issued plus 1.50%. Interest together with principal on each Six-Month Promissory Note shall be payable in a single lump sum on the Maturity Date, as may be extended in accordance with the terms of such note. Interest shall be calculated daily on the basis of a 360 day year.

(b)     Twelve-Month Promissory Notes. Twelve-Month Promissory Notes shall be substantially in the form attached as Exhibit "B-2" hereto, and shall provide for maturity of the obligation on a date which is 365 days from its issue date. The outstanding principal amount from time to time of each Twelve-Month Promissory Note shall bear interest, after as well as before maturity, default and judgment, at a fixed rate per annum equal to the Twelve-Month LIBOR existing on the date which such Promissory Note is issued plus 1.75%. Interest on each Twelve-Month Promissory Note shall be payable in two installments, the first of which shall be on the 185th day after the date of issue. The second installment shall be payable together with principal on the Maturity Date, as may be extended in accordance with the terms of such note. Interest shall be calculated daily on the basis of a 360 day year.

(c)     Maturity Date Extension. In accordance to the terms of the Promissory Notes, Borrower shall have the option to extend the Maturity Date of any or all of the Promissory Notes unless Borrower shall have received written notice from the Lender at least twenty (20) days prior to the applicable Maturity Date of a Lender's intention that such note's maturity not be extended. Subject to the provisions of this Section 1.02(c), in the event that the maturity date of a Promissory Note is extended, the new Maturity Date in the case of a Six-Month Promissory Note shall be 185 days from the original Maturity Date, or any previously extended Maturity Date, as applicable; and in the case of a Twelve-Month Promissory Note shall be 365 days from the original Maturity Date, or any previously extended Maturity Date, as applicable. Interest on the Promissory Notes during such extension period shall be adjusted on the original Maturity Date in accordance with the then applicable interest rates for Six Month Promissory Notes or Twelve Month Promissory Notes, as the case may be, and such readjusted rate shall be the interest rate during the extended term.

(d)     Collateral and Security Interest. Subject to the rights and authority granted to the Collateral Agent under the Master Security Agreement, the Promissory Notes shall initially be secured by a security interest (the "Security Agreement") in the Collateral substantially in the form attached as Exhibit "C" hereto, which Security Agreement shall incorporate by reference the terms of this Master Credit Agreement; provided, however, that pursuant to the terms of this Agreement and the Security Agreement, such security interest may be subordinated to the interests of third party lenders under certain circumstances as more particularly described in the Master Security

Agreement. The Promissory Notes and the Security Documents shall be executed prior to, or simultaneously with, this Agreement.

(e)     Additional Loans. Borrower, Collateral Agent and Lenders acknowledge that the Promissory Notes initially being issued under this Master Credit Agreement are being issued to foreign lenders pursuant to one or more exemptions from United States securities laws. Borrower reserves the right to issue additional Promissory Notes under this Master Credit Agreement of similar or different series, and the other Credit Documents, to persons other than solely foreign persons. In the event of such issuance of Promissory Notes, the Borrower, Collateral Agent and Lenders agree that Borrower may request a modification or amendment to this Master Credit Agreement and the other Credit Documents, as Borrower shall reasonably request, in order to permit Borrower to issue Promissory Notes to U.S. persons and that Collateral Agent, as agent and attorney-in-fact for the Lenders, shall be authorized to consent to such changes as it shall reasonably determine in its sole and absolute discretion.

1.03.   Ranking of Promissory Notes. *Each Promissory Note, regardless of whether a Six-Month Promissory Note, Twelve-Month Promissory Note, or other series as may be issued from time to time as authorized by this Agreement, and regardless of the exercise of a Maturity Date Extension option, shall rank pari passu with all other Promissory Notes issued by Borrower under this Master Credit Agreement, and shall be secured by the Collateral equally and ratably according to the principal amount thereof and the interest from time to time owing thereon, regardless of the Issue Date or terms of the Promissory Notes.*

1.04.   Use of Proceeds of Loan.     At all times during which any of the Promissory Notes evidencing the Loan are outstanding, Borrower covenants and agrees to limit the use of proceeds from the Loan for the following: (i) the payment of the purchase price of accounts receivables, including the purchase of accounts receivable of new clients, accounts receivable which may be assigned by or purchased from Bankest Capital Corp., E.S. Bankest LC, Bankest Finance LLC, or any other third party factor which such accounts receivable may or may not be insured and to make advances and/or other loans to factoring clients; (ii) to purchase participation interests and otherwise participate in the factoring operations of other factors and the business arrangements with their clients; (iii) to acquire accounts receivable factoring contracts and other assets from various sources; and/or (iv) to engage in the refactoring of any accounts receivable which may be acquired.

1.05.   Registration and Transfer of Promissory Notes. The Borrower shall maintain a register of the Promissory Notes, in which shall be entered the name, address, telephone, telex and facsimile number, if any, of each of holder of a Promissory Note, from time to time. The Borrower may appoint one or more other or additional registrars of the Promissory Notes. Such registration shall be noted on the Promissory Notes. No transfer of any Promissory Note shall be valid unless made by the registered Holder or its successors or attorney duly appointed by an instrument in writing in form and execution satisfactory to the Borrower, and upon compliance with such reasonable requirements as the Borrower may prescribe; such transfer shall have been duly noted on the Promissory Notes by the Borrower or a new Promissory Note shall have been

issued and certified in lieu thereof; and such transfer shall have been duly noted on one of the registers. The provisions of this section are intended to comply with the provisions of Treas. Reg. §5f.103 and §5f.163-1 which define the requirements applicable to "registered obligations". Neither the Borrower nor any other registrar or registrars shall be required to transfer any Promissory Note during the period of seven (7) Business Days immediately preceding the date of maturity of such Promissory Note. The registers shall at all reasonable times be open for inspection by the Lenders.

The Promissory Notes have not been and will not be registered under the United States Securities Act of 1933, as amended (the "Securities Act") nor the securities laws of the State of Florida or any of the other States of the United States or any other jurisdiction. The offering of the Promissory Notes will be made in reliance upon (i) a safe harbor from the registration requirements of the Securities Act for offers and sales of securities which occur outside of the United States, and/or (ii) an exemption from the registration requirements of the Securities Act for offers and sales of securities which do not involve any public offering, and (iii) analogous exemptions under State securities laws. As such, the Notes may not be offered, sold, transferred, accepted or delivered, directly or indirectly except pursuant to registration under the Securities Act and applicable state laws and any non-United States securities laws, or pursuant to an available exemption from the registration provisions of the Securities Act and applicable state securities laws and non-United States securities laws.

The Promissory Notes are subject to substantial restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and the applicable State Securities laws pursuant to registration or exemption therefrom, and the applicable securities laws of any other jurisdiction (including the Florida Securities Act).

1.06. <u>Aggregate Loan</u>. The Loan is referred to in the aggregate which includes each position in the Loan made by each of the Lender, whether such Lender funds its portion of the Loan contemporaneously or not, and *regardless of the Issue Date of each Promissory Note which may and will vary among all of the Promissory Notes*. The Loan is deemed to include the entire aggregate unpaid accrued interest and unpaid principal balance owed from time to time by Borrower pursuant to the terms of this Master Credit Agreement and the terms of the Promissory Notes.

1.07. <u>Participant Lenders</u>. Each Lender agrees severally and not jointly with the other Lenders to make the Loan to Borrower and to fund that portion of the Loan represented by each such separate Promissory Note issued by the Borrower. The Borrower covenants and agrees not to issue a Promissory Note under this Master Credit Agreement unless and until a Lender has advanced the funds for such Loan. Each Lender shall evidence its consent and joinder to the terms and conditions of this Master Credit Agreement by executing and delivering to the Borrower and the Collateral Agent a Joinder, Appointment of Collateral Agent and Consent, substantially in the form and content attached as Exhibit "E" hereto. *By execution of such Joinder, each Lender expressly acknowledges and agrees that the principal amount of the Loan under this Master Credit Agreement is unlimited and that additional Promissory Notes may be issued by Borrower which Promissory Notes, although issued after a Lender's*

*particular Promissory Note, shall rank pari passu with all other outstanding Promissory Notes regardless of the terms and conditions of such additional Notes. Upon execution and delivery of such Joinder, Borrower shall amend Schedule A to include the name, address and facsimile of such Lender.*

Subject to Article VII hereof, the Lenders have herein designated and granted Collateral Agent the authority to determine and to take all such requisite actions as may be necessary or reasonable on behalf of the Lenders and in their interests to modify, amend, grant subordinations of the liens hereof, maintain, collect and enforce this Loan. The Lenders participating herein shall rely upon and shall ratify the decisions, determinations and instructions of the Collateral Agent and the Collateral Agent shall be required to take any actions mandated by Lenders which are holders of Promissory Notes representing at least 66⅔% of the aggregate amounts outstanding under the Loan as required by Section 7.02 hereof.

1.08.   Prepayments.   The installments of principal due under the Promissory Notes may be prepaid at any time prior to the stated installment dates thereof without penalty and prepayments need not be equal or pro rata amongst all outstanding Notes.

1.09.   Payment of Closing and Other Costs.   Borrower agrees to pay all out-of-pocket expenses (hereafter "Closing Costs") in connection with the preparation, execution and delivery of the Loan. In addition to the foregoing, Borrower agrees to pay all out-of-pocket expenses of the Collateral Agent in connection with the administration of the Loan, including any special problems which may arise with respect to this Master Credit Agreement, the Promissory Notes and the other instruments and documents to be delivered hereunder and thereunder, and all fees and expenses, if any, incurred by the Lenders in connection with the enforcement of this Master Credit Agreement, the Promissory Notes, and the Credit Documents, or any of them. In addition, Borrower shall pay (or reimburse the Lenders for paying) all documentary stamp taxes, intangible taxes, and other taxes payable or determined to be payable in connection with the execution and delivery of this Master Credit Agreement, the Promissory Notes, the Credit Documents, or any other note, document, instrument or agreement delivered or to be delivered hereunder or thereunder.

1.10.   Payments Generally.   All payments (including prepayments) of the principal of, or interest on, any of the Promissory Notes or in respect of any fees, costs, expenses or taxes hereunder, or any other amounts payable hereunder, shall be paid directly by the Borrower to each Lender in United States Dollars in immediately available funds. Whenever any payment hereunder or on any Promissory Note is stated as due on a Saturday, Sunday, or any public holiday under the laws of the State of Florida, the maturity of such payment shall be extended to the next succeeding Business Day and interest shall continue to accrue during such extension. Upon payment in full of the principal of, and interest on, each such Promissory Note issued to a Lender, together with all other amounts payable hereunder, each such Lender will surrender to Borrower such Promissory Note duly marked canceled.

1.11.   Specified Currency.   This is an international loan transaction in which the requirement for paying in United States dollars and in Miami, Florida, is of the essence, and

United States dollars shall be the denominated currency of the Promissory Notes in all events. The obligation of Borrower to repay the Promissory Notes and all other obligations arising under this Master Credit Agreement shall not be discharged by any amount paid in any other currency or in any other place, whether pursuant to a judgment or otherwise, except to the extent that full payment in United States dollars is actually received.

1.12.   <u>Maximum Interest Rate</u>.  Notwithstanding any provisions of this Master Credit Agreement to the contrary, in no event shall the aggregate "interest" (as that term is defined in Section 687.02 of the Florida Statutes (2002)) hereunder exceed the maximum rate allowed by applicable law.  If from any circumstance whatsoever, fulfillment of any obligation hereof, at the time such performance shall be due, shall cause the effective rate of interest due hereunder to exceed the maximum rate of interest allowed by applicable law, then, the obligation to be fulfilled shall be reduced automatically to the extent necessary to prevent that effective rate of interest from exceeding the maximum rate allowable under applicable law.  Such reduction shall not constitute an Event of Default hereunder.

## ARTICLE II

### Representations and Warranties

Borrower represents and warrants to the Lenders and to the Collateral Agent that:

2.01.   <u>Organization</u>.  Borrower is the duly organized, validly subsisting limited liability company under the laws of the State of Florida and Borrower has all the power and authority necessary to conduct the activities necessary to enter into and perform this Agreement, to become obligated for the repayment and for the performance of its obligations hereunder and under the Promissory Notes and to pledge the Collateral as herein provided.

2.02.   <u>Performance</u>.   The performance of this Master Credit Agreement and the repayment of the obligations and the Promissory Notes by Borrower will not, under present law: (i) require any consent or approval of any member, shareholder or of any public authority, (ii) violate any provision of law (including without limitation any usury law), or violate any rule or regulation governing, or applicable to Borrower, violate any rule, regulation, order, writ, judgment, injunction, decree, determination or award presently in effect and having application to Borrower or to any transaction contemplated hereby, or any provision of this Master Credit Agreement, or (iii) result in any breach of, or constitute a default under, or result in the creation or imposition of any lien or charge upon any property of Borrower pursuant to the terms of any document or any indenture, loan or credit agreement (other than this Master Credit Agreement), or other agreement, lease or instrument to which Borrower is a party or by which it may be bound or to which any of its properties may be subject.

2.03.   <u>Validity of Documents</u>.  This Master Credit Agreement is, and the Promissory Notes and the Documents when executed and delivered will be, the legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their terms.   No authorization, consent, approval, license, exemption of or filing or registration with any court or

other tribunal or any governmental department, commission, board, bureau or agency, domestic or foreign, is or under present law will be necessary to the valid execution, delivery or performance by Borrower of this Master Credit Agreement, any of the Promissory Notes or the Documents.

2.04.   Litigation.   There are no actions, suits or proceedings pending or, to the knowledge of Borrower and its executive officers, threatened against or affecting Borrower, or any of the assets or properties of the Borrower, before any court or other tribunal or any governmental department, commission, board, bureau or agency, domestic or foreign, which if determined adversely to Borrower could have a material adverse effect on the financial condition, operations or properties of Borrower or upon the ability of Borrower to perform its obligations hereunder, or its obligations under the Promissory Notes.

## ARTICLE III

### Portfolio Interest Qualification

3.01.   Portfolio Interest Qualification.   The Promissory Notes are designed and intended to constitute "registered obligations" as defined by the Code and, when held by non-U.S. persons, are intended to qualify for exemption from United States withholding taxes on interest paid to foreign lenders pursuant to the Repeal of Tax on Interest of Non-Resident Alien Individuals and Foreign Corporations Received from Certain Portfolio Debt Investments provisions of Section 871(h) and 881(c) of the Code. Borrower shall in no way take any action in violation of such provisions or which may result in the Promissory Notes failing to so qualify. All terms and conditions of this Master Credit Agreement shall be construed in accordance with such provisions. In the event of any conflict between this Master Credit Agreement or the other Credit Documents and the provisions applicable to Portfolio Debt Investments, the provisions applicable to Portfolio Debt Investments shall control and the Credit Documents shall automatically be modified accordingly.

3.02.   Registration.   In accordance with Section 1.05 of this Master Credit Agreement, transfer and surrender of the Promissory Notes may be achieved only by actual surrender of the Promissory Notes to the Borrower and registration of the transfer by the Borrower.

3.03.   Certification.   In accordance with applicable Code sections and United States Treasury regulations, each non-United States holder of Promissory Notes shall provide to the Borrower a certification stating, under penalties of perjury, that the holder is not a United States person. Certifications shall be obtained annually and shall be retained by the Borrower for a period of not less than four (4) years. Each Lender or holder of a Promissory Note shall immediately notify the Borrower of any changes to any certifications.

3.04.   Additional Notes to United States Persons.   In accordance with Section 1.02(e), the Borrower may issue notes to United States Persons which notes will be substantially the same as the Promissory Notes contemplated under this Master Credit Agreement, and which will be in registered form but need not otherwise comply with the Portfolio Debt exemption

provisions applicable to foreign lenders. Such notes shall be of a separate series and issued in such manner so as not to conflict with the exemptions for notes issued to foreign persons.

## ARTICLE IV

### Covenants of Borrower

4.01.  Affirmative Covenants.  At all times prior to payment in full of all of the Promissory Notes and the performance of all of its other obligations hereunder and under the Loan Documents, unless excused in writing by the Collateral Agent or the Lenders, Borrower will:

(a)     Company Existence.  Maintain its existence in good standing as an entity authorized to contract for credit and perform the obligations hereunder and pursuant to the Promissory Notes under the laws of the State of Florida.

(b)     Performance of Loan Documents, Etc.  Duly and punctually perform each and every obligation of Borrower under this Master Credit Agreement, the Promissory Notes and each of the Credit Documents and execute and deliver all such other and further instruments, and do and perform all such further acts and things, as the Lenders or the Collateral Agent may reasonably request to protect or further protect and assure to the Lenders the rights and benefits intended to be afforded.

(c)     Records and Books of Account.  Keep adequate records and books of account in which complete and correct entries will be made in accordance with sound accounting practice, reflecting all financial transactions of these credit arrangements.

4.02.  Negative Covenants.  At all times prior to the Maturity Date and thereafter until payment in full of the Promissory Notes and the performance of all of its other obligations hereunder and subject to the provisions of this Master Credit Agreement, Borrower will not, unless authorized or permitted as provided herein or with required consent, take any action, fail to take any action, do any thing or cause another to do any thing or take any act which shall diminish the value of the undertaking hereunder by the Lenders or repudiate the obligations hereunder or under the Promissory Notes.

## ARTICLE V

### Events of Default

5.01.  Events of Default.  If any one or more of the following events (hereinafter an "Event of Default") shall occur:

(a)     default shall be made in any repayment of the principal of or the payment of interest on any of the Promissory Notes when due and payable, whether at an

installment date, at maturity, by notice of intention to prepay or otherwise and which default shall not have been cured within thirty (30) days; or

(b)      default shall be made in the due observance or performance of any term, covenant or condition contained in Section 4.01 or 4.02 hereof; or

(c)      default shall be made in the due observance or performance of any other term, covenant or condition contained in this Master Credit Agreement or any Credit Document and such default shall have continued unremedied for a period of thirty (30) days after written notice thereof, specifying such default and requiring that it be remedied, shall have been given to Borrower by the Collateral Agent (which notice the Collateral Agent shall give if required to do so by the Lenders); or

(d)      any representation or warranty made by Borrower herein or in any Credit Document, or any statement or representation made in any certificate, report or opinion delivered pursuant hereto or thereto, shall prove to have been incorrect in any material respect when made;

then, upon the happening of any one or more of the foregoing Events of Default which shall be continuing, any and all further obligations (if any) of the Lenders shall terminate and all sums payable by Borrower hereunder and under the Promissory Notes shall become and be immediately due and payable upon declaration to such effect delivered by the Collateral Agent to Borrower (which declaration the Collateral Agent shall deliver if requested to do so by the Lenders); and the Promissory Notes then outstanding shall be accelerated and immediately mature and become due and payable without declaration or other notice to Borrower. Borrower expressly waives any presentment, demand, protest or other notice of any kind.

## ARTICLE VI

### The Collateral Agent

6.01.  <u>Appointment and Authorization</u>.  Each Lender hereby irrevocably appoints and authorizes the Collateral Agent to take such action on its behalf and to exercise such powers under this Master Credit Agreement as are specifically delegated to the Collateral Agent by the terms hereof, together with such other powers as are reasonably incidental thereto.  Without limiting the generality of the foregoing, each Lender hereby authorizes the Collateral Agent to execute and deliver, and to perform all of the Collateral Agent's obligations under the Master Credit Agreement, the Promissory Notes and the Credit Documents.  The relationship between the Collateral Agent and each of the Lenders is only that of agent and principal and has no fiduciary aspects.  Nothing in this Agreement or elsewhere contained shall be construed to impose on the Collateral Agent any duties or responsibilities other than those for which express provision is herein made.  In performing its duties and functions hereunder, the Collateral Agent does not assume and shall not be deemed to have assumed, and hereby expressly disclaims, any obligation or responsibility toward, or any relationship of agency or trust with or for, Borrower. As to matters not expressly provided for in this Agreement, the Collateral Agent shall not be

required to exercise any discretion or to take any action or communicate any notice, but shall be fully protected in so acting or refraining from acting upon the instructions of the Lenders and their respective successors and assigns; provided, however, that in no event shall the Collateral Agent be required to take any action which exposes it to personal liability or which is contrary to this Master Credit Agreement or applicable law, and the Collateral Agent shall be fully justified in failing or refusing to take any action hereunder unless it shall first be specifically indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or omitting to take any such action.

6.02.   <u>Duties and Obligations</u>.   In performing its functions and duties hereunder on behalf of the Lenders, the Collateral Agent shall exercise the same care and skill as it would exercise in dealing with loans for its own account.   Neither the Collateral Agent nor any of its directors, officers, employees or other agents shall be liable for any action taken or omitted to be taken by it or them under or in connection with this Master Credit Agreement except for its or their own gross negligence or willful misconduct.   Without limiting the generality of the foregoing, the Collateral Agent (i) may consult with legal counsel and other experts selected by it and shall not be liable for any action taken or omitted to be taken by it in good faith and in accordance with the advice of such experts; (ii) makes no representation or warranty to any Lender as to, and shall not be responsible to any Lender for, any recital, statement, representation or warranty made in or in connection with this Master Credit Agreement or in any written or oral statement (including a financial or other such statement), instrument or  other document delivered in connection herewith or furnished to any of the Lenders by or on behalf of Borrower; (iii) shall have no duty to ascertain or inquire into Borrower's performance or observance of any of the covenants or conditions contained herein or to inspect any of the property (including the books and records) of Borrower or inquire into the use of the proceeds of the Loans or to inquire into the existence or possible existence of any Event of Default or of any act, event, circumstance or condition which with the giving of notice or the lapse of time, or both, would constitute such an Event of Default; (iv) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, effectiveness, genuineness, sufficiency, collectibility or value of this Agreement or any instrument or document executed or issued pursuant hereto or in connection herewith; (v) except as expressly provided herein in respect of information and data furnished to the Collateral Agent for distribution to the Lenders, shall have no duty or responsibility, either initially or on a continuing basis, to provide to any Lender any credit or other information with respect to Borrower whether coming into its possession before the making of the Loan or at any time or times thereafter; (vi) shall incur no liability under or in respect of this Master Credit Agreement for, and shall be entitled to rely and act upon, any notice, consent, certificate or other instrument or writing (which may be by facsimile (telecopier), telegram, cable, telex or other electronic means) delivered to it and believed by it to be genuine and correct and to have been signed  or sent by the proper party or parties; and (vii) shall be under no duty to inquire into or investigate the validity, accuracy or content of any notice, consent, certificate or other instrument delivered to it.

6.03.   <u>Independent Credit Decision</u>.   Each Lender acknowledges to each of the other Lenders and to the Collateral Agent that it has, independently and without reliance upon the Collateral Agent or any other Lender, and based upon such documents and information as it has

deemed appropriate, made its own independent credit analysis and decision to enter into this Master Credit Agreement. Each Lender also acknowledges that it will, independently or through other advisers and representatives but without reliance upon the Collateral Agent or any other Lender, and based upon such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or refraining from taking any action under this Agreement.

6.04.   Indemnification.   The Lenders agree to indemnify the Collateral Agent (to the extent not reimbursed by Borrower), ratably according to the respective unpaid principal amounts of their Loans (or if there be no Loans outstanding at the time, ratably according to the respective commitments of the Lenders), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against the Collateral Agent in any way relating to or arising out of this Master Credit Agreement or any of the Credit Documents or any action taken or omitted to be taken by the Collateral Agent hereunder or under any of the Credit Documents; provided that none of the Lenders shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Collateral Agent's gross negligence or willful misconduct. Without limiting the generality of the foregoing, each Lender agrees to reimburse or advance to the Collateral Agent promptly on demand, for such Lender's ratable share (based upon the aforesaid apportionment) of any out-of-pocket expenses (including counsel fees and disbursements) incurred by the Collateral Agent in connection with the preparation, execution, administration or enforcement of, or the preservation of any rights under, this Master Credit Agreement, the Promissory Notes and the Credit Documents to the extent that the Collateral Agent is not advanced or reimbursed for such expenses by Borrower.

6.05.   Successor Collateral Agent.   The Collateral Agent may resign at any time by giving written notice of such resignation to the Lenders and Borrower, and may be removed at any time, with or without cause, upon ten (10) days' prior written notice to the Collateral Agent and Borrower in writing signed by 66⅔% of the Lenders, such resignation or removal to be effective only upon the appointment of a successor Collateral Agent as hereinafter provided. The Collateral Agent shall have the right to withhold an amount equal to the amount due and owing to the Collateral Agent, plus any costs and expenses the Collateral Agent shall reasonably believe may be incurred by the Collateral Agent in connection with its resignation or removal as Collateral Agent. Upon any such notice of resignation or removal, the Lenders shall appoint a successor Collateral Agent upon written notice to Borrower and the retiring Collateral Agent. If no successor Collateral Agent shall have been appointed by the Lenders and shall have accepted such appointment within thirty (30) days after the retiring Collateral Agent shall have given notice of resignation or the Lenders shall have given notice of the removal of the retiring Collateral Agent, the retiring Collateral Agent may, upon notice to Borrower and the Lenders, appoint a successor Collateral Agent. Upon its acceptance of any appointment as Collateral Agent hereunder, the successor Collateral Agent shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Collateral Agent, and the retiring Collateral Agent shall be discharged from its duties and obligations under this Master Credit Agreement.   After any retiring Collateral Agent's resignation or removal hereunder, the

provisions of this Article VI shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Collateral Agent under this Master Credit Agreement.

## ARTICLE VII

### Arrangement Amongst Lenders

7.01.  Participation in Master Credit Agreement.  The Lenders agree that each Lender has an undivided interest in the Loan in the percentage equal to the proportion of such Lender's principal amount indicated on its Promissory Note as bears to the aggregate outstanding principal balance on all outstanding Promissory Notes and each Lender further agrees that such percentages shall reflect each Lender's percentage interest in the Master Credit Agreement and the Credit Documents and the rights and powers contained therein.  Collateral Agent shall hold the Loan Documents for and on behalf of the Lenders and to the extent of each Lender's interest therein.  Upon funding, each Lender shall be entitled to receive as evidence of its participation in the Loan a Promissory Note as provided herein and each Lender agrees that its Promissory Note is intended to reflect and evidence such percentage participation.  The respective interests of the Lenders shall be ratably proportionate and none shall have priority over the others.

7.02.  Receipt of Payments.  Except as expressly provided herein to the contrary, Collateral Agent shall promptly, upon receipt of written instructions from 66⅔% of Lenders, credit to each of the Lender's account or accounts at Collateral Agent each Lender's pro rata share of each repayment of principal, payment of interest or payment of expenses, taxes, fees or otherwise as of the date of payment or due date thereof, as applicable.  All late charges, penalties, costs, expenses taxes and any other charges or additional amounts owed shall be shared pro rata by the Lenders based upon each Lender's pro rata share of the then outstanding principal balances owed by Borrower.  Except as expressly provided herein to the contrary, if any of the Lenders ever receives any payment (whether voluntarily, involuntarily, by offset or application against any existing indebtedness, by virtue of any exercise of legal rights, or otherwise) on account of the Loan or treated by such Lender as on account of the Loan or any other amount payable hereunder, other than amounts reimbursable to a particular Lender or Lenders, and such payment is in excess of such Lender's pro rata share thereof (based upon the total amounts outstanding that are owed to the Lenders by  Borrower), then such Lender obtaining such excess payment shall (unless resolved in accordance with this Section) pay to the other Lenders the amount necessary to equalize the excess payment among all of the Lenders. This provision is intended to require that any sum applied or to be applied to the obligations of Borrower under this Loan shall be shared in a manner so that each of the Lenders receives (or retains) up to, but not in excess of, its pro rata share thereof; PROVIDED, HOWEVER, that so long as the Loan shall not be in default, each Lender agrees that payments of principal and interest on each separate Promissory Note may be made in accordance with the terms of such notes and that each holder shall not be required to return any payments in the event of a later default under the Loan.

7.03.  Borrower Failure to Pay Expenses.  In the event of any failure of Borrower to pay expenses, fees, types, costs or additional amounts required by this Master Credit Agreement or

the Credit Documents, Collateral Agent may request each of the Lenders to advance a proportionate share of such amounts as may be necessary to pay the same and the Lenders shall remit their applicable portion to the Collateral Agent within ten (10) days after notice and request thereof. In the event any Lender shall fail or refuse to pay its proportionate share of such amounts or shall fail or refuse to reimburse the Collateral Agent upon request as provided, then the other Lenders may advance such additional sums as necessary and the Collateral Agent may apply any amounts paid by Borrower or held by Collateral Agent first to pay such advances or reimbursements to the other Lenders before any further distribution of monies to such Lender.

      7.04.   <u>Sharing of Expenses and Losses</u>. Each of the Lenders shall pay its pro rata share of all reasonable attorneys' fees and other expenses incurred in connection with the maintenance, collection or enforcement of the obligations of Borrower under the Loan, and each of the Lenders shall be entitled to a pro rata share of any payments subsequently received with respect to such fees and expenses. Except as expressly provided herein to the contrary, nothing herein shall be deemed (a) to give any of the Lenders an advantage over any of the other Lenders with respect to reimbursement for or other payment on account of any of Borrower's obligations under the Loan or of any attorneys' fees and expenses incurred by the Collateral Agent in connection with enforcement of the obligations of Borrower under any of the Promissory Notes, or (b) to relieve any of the Lenders from absorbing its pro rata share of any losses sustained with respect to the amount of any of Borrower's obligations under the Loan, except to the extent unilateral actions or inactions by any of the Lenders result in any credit, allowance, set-off, defense, or counterclaim solely with respect to all or any part of such Lender's pro rata obligations under the Loan. Upon demand, each of the Lenders shall repay to Collateral Agent any sums distributed to any of the Lenders which the Collateral Agent shall be required to return to Borrower or to any receiver, trustee, or custodian for Borrower.

      7.05.   <u>No Joint Venture or Loan</u>. Neither the execution of this Master Credit Agreement, the sharing in the Loan, nor any agreement to share in profits or losses arising as a result of the transactions contemplated hereby is intended to be or to create, and the foregoing shall not be construed to be or to create, any partnership, joint venture, or other joint enterprise between the Lenders; and neither the execution of this Master Credit Agreement, nor the management and administration of the Loan and the related documents by the Collateral Agent, nor any other right, duty or obligation of the Collateral Agent, under or pursuant to this Master Credit Agreement is intended to be or to create any express, implied, or constructive trust or other fiduciary relationship between or amongst the Collateral Agent and the Lenders. No amounts funded by any of the Lenders pursuant to any of the Promissory Notes shall be considered a loan by any of the Lenders to the Collateral Agent.

<div align="center">ARTICLE VIII</div>

<div align="center">Miscellaneous</div>

      8.01.   <u>No Waiver; Cumulative Remedies</u>. No failure or delay on the part of the Collateral Agent or any Lender or any other holder of any Promissory Notes in exercising any right, power or remedy hereunder or under any Loan Document shall operate as a waiver thereof;

nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder. The remedies provided for herein and in the Credit Documents are cumulative and not exclusive of any remedies provided by law.

    8.02.   <u>Amendments, Etc</u>.  No amendment, modification, termination or waiver of this Master Credit Agreement or any provision hereof, nor any consent to any departure by Borrower therefrom, shall be effective unless the same is in writing and signed (or authorized by a writing signed) by the Collateral Agent and then any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. No notice to or demand on Borrower in any case shall entitle Borrower to any other or further notice or demand in similar or other circumstances.

    8.03.   <u>Addresses for Notices, Etc</u>.   All notices, requests, demands, directions, declarations and other communications provided for herein or in any Promissory Notes shall (except as otherwise expressly provided) be sent by overnight courier or transmitted by facsimile with confirmation receipt or delivered in hand to the applicable party at its address indicated below:

        If to Borrower:

                BANKEST RECEIVABLES USA LLC
                999 Brickell Avenue, 11th Floor
                Miami, Florida 33131
                Telephone: (305) 358-5610
                Facsimile:    (305) 372-2816
                Attention:    Hector Orlansky, President

                with copy to:

                Mark J. Scheer, Esq.
                Gunster, Yoakley & Stewart, P.A.
                One Biscayne Tower
                Two South Biscayne Boulevard, Suite 3400
                Miami, Florida 33131-1897
                Telephone: (305) 376-6000
                Facsimile: (305) 376-6010

        If to the Collateral Agent:

                B.F. SECURITY HOLDINGS LTD.
                C/o Overseas Management Company (Anguilla) Limited
                Victoria House
                The Valley, P.O. Box 58
                Anguilla, British West Indies

Telephone:
Facsimile:

If to any Lender:

At its address set forth on Schedule "A" hereto.

or, as to each party, at such other address as shall be designated by such party in a written notice to all of the others complying as to delivery with the terms of this Section. All such notices, requests, demands, directions, declarations and other communications shall be effective when received.

8.04. Applicable Law, Jurisdiction, Etc. This Master Credit Agreement and each of the Promissory Notes and Credit Documents, and all of the rights and obligations of the parties hereunder and thereunder, shall be governed by and construed and enforced in accordance with the laws of the State of Florida. Any action brought under this Master Credit Agreement and each of the Promissory Notes and Credit Documents shall be brought exclusively in the State or Federal Courts of Miami-Dade County, Florida and all parties hereby submit to jurisdiction in such location.

8.05. Execution in Counterparts. This Master Credit Agreement may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which, taken together, shall constitute but one and the same instrument.

8.06. Binding Effect; Assignment. This Master Credit Agreement shall bind and inure to the benefit of Borrower, the Collateral Agent and the Lenders and their respective successors and assigns, except that Borrower shall not have the right to assign any of its rights hereunder or any interest of it herein without the prior written consent of the Lenders in each case. No person not a party hereto is intended to be benefited hereby.

8.07. Severability of Provisions. Any provision of this Master Credit Agreement or any Promissory Notes or Credit Document which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective solely to the extent of such prohibition or unenforceability without affecting the validity or enforceability of the remainder of this Master Credit Agreement or such Promissory Notes or Credit Document or the enforceability of such provision in any other jurisdiction.

8.08. Captions. Article and section captions in this Agreement are included for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

8.09    Schedules.    As provided in this Master Credit Agreement, Borrower shall maintain one or more registers containing the names, addresses and other information relative to each Promissory Note Holder.   Such registers may be kept electronically or otherwise by Borrower.   Further, such registers shall constitute Schedule A hereto as such Schedule and registers are from time to time amended.

8.10.    Waiver of Jury Trial.   Borrower and the Lenders, after consulting or having had the opportunity to consult with their respective counsel, knowingly, voluntarily and intentionally waives any right each may have to a trial by jury in any action brought with respect to any of the Loan Documents or any related instrument or agreement of any of the transactions contemplated by this Master Credit Agreement, the Promissory Notes or any course of conduct, dealing, statements (whether oral or written) or actions of any party to this Master Credit Agreement, the Promissory Notes, or any other Credit Documents.   Neither Borrower nor the Lenders shall seek to consolidate, by counterclaim or otherwise, any such action in which a jury trial cannot be or has not been waived with any other action brought by any of the parties hereto for which a jury trial has been waived.   These provisions shall not be deemed to have been modified in any respect or relinquished by any of the parties except by a written instrument executed by all of the parties.

**[REMAINDER OF PAGE LEFT BLANK INTENTIONALLY]**

IN WITNESS WHEREOF, Borrower and the Collateral Agent have caused this Master Credit Agreement to be executed by their proper corporate officers thereunto duly authorized as of the day and year first above written.

BORROWER:

BANKEST RECEIVABLES USA LLC,
a Florida limited liability company

By: _____
Name: _____
Title: _____


COLLATERAL AGENT:

B.F. SECURITY HOLDINGS, LTD.
an Anguilla corporation

By: _____
Name: _____
Title: _____

## SCHEDULE "A"

### NAMES, ADDRESSES AND FACSIMILE NUMBERS FOR LENDERS

| Note Reg. No./Series | Name and Address | Principal Amount | Interest Rate | Notes/ Comments |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

## EXHIBIT "A"

## DEFINED TERMS

For purposes of this Master Credit Agreement, the following terms shall have the respective meanings set out below:

"Account" shall mean each individual account for which the rights to receive payment have been assigned to Bankest Receivables USA LLC pursuant to the terms of a factoring agreement, an assignment, or other means.

"Business Day" means a day on which banks are open for business in Miami, Florida and in Anguilla, British West Indies.

"Code" means the United States Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means all of Borrower's right, title and interest in and to the following, whether now owned or hereafter acquired, whether now or hereafter existing and wherever located:

> (a)    a pledge and security interest in all of Borrower's rights to the payment of money however evidenced or arising, including each existing and future account, contract right, general intangible, instrument and document, within the meaning of the Florida Uniform Commercial Code (the "UCC"), and in all causes of action and goods giving rise to Borrower's right to the payment of money, including such goods in which Borrower has retained a security interest or which have been reclaimed, returned or repossessed, all documents of title and warehouse receipts, and all book entries, records and files relating to the foregoing;

"Credit Document(s)" means this Master Credit Agreement, the Security Agreement, the Notes, any additional security documents attached hereto or thereto, and any related instrument or agreement for any of the transactions contemplated by this Master Credit Agreement.

"Event of Default" means an event described in Section 5.01.

"Governmental Approval" means any authorization, order, permit, approval, grant, license, consent, commitment, right, franchise, privilege, certificate, judgment, writ, injunction, award, determination, direction, decree or demand or the like which may be issued or granted by law or by rule or regulation of any Governmental Body.

"Governmental Body" means any government, parliament or legislature, whether federal, provincial, state, municipal or otherwise, or any regulatory authority, agency, commission or

board of any government, parliament or legislature, whether federal, provincial, state, municipal or otherwise, or any court or (without limitation to the foregoing) other law-making, regulation-making or rule-making entity having or purporting to have jurisdiction in the relevant circumstances, or any person acting or purporting to act under the authority of any of the foregoing.

"Holder" and "Holders" means the Persons entered in the Registers as holders of any of the Promissory Notes.

"Lenders' Resolution" means an instrument approving any action or circumstance specified therein or containing a determination by all of the Lenders or any of them or requiring the Collateral Agent to take some action or proceeding specified therein (provided such action or proceeding is within the scope of the duties of the Collateral Agent as set forth in any of the Credit Documents), and signed in one or more counterparts by Holders of at least 66⅔% of the outstanding principal amount, in the aggregate, of all of the Promissory Notes.

"Maturity Date shall mean:

    (a)    with respect to a Six-Month Promissory Note, a date which is 185 days from its issue date, or the date of any extension, as applicable; or

    (b)    with respect to a Twelve-Month Promissory Note, a date which is 365 days from its issue date, or the date of any extension, as applicable.

"Obligor" shall mean, with respect to any Account, the Person or Persons obligated to make payments with respect to such Account, including any guarantor thereof.

"Person" or "person" means an individual, corporation, partnership, trust, joint venture, unincorporated organization, or any other juridical entity or a Government Body; and pronouns have a similarly extended meaning.

"Promissory Notes" means collectively at any time, the Series A and B Notes issued and certified hereunder and outstanding at such time together with any additional series or forms of notes issued as provided for or permitted under the Master Credit Agreement.

"Receivable" shall mean any and all amounts owing by the Obligors under an Account from time to time, including, without limitation, the right to payment of amounts owing for the payment of goods and services. A Receivable shall be deemed to have been created at the end of the day on the date of processing of such Receivable by the Borrower.

## EXHIBIT "B-1"

> Any United States person who holds this obligation may be subject to limitations under United States income tax laws, including the limitations provided in Sections 165(j) and 1287(a) of the Internal Revenue Code of 1986, as amended.

THIS PROMISSORY NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, UNDER THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, NOR UNDER THE SECURITIES LAWS OF ANY OTHER JURISDICTION. THE PROMISSORY NOTE HAS NOT BEEN AND IS NOT BEING OFFERED FOR SALE IN THE UNITED STATES (OR ANY OF ITS TERRITORIES, POSSESSIONS OR AREAS SUBJECT TO ITS JURISDICTION), OR TO ANY PERSON WHO IS A U.S. PERSON (AS SUCH TERM IS DEFINED IN REGULATION S UNDER THE SECURITIES ACT OF 1933, AS AMENDED). THIS NOTE IS SUBJECT TO SUBSTANTIAL RESTRICTIONS ON RESALE.

SERIES A

## PROMISSORY NOTE

The capitalized and defined terms used in this Promissory Note shall have the following meanings:

HOLDER:        _____

    mailing address:    _____

                      _____

                      _____

MAKER:    BANKEST RECEIVABLES USA LLC, a Florida limited liability company with its principal business address at 999 Brickell Avenue, 11th Floor, Miami, Florida 33131

DATE:_____ __, 2003        PLACE OF EXECUTION:

PRINCIPAL AMOUNT:    _____ ($_____)

STATED INTEREST RATE: The rate of _____ (__%), which rate is equal to the Six-Month London Inter-Bank Offered Rate ("LIBOR") existing on the date this Note is executed plus 1.50%.

GOVERNING LAW: The laws of the State        LOAN AND SECURITY DOCUMENTS:

of Florida without regard to its conflicts of law principles shall govern all matters hereunder.

Master Credit Agreement and Security Agreement dated as of March 11, 2003.

INITIAL MATURITY DATE: Six (6) Months

SECURITY: The property described in and conveyed or encumbered by the Security Documents.

**FOR VALUE RECEIVED,** Maker hereby promises to pay to Holder, in lawful money of the United States of America at the office of the Holder, or at such other place outside the United States as Holder may designate in writing, the Principal Amount, or so much of the Principal Amount as shall be advanced by Holder to Maker with interest thereon, at the Stated Interest Rate. Interest shall be calculated daily and on the basis of a 360-day year.

Accrued interest and principal shall be paid in a single lump sum on the Maturity Date.

This Note may be repaid at any time without penalty.

1.     Obligations Secured. This Note is made pursuant to that certain Master Credit Agreement between BANKEST RECEIVABLES USA LLC, as Borrower, B.F. SECURITY HOLDINGS, LTD., an Anguilla corporation, as Collateral Agent and the Lender (as defined therein) and the obligations of the Holder and Maker hereunder shall be subject to all the terms and conditions of the Loan and Security Documents.

2.     Maturity Date Extension. Subject to the provisions of this paragraph, the entire Principal Amount of the indebtedness evidenced by this Note, together with all accrued and unpaid interest hereon, shall be due and payable by Maker to Holder on the Initial Maturity Date. Notwithstanding the foregoing, and subject to the terms of this paragraph, Maker may elect to extend the Maturity Date of this Note to Holder for additional periods of six (6) months (each an "Extension Period"). During each such Extension Period the Stated Interest Rate payable under this Note shall be adjusted to reflect the applicable current Stated Interest Rate as of the day immediately preceding the Maturity Date which would otherwise have been applicable hereunder. Maker shall notify Holder of the intention to exercise of the extension by providing a written notice of extension not later than twenty-five (25) days prior to the Maturity Date and, unless Holder shall request full repayment on the Maturity Date in writing not later than ten (10) days prior to the Maturity Date, this Note shall be automatically extended for the Extension Period without further action by Holder or Maker.

3.     Portfolio Debt Compliance. Notwithstanding anything herein to the contrary, this Note is intended to qualify under the provisions of Sections 871 and 881 of the United States Internal Revenue Code of 1986, as amended, relating to the Repeal of Interest on Portfolio Debt Obligations of Certain Foreign Persons and, in accordance therewith, this Note may only be transferred by Holder in accordance with the provisions

of the Master Credit Agreement and the registration-required obligation provisions of Section 163(f) of the Internal Revenue Code of 1986, as amended, and accompanying regulations.

4.     Default.  If default be made in the payment of any installment under this Note or if the Maker violates any of the terms or breaches any of the conditions of the Master Credit Agreement or any other Credit Document, and such default or breach shall remain unpaid or uncured for a period of thirty (30) days, the entire principal sum and accrued interest shall become due and payable after notice of default to Maker at the option of the Holder unless conflicting provisions with respect to notice appear in the Master Credit Agreement, in which case the provisions of the Master Credit Agreement shall control.  Failure to exercise this option shall not constitute a waiver of the right to exercise the same at any other time.  From and after notice of default and until such default is either cured or this Note paid, the principal of this Note and any part thereof, shall bear interest at the Stated Interest Rate, plus five percent (5%), but in no event higher than eighteen percent (18%) per annum (the "Default Rate").

5.     Governing Law; Consent to Jurisdiction and Venue.  This Note shall be governed by, and construed and enforced according to, the laws of the State of Florida, without giving effect to conflicts of laws principles, except where specifically preempted by Federal law.  Any action brought under this Note shall be brought exclusively in the State or Federal Courts of Miami-Dade County, Florida and Maker and Holder hereby submit to jurisdiction in such location.

6.     No Usury Violation Intended.  Notwithstanding anything herein to the contrary, the Holder does not intend to violate any applicable usury laws.  Accordingly, all agreements between Maker and Holder are expressly limited so that in no contingency or event whatsoever, whether by reason of advancement of the proceeds hereof, acceleration of maturity of the unpaid principal balance hereof, or otherwise, shall the amount paid or agreed to be paid to the Holder for the use, forbearance or detention of the money to be advanced hereunder (including all interest on this Note, all loan fees, and the aggregate of all other amounts taken, reserved or charged pursuant to this Note, the Master Credit  Agreement or any Loan Documents, which, under applicable laws is or may be deemed to be interest) exceed the maximum rate allowed by applicable law.  At the time performance of such obligation shall be due, if any circumstances whatsoever shall cause the effective rate of interest upon the sums evidenced hereby to exceed the maximum rate of interest allowed by applicable law, then, the obligation to be fulfilled shall be reduced automatically to the extent necessary to prevent that effective rate of interest from exceeding the maximum rate allowable under applicable law and to the extent that the Holder shall receive any sum which would constitute excessive interest, such sum shall be applied to the reduction of the unpaid principal balance due hereunder and not to the payment of interest or, if such excessive interest exceeds the unpaid balance of principal, the excess shall be refunded to the Maker.  This provision shall control every other provision of all agreements between the Maker and the Holder.

7.   <u>WAIVER OF JURY TRIAL</u>.   THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF, UNDER OR IN CONNECTION WITH THE LOAN EVIDENCED BY THIS NOTE, AND ANY INCREASES, AMENDMENTS, EXTENSIONS, MODIFICATIONS OR RENEWALS THEREOF, AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION THEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER PARTY.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR HOLDER EXTENDING THIS LOAN, AND ANY INCREASES, AMENDMENTS, EXTENSIONS, MODIFICATIONS OR RENEWALS THERETO.

IN WITNESS WHEREOF, Maker has executed this Note as of the date first herein above written.

MAKER:

BANKEST RECEIVABLES USA LLC,
a Florida limited liability company

By:_____
Print Name:_____
Title:_____

MIAMI 353450.3

-4-

## EXHIBIT "B-2"

> Any United States person who holds this obligation may be subject to
> limitations under United States income tax laws, including the
> limitations provided in Sections 165(j) and 1287(a) of the Internal
> Revenue Code of 1986, as amended.

**THIS PROMISSORY NOTE HAS NOT BEEN AND WILL NOT BE
REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS
AMENDED, UNDER THE SECURITIES LAWS OF ANY STATE OF THE
UNITED STATES, NOR UNDER THE SECURITIES LAWS OF ANY OTHER
JURISDICTION. THE PROMISSORY NOTE HAS NOT BEEN AND IS NOT
BEING OFFERED FOR SALE IN THE UNITED STATES (OR ANY OF ITS
TERRITORIES, POSSESSIONS OR AREAS SUBJECT TO ITS JURISDICTION),
OR TO ANY PERSON WHO IS A U.S. PERSON (AS SUCH TERM IS DEFINED
IN REGULATION S UNDER THE SECURITIES ACT OF 1933, AS AMENDED).
THIS NOTE IS SUBJECT TO SUBSTANTIAL RESTRICTIONS ON RESALE.**

**SERIES B**

## PROMISSORY NOTE

The capitalized and defined terms used in this Promissory Note shall have the following meanings:

HOLDER: _____
whose mailing address is c/o _____

MAKER: BANKEST RECEIVABLES USA LLC, a Florida limited liability company with its principal business address at 999 Brickell Avenue, 11th Floor, Miami, Florida 33131

DATE:_____ __, 2003          PLACE OF EXECUTION:

PRINCIPAL AMOUNT: _____ ($____ )

STATED INTEREST RATE: The rate of _____ (__%), which rate is equal to the Twelve-Month London Inter-Bank Offered Rate ("LIBOR") existing on the date this Note is executed plus 1.50%.

GOVERNING LAW: The laws of the State of Florida without regard to its conflicts of law principles shall govern all matters hereunder.

LOAN AND SECURITY DOCUMENTS: Master Credit Agreement and Security Agreement dated as of March 11, 2003.

-1-

INITIAL MATURITY DATE: Twelve (12) Months

SECURITY:  The property described in and conveyed  or encumbered by the Security Documents.

**FOR VALUE RECEIVED,** Maker hereby promises to pay to the order of Holder, in lawful money of the United States of America at the office of the Holder, or at such other place outside the United States as Holder may designate in writing, the Principal Amount, or so much of the Principal Amount as shall be advanced by Holder to Maker with interest thereon, at the Stated Interest Rate.  Interest shall be calculated daily and on the basis of a 360-day year.

Accrued interest shall be paid one hundred and eighty five (185) days after the date of issuance, or renewal, as applicable, and additional accrued interest and all outstanding principal shall be paid in a single lump sum on the Maturity Date.

This Note may be repaid at any time without penalty.

1.      Obligations Secured.  This Note is made pursuant to that certain Master Credit Agreement between BANKEST RECEIVABLES USA LLC, as Borrower, B.F. SECURITY HOLDINGS LTD., an Anguilla corporation, as Collateral Agent and the Lender (as defined therein) and the obligations of the Holder and Maker hereunder shall be subject to all the terms and conditions of the Loan and Security Documents.

2.      Maturity Date Extension.  Subject to the provisions of this paragraph, accrued interest on the indebtedness evidenced by this Note shall be paid one hundred and eighty five (185) days after the date of issuance, or renewal, as applicable, and additional accrued interest and the entire Principal Amount shall be due and payable by Maker to Holder on the Maturity Date.  Notwithstanding the foregoing, and subject to the terms of this paragraph, Maker may elect to extend the Maturity Date of this Note to Holder for additional periods of twelve (12) months (each an "Extension Period").  During each such Extension Period the Stated Interest Rate payable under this Note shall be adjusted to reflect the applicable current Stated Interest Rate as of the day immediately preceding the Maturity Date which would otherwise have been applicable hereunder.  Maker shall notify Holder of the intention to exercise of the extension by providing a written notice of extension not later than twenty-five (25) days prior to the Maturity Date and, unless Holder shall request full repayment on the Maturity Date in writing not later than ten (10) days prior to the Maturity Date, this Note shall be automatically extended for the Extension Period without further action by Holder or Maker.

3.      Portfolio Debt Compliance.   Notwithstanding anything herein to the contrary, this Note is intended to qualify under the provisions of Sections 871 and 881 of the United States Internal Revenue Code of 1986, as amended, relating to the Repeal of Interest on Portfolio Debt Obligations of Certain Foreign Persons and, in accordance therewith, this Note may only be transferred by Holder in accordance with the provisions of the Master Credit Agreement and the registration-required obligation provisions of

Section 163(f) of the Internal Revenue Code of 1986, as amended, and accompanying regulations.

4.   Default.  If default be made in the payment of any installment under this Note or if the Maker violates any of the terms or breaches any of the conditions of the Master Credit Agreement or any other Credit Document, and such default or breach shall remain unpaid or uncured for a period of thirty (30) days, the entire principal sum and accrued interest shall become due and payable after notice of default to Maker at the option of the Holder unless conflicting provisions with respect to notice appear in the Master Credit Agreement, in which case the provisions of the Master Credit Agreement shall control.  Failure to exercise this option shall not constitute a waiver of the right to exercise the same at any other time.  From and after notice of default and until such default is either cured or this Note paid, the principal of this Note and any part thereof, shall bear interest at the Stated Interest Rate, plus five percent (5%) but in no event higher than eighteen percent (18%) per annum (the "Default Rate").

5.   Governing Law; Consent to Jurisdiction and Venue.  This Note shall be governed by, and construed and enforced according to, the laws of the State of Florida, without giving effect to conflicts of laws principles, except where specifically preempted by Federal law.  Any action brought under this Note shall be brought exclusively in the State or Federal Courts of Miami-Dade County, Florida and Maker and Holder hereby submit to jurisdiction in such location.

6.   No Usury Violation Intended.  Notwithstanding anything herein to the contrary, the Holder does not intend to violate any applicable usury laws.  Accordingly, all agreements between Maker and Holder are expressly limited so that in no contingency or event whatsoever, whether by reason of advancement of the proceeds hereof, acceleration of maturity of the unpaid principal balance hereof, or otherwise, shall the amount paid or agreed to be paid to the Holder for the use, forbearance or detention of the money to be advanced hereunder (including all interest on this Note, all loan fees, and the aggregate of all other amounts taken, reserved or charged pursuant to this Note, the Master Credit Agreement or any Loan Documents, which, under applicable laws is or may be deemed to be interest) exceed the maximum rate allowed by applicable law.  At the time performance of such obligation shall be due, if any circumstances whatsoever shall cause the effective rate of interest upon the sums evidenced hereby to exceed the maximum rate of interest allowed by applicable law, then, the obligation to be fulfilled shall be reduced automatically to the extent necessary to prevent that effective rate of interest from exceeding the maximum rate allowable under applicable law and to the extent that the Holder shall receive any sum which would constitute excessive interest, such sum shall be applied to the reduction of the unpaid principal balance due hereunder and not to the payment of interest or, if such excessive interest exceeds the unpaid balance of principal, the excess shall be refunded to the Maker.  This provision shall control every other provision of all agreements between the Maker and the Holder.

7.   **WAIVER OF JURY TRIAL.   THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT**

EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF, UNDER OR IN CONNECTION WITH THE LOAN EVIDENCED BY THIS NOTE, AND ANY INCREASES, AMENDMENTS, EXTENSIONS, MODIFICATIONS OR RENEWALS THEREOF, AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION THEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER PARTY.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR HOLDER EXTENDING THIS LOAN, AND ANY INCREASES, AMENDMENTS, EXTENSIONS, MODIFICATIONS OR RENEWALS THERETO.

IN WITNESS WHEREOF, Maker has executed this Note as of the date first herein above written.

MAKER:

BANKEST RECEIVABLES USA LLC,
a Florida limited liability company

By:_____
Print Name:_____
Title:_____

MIAMI 353454.3

EXHIBIT "C" TO MASTER CREDIT AGREEMENT

## MASTER SECURITY AGREEMENT
### AND
## APPOINTMENT OF COLLATERAL AGENT AGREEMENT

THIS MASTER SECURITY AGREEMENT AND APPOINTMENT OF COLLATERAL AGENT AGREEMENT dated as of March 11, 2003, by and among BANKEST RECEIVABLES USA LLC, a Florida limited liability company with its principal business address at 999 Brickell Avenue, 11th Floor, Miami, Florida, USA 33131 ("Debtor"), B.F. SECURITY HOLDINGS LTD., an Anguilla corporation (hereinafter sometimes referred to either as the "Collateral Agent," "Secured Party," or "Collateral Agent as Secured Party"), and each of the Lenders to Debtor pursuant to that certain Master Credit Agreement dated of even date herewith.

## RECITALS

A.     Debtor is a newly formed entity which desires to engage in the business of operating a non-regulated commercial factoring business;

B.     In order to finance Debtor's factoring business, Debtor desires to issue certain Promissory Notes (as more particularly defined in the Master Credit Agreement) to investors who shall become the lenders ("Lenders") of the Loan to Debtor under the Master Credit Agreement and which loans are intended to be secured by the Collateral as hereinafter set forth;

C.     In order to secure the Promissory Notes and thus create a valid and subsisting security interest in the accounts receivable and other described assets, and as a condition of the Master Credit Agreement, Debtor by this instrument intends and hereby grants the security interest in favor of the Collateral Agent as Secured Party on behalf of the Lenders pursuant to the terms and conditions herein contained.

NOW, THEREFORE, in consideration of the mutual promises and other covenants herein contained, and for $1.00 and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

Section 1.     Defined Terms. Capitalized Terms shall have the same meaning as used in the Master Credit Agreement except as otherwise defined herein. Unless otherwise defined herein or in the Master Credit Agreement, terms defined in Article 9 of the Uniform Commercial Code of Florida, as amended (the "UCC") are used herein as therein defined.

Section 2.     Grant of Security Interest. Debtor hereby grants to the Secured Party, to secure the payment and performance in full of all of the Obligations, a security interest in and so pledges and assigns to the Secured Party, the following properties, assets and rights of the Debtor, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof (cash and non-cash), (all of the same being hereinafter called the "Collateral"): all of Debtor's rights to the payment of money however evidenced or arising, including each existing and future account, each instrument (including promissory notes), all chattel paper (whether tangible or electronic), all letter-of-credit rights (whether or not the letter

1

of credit is evidenced by a writing), all documents (including documents of title and warehouse receipts), and proceeds thereof, any and all supporting obligations regarding any of the foregoing arising out of or in connection with Debtor's purchase of accounts receivable and also including any goods in which Debtor has retained a security interest or which have been reclaimed, returned or repossessed, moneys, or other property of Debtor which may at any time be in the possession of, delivered to, or owed by the Secured Party, including any proceeds or return or unearned premiums of insurance, and all book entries, records and files relating to the foregoing.

Section 3.    Collateral; Use of Loan Proceeds.    At all times during which any of the Promissory Notes evidencing the Loan are outstanding, Debtor has covenanted and agreed under the Master Credit Agreement to limit the use of proceeds from the Loan for the following: (i) the payment of the purchase price of certain accounts receivable, including the purchase of accounts receivable of new clients, accounts receivable which may be assigned by or purchased from Bankest Capital Corp., E.S. Bankest LC, Bankest Finance LLC, or any other third party factor which such accounts receivable may or may not be insured and to make advances and/or other loans to factoring clients; (ii) the purchase of participation interests and otherwise participate in the factoring operations of other factors and the business arrangements with their clients; (iii) to acquire accounts receivable factoring contracts and other assets from various sources; and/or (iv) to engage in the refactoring of any accounts receivable which may be acquired.

Section 4.    Secured Obligations.

(a)    The foregoing security interests are granted to the Collateral Agent as Secured Party on behalf of the Lenders as security for the due, prompt, full and complete payment and performance by Debtor of: (i) all obligations of Debtor under this Agreement and the Master Credit Agreement, including without limitation the payment of all sums due and to become due under the Promissory Notes, as the same become due and payable, whether at maturity, by acceleration or otherwise; (ii) all costs and expenses, including reasonable attorney's fees, incurred by the Secured Party in the collection of the same or in the enforcement of any of the rights of the Secured Party or the Lenders hereunder or under or in connection with the Promissory Notes; (iii) all future advances made by the Secured Party or the Lenders for taxes, levies, insurance and repairs to, or maintenance or protection of, any of the Collateral; and (iv) all other past, present and future, direct or indirect, absolute or contingent, liabilities of Debtor arising under this Agreement, the Master Credit Agreement or any other related document (collectively, the "Secured Obligations")

(b)    All obligations secured hereby shall be secured with the same priority at all times, notwithstanding that any such obligations may be increased or decreased at any time during the term hereof; provided the Secured Party in its sole discretion may elect to enforce any remedies hereunder in any order of priority, partially or fully, as to any particular obligation or collateral, without otherwise affecting its remaining interests hereunder.

Section 5.    Effective Date of Security.  The mortgages, assignments, pledges, charges and security interests hereby created or provided to be created shall be effective whether the moneys thereby secured or any part thereof shall be advanced before or after or at the same time as the issue of any of the Promissory Notes intended to be secured thereby or before or after or upon the date of execution of this Agreement.

*Bankest Receivables USA LLC - Security Agreement*
*As of. 3/11/03*
MIAMI 353562 3

Section 6.    Defeasance. These presents are upon the express condition that if Debtor shall well and truly pay all moneys payable to the Secured Party and satisfy all obligations secured hereby then these presents and the rights hereby granted shall cease and become null and void and the Collateral shall revert to and revest in Debtor, without any release, acquittance, reconveyance, re-entry or other act or formality whatsoever.

Section 7.    Assignments. Nothing in this Agreement shall be construed as an attempt to assign (i) any representation, warranty, covenant, agreement, account, claim, demand or cause of action which, as a matter of law or by its terms, is non-assignable without the consent of some other person unless such consent shall have been given or (ii) unless and to the extent that any Lenders' Resolution otherwise requires, any agreement or claim as to which all the remedies for the enforcement of same that are available to Debtor would not, as a matter of law, be available to the Secured Party upon any realization proceedings hereunder, provided, however, that the foregoing shall not apply to any such agreement or claim which would be available to the Secured Party, except as otherwise provided in this Section 7. In order, however, that the full value of the items described in clauses (i) and (ii) above may constitute security hereunder and may be realized for the benefit of the Secured Party, Debtor shall at its expense and at the request of the Secured Party or pursuant to any Lenders' Resolution to that effect, in the name of Debtor or otherwise as the Secured Party or Lenders' Resolution may specify, and whether as Secured Party or agent of the Secured Party or otherwise, execute and deliver any necessary financing statements and take all such action and do or cause to be done all such things as shall, in the reasonable opinion of the Secured Party or as specified in such Lenders' Resolution, be necessary or proper in order that the items described in clauses (i) and (ii) above shall inure to the benefit of and be enforceable in favor of the Secured Party and the Lenders.

Section 8.    Attachment. Debtor and the Secured Party agree that it is their intention that the security interests hereby created shall attach immediately to the Collateral in which Debtor has any interest on the date hereof, and, with respect to any after-acquired property, forthwith at the time Debtor shall acquire an interest therein.

Section 9.    Release of Collateral; Substitution of Collateral; Grant of Senior Interests. Secured Party, acting by and through the Collateral Agent in its sole but reasonable judgment, shall have the sole and exclusive authority to modify the security interest granted hereby including, but not limited to, the authority and power to (a) release all or any part of the Collateral from the lien created hereby; (b) substitute other collateral for the Collateral; and/or (c) subordinate the interests of the Lenders in the Collateral to third party lenders; provided, that any such release of all or any part of the Collateral shall be based upon the determination by the Collateral Agent as Secured Party, in its sole discretion, that such release of Collateral and/or subordination of interests is reasonably likely or reasonably necessary to increase Debtor's cash flow and as such, provide implicit benefits to the Lenders by contributing to the profitability and/or stability of Debtor's business or is reasonable in light of exigent business circumstances of the Debtor and so as to best protect and preserve the interests of the Lenders.

Section 10.    Application of Moneys Held by Secured Party.

(a)    Any moneys received by the Secured Party in respect of the Collateral and all other moneys at any time held by or on behalf of the Secured Party pursuant to any other

3

provisions hereof or of any other instruments or agreements in connection with the Collateral, the disposition of which is not otherwise provided for herein, shall be held by the Secured Party as part of the Collateral and applied by the Secured Party as determined by the Collateral Agent or as otherwise directed by a Lenders' Resolution.  Pending such application, such moneys shall be held and dealt with by the Secured Party in accordance with Section 31.

(b)     In no case shall the receipt of moneys by the Secured Party from releases or other dealings with any Collateral be deemed to be a payment hereunder nor shall the lien hereof be affected by reason of such receipt except as herein expressly provided.

Section 11.     Protection of Purchasers.  It is hereby declared and agreed that no purchaser or purchasers from, or other person having dealings with, Debtor or the Secured Party or their respective permitted successors or assigns shall be obliged to inquire into the necessity, expediency, authority or regularity of or for any action or concurrence on the part of the Collateral Agent as Secured Party or any release or other instrument taken or given under the provisions of this Section nor be obliged to inquire into the sufficiency of the performance by Debtor of any of the conditions upon which it is or may be entitled to any such action or concurrence or release or other instrument.  For the avoidance of doubt it is made clear that the Collateral Agent shall have full authority to deal with the Collateral on behalf of the Lenders as the Secured Party without need of any third party to require or request any Lenders' Resolution.

Section 12.     Proceeds Held in Trust.  Subject to the provision of Section 5, all proceeds of any disposition or transfer of the Collateral received or obtained by Debtor at any time shall be held in trust by Debtor for the benefit of the Lenders and forthwith delivered to the Secured Party.

Section 13.     Representations and Warranties.  Debtor represents and warrants to Secured Party as set forth below.

(a)     Debtor is the legal and beneficial owner of the Collateral.  No effective financing statement or other instrument similar in effect covering all or any part of the Collateral is on file in any recording office, except such as may have been filed in favor of Secured Party relating to this Agreement.

(b)     Debtor has the exclusive right and claim to the Collateral.

(c)     This Agreement, together with (i) appropriate UCC-1 filings in the states identified in Exhibit "A" attached hereto creates a valid and perfected first-priority security interest in the Collateral, securing the payment of the Secured Obligations, and all filings and other actions necessary or desirable to perfect and protect such security interest have been duly taken or made.

(d)     No authorization, approval or other action by, or notice to or filing with, any governmental authority or regulatory body (other than appropriate UCC-1 filings) is required (i) for the grant by Debtor of the security interest granted hereby or for the execution, delivery or performance of this Agreement by Debtor or (ii) for the perfection of or the exercise by Secured Party of its rights and remedies hereunder.

4

(e)     The execution, delivery and performance by Debtor of this Agreement are within Debtor's company powers, have been duly authorized by all necessary corporate action and do not contravene (i) Debtor's articles of organization or regulations/operating agreement or (ii) any applicable law or contractual restriction binding on or affecting Debtor. This Agreement has been duly executed and delivered by Debtor and is the legal, valid and binding obligation of Debtor, enforceable against Debtor in accordance with its terms, except as the enforceability hereof may be limited by bankruptcy, insolvency, moratorium, reorganization or other similar laws affecting creditors, rights generally.

Section 14.     Further Assurances.

(a)     Debtor agrees that at any time and from time to time, at its own expense, it will promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that Secured Party may request, in order to perfect and protect the security interest granted or purported to be granted hereby or to enable Secured Party to exercise and enforce its rights and remedies hereunder with respect to any Collateral.

(b)     Debtor hereby authorizes Secured Party to file one or more financing or continuation statements, and amendments thereto, relating to all or any part of the Collateral without the signature of Debtor in any filing office in any UCC jurisdiction. A photographic or other reproduction of this Agreement or any financing statement covering the Collateral or any part thereof shall be sufficient as a financing statement where permitted by law.

(c)     Debtor will furnish to Secured Party from time to time such statements and schedules further identifying and describing the Collateral, and such other reports in connection with the Collateral, as Secured Party may reasonably request.

Section 15.     Conditions Precedent to Collateral Agent's Obligation to Act.

(a)     The Collateral Agent shall have the exclusive authority to initiate and continue to pursue any and all actions to enforce the security interest created hereby or otherwise proceed against the Collateral; provided however; that the Lenders, by resolution may require the Collateral Agent to take such actions as set forth in Sections 26 and 43 hereof. The obligation of the Collateral Agent to commence or continue any act, action or proceeding for the purpose of enforcing any rights of the Collateral Agent as Secured Party on behalf of any of the Lenders hereunder shall be conditional upon the Lenders or, if less than all the Lenders request that the Collateral Agent as Secured Party proceed to realize upon the lien hereof and to enforce its rights as contemplated by Sections 26 and 43, then, upon such requesting Lender or Lenders furnishing, when required by notice in writing by the Collateral Agent, sufficient funds to commence or continue such act, action or proceeding and an indemnity reasonably satisfactory to the Collateral Agent to protect and hold harmless the Collateral Agent against the costs, charges and expenses and liabilities to be incurred thereby and any loss and damage it may suffer by reason thereof. Without limiting the generality of the foregoing, such requesting Lender or Lenders shall ensure that the Collateral Agent is furnished with sufficient funds:

(i)     to pay all amounts it is required to pay pursuant to Section 26;

5

(ii)      to pay amounts necessary to discharge all liens, if any, on the Collateral ranking (or capable of ranking) in priority to the lien hereof or to keep any such prior lien in good standing; and

(iii)      to pay all costs and expenses incurred in connection with the repossession, holding, processing, preparing for disposition and remarketing of the Collateral.

(b)      None of the provisions contained in this Agreement shall require the Collateral Agent as Secured Party to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties or in the exercise of any of its rights or powers unless indemnified as aforesaid.

(c)      The Collateral Agent as Secured Party may, before commencing, or at any time during the continuance of, any such act, action or proceeding, require the Lenders at whose instance it is acting to deposit with the Collateral Agent the Promissory Notes held by it, for which Promissory Notes the Collateral Agent shall issue receipts.

Section 16.      Evidence.

(a)      Whenever it is provided in this Agreement with reference to any application to the Collateral Agent as Secured Party, for the certification and delivery of Promissory Notes, the release of property, the withdrawal of money or other action hereunder or thereunder, that Debtor shall deposit with the Collateral Agent resolutions, certificates or other documents, it is intended that the truth, accuracy and good faith at the time of granting of such application (or on the effective date of any such certificate or document, as the case may be) of the acts and opinions stated in all documents so deposited shall, in each and every such case, be conditions precedent to the right of Debtor to have such application granted.

(b)      The Collateral Agent as Secured Party may rely and shall be protected in acting upon any resolution, certificate or other document believed by it to be genuine and to have been signed, sent or presented by or on behalf of the proper party or parties. However the Collateral Agent may in its discretion require reasonable evidence of the due execution thereof before acting or relying thereon.

Section 17.      Experts and Advisors. The Secured Party may act and shall be protected in acting in good faith on the opinion or advice of or information obtained from any counsel, accountant or other expert or advisor, whether retained or employed by Debtor or the Secured Party, in relation to any matters arising in the performance of the Secured Party's duties as Collateral Agent.

Section 18.      Documents, Cash, Etc. Held by the Secured Party.

(a)      Pending the application or withdrawal thereof under any of the provisions of this Agreement, all moneys that may at any time be deposited with or held by the Collateral Agent as Secured Party in accordance with the provisions hereof shall be held in an account maintained by the Collateral Agent or invested by the Collateral Agent (and reinvested) in Approved Securities in the same currency as the moneys so deposited and held by the Collateral

6

Agent for the exclusive benefit of the Lenders, provided that if the Collateral shall revert to Debtor in accordance with Section 6, any amounts to be discharged or any residual amounts shall be paid to Debtor, and the Collateral Agent may deposit the same or any part thereof in the name of the Collateral Agent in any Eligible Institution or for safekeeping with any Eligible Institution.

(b)     For the purposes of immediately applying the proceeds of any securities pursuant to any provision hereof the Collateral Agent as Secured Party may sell such securities from time to time in its discretion at the best prices in the Collateral Agent's opinion obtainable. Unless a Default or an Event of Default (as defined in Article V of the Master Credit Agreement) shall have occurred and be continuing, all interest or other income received by the Collateral Agent as Secured Party in respect of such investments and any profits realized by the Collateral Agent as Secured Party upon any such sale thereof shall belong to Debtor.

Section 19.    Action by Secured Party to Protect Security. After the occurrence of an Event of Default and so long as it is continuing, the Secured Party shall have power to institute and maintain such action and proceedings as it may consider necessary or expedient to prevent any impairment of the lien hereof by any acts of Debtor or of other persons or to preserve or protect its interests and the security and interests of the Lenders in respect of the Collateral or in respect of the income, earnings, rents, issues and profits thereof.

Section 20.    Secured Party Not Required to Give Security. The Collateral Agent shall not be required to give any security in respect of the appointment as Collateral Agent or as Secured Party under this Agreement or otherwise in respect of the Collateral.

Section 21.    Protection of the Lenders and Secured Party. By way of supplement to the provisions of any law for the time being relating to secured parties, it is expressly declared and agreed that, except as otherwise provided herein:

(a)     neither the Collateral Agent as Secured Party nor any Lender shall be liable for or by reason of any failure or defect of title to, or any lien upon, the Collateral;

(b)     neither the Collateral Agent as Secured Party nor any Lender shall be liable for or by reason of any statements of fact or recitals in this Agreement or in the Promissory Notes (except in the certificate of the Secured Party thereon) or be required to verify the same, but all such statements or recitals are and shall be deemed to be made by Debtor;

(c)     nothing herein contained shall cast any obligation on the Secured Party or any Lender to see to or to require evidence of the registration or filing or renewal of this Agreement or any other instrument ancillary or supplemental hereto or any other document or writing by way of mortgage, security interest or charge upon the Collateral or any part thereof or upon any other property of Debtor or to procure any further, other or additional instrument or to do any other act for the continuance of the lien hereof or for giving notice of the existence of such liens or for extending or supplementing the same;

(d)     neither the Secured Party nor any Lender shall be bound to give notice to any person or persons of the execution hereof or of the lien hereof or in any way to interfere with

7

the conduct of the business of Debtor unless and until the lien hereof shall have become enforceable and the Secured Party shall have become bound to enforce the same;

(e)     the Secured Party and each Lender, on their own behalf or in any other capacity, may buy, lend upon and deal in other securities of Debtor and in the Promissory Notes and generally may contract and enter into financial transactions with Debtor or any affiliate of Debtor without being liable to account for any profit made thereby.

Section 22.    Replacement of the Secured Party. The Secured Party may resign as collateral agent and be discharged from all further duties and liabilities hereunder by giving to Debtor and the Lenders two (2) months prior notice in writing or such shorter notice as Debtor and the Lenders may accept as sufficient. The Lenders shall have power at any time to remove the Collateral Agent as Secured Party from its position and to appoint a new collateral agent to act as secured party in accordance with the proceedings set forth in Section 38 hereof, the costs of which removal and appointment shall be at Debtor's expense. In the event of the Secured Party resigning or being removed as set forth above or being dissolved, becoming bankrupt, going into liquidation or otherwise becoming incapable of acting hereunder, Debtor shall forthwith appoint a new collateral agent to act as secured party unless a new collateral agent has already been appointed by the Lenders; failing such appointment by Debtor, the retiring Collateral Agent or any Lender may apply to a court of competent jurisdiction for the appointment of a new collateral agent to act as secured party; but any new collateral agent so appointed by Debtor or by the Court shall be subject to removal as aforesaid by the Lenders. Any new collateral agent appointed under any provision of this section shall be a corporation or other business entity authorized and qualified to carry on business in its jurisdiction of organization and in every other jurisdiction where such authorization or qualification is necessary to enable it to act as secured party and collateral agent hereunder. On any new appointment the new secured party and collateral agent shall, to the extent permitted by law, be vested with the same powers, rights, duties and responsibilities as if it had been originally named herein as secured party and collateral agent, without any further assurance, conveyance, act or authorization; but there shall be immediately executed, at the expense of Debtor, all such conveyances or other instruments as may, in the opinion of counsel, be necessary or advisable for the purpose of assuring to the new secured party a perfected security interest in the Collateral. Any corporation or business entity into which the Secured Party may be merged or with which it may be consolidated or amalgamated, or any corporation or business entity resulting from any merger, consolidation or amalgamation to which the Secured Party shall be a party, shall be the successor Secured Party under this Agreement without the execution of any instrument or any further act. Except as otherwise provided herein, the costs of resignation and appointment of Secured Parties hereunder shall be at the expense of Debtor.

Section 23.    Acceptance of Duties as Collateral Agent. The Secured Party hereby accepts the duties of Collateral Agent as set forth in this Agreement and agrees to perform the same upon the terms and conditions set forth herein and to hold the Collateral and the fixed and specific mortgages, assignments, pledges, charges and security interests and all the rights, privileges and benefits conferred hereby and by law as Collateral Agent, for the various persons who shall from time to time be Lenders, each of whom shall be owed the relevant legal duties as principals of such Collateral Agent, subject to all the terms and conditions set forth herein.

8

Section 24.   Legislation Relating to Agreements.  The provisions of these Sections 14 through 24 are subject to the provisions of any legislation applicable from time to time relating to Agreements and to the rights, duties and obligations of Secured Parties acting as agents responsible for the safekeeping of property and of corporations or business entities serving as agents to certain principals.

Section 25.   General Liability of Collateral Agent as Secured Party.  Notwithstanding anything herein to the contrary, Collateral Agent shall not be liable for any action taken or failure to act in the performance of its duties as Secured Party hereunder unless such action or failure of action shall have resulted from Collateral Agent's gross negligence or willful fraud.

Section 26.   Rights and Duties of Collateral Agent.

(a)   Rights and Duties Generally.  The Collateral Agent as Secured Party shall have the rights to take any and all actions necessary or appropriate to fulfill its duties hereunder and/or to otherwise take any and all actions authorized hereby, including, but not limited to, the actions authorized in Section 9 hereof. The Collateral Agent as Secured Party shall have the duty to comply with the terms of any Lenders' Resolution.

(b)   Notice to Lenders.  Upon the Collateral Agent becoming aware of the occurrence of any material Event of Default arising under this Agreement or the Master Credit Agreement, and which Event of Default remains uncured beyond any applicable cure period, it shall give notice to the Lenders and each Holder of a Promissory Note of the occurrence of the Event of Default unless the Collateral Agent in good faith determines and reasonably believes that the withholding of such notice is in the best interest of the Lenders and Holders of Promissory Notes and so advises Debtor in writing.  Where notice of the occurrence of the Event of Default has been given to Lenders and Holders of Promissory Notes and the Event of Default is thereafter remedied or cured, notice that the Event of Default is no longer continuing shall be given by the Collateral Agent to the Lenders and Holders of Promissory Notes within a reasonable time after the Collateral Agent becomes aware that the Event of Default has been cured.

(b)   Enforcement by the Collateral Agent as Secured Party.  Whenever the lien hereof shall have become and so long as it remains enforceable and the Collateral Agent has declared the Promissory Notes to be accelerated, the Collateral Agent as Secured Party may, in its discretion, and, upon the receipt of a Lenders' Resolution requesting it to do so shall, proceed to realize upon the lien hereof and to enforce its rights hereunder by any or all of: (a) proceedings in any court of competent jurisdiction for sale or other disposition of the Collateral or any part thereof; (b) generally any other action, suit, remedy or proceeding authorized or permitted by the Master Credit Agreement, the provisions of this Agreement, including, but not limited to, such remedies set forth in Section 43, or by law or by equity; or (c) any and all remedies allowed secured parties under the provisions of the Uniform Commercial Code of Florida, as amended, provided that in the event of any such acceleration or realization, Debtor shall have the right to pay to the Secured Party all amounts then owing by Debtor hereunder and under the Promissory Notes, and shall be entitled to the release and reconveyance of the Collateral in accordance with Section 6. Whenever the lien hereof shall have become and so long as it remains enforceable and the Collateral Agent has declared the Promissory Notes to be accelerated, the Collateral

9

Agent as Secured Party may file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Lenders and Holders of Promissory Notes lodged in any bankruptcy, winding-up or other judicial proceeding relative to Debtor or the Collateral; and none of the aforesaid remedies for the realization of the lien hereof or for the enforcement of the rights of the Lenders and Holders of Promissory Notes and the Collateral Agent as Secured Party shall be exclusive of or dependent on any other such remedy but any one or more of such remedies may from time to time be exercised independently or in combination. Further, no taking of any judgment or order in respect of any of the covenants contained in this Agreement shall operate as a merger of any of the said covenants or operate to prevent any further judgment or order in respect thereof or any further remedy for the enforcement of the lien hereof.

       (c)      <u>Waiver of Default</u>.

       (i)      In case the lien hereof shall have become enforceable, and the Collateral Agent as Secured Party shall have determined to realize upon the lien hereof and to enforce its rights hereunder, whether or not it shall have received a Lenders' Resolution in accordance with Section 39, the Lenders and Holders of Promissory Notes shall have the power exercisable by Lenders' Resolution to require the Collateral Agent to waive any default and/or cancel any declaration made by the Collateral Agent as Secured Party under Section 38 and the Collateral Agent shall thereupon waive such default and/or cancel such declaration upon such terms and conditions as such Lenders and Holders of Promissory Notes shall prescribe. So long as the Secured Party has not become bound as provided in this Section 26 to declare the Promissory Notes accelerated, or to obtain and enforce payment of the Promissory Notes, the Collateral Agent shall have power to waive any default arising hereunder if, in the opinion of the Collateral Agent, the same shall have been cured or adequate satisfaction made therefor, and in such event cancel any declaration therefor made by the Collateral Agent pursuant to Section 26 upon such terms and conditions as the Collateral Agent may deem advisable.

       (ii)      If as a result of any default herein, the Secured Party shall have taken any steps pursuant to the provisions of this Agreement to enforce the lien hereof and subsequently such default shall be waived by the Lenders as herein provided or such Event of Default shall be deemed to have been cured or remedied, the Secured Party shall at the request and at the cost of Debtor take such action as may be reasonably required to restore the position which prevailed immediately prior to the taking of such steps by the Secured Party, subject, however, to any condition or conditions imposed by the Lenders in such waiver, if applicable, and neither the Secured Party nor any receiver theretofore appointed by the Secured Party or by a court shall incur any liability by reason of the taking of such steps.

       <u>Section 27</u>.    <u>Proof of Promissory Notes</u>. All rights of action hereunder may be enforced by the Secured Party without the possession of any of the Promissory Notes or the production thereof at the trial or other proceedings relative thereto.

       <u>Section 28</u>.    <u>Lenders May Direct Secured Party's Action</u>. The Lenders may, by Lenders' Resolution and upon indemnifying the Secured Party to its satisfaction as provided in Section 15, from time to time direct and control the actions of the Secured Party with respect to matters set forth in Section 38. Any and all Lenders' Resolutions purporting to direct and/or

<div align="center">10</div>

control the actions of the Secured Party shall be executed as set forth in Section 39 by at least sixty six and two thirds percent (66⅔ %) of all of the current Lenders as of the date of any such resolution (a "Lenders' Resolution").

<u>Section 29.</u>    <u>Enforcement by Lenders.</u>

(a)    No Lender shall have any right to institute any action or proceeding or to exercise any other remedy authorized by this Agreement or by law or by equity for the purpose of enforcing payment of the principal or interest on the Promissory Notes or of realizing on the lien hereof, or by reason of jeopardy of security, or for the execution of any power hereunder, unless the Lenders' Resolution referred to in Section 38 and the indemnity referred to in Section 15 shall have been tendered to the Secured Party and the Secured Party shall have failed to act on any such matter within a reasonable time. In such case but not otherwise, any Lender acting on behalf of itself and all other Lenders shall be entitled to institute proceedings in any court of competent jurisdiction such as the Secured Party might have taken under Section 26, including, without limitation, applying for an order appointing a receiver to take possession of the Collateral or such part thereof as may be the subject matter of such proceedings with any or all of the powers and rights set forth in Section 26 and such additional powers and rights as the court may direct, and, in that event, all of the Lenders shall be deemed to have consented to such proceedings and to any such order; it being understood and intended that no one or more Lenders shall have any right in any manner whatsoever to affect, disturb or prejudice the lien hereof by its or their action, or to enforce any right hereunder or under any Promissory Note, except subject to the conditions and in the manner herein provided, and that all powers and trusts hereunder shall be exercised and all proceedings at law shall be instituted, had and maintained by the Secured Party, except only as herein provided, and in any event for the benefit of all Lenders.

(b)    Notwithstanding, however, any provision of this Agreement, if in any competent jurisdiction neither the Secured Party nor any Lender has the right under the laws of such jurisdiction to act on behalf of the Lenders in connection with the enforcement of any rights hereunder, then each Lender shall have the right to enforce its rights hereunder individually provided that the Lenders shall have first authorized such individual action by Lenders' Resolution.

<u>Section 30.</u>    <u>Lenders May Bid</u>. The Lenders shall be entitled, at any sale pursuant to the provisions hereof, to credit against any purchase price bid at such sale by such Lender all or any part of the unpaid obligations owing to such Lender and secured by the lien hereof.

<u>Section 31</u>.    <u>Application of Proceeds of Realization of Security</u>. Except as otherwise provided herein or by law or by the order of a court, the moneys arising from the enforcement of any remedy provided for herein or in any other instrument concerning the Collateral, including, without limitation, the sale or other realization of the whole or any part of the Collateral, whether under any sale by the Collateral Agent as Secured Party or by judicial process or otherwise, shall be held by the Secured Party and, together with any other moneys then or thereafter in the hands of the Collateral Agent as Secured Party available for the purpose, shall be applied by the Collateral Agent as Secured Party as follows:

*Bankest Receivables USA LLC - Security Agreement*
*As of 3/11/03*
MIAMI 353562 3

(a)     first, to pay all amounts due to the Secured Party hereunder, including, without limitation, amounts in respect of remuneration, expenses, disbursements and advances, including the interest thereon, but not including any amounts in respect of such expenses, disbursements and advances to the extent that the funds used to incur or make such expenses, disbursements or advances were provided to the Secured Party by a Lender or Lenders pursuant to Section 15;

(b)     second, to repay in full all Lenders who provided funds to the Secured Party pursuant to Section 15;

(c)     third, to pay the amount due on the Promissory Notes outstanding first for principal and then for interest, including interest on amounts overdue, and then for premium, if any, and then for any other amounts secured hereunder unless otherwise directed by a Lenders' Resolution and in that case in such order of priority as between principal, interest and premium, if any, and such other amounts as may be directed by such Lenders' Resolution; and

(d)     fourth, the surplus, if any, of such moneys shall be paid to Debtor or its assigns or otherwise in accordance with applicable law.

Section 32.     Distribution of Proceeds.  Payments to Lenders pursuant to Section 1.10 of the Master Credit Agreement, shall be made upon presentation thereby of Promissory Notes in the form of Promissory Note attached as Exhibits B-1 or B-2 to the Master Credit Agreement, as the case may be, and any such Promissory Note thereby paid in full shall be surrendered. The Secured Party may in its discretion dispense with presentation and surrender upon such indemnity being given as it shall deem sufficient or the Secured Party may endorse on such Promissory Note a memorandum of payment.

Section 33.     Maintenance of Records.  The Secured Party shall create and maintain proper accounts and records showing, without limitation:

(a)     all amounts due to the Secured Party;

(b)     all expenditures made by the Secured Party pursuant to Section 15 or in connection with the repossession, holding, processing, preparing for disposition and remarketing of the Collateral or to pay Liens, if any, on the Collateral ranking (or capable of ranking) in priority to the lien hereof or to keep any such prior Lien in good standing;

(c)     all proceeds arising from the sale or other realization of the whole or any part of the Collateral; and

(d)     all amounts furnished to the Secured Party pursuant to Section 6;

Absent proof of manifest error, the accounts and records maintained by the Secured Party shall constitute prima facie evidence of such matters so recorded therein.

Section 34.     Person Dealing with the Secured Party.  No person dealing with the Collateral Agent as Secured Party or any agents thereof shall be concerned to inquire whether the

*Bankest Receivables USA LLC - Security Agreement*
*As of 3/11/03*
MIAMI 353562.3

lien hereof has become or remains enforceable or whether the powers which the Collateral Agent as Secured Party is purporting to exercise have become or remain exercisable, or whether any moneys remain due upon the security of this Agreement or under any Promissory Note, or as to the necessity or expediency of the stipulations and conditions subject to which any sale shall be made or otherwise as to the propriety or regularity of any sale or of any other dealing by the Secured Party with the Collateral or any part thereof, or to see to the application of any moneys paid to the Secured Party and, in the absence of fraud on the part of such person, such dealing shall be deemed so far as regards the safety and protection of such person, to be within the powers hereby conferred and to be valid and effective.

Section 35. Cancellation and Destruction. Prior to the payment of any Promissory Note in full, such Promissory Note shall forthwith be delivered to the Secured Party and after payment thereof, such Promissory Note shall be canceled. All Promissory Notes so canceled or required to be canceled under this or any other provision of this Agreement shall be destroyed by the Secured Party, and if required by Debtor, the Secured Party shall furnish to it a destruction certificate setting forth the numbers and denominations of the Promissory Notes so destroyed.

Section 36. Non-Presentation of Promissory Notes. In case the Holder of any Promissory Note shall fail to present the same for payment or shall otherwise not accept payment on account thereof as herein provided and give such receipt therefor, if any, as the Secured Party may require, Debtor shall be entitled to deposit with the Secured Party the amount due on such Promissory Note (including interest and interest on overdue interest, if any) in trust to be paid to such Holder upon due presentation for surrender thereof in accordance with the provisions of this Agreement or as otherwise provided herein and thereupon the principal amount of such Promissory Note and interest (including interest on overdue interest, if any) payable on or represented by such Promissory Note in respect whereof such amounts have been deposited shall be deemed to have been paid and such Holder thereof shall thereafter have no right in respect thereof except that of receiving payment of the amounts so deposited with the Secured Party upon due presentation and surrender thereof or as otherwise provided herein, subject always to the provisions of Section 35. Upon receipt of such funds Secured Party shall deposit such monies with a bank of its choosing.

Section 37. Repayment of Unclaimed Moneys to Debtor. Any moneys deposited under Section 36 and not claimed by and paid to Holders of Promissory Notes as provided in Section 32 within six (6) years after the date of such deposit shall be repaid to Debtor by the Secured Party on demand and thereupon the Secured Party shall be released from all further liability with respect to such moneys and thereafter the Holders of the Promissory Notes in respect of which such moneys were so repaid to Debtor shall have no right in respect of such Promissory Notes except to obtain payment of such moneys from Debtor.

Section 38. Powers of the Lenders. The Lenders shall have the following powers exercisable from time to time by Lenders' Resolution (as described more particularly in Section 39):

(a) power to take such actions as are provided for in this Agreement to be taken upon the making of a Lenders' Resolution, or such other actions as may be necessary or desirable in furtherance thereof;

13

(b)      power to require the Secured Party to refrain from enforcing any of the covenants on the part of Debtor herein contained or to refrain from exercising any of the powers hereby conferred upon the Secured Party or to direct the Secured Party to waive any Default or Event of Default on the part of Debtor on such terms as may be deemed advisable or to cancel any declaration or waiver previously made by the Secured Party hereunder;

(c)      power to remove the Collateral Agent from office and to appoint a new Collateral Agent to act as Secured Party, provided such new Collateral Agent is acceptable to Debtor, acting reasonably;

(d)      power to assent to any judgment, compromise or arrangement by Debtor with any creditor, creditors or class or classes of creditors or with the holders of any shares or securities of Debtor;

(e)      power to require the Secured Party to take any action or to do any other matter or thing which is consented to by Debtor and approved by a Lenders' Resolution;

(f)      power to direct the Secured Party, when the lien hereof shall have become enforceable, as to the manner of sale or disposition of any part of the Collateral;

(g)      power to authorize the Secured Party, in the event of Debtor making an authorized assignment to an assignee, Secured Party or liquidator under applicable bankruptcy or insolvency legislation or legislation relating to winding-up, for and on behalf of the Lenders, and in addition to any claim or debt proved or made for its own account as Secured Party hereunder, to file and prove a claim or debt against Debtor and its property for an amount equivalent to the aggregate amount which may be payable in respect of the Promissory Notes and other amounts payable hereunder, and vote such claim or debt at meetings of creditors and generally act for and on behalf of the Lenders in such proceedings as such resolution or requisition may provide; and

(h)      power to appoint a committee with power and authority (subject to such limitations, if any, as may be prescribed in the resolution of requisition) to exercise, and to direct the Collateral Agent as Secured Party to exercise, on behalf of the Lenders, such of the powers of the Lenders which are exercisable by resolution as shall be included in the resolution appointing the committee.  The resolution making such appointment may provide for payment of the expenses, disbursements and compensation of such committee.  Such committee shall consist of such number of persons as shall be prescribed in the resolution appointing it and the members need not be themselves Lenders.  Every such committee may elect its chairman and may make regulations respecting its quorum, the calling of its meetings, the filing of vacancies occurring in its number and its procedures generally.  Such regulations may provide that the committee may act at a meeting at which a quorum is present or may act by minutes signed by the number of members thereof necessary to constitute a quorum.  All acts of any such committee within the authority delegated to it shall be binding upon the Lenders.  Neither the committee nor any member thereof shall be liable for any loss arising from or in connection with any action taken or omitted to be taken by them in good faith.

The grant of the foregoing powers to Lenders shall in no way create any requirement or duty of Secured Party or Debtor to obtain the consent of any Lender to take any actions which,

<div align="center">14</div>

by the terms of this Agreement and/or the Master Credit Agreement, do not expressly require the consent of Lenders.

Section 39.    Execution of Lenders' Resolutions. Any instrument comprising a Lenders' Resolution, and any requisition or other instrument to be executed by Lenders under any provision of this Agreement, may be in any number of concurrent instruments of similar tenor and effect and any Lender may execute the same in person or by agent or attorney duly authorized in writing. The fact and date of execution by any Lender of any power of attorney may be proved by the certificate of any notary public that the person signing the same acknowledged to him the execution thereof or by the affidavit or statutory declaration of a witness to such execution, and such proof shall be conclusive in favor of the Secured Party with regard to any action taken or suffered by the Secured Party under such instrument. No such instrument shall be effective until delivery thereof to the Secured Party. The Secured Party shall give notice to all Lenders of each Lenders' Resolution delivered as aforesaid.

Section 40.    Effect of Lenders' Resolution. Any Lenders' Resolution which has been executed as required by Section 39 by at least sixty six and two thirds percent (66⅔ %) of all of the current Lenders as of the date of any such resolution shall be binding upon the Lenders and each of them, and the Secured Party (subject to the provisions for its indemnity herein contained) shall be bound to give effect thereto accordingly.

Section 41.    Secured Party Appointed Attorney-in-Fact. Debtor hereby irrevocably appoints Secured Party as Debtor's attorney-in-fact, with full authority in the place and stead of Debtor and in the name of Debtor or otherwise, from time to time in Secured Party's discretion upon the occurrence and during the continuation of any Event of Default, to take any action and to execute any instrument in the name of, or on behalf of Debtor, that Secured Party may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation, the following:

(a)    to ask for, demand, collect, sue for, recover, compromise, receive, and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral;

(b)    to file any claims, take any action and institute any proceedings that Secured Party may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of Secured Party with respect to any of the Collateral.

Section 42.    Secured Party's Duties. The powers conferred on Secured Party under this Agreement are solely to protect its interest in the Collateral as Collateral Agent and shall not impose any duty upon it to exercise any such powers, except as provided herein. Secured Party shall be deemed to have exercised reasonable care in the custody and presentation of any Collateral in its possession if such Collateral is accorded treatment substantially equal to the treatment that Secured Party accords its own property.

Section 43.    Remedies. If any Event of Default occurs and shall remain unpaid or uncured for a period of thirty (30) days, Secured Party shall be entitled to exercise the following remedies, in addition to those set forth in Section 26.

15

(a)     Secured Party may exercise in respect of the Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all of the rights and remedies of a secured party in default under the UCC, as in effect at that time, (whether or not the UCC applies to the affected Collateral).

(b)     All cash held by Secured Party as Collateral, all payments received by Secured Party in connection with the Collateral and all cash proceeds received by Secured Party in respect of any sale of, collection from or other realization upon all or any part of the Collateral may, in the discretion of Secured Party, be held by Secured Party as collateral for, and/or then or at any time thereafter applied (after payment of any amounts payable to Secured Party) in whole or in part by Secured Party against, all or any part of the Secured Obligations (as set forth in Section 4 hereof) in such order as Secured Party may elect.  Any surplus of such cash or cash proceeds held by Secured Party and remaining after payment in full of the Secured Obligations shall be paid over to Debtor or to whoever may be lawfully entitled to receive such surplus.

Section 44.     Indemnity and Expenses.

(a)     Debtor agrees to indemnify Secured Party from and against any and all claims, losses and liabilities arising out of or resulting from this Agreement (including, without limitation, enforcement of this Agreement), except claims, losses or liabilities resulting from Secured Party's gross negligence or willful misconduct.

(b)     Debtor will upon demand pay to Secured Party the amount of any and all reasonable expenses, including, without limitation, the reasonable fees and disbursements of its counsel and of any experts and agents, that Secured Party may incur in connection with (i) the custody, preservation, use, operation or sale of, the collection from, or any other realization upon, any of the Collateral, (ii) the exercise or enforcement of any of the rights of Secured Party hereunder, whether in any insolvency or reorganization proceeding or otherwise, or (iii) the failure by Debtor to perform or observe any of the provisions hereof.

Section 45.     Amendments, Waivers, Etc.

(a)     No amendment or waiver of any provision of this Agreement or consent to any departure by Debtor therefrom shall in any event be effective unless the same is in writing and signed by Secured Party, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

(b)     The waiver (whether express or implied) by Secured Party of any breach of any term or condition of this Agreement shall not prejudice any remedy of Secured Party in respect of any continuing or other breach of the terms and conditions hereof and shall not be construed as a bar to any right or remedy that Secured Party would otherwise have on any future occasion under this Agreement.

(c)     No failure to exercise or delay in exercising, on the part of Secured Party, any right, power or privilege under this Agreement shall operate as a waiver thereof or the exercise of any other right, power or privilege.

16

Section 46.    Notices, Etc. All notices and other communications provided for hereunder shall be given in accordance with Section 8.03 of the Master Credit Agreement.

Section 47.    Continuing Security Interest. This Agreement creates a continuing security interest in the Collateral and shall (a) remain in full force and effect until payment in full of the Secured Obligations, (b) be binding upon Debtor and its successors and assigns and (c) inure, together with the rights and remedies of Secured Party hereunder, to the benefit of Secured Party and its successors, transferees and assigns. Without limiting the generality of the foregoing clause (c), Secured Party may assign or otherwise transfer any or all of its rights and obligations under this Agreement to any other person, and such other person shall thereupon become vested with all of the benefits in respect thereof granted to Secured Party herein or otherwise. Upon payment in full of the Secured Obligations, the security interest granted hereby shall terminate, and all rights to the Collateral shall revert to Debtor, as provided for in Section 6. Upon any such termination, Secured Party will, at Debtor's expense, execute and deliver to Debtor such documents as Debtor may reasonably request to evidence such termination.

Section 48.    Governing Law; Terms. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF FLORIDA APPLICABLE TO CONTRACTS MADE AND PERFORMED IN THE STATE OF FLORIDA, EXCEPT TO THE EXTENT THAT THE VALIDITY OR PERFECTION OF THE SECURITY INTEREST HEREUNDER, OR REMEDIES HEREUNDER, IN RESPECT OF ANY PARTICULAR COLLATERAL ARE GOVERNED BY THE LAWS OF A JURISDICTION OTHER THAN THE STATE OF FLORIDA.

*Bankest Receivables USA LLC - Security Agreement*
*As of. 3/11/03*
MIAMI 353562.3

**SECURED PARTY AND
COLLATERAL AGENT:**

**B.F. SECURITY HOLDINGS LTD.,**
an Anguilla corporation

By:_____
Name:_____
Title:_____


**DEBTOR:**

**BANKEST RECEIVABLES USA LLC,** a
Florida limited liability company

By:_____
Name:_____
Title:_____

---

18

## EXHIBIT "A" TO MASTER SECURITY AGREEMENT

## AND APPOINTMENT OF COLLATERAL AGENT AGREEMENT

### <u>UCC FILINGS</u>

1.      Florida.

*Bankest Receivables USA LLC - Security Agreement*
*As of 3/11/03*
MIAMI 353562.3

## EXHIBIT "D" TO MASTER CREDIT AGREEMENT

## JOINDER, APPOINTMENT OF COLLATERAL AGENT AND CONSENT

LENDER: _____     LOAN AMOUNT:_____

ADDRESS: _____     ISSUE DATE:_____

_____     NOTE SERIES:_____

The undersigned Lender hereby acknowledges that:

• Lender has received a copy of that certain Master Credit Agreement dated March 11, 2003 (the "Master Credit Agreement") by and among BANKEST RECEIVABLES USA LLC, a Florida limited liability company with its principal business address at 999 Brickell Avenue, 11th Floor, Miami, Florida, USA 33131 (herein "Borrower"); and B.F. SECURITY HOLDINGS LTD., an Anguilla corporation, as Collateral Agent ("Collateral Agent").

• Lender has received a copy of that certain Security Agreement dated March 11, 2003 by and between Borrower and Collateral Agent, including Collateral Agent's disclosure of its relation to and affiliation with Borrower.

• Lender acknowledges and understands that each promissory note issued by Borrower under the Master Credit Agreement, including the Promissory Note issued to Lender shall be treated pari passu with all other Promissory Notes issued by Borrower and all such Promissory Notes shall be secured by collateral equally and ratably according to the principal amount thereof and the interest from time to time owing thereon, regardless of the Issue Date or interest terms of each separate Promissory Notes.

• Lender acknowledges and agrees that as a condition to the extension of credit to Borrower under the Master Credit Agreement and the issuance of a Promissory Note to Lender, Borrower and the other lenders under the Master Credit Agreement require that Lender appoint B.F. Security Holdings Ltd. as the Collateral Agent to administer the Security Interests for the benefit of all lenders pursuant to all of the terms and conditions of the Loan Documents.

NOW THEREFORE, Lender agrees as follows:

By execution and delivery of this Joinder, Appointment of Collateral Agent and Consent Lender hereby:

1.  Joins in the execution and agrees to the terms of the Master Credit Agreement and each and every other Loan or Credit Document relating to the Loan (as defined in the Master Credit Agreement);

2.  Appoints the Collateral Agent to act as its agent in connection with the Loan and the Collateral thereof and acknowledges that Collateral Agent shall act as agent for all of the Lenders under the Master Credit Agreement with respect to the administration of the Collateral for the Loan including but not limited to taking such actions with respect to Collateral as set forth in the Master Credit Agreement and Master Security Agreement; and

3.  Expressly consents to the appointment of Collateral Agent as Lender's attorney-in-fact in connection with the Master Credit Agreement and all other loan documents related thereto.

IN WITNESS WHEREOF, Lender has executed this Joinder, Appointment of Collateral Agent and Consent this __ day of _____, 200__.


_____          _____
Witness                                       Lender


_____
Witnesses

## EXHIBIT "B-1"

> **Any United States person who holds this obligation may be subject to limitations under United States income tax laws, including the limitations provided in Sections 165(j) and 1287(a) of the Internal Revenue Code of 1986, as amended.**

**THIS PROMISSORY NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, UNDER THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, NOR UNDER THE SECURITIES LAWS OF ANY OTHER JURISDICTION. THE PROMISSORY NOTE HAS NOT BEEN AND IS NOT BEING OFFERED FOR SALE IN THE UNITED STATES (OR ANY OF ITS TERRITORIES, POSSESSIONS OR AREAS SUBJECT TO ITS JURISDICTION), OR TO ANY PERSON WHO IS A U.S. PERSON (AS SUCH TERM IS DEFINED IN REGULATION S UNDER THE SECURITIES ACT OF 1933, AS AMENDED). THIS NOTE IS SUBJECT TO SUBSTANTIAL RESTRICTIONS ON RESALE.**

**SERIES A**

## PROMISSORY NOTE

The capitalized and defined terms used in this Promissory Note shall have the following meanings:

HOLDER: _____

       mailing address: _____

                  _____

                  _____

MAKER: BANKEST RECEIVABLES USA LLC, a Florida limited liability company with its principal business address at 999 Brickell Avenue, 11th Floor, Miami, Florida 33131

DATE: _____, 2003        PLACE OF EXECUTION:

PRINCIPAL AMOUNT: _____ ($_____)

STATED INTEREST RATE: The rate of _____ (___%), which rate is equal to the Six-Month London Inter-Bank Offered Rate ("LIBOR") existing on the date this Note is executed plus 1.50%.

GOVERNING LAW: The laws of the State    LOAN AND SECURITY DOCUMENTS:

-1-

of Florida without regard to its conflicts of law principles shall govern all matters hereunder.

Master Credit Agreement and Security Agreement dated as of March 11, 2003.

INITIAL MATURITY DATE: Six (6) Months

SECURITY: The property described in and conveyed or encumbered by the Security Documents.

**FOR VALUE RECEIVED**, Maker hereby promises to pay to Holder, in lawful money of the United States of America at the office of the Holder, or at such other place outside the United States as Holder may designate in writing, the Principal Amount, or so much of the Principal Amount as shall be advanced by Holder to Maker with interest thereon, at the Stated Interest Rate. Interest shall be calculated daily and on the basis of a 360-day year.

Accrued interest and principal shall be paid in a single lump sum on the Maturity Date.

This Note may be repaid at any time without penalty.

1.    Obligations Secured. This Note is made pursuant to that certain Master Credit Agreement between BANKEST RECEIVABLES USA LLC, as Borrower, B.F. SECURITY HOLDINGS, LTD., an Anguilla corporation, as Collateral Agent and the Lender (as defined therein) and the obligations of the Holder and Maker hereunder shall be subject to all the terms and conditions of the Loan and Security Documents.

2.    Maturity Date Extension. Subject to the provisions of this paragraph, the entire Principal Amount of the indebtedness evidenced by this Note, together with all accrued and unpaid interest hereon, shall be due and payable by Maker to Holder on the Initial Maturity Date. Notwithstanding the foregoing, and subject to the terms of this paragraph, Maker may elect to extend the Maturity Date of this Note to Holder for additional periods of six (6) months (each an "Extension Period"). During each such Extension Period the Stated Interest Rate payable under this Note shall be adjusted to reflect the applicable current Stated Interest Rate as of the day immediately preceding the Maturity Date which would otherwise have been applicable hereunder. Maker shall notify Holder of the intention to exercise of the extension by providing a written notice of extension not later than twenty-five (25) days prior to the Maturity Date and, unless Holder shall request full repayment on the Maturity Date in writing not later than ten (10) days prior to the Maturity Date, this Note shall be automatically extended for the Extension Period without further action by Holder or Maker.

3.    Portfolio Debt Compliance. Notwithstanding anything herein to the contrary, this Note is intended to qualify under the provisions of Sections 871 and 881 of the United States Internal Revenue Code of 1986, as amended, relating to the Repeal of Interest on Portfolio Debt Obligations of Certain Foreign Persons and, in accordance therewith, this Note may only be transferred by Holder in accordance with the provisions

of the Master Credit Agreement and the registration-required obligation provisions of Section 163(f) of the Internal Revenue Code of 1986, as amended, and accompanying regulations.

4.    Default.  If default be made in the payment of any installment under this Note or if the Maker violates any of the terms or breaches any of the conditions of the Master Credit Agreement or any other Credit Document, and such default or breach shall remain unpaid or uncured for a period of thirty (30) days, the entire principal sum and accrued interest shall become due and payable after notice of default to Maker at the option of the Holder unless conflicting provisions with respect to notice appear in the Master Credit Agreement, in which case the provisions of the Master Credit Agreement shall control.  Failure to exercise this option shall not constitute a waiver of the right to exercise the same at any other time.  From and after notice of default and until such default is either cured or this Note paid, the principal of this Note and any part thereof, shall bear interest at the Stated Interest Rate, plus five percent (5%), but in no event higher than eighteen percent (18%) per annum (the "Default Rate").

5.    Governing Law; Consent to Jurisdiction and Venue.  This Note shall be governed by, and construed and enforced according to, the laws of the State of Florida, without giving effect to conflicts of laws principles, except where specifically preempted by Federal law.  Any action brought under this Note shall be brought exclusively in the State or Federal Courts of Miami-Dade County, Florida and Maker and Holder hereby submit to jurisdiction in such location.

6.    No Usury Violation Intended.  Notwithstanding anything herein to the contrary, the Holder does not intend to violate any applicable usury laws.  Accordingly, all agreements between Maker and Holder are expressly limited so that in no contingency or event whatsoever, whether by reason of advancement of the proceeds hereof, acceleration of maturity of the unpaid principal balance hereof, or otherwise, shall the amount paid or agreed to be paid to the Holder for the use, forbearance or detention of the money to be advanced hereunder (including all interest on this Note, all loan fees, and the aggregate of all other amounts taken, reserved or charged pursuant to this Note, the Master Credit  Agreement or any Loan Documents, which, under applicable laws is or may be deemed to be interest) exceed the maximum rate allowed by applicable law.  At the time performance of such obligation shall be due, if any circumstances whatsoever shall cause the effective rate of interest upon the sums evidenced hereby to exceed the maximum rate of interest allowed by applicable law, then, the obligation to be fulfilled shall be reduced automatically to the extent necessary to prevent that effective rate of interest from exceeding the maximum rate allowable under applicable law and to the extent that the Holder shall receive any sum which would constitute excessive interest, such sum shall be applied to the reduction of the unpaid principal balance due hereunder and not to the payment of interest or, if such excessive interest exceeds the unpaid balance of principal, the excess shall be refunded to the Maker.  This provision shall control every other provision of all agreements between the Maker and the Holder.

7.   <u>WAIVER OF JURY TRIAL.</u>   **THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF, UNDER OR IN CONNECTION WITH THE LOAN EVIDENCED BY THIS NOTE, AND ANY INCREASES, AMENDMENTS, EXTENSIONS, MODIFICATIONS OR RENEWALS THEREOF, AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION THEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER PARTY.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR HOLDER EXTENDING THIS LOAN, AND ANY INCREASES, AMENDMENTS, EXTENSIONS, MODIFICATIONS OR RENEWALS THERETO.**

IN WITNESS WHEREOF, Maker has executed this Note as of the date first herein above written.

MAKER:

**BANKEST RECEIVABLES USA LLC,**
a Florida limited liability company

By:_____
Print Name:_____
Title:_____

MIAMI 353450.3

## EXHIBIT "B-2"

> **Any United States person who holds this obligation may be subject to limitations under United States income tax laws, including the limitations provided in Sections 165(j) and 1287(a) of the Internal Revenue Code of 1986, as amended.**

**THIS PROMISSORY NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, UNDER THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, NOR UNDER THE SECURITIES LAWS OF ANY OTHER JURISDICTION. THE PROMISSORY NOTE HAS NOT BEEN AND IS NOT BEING OFFERED FOR SALE IN THE UNITED STATES (OR ANY OF ITS TERRITORIES, POSSESSIONS OR AREAS SUBJECT TO ITS JURISDICTION), OR TO ANY PERSON WHO IS A U.S. PERSON (AS SUCH TERM IS DEFINED IN REGULATION S UNDER THE SECURITIES ACT OF 1933, AS AMENDED). THIS NOTE IS SUBJECT TO SUBSTANTIAL RESTRICTIONS ON RESALE.**

**SERIES B**

## PROMISSORY NOTE

The capitalized and defined terms used in this Promissory Note shall have the following meanings:

HOLDER: _____
whose mailing address is c/o _____

MAKER: BANKEST RECEIVABLES USA LLC, a Florida limited liability company with its principal business address at 999 Brickell Avenue, 11th Floor, Miami, Florida 33131

DATE:_____, 2003                     PLACE OF EXECUTION:

PRINCIPAL AMOUNT: _____ ($____ )

STATED INTEREST RATE: The rate of _____ (__%), which rate is equal to the Twelve-Month London Inter-Bank Offered Rate ("LIBOR") existing on the date this Note is executed plus 1.50%.

GOVERNING LAW: The laws of the State of Florida without regard to its conflicts of law principles shall govern all matters hereunder.

LOAN AND SECURITY DOCUMENTS: Master Credit Agreement and Security Agreement dated as of March 11, 2003.

-1-

INITIAL MATURITY DATE: Twelve (12) Months

SECURITY:  The property described in and conveyed  or encumbered by the Security Documents.

**FOR VALUE RECEIVED,** Maker hereby promises to pay to the order of Holder, in lawful money of the United States of America at the office of the Holder, or at such other place outside the United States as Holder may designate in writing, the Principal Amount, or so much of the Principal Amount as shall be advanced by Holder to Maker with interest thereon, at the Stated Interest Rate.  Interest shall be calculated daily and on the basis of a 360-day year.

Accrued interest shall be paid one hundred and eighty five (185) days after the date of issuance, or renewal, as applicable, and additional accrued interest and all outstanding principal shall be paid in a single lump sum on the Maturity Date.

This Note may be repaid at any time without penalty.

1.     <u>Obligations Secured.</u>  This Note is made pursuant to that certain Master Credit Agreement between BANKEST RECEIVABLES USA LLC, as Borrower, B.F. SECURITY HOLDINGS LTD., an Anguilla corporation, as Collateral Agent and the Lender (as defined therein) and the obligations of the Holder and Maker hereunder shall be subject to all the terms and conditions of the Loan and Security Documents.

2.     <u>Maturity Date Extension</u>. Subject to the provisions of this paragraph, accrued interest on the indebtedness evidenced by this Note shall be paid one hundred and eighty five (185) days after the date of issuance, or renewal, as applicable, and additional accrued interest and the entire Principal Amount shall be due and payable by Maker to Holder on the Maturity Date.  Notwithstanding the foregoing, and subject to the terms of this paragraph, Maker may elect to extend the Maturity Date of this Note to Holder for additional periods of twelve (12) months (each an "Extension Period"). During each such Extension Period the Stated Interest Rate payable under this Note shall be adjusted to reflect the applicable current Stated Interest Rate as of the day immediately preceding the Maturity Date which would otherwise have been applicable hereunder. Maker shall notify Holder of the intention to exercise of the extension by providing a written notice of extension not later than twenty-five (25) days prior to the Maturity Date and, unless Holder shall request full repayment on the Maturity Date in writing not later than ten (10) days prior to the Maturity Date, this Note shall be automatically extended for the Extension Period without further action by Holder or Maker.

3.     <u>Portfolio Debt Compliance</u>.  Notwithstanding anything herein to the contrary, this Note is intended to qualify under the provisions of Sections 871 and 881 of the United States Internal Revenue Code of 1986, as amended, relating to the Repeal of Interest on Portfolio Debt Obligations of Certain Foreign Persons and, in accordance therewith, this Note may only be transferred by Holder in accordance with the provisions of the Master Credit Agreement and the registration-required obligation provisions of

Section 163(f) of the Internal Revenue Code of 1986, as amended, and accompanying regulations.

4.     <u>Default.</u>  If default be made in the payment of any installment under this Note or if the Maker violates any of the terms or breaches any of the conditions of the Master Credit Agreement or any other Credit Document, and such default or breach shall remain unpaid or uncured for a period of thirty (30) days, the entire principal sum and accrued interest shall become due and payable after notice of default to Maker at the option of the Holder unless conflicting provisions with respect to notice appear in the Master Credit Agreement, in which case the provisions of the Master Credit Agreement shall control.  Failure to exercise this option shall not constitute a waiver of the right to exercise the same at any other time.  From and after notice of default and until such default is either cured or this Note paid, the principal of this Note and any part thereof, shall bear interest at the Stated Interest Rate, plus five percent (5%) but in no event higher than eighteen percent (18%) per annum (the "Default Rate").

5.     <u>Governing Law; Consent to Jurisdiction and Venue.</u>  This Note shall be governed by, and construed and enforced according to, the laws of the State of Florida, without giving effect to conflicts of laws principles, except where specifically preempted by Federal law.  Any action brought under this Note shall be brought exclusively in the State or Federal Courts of Miami-Dade County, Florida and Maker and Holder hereby submit to jurisdiction in such location.

6.     <u>No Usury Violation Intended.</u>  Notwithstanding anything herein to the contrary, the Holder does not intend to violate any applicable usury laws.  Accordingly, all agreements between Maker and Holder are expressly limited so that in no contingency or event whatsoever, whether by reason of advancement of the proceeds hereof, acceleration of maturity of the unpaid principal balance hereof, or otherwise, shall the amount paid or agreed to be paid to the Holder for the use, forbearance or detention of the money to be advanced hereunder (including all interest on this Note, all loan fees, and the aggregate of all other amounts taken, reserved or charged pursuant to this Note, the Master Credit Agreement or any Loan Documents, which, under applicable laws is or may be deemed to be interest) exceed the maximum rate allowed by applicable law.  At the time performance of such obligation shall be due, if any circumstances whatsoever shall cause the effective rate of interest upon the sums evidenced hereby to exceed the maximum rate of interest allowed by applicable law, then, the obligation to be fulfilled shall be reduced automatically to the extent necessary to prevent that effective rate of interest from exceeding the maximum rate allowable under applicable law and to the extent that the Holder shall receive any sum which would constitute excessive interest, such sum shall be applied to the reduction of the unpaid principal balance due hereunder and not to the payment of interest or, if such excessive interest exceeds the unpaid balance of principal, the excess shall be refunded to the Maker.  This provision shall control every other provision of all agreements between the Maker and the Holder.

7.     <u>WAIVER OF JURY TRIAL.</u>  **THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT**

**EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF, UNDER OR IN CONNECTION WITH THE LOAN EVIDENCED BY THIS NOTE, AND ANY INCREASES, AMENDMENTS, EXTENSIONS, MODIFICATIONS OR RENEWALS THEREOF, AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION THEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER PARTY.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR HOLDER EXTENDING THIS LOAN, AND ANY INCREASES, AMENDMENTS, EXTENSIONS, MODIFICATIONS OR RENEWALS THERETO.**

IN WITNESS WHEREOF, Maker has executed this Note as of the date first herein above written.

MAKER:

**BANKEST RECEIVABLES USA LLC,**
a Florida limited liability company

By:_____
Print Name:_____
Title:_____

MIAMI 353454.3

## EXHIBIT "B-3"
## SERIES A 6-MONTH
## MASTER PROMISSORY NOTE

> **Any United States person who holds interests evidencing Note Participations under this obligation may be subject to limitations under United States income tax laws, including the limitations provided in Sections 165(j) and 1287(a) of the Internal Revenue Code of 1986, as amended.**

**THIS MASTER PROMISSORY NOTE AND THE NOTE PARTICIPATIONS HEREUNDER HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, UNDER THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, NOR UNDER THE SECURITIES LAWS OF ANY OTHER JURISDICTION. THE MASTER PROMISSORY NOTE AND NOTE PARTICIPATIONS HAVE NOT BEEN AND ARE NOT BEING OFFERED FOR SALE IN THE UNITED STATES (OR ANY OF ITS TERRITORIES, POSSESSIONS OR AREAS SUBJECT TO ITS JURISDICTION), OR TO ANY PERSON WHO IS A U.S. PERSON (AS SUCH TERM IS DEFINED IN REGULATION S UNDER THE SECURITIES ACT OF 1933, AS AMENDED). THIS NOTE AND EACH NOTE PARTICIPATION IS SUBJECT TO SUBSTANTIAL RESTRICTIONS ON TRANSFER AND RESALE.**

## MASTER
## PROMISSORY NOTE

The capitalized and defined terms used in this Promissory Note shall have the following meanings:

HOLDER:     Each purchaser of a Note Participation as named and recorded on the records of Holders' Agent as provided herein

HOLDER'S
AGENT:     _____ with its mailing address at _____ _____ (also sometimes referred to as "Lenders' Agent" in the Loan and Security Documents)

MAKER:     BANKEST RECEIVABLES USA LLC, a Florida limited liability company with its principal business address at 999 Brickell Avenue, 11th Floor, Miami, Florida 33131

DATE:     _____, 2003     PLACE OF EXECUTION:

MIAMI 358852.5

PRINCIPAL AMOUNT:  The Principal Amount shall be the principal amount outstanding from time to time pursuant to advances made and recorded in connection with the authenticated facsimile confirmation associated with each advance (each advance being referred to herein as a "Note Participation")

STATED INTEREST RATE:Each Note Participation shall bear interest corresponding to the Stated Interest Rate identified on the authenticated facsimile confirmation associated with each Note Participation, which Stated Interest Rate shall be equal to the Six-Month London Inter-Bank Offered Rate ("LIBOR") existing on the date immediately preceding the date on which each such Note Participation is recorded plus 1.50%.

GOVERNING LAW:  The laws of the State of Florida without regard to its conflicts of law principles shall govern all matters hereunder.

LOAN AND SECURITY DOCUMENTS: Master Credit Agreement and Master Security Agreement each dated as of March 11, 2003, as amended.

MATURITY DATES: The Maturity Dates for each Note Participation shall be set forth on the Master Grid.

SECURITY:  The property described in and conveyed or encumbered by the Security Documents.

**FOR VALUE RECEIVED,** Maker hereby promises to pay to each identified Holder, in lawful money of the United States of America, at the office of the Holders' Agent, or at such other place outside the United States as Holder may designate in writing, the principal amount of each Note Participation, with interest thereon at the Stated Interest Rate as set forth in connection with each such Note Participation as provided in this Note.  Interest shall be calculated on each Note Participation on a daily basis and on the basis of a 360-day year.

Each Note Participation shall be evidenced by an authenticated facsimile confirmation message including the following information:  Name of Holder, Principal Amount of each Note Participation, Issuance Date, initial Maturity Date and Stated Interest Rate and in the format attached hereto.  The combination of a copy of this Note together with the individual facsimile confirmation shall constitute a promissory note which will be deemed to be held under the custody and control of Holders' Agent unless otherwise agreed to as provided herein or unless Holder shall request issuance of a separate note as provided herein.

Without limitation to the foregoing mechanism for authenticated facsimile confirmation of Note Participations under this Note, Maker shall maintain a grid recording for each such Note Participation under this Note (the "Master Grid") and on which Maker shall record (i) the date and principal amount of each Note Participation made , (ii) the name and address of the Holder extending such Note Participation (hereinafter sometimes referred to as an "Note Participant"); and (iii) the Stated Interest Rate for such Note Participation.  Each Note Participation shall be

assigned an Note Participation Identification Number and a Maturity Date which shall also be recorded on the Master Grid together with all repayments and prepayments, if any. Maker shall, upon request, provide copies of the Master Grid to Holders' Agent. In the absence of manifest error or other notice from Maker objecting to entries on the Master Grid, the entries on the Master Grid shall be presumed correct. In the event of any inconsistencies in the Master Grid and each facsimile confirmation for a specific Note Participation, the terms of each such facsimile confirmation shall control. Notwithstanding any such presumption, the failure to (i) record a Note Participation to Maker shall not relieve Maker of the obligation to repay such amounts or (ii) record a repayment shall not obligate Maker to continue to pay such repaid amount to Holder.

Accrued interest on each Note Participation shall be paid in a single lump sum on the applicable Maturity Date of such Note Participation.

This Note, and any and all Note Participations made hereunder, may be repaid at any time without penalty.

1.      Obligations Secured. This Note and each Note Participation hereunder is made pursuant to that certain Master Credit Agreement between BANKEST RECEIVABLES USA LLC, as Borrower, B.F. SECURITY HOLDINGS, LTD., an Anguilla corporation, as Collateral Agent and the Lenders (as defined therein) and the obligations of the Holder and Maker hereunder shall be subject to all the terms and conditions of the Loan and Security Documents, as amended. Each Holder acknowledges and agrees that this Note represents a Master Note evidencing multiple Note Participations by multiple Holders to Maker, all of which Note Participations are on substantially the same terms, except that the issue dates, principal amounts, interest rates and holders may differ. Further, under the terms of the Master Credit Agreement, Maker may borrow additional sums from other lenders evidenced by one or more other notes, all of which will be pari passu with all Holders in connection with any collateral.

2.      Payments made to Holders' Agent. Until otherwise notified in writing by an Note Participant, Maker shall make all payments in connection with each Note Participation directly to Holders' Agent. Holders' Agent shall promptly remit to each Note Participant upon its receipt of any payment from or on behalf of Maker relating to such Note Participation, the amount of such payment, in accordance with the provisions of this Note, the Master Credit Agreement and the other Security Documents. In the event of nonpayment of interest or principal by Maker, each Holder agrees to look solely to Maker for repayment of all interest and principal then due under this Note, it being the intent of the parties that each Holder is acquiring its interest under this Note without recourse to Holders' Agent.

3.      Maturity Date Extension. Subject to the provisions of this paragraph, each Note Participation, together with all accrued and unpaid interest hereon, shall be due and payable by Maker to the registered Holder on the initial Maturity Date of each Note Participation as noted on each Note Participation's facsimile confirmation and as further recorded on the Master Grid. Notwithstanding the foregoing, and subject to the terms of this paragraph, Maker may elect to extend the Maturity Date of any Note Participation for additional periods of six (6) months (each

MIAMI 358852.5

an "Extension Period"). During each such Extension Period the Stated Interest Rate payable under this Note shall be adjusted to reflect the applicable then current Stated Interest Rate as of the day immediately preceding the Maturity Date for such Note Participation which would otherwise have been applicable hereunder. Maker shall notify an Note Participant of the intention to exercise of the extension by providing a written notice of extension with respect to each Note Participation not later than twenty-five (25) days prior to the Maturity Date of such Note Participation and, unless such Note Participant shall request full repayment of the Note Participation on the Maturity Date in writing not later than ten (10) days prior to the Maturity Date, this Note shall be automatically extended for the Extension Period without further action by the Note Participant and Holders' Agent shall reflect such Extension Period on the Master Grid.

4.    Portfolio Debt Compliance. Notwithstanding anything herein to the contrary, this Note and each Note Participation hereunder is intended to qualify under the provisions of Sections 871 and 881 of the United States Internal Revenue Code of 1986, as amended, relating to the Repeal of Interest on Portfolio Debt Obligations of Certain Foreign Persons and, in accordance therewith, this Note and any rights of any Holder in connection with any Note Participation hereunder may only be transferred in accordance with the provisions of the Master Credit Agreement and the registration-required obligation provisions of Section 163(f) of the Internal Revenue Code of 1986, as amended, and accompanying regulations (the "Portfolio Debt Requirements"). By accepting this Note, each Holder agrees that all Note Participations made under this Note shall only be made and administered in a manner which is determined by the Maker's legal and tax counsel to be consistent with the requirements of the Portfolio Debt Requirements.

5.    Rights, Obligations and Liability of Holders' Agent. Holders' Agent shall have the right on behalf of all Holders to take any and all actions it shall deem necessary or appropriate in connection with this Note, including, but not limited to, consenting to any request by Maker or the Collateral Agent to any modification or amendment to the Loan and Security Documents or to the release or modification of any Collateral securing this Note. Holders' Agent approval of any such action, or the failure or refusal of Holders' Agent to take any such action, without having received the approval of one or more Holders shall not be cause for any action against Holders' Agent. In no event however shall Holders' Agent, without a Holder's prior consent to be given or confirmed in writing, exercise any rights which would (i) reduce the amount of or rate of principal or interest on such Holder's Note Participation or (ii) release any party liable on the Note Participation including any guarantor or surety except as may be explicitly provided in the Loan and Security Documents.

Holders' Agent shall, until each Note Participant's interest in each Note Participation has been paid in full (i) hold the Note and all other Loan and Security Documents for the benefit of each Holder (each party shall be deemed to have an interest in this Note), (ii) receive all payments of interest, principal and other sums on account of or with respect to each Note Participation, (iii) promptly remit to each Note Participant his share of interest, principal and other sums received by Holders' Agent on account of or with respect to each Note Participation, as determined in accordance with the provisions of the Master Credit Agreement, (iv) keep full and complete records and accounts of all Note Participations and of all payments on the Note

Participations and furnish each Holder with copies thereof relating solely to such Holder's Note Participation at no charge, with copies of credit information furnished by Maker including financial statements and collateral information, (v) use its best efforts to promptly notify Holders of the occurrences of any material event of default by Maker in the observance or performance of its obligations under the Loan and Security Documents of which the responsible officers of Holders' Agent have actual knowledge, provided that no failure to provide such notice shall result in any liability to Holders' Agent. Except as stated herein, Holders' Agent shall have no duty to obtain or to provide any Note Participant with any information concerning any Note Participation or the financial or other condition of Maker.

By making each Note Participation, each Holder hereby acknowledges that Holders' Agent has made no representations or warranties with respect to (i) any Note Participation, and collectibility of any Note Participation, (ii) the validity, enforceability or legal effect of any of the Loan and Security Documents, (iii) the financial condition of Maker or the accuracy of any information supplied or to be supplied by a Maker. Each Holder assumes all risk of loss in connection with its Note Participation as if Holder had negotiated each Note Participation directly with Maker and had made Note Participations on account thereof directly to Maker.

Neither Holders' Agent nor any of its officers, directors or employees shall be liable to any Holder for any error in judgment or for any action taken or omitted with respect to any Note Participation except to the extent of its gross negligence or willful misconduct. Without limiting the foregoing, Holders' Agent may rely upon the advice of counsel concerning legal matters or upon any written document believed by it to be genuine and correct and to have been sent by the proper person.

Holders' Agent shall not be required to take any collection action with respect to any Note Participation unless indemnified to its satisfaction by such Holder for its cost or share of the cost of such action.

6.    Note Participants Right to Separate Note. At any time an Note Participant may by written notice request the issuance by Maker to such Holder of a separate individual promissory note substantially in the form attached to the Master Credit Agreement. In such case, upon issuance of such separate note by Maker, Holders' Agent shall make appropriate entries in the Master Grid and such issuance or re-issuance of a new separate note shall not be considered a new advance or loan by such Holder. Maker and/or Holders' Agent may condition the issuance of a separate promissory note on the payment of any costs or expenses incurred by either in connection with the issuance of such note by Maker.

7.    Default. If default be made in the payment of any Note Participation under this Note or if the Maker violates any of the terms or breaches any of the conditions of the Master Credit Agreement or any other Security Document, and such payment default, other default or breach shall remain unpaid or uncured for a period of thirty (30) days, the entire principal sum and accrued interest of such Note Participation shall become due and payable after notice of default to Maker at the option of the Note Participant unless conflicting provisions with respect to notice appear in the Master Credit Agreement, in which case the provisions of the Master Credit Agreement shall control. Default declared by any one Note Participant shall not automatically constitute a declaration of Default under the entire Note and all other sums due under this Note with respect to other Note Participations shall not be accelerated. Failure to

exercise this option by an Note Participant shall not constitute a waiver of the right to exercise the same at any other time. From and after notice of default and until such default is either cured or the Note Participation paid, the principal of Note Participation and any part thereof, shall bear interest at the Stated Interest Rate, plus five percent (5%), but in no event higher than eighteen percent (18%) per annum (the "Default Rate"). Notwithstanding anything to the contrary in this paragraph, Collateral Agent under the Master Credit Agreement or any other Security Document may, in the event of a default as provided therein, and in which case if such default or breach shall remain unpaid or uncured for a period of thirty (30) days, the entire principal sum and accrued interest of this Note and all Note Participations hereunder shall become due and payable after notice of default to Maker at the option of the Collateral Agent on behalf of all Holders unless conflicting provisions with respect to notice appear in the Master Credit Agreement, in which case the provisions of the Master Credit Agreement shall control.

8.    No Usury Violation Intended.  Notwithstanding anything herein to the contrary, the Holder does not intend to violate any applicable usury laws.  Accordingly, all agreements between Maker, Holders' Agent and Holders are expressly limited so that in no contingency or event whatsoever, whether by reason of advancement of the proceeds hereof, acceleration of maturity of the unpaid principal balance hereof, or otherwise, shall the amount paid or agreed to be paid to the Holder for the use, forbearance or detention of the money to be advanced hereunder (including all interest on this Note, all Note Participations, all loan fees, and the aggregate of all other amounts taken, reserved or charged pursuant to this Note, the Master Credit Agreement or any Loan Documents, which, under applicable laws is or may be deemed to be interest) exceed the maximum rate allowed by applicable law. At the time performance of such obligation shall be due, if any circumstances whatsoever shall cause the effective rate of interest upon the sums evidenced hereby to exceed the maximum rate of interest allowed by applicable law, then, the obligation to be fulfilled shall be reduced automatically to the extent necessary to prevent that effective rate of interest from exceeding the maximum rate allowable under applicable law and to the extent that the Holder shall receive any sum which would constitute excessive interest, such sum shall be applied to the reduction of the unpaid principal balance due in connection with the corresponding Note Participation hereunder and not to the payment of interest or, if such excessive interest exceeds the unpaid balance of principal of any related Note Participation, the excess shall be refunded to the Maker.  This provision shall control every other provision of all agreements between the Maker and the Holder.

9.    **WAIVER OF JURY TRIAL.  THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF, UNDER OR IN CONNECTION WITH THE LOAN EVIDENCED BY THIS NOTE, AND ANY INCREASES, AMENDMENTS, EXTENSIONS, MODIFICATIONS OR RENEWALS THEREOF, AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION THEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR HOLDER EXTENDING THIS LOAN, AND ANY INCREASES, AMENDMENTS, EXTENSIONS, MODIFICATIONS OR RENEWALS THERETO.**

MIAMI 358852.5

IN WITNESS WHEREOF, Maker has executed this Note as of the date first herein above written.

MAKER:

**BANKEST RECEIVABLES USA LLC,**
a Florida limited liability company


By:_____
Print Name:_____
Title:_____

## EXHIBIT A

### Form of Facsimile Confirmation Notification

To:

Fax No.:

### Re:  Confirmation of Note Participation under Master Promissory Note

Dear Sirs:

We herewith confirm the following Note Participation under that certain Master Promissory Note dated _____ 2003:

Holder Name: _____

Principal Amount of Note Participation:    $_____

Note Participation Issue Date:    ____/____/_____

Note Participation Maturity Date:____/____/_____

Stated Interest Rate: _____%

Bankest Receivables USA LLC

By:_____

Name:_____

Title:_____

MIAMI 358852.5

# NOTE PARTICIPATIONS AND REPAYMENT OF PRINCIPAL AMOUNTS

6-Month
MASTER GRID

Holders' Agent: _____
Maker: Bankest Receivables USA LLC

Date: as of _____, 2003

| Note Participation Identification Number | Date of Note Participation | Name and Address of Holder | Note Participation Amount | Stated Interest Rate | Maturity Date | Repayments and Prepayments | Notation Made By |
|---|---|---|---|---|---|---|---|
| BR-03-A-00001 | | | | | | | |
| BR-03-A-00002 | | | | | | | |
| BR-03-A-00003 | | | | | | | |
| BR-03-A-00004 | | | | | | | |
| BR-03-A-00005 | | | | | | | |
| BR-03-A-00006 | | | | | | | |
| BR-03-A-00007 | | | | | | | |
| BR-03-A-00008 | | | | | | | |

MIAMI 358852.5

| BR-03-A-00009 | | | | | | |
| BR-03-A-00010 | | | | | | |
| BR-03-A-00011 | | | | | | |
| BR-03-A-00012 | | | | | | |
| BR-03-A-00013 | | | | | | |
| BR-03-A-00014 | | | | | | |
| BR-03-A-00015 | | | | | | |
| BR-03-A-00016 | | | | | | |
| BR-03-A-00017 | | | | | | |
| BR-03-A-00018 | | | | | | |
| BR-03-A-00019 | | | | | | |
| BR-03-A-00020 | | | | | | |
| BR-03-A-00021 | | | | | | |
| BR-03-A-00022 | | | | | | |

-10-

| BR-03-B-00009 | BR-03-B-00010 | BR-03-B-00011 | BR-03-B-00012 | BR-03-B-00013 | BR-03-B-00014 | BR-03-B-00015 | BR-03-B-00016 | BR-03-B-00017 | BR-03-B-00018 | BR-03-B-00019 | BR-03-B-00020 | BR-03-B-00021 | BR-03-B-00022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | |

-10-

### EXHIBIT "B-4"
### SERIES B 12-MONTH
### MASTER PROMISSORY NOTE

> Any United States person who holds interests evidencing Note Participations under this obligation may be subject to limitations under United States income tax laws, including the limitations provided in Sections 165(j) and 1287(a) of the Internal Revenue Code of 1986, as amended.

THIS MASTER PROMISSORY NOTE AND THE NOTE PARTICIPATIONS HEREUNDER HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, UNDER THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, NOR UNDER THE SECURITIES LAWS OF ANY OTHER JURISDICTION.  THE MASTER PROMISSORY NOTE AND NOTE PARTICIPATIONS HAVE NOT BEEN AND ARE NOT BEING OFFERED FOR SALE IN THE UNITED STATES (OR ANY OF ITS TERRITORIES, POSSESSIONS OR AREAS SUBJECT TO ITS JURISDICTION), OR TO ANY PERSON WHO IS A U.S. PERSON (AS SUCH TERM IS DEFINED IN REGULATION S UNDER THE SECURITIES ACT OF 1933, AS AMENDED).  THIS NOTE AND EACH NOTE PARTICIPATION IS SUBJECT TO SUBSTANTIAL RESTRICTIONS ON TRANSFER AND RESALE.

### MASTER
### PROMISSORY NOTE

The capitalized and defined terms used in this Promissory Note shall have the following meanings:

HOLDER:  Each purchaser of a Note Participation as named and recorded on the records of Holders' Agent as provided herein

HOLDER'S AGENT:  _____ with its mailing address at _____ _____ (also sometimes referred to as "Lenders' Agent" in the Loan and Security Documents)

MAKER:  BANKEST RECEIVABLES USA LLC, a Florida limited liability company with its principal business address at 999 Brickell Avenue, 11th Floor, Miami, Florida 33131

DATE:  _____, 2003          PLACE OF EXECUTION:

MIAMI 363436.1

PRINCIPAL AMOUNT:    The Principal Amount shall be the principal amount outstanding from time to time pursuant to advances made and recorded in connection with the authenticated facsimile confirmation associated with each advance (each advance being referred to herein as a "Note Participation")

STATED INTEREST RATE:  Each Note Participation shall bear interest corresponding to the Stated Interest Rate identified on the authenticated facsimile confirmation associated with each Note Participation, which Stated Interest Rate shall be equal to the Twleve-Month London Inter-Bank Offered Rate ("LIBOR") existing on the date immediately preceding the date on which each such Note Participation is recorded plus 1.75%.

GOVERNING LAW:  The laws of the State of Florida without regard to its conflicts of law principles shall govern all matters hereunder.

LOAN AND SECURITY DOCUMENTS: Master Credit Agreement and Master Security Agreement each dated as of March 11, 2003, as amended.

MATURITY DATES: The Maturity Dates for each Note Participation shall be set forth on the Master Grid.

SECURITY:  The property described in and conveyed or encumbered by the Security Documents.

**FOR VALUE RECEIVED,** Maker hereby promises to pay to each identified Holder, in lawful money of the United States of America, at the office of the Holders' Agent, or at such other place outside the United States as Holder may designate in writing, the principal amount of each Note Participation, with interest thereon at the Stated Interest Rate as set forth in connection with each such Note Participation as provided in this Note.  Interest shall be calculated on each Note Participation on a daily basis and on the basis of a 360-day year.

Each Note Participation shall be evidenced by an authenticated facsimile confirmation message including the following information:  Name of Holder, Principal Amount of each Note Participation, Issuance Date, initial Maturity Date and Stated Interest Rate and in the format attached hereto.  The combination of a copy of this Note together with the individual facsimile confirmation shall constitute a promissory note which will be deemed to be held under the custody and control of Holders' Agent unless otherwise agreed to as provided herein or unless Holder shall request issuance of a separate note as provided herein.

Without limitation to the foregoing mechanism for authenticated facsimile confirmation of Note Participations under this Note, Maker shall maintain a grid recording for each such Note Participation under this Note (the "Master Grid") and on which Maker shall record (i) the date and principal amount of each Note Participation made , (ii) the name and address of the Holder extending such Note Participation (hereinafter sometimes referred to as an "Note Participant"); and (iii) the Stated Interest Rate for such Note Participation.  Each Note Participation shall be assigned an Note Participation Identification Number and a Maturity Date which shall also be

MIAMI 363436.1

recorded on the Master Grid together with all repayments and prepayments, if any. Maker shall, upon request, provide copies of the Master Grid to Holders' Agent. In the absence of manifest error or other notice from Maker objecting to entries on the Master Grid, the entries on the Master Grid shall be presumed correct. In the event of any inconsistencies in the Master Grid and each facsimile confirmation for a specific Note Participation, the terms of each such facsimile confirmation shall control. Notwithstanding any such presumption, the failure to (i) record a Note Participation to Maker shall not relieve Maker of the obligation to repay such amounts or (ii) record a repayment shall not obligate Maker to continue to pay such repaid amount to Holder.

Accrued interest on each Note Participation shall be paid (i) on such date as is one hundred eighty five (185) days after the date of such Note Participation and (ii) on the applicable Maturity Date of such Note Participation.

This Note, and any and all Note Participations made hereunder, may be repaid at any time without penalty.

1.     Obligations Secured. This Note and each Note Participation hereunder is made pursuant to that certain Master Credit Agreement between BANKEST RECEIVABLES USA LLC, as Borrower, B.F. SECURITY HOLDINGS, LTD., an Anguilla corporation, as Collateral Agent and the Lenders (as defined therein) and the obligations of the Holder and Maker hereunder shall be subject to all the terms and conditions of the Loan and Security Documents, as amended. Each Holder acknowledges and agrees that this Note represents a Master Note evidencing multiple Note Participations by multiple Holders to Maker, all of which Note Participations are on substantially the same terms, except that the issue dates, principal amounts, interest rates and holders may differ. Further, under the terms of the Master Credit Agreement, Maker may borrow additional sums from other lenders evidenced by one or more other notes, all of which will be pari passu with all Holders in connection with any collateral.

2.     Payments made to Holders' Agent. Until otherwise notified in writing by an Note Participant, Maker shall make all payments in connection with each Note Participation directly to Holders' Agent. Holders' Agent shall promptly remit to each Note Participant upon its receipt of any payment from or on behalf of Maker relating to such Note Participation, the amount of such payment, in accordance with the provisions of this Note, the Master Credit Agreement and the other Security Documents. In the event of nonpayment of interest or principal by Maker, each Holder agrees to look solely to Maker for repayment of all interest and principal then due under this Note, it being the intent of the parties that each Holder is acquiring its interest under this Note without recourse to Holders' Agent.

3.     Maturity Date Extension. Subject to the provisions of this paragraph, each Note Participation, together with all accrued and unpaid interest hereon, shall be due and payable by Maker to the registered Holder on the initial Maturity Date of each Note Participation as noted on each Note Participation's facsimile confirmation and as further recorded on the Master Grid. Notwithstanding the foregoing, and subject to the terms of this paragraph, Maker may elect to extend the Maturity Date of any Note Participation for additional periods of twelve (12) months (each an "Extension Period"). During each such Extension Period the Stated Interest Rate

MIAMI 363436.1

payable under this Note shall be adjusted to reflect the applicable then current Stated Interest Rate as of the day immediately preceding the Maturity Date for such Note Participation which would otherwise have been applicable hereunder. Maker shall notify an Note Participant of the intention to exercise of the extension by providing a written notice of extension with respect to each Note Participation not later than twenty-five (25) days prior to the Maturity Date of such Note Participation and, unless such Note Participant shall request full repayment of the Note Participation on the Maturity Date in writing not later than ten (10) days prior to the Maturity Date, this Note shall be automatically extended for the Extension Period without further action by the Note Participant and Holders' Agent shall reflect such Extension Period on the Master Grid.

4.      Portfolio Debt Compliance. Notwithstanding anything herein to the contrary, this Note and each Note Participation hereunder is intended to qualify under the provisions of Sections 871 and 881 of the United States Internal Revenue Code of 1986, as amended, relating to the Repeal of Interest on Portfolio Debt Obligations of Certain Foreign Persons and, in accordance therewith, this Note and any rights of any Holder in connection with any Note Participation hereunder may only be transferred in accordance with the provisions of the Master Credit Agreement and the registration-required obligation provisions of Section 163(f) of the Internal Revenue Code of 1986, as amended, and accompanying regulations (the "Portfolio Debt Requirements"). By accepting this Note, each Holder agrees that all Note Participations made under this Note shall only be made and administered in a manner which is determined by the Maker's legal and tax counsel to be consistent with the requirements of the Portfolio Debt Requirements.

5.      Rights, Obligations and Liability of Holders' Agent. Holders' Agent shall have the right on behalf of all Holders to take any and all actions it shall deem necessary or appropriate in connection with this Note, including, but not limited to, consenting to any request by Maker or the Collateral Agent to any modification or amendment to the Loan and Security Documents or to the release or modification of any Collateral securing this Note. Holders' Agent approval of any such action, or the failure or refusal of Holders' Agent to take any such action, without having received the approval of one or more Holders shall not be cause for any action against Holders' Agent. In no event however shall Holders' Agent, without a Holder's prior consent to be given or confirmed in writing, exercise any rights which would (i) reduce the amount of or rate of principal or interest on such Holder's Note Participation or (ii) release any party liable on the Note Participation including any guarantor or surety except as may be explicitly provided in the Loan and Security Documents.

Holders' Agent shall, until each Note Participant's interest in each Note Participation has been paid in full (i) hold the Note and all other Loan and Security Documents for the benefit of each Holder (each party shall be deemed to have an interest in this Note), (ii) receive all payments of interest, principal and other sums on account of or with respect to each Note Participation, (iii) promptly remit to each Note Participant his share of interest, principal and other sums received by Holders' Agent on account of or with respect to each Note Participation, as determined in accordance with the provisions of the Master Credit Agreement, (iv) keep full and complete records and accounts of all Note Participations and of all payments on the Note Participations and furnish each Holder with copies thereof relating solely to such Holder's Note Participation at no charge, with copies of credit information furnished by Maker including

financial statements and collateral information, (v) use its best efforts to promptly notify Holders of the occurrences of any material event of default by Maker in the observance or performance of its obligations under the Loan and Security Documents of which the responsible officers of Holders' Agent have actual knowledge, provided that no failure to provide such notice shall result in any liability to Holders' Agent. Except as stated herein, Holders' Agent shall have no duty to obtain or to provide any Note Participant with any information concerning any Note Participation or the financial or other condition of Maker.

By making each Note Participation, each Holder hereby acknowledges that Holders' Agent has made no representations or warranties with respect to (i) any Note Participation, and collectibility of any Note Participation, (ii) the validity, enforceability or legal effect of any of the Loan and Security Documents, (iii) the financial condition of Maker or the accuracy of any information supplied or to be supplied by a Maker. Each Holder assumes all risk of loss in connection with its Note Participation as if Holder had negotiated each Note Participation directly with Maker and had made Note Participations on account thereof directly to Maker.

Neither Holders' Agent nor any of its officers, directors or employees shall be liable to any Holder for any error in judgment or for any action taken or omitted with respect to any Note Participation except to the extent of its gross negligence or willful misconduct. Without limiting the foregoing, Holders' Agent may rely upon the advice of counsel concerning legal matters or upon any written document believed by it to be genuine and correct and to have been sent by the proper person.

Holders' Agent shall not be required to take any collection action with respect to any Note Participation unless indemnified to its satisfaction by such Holder for its cost or share of the cost of such action.

6.      Note Participants Right to Separate Note. At any time an Note Participant may by written notice request the issuance by Maker to such Holder of a separate individual promissory note substantially in the form attached to the Master Credit Agreement. In such case, upon issuance of such separate note by Maker, Holders' Agent shall make appropriate entries in the Master Grid and such issuance or re-issuance of a new separate note shall not be considered a new advance or loan by such Holder. Maker and/or Holders' Agent may condition the issuance of a separate promissory note on the payment of any costs or expenses incurred by either in connection with the issuance of such note by Maker.

7.      Default. If default be made in the payment of any Note Participation under this Note or if the Maker violates any of the terms or breaches any of the conditions of the Master Credit Agreement or any other Security Document, and such payment default, other default or breach shall remain unpaid or uncured for a period of thirty (30) days, the entire principal sum and accrued interest of such Note Participation shall become due and payable after notice of default to Maker at the option of the Note Participant unless conflicting provisions with respect to notice appear in the Master Credit Agreement, in which case the provisions of the Master Credit Agreement shall control. Default declared by any one Note Participant shall not automatically constitute a declaration of Default under the entire Note and all other sums due under this Note with respect to other Note Participations shall not be accelerated. Failure to exercise this option by an Note Participant shall not constitute a waiver of the right to exercise the same at any other time. From and after notice of default and until such default is either cured or the Note Participation paid, the principal of Note Participation and any part thereof, shall bear

MIAMI 363436.1

interest at the Stated Interest Rate, plus five percent (5%), but in no event higher than eighteen percent (18%) per annum (the "Default Rate"). Notwithstanding anything to the contrary in this paragraph, Collateral Agent under the Master Credit Agreement or any other Security Document may, in the event of a default as provided therein, and in which case if such default or breach shall remain unpaid or uncured for a period of thirty (30) days, the entire principal sum and accrued interest of this Note and all Note Participations hereunder shall become due and payable after notice of default to Maker at the option of the Collateral Agent on behalf of all Holders unless conflicting provisions with respect to notice appear in the Master Credit Agreement, in which case the provisions of the Master Credit Agreement shall control.

8.    No Usury Violation Intended.   Notwithstanding anything herein to the contrary, the Holder does not intend to violate any applicable usury laws.  Accordingly, all agreements between Maker, Holders' Agent and Holders are expressly limited so that in no contingency or event whatsoever, whether by reason of advancement of the proceeds hereof, acceleration of maturity of the unpaid principal balance hereof, or otherwise, shall the amount paid or agreed to be paid to the Holder for the use, forbearance or detention of the money to be advanced hereunder (including all interest on this Note, all Note Participations, all loan fees, and the aggregate of all other amounts taken, reserved or charged pursuant to this Note, the Master Credit Agreement or any Loan Documents, which, under applicable laws is or may be deemed to be interest) exceed the maximum rate allowed by applicable law.  At the time performance of such obligation shall be due, if any circumstances whatsoever shall cause the effective rate of interest upon the sums evidenced hereby to exceed the maximum rate of interest allowed by applicable law, then, the obligation to be fulfilled shall be reduced automatically to the extent necessary to prevent that effective rate of interest from exceeding the maximum rate allowable under applicable law and to the extent that the Holder shall receive any sum which would constitute excessive interest, such sum shall be applied to the reduction of the unpaid principal balance due in connection with the corresponding Note Participation hereunder and not to the payment of interest or, if such excessive interest exceeds the unpaid balance of principal of any related Note Participation, the excess shall be refunded to the Maker.  This provision shall control every other provision of all agreements between the Maker and the Holder.

9.    **WAIVER OF JURY TRIAL.  THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF, UNDER OR IN CONNECTION WITH THE LOAN EVIDENCED BY THIS NOTE, AND ANY INCREASES, AMENDMENTS, EXTENSIONS, MODIFICATIONS OR RENEWALS THEREOF, AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION THEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR HOLDER EXTENDING THIS LOAN, AND ANY INCREASES, AMENDMENTS, EXTENSIONS, MODIFICATIONS OR RENEWALS THERETO.**

MIAMI 363436.1

IN WITNESS WHEREOF, Maker has executed this Note as of the date first herein above written.

MAKER:

**BANKEST RECEIVABLES USA LLC,**
a Florida limited liability company

By:_____
Print Name:_____
Title:_____

**EXHIBIT A**

**Form of Facsimile Confirmation Notification**

To:

Fax No.:

**Re: Confirmation of Note Participation under Master Promissory Note**

Dear Sirs:

We herewith confirm the following Note Participation under that certain Master Promissory Note dated _____ 2003:

       Holder Name: _____

       Principal Amount of Note Participation:   $_____

       Note Participation Issue Date:   _____ / _____ / _____

       Note Participation Maturity Date: _____ / _____ / _____

       Stated Interest Rate: _____ %

       Bankest Receivables USA LLC

       By:_____

       Name:_____

       Title:_____

MIAMI 363436.1

NOTE PARTICIPATIONS AND REPAYMENT OF PRINCIPAL AMOUNTS

12-Month
MASTER GRID

Holders' Agent:
Maker: Bankest Receivables USA LLC

Date: as of _____, 2003

| Note Participation Identification Number | Date of Note Participation | Name and Address of Holder | Note Participation Amount | Stated Interest Rate | Maturity Date | Repayments and Prepayments | Notation Made By |
|---|---|---|---|---|---|---|---|
| BR-03-B-00001 | | | | | | | |
| BR-03-B-00002 | | | | | | | |
| BR-03-B-00003 | | | | | | | |
| BR-03-B-00004 | | | | | | | |
| BR-03-B-00005 | | | | | | | |
| BR-03-B-00006 | | | | | | | |
| BR-03-B-00007 | | | | | | | |
| BR-03-B-00008 | | | | | | | |

MIAMI 363436.1

# MASTER SECURITY AGREEMENT
## AND
## APPOINTMENT OF COLLATERAL AGENT AGREEMENT

**THIS MASTER SECURITY AGREEMENT AND APPOINTMENT OF COLLATERAL AGENT AGREEMENT** dated as of March 11, 2003, by and among **BANKEST RECEIVABLES USA LLC,** a Florida limited liability company with its principal business address at 999 Brickell Avenue, 11th Floor, Miami, Florida, USA 33131 ("Debtor"), **B.F. SECURITY HOLDINGS LTD.,** an Anguilla corporation (hereinafter sometimes referred to either as the "Collateral Agent," "Secured Party," or "Collateral Agent as Secured Party"), and each of the Lenders to Debtor pursuant to that certain Master Credit Agreement dated of even date herewith.

## <u>RECITALS</u>

A.      Debtor is a newly formed entity which desires to engage in the business of operating a non-regulated commercial factoring business;

B.      In order to finance Debtor's factoring business, Debtor desires to issue certain Promissory Notes (as more particularly defined in the Master Credit Agreement) to investors who shall become the lenders ("Lenders") of the Loan to Debtor under the Master Credit Agreement and which loans are intended to be secured by the Collateral as hereinafter set forth;

C.      In order to secure the Promissory Notes and thus create a valid and subsisting security interest in the accounts receivable and other described assets, and as a condition of the Master Credit Agreement, Debtor by this instrument intends and hereby grants the security interest in favor of the Collateral Agent as Secured Party on behalf of the Lenders pursuant to the terms and conditions herein contained.

NOW, THEREFORE, in consideration of the mutual promises and other covenants herein contained, and for $1.00 and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

Section 1.      <u>Defined Terms</u>. Capitalized Terms shall have the same meaning as used in the Master Credit Agreement except as otherwise defined herein. Unless otherwise defined herein or in the Master Credit Agreement, terms defined in Article 9 of the Uniform Commercial Code of Florida, as amended (the "UCC") are used herein as therein defined.

Section 2.      <u>Grant of Security Interest</u>. Debtor hereby grants to the Secured Party, to secure the payment and performance in full of all of the Obligations, a security interest in and so pledges and assigns to the Secured Party, the following properties, assets and rights of the Debtor, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof (cash and non-cash), (all of the same being hereinafter called the "Collateral"): all of Debtor's rights to the payment of money however evidenced or arising, including each existing and future account, each instrument (including promissory notes), all chattel paper (whether tangible or electronic), all letter-of-credit rights (whether or not the letter

<hr>

1

of credit is evidenced by a writing), all documents (including documents of title and warehouse receipts), and proceeds thereof, any and all supporting obligations regarding any of the foregoing arising out of or in connection with Debtor's purchase of accounts receivable and also including any goods in which Debtor has retained a security interest or which have been reclaimed, returned or repossessed, moneys, or other property of Debtor which may at any time be in the possession of, delivered to, or owed by the Secured Party, including any proceeds or return or unearned premiums of insurance, and all book entries, records and files relating to the foregoing.

Section 3.    Collateral; Use of Loan Proceeds.    At all times during which any of the Promissory Notes evidencing the Loan are outstanding, Debtor has covenanted and agreed under the Master Credit Agreement to limit the use of proceeds from the Loan for the following: (i) the payment of the purchase price of certain accounts receivable, including the purchase of accounts receivable of new clients, accounts receivable which may be assigned by or purchased from Bankest Capital Corp., E.S. Bankest LC, Bankest Finance LLC, or any other third party factor which such accounts receivable may or may not be insured and to make advances and/or other loans to factoring clients; (ii) the purchase of participation interests and otherwise participate in the factoring operations of other factors and the business arrangements with their clients; (iii) to acquire accounts receivable factoring contracts and other assets from various sources; and/or (iv) to engage in the refactoring of any accounts receivable which may be acquired.

Section 4.    Secured Obligations.

(a)    The foregoing security interests are granted to the Collateral Agent as Secured Party on behalf of the Lenders as security for the due, prompt, full and complete payment and performance by Debtor of: (i) all obligations of Debtor under this Agreement and the Master Credit Agreement, including without limitation the payment of all sums due and to become due under the Promissory Notes, as the same become due and payable, whether at maturity, by acceleration or otherwise; (ii) all costs and expenses, including reasonable attorney's fees, incurred by the Secured Party in the collection of the same or in the enforcement of any of the rights of the Secured Party or the Lenders hereunder or under or in connection with the Promissory Notes; (iii) all future advances made by the Secured Party or the Lenders for taxes, levies, insurance and repairs to, or maintenance or protection of, any of the Collateral; and (iv) all other past, present and future, direct or indirect, absolute or contingent, liabilities of Debtor arising under this Agreement, the Master Credit Agreement or any other related document (collectively, the "Secured Obligations")

(b)    All obligations secured hereby shall be secured with the same priority at all times, notwithstanding that any such obligations may be increased or decreased at any time during the term hereof; provided the Secured Party in its sole discretion may elect to enforce any remedies hereunder in any order of priority, partially or fully, as to any particular obligation or collateral, without otherwise affecting its remaining interests hereunder.

Section 5.    Effective Date of Security. The mortgages, assignments, pledges, charges and security interests hereby created or provided to be created shall be effective whether the moneys thereby secured or any part thereof shall be advanced before or after or at the same time as the issue of any of the Promissory Notes intended to be secured thereby or before or after or upon the date of execution of this Agreement.

Section 6.    Defeasance. These presents are upon the express condition that if Debtor shall well and truly pay all moneys payable to the Secured Party and satisfy all obligations secured hereby then these presents and the rights hereby granted shall cease and become null and void and the Collateral shall revert to and revest in Debtor, without any release, acquittance, reconveyance, re-entry or other act or formality whatsoever.

Section 7.    Assignments. Nothing in this Agreement shall be construed as an attempt to assign (i) any representation, warranty, covenant, agreement, account, claim, demand or cause of action which, as a matter of law or by its terms, is non-assignable without the consent of some other person unless such consent shall have been given or (ii) unless and to the extent that any Lenders' Resolution otherwise requires, any agreement or claim as to which all the remedies for the enforcement of same that are available to Debtor would not, as a matter of law, be available to the Secured Party upon any realization proceedings hereunder, provided, however, that the foregoing shall not apply to any such agreement or claim which would be available to the Secured Party, except as otherwise provided in this Section 7. In order, however, that the full value of the items described in clauses (i) and (ii) above may constitute security hereunder and may be realized for the benefit of the Secured Party, Debtor shall at its expense and at the request of the Secured Party or pursuant to any Lenders' Resolution to that effect, in the name of Debtor or otherwise as the Secured Party or Lenders' Resolution may specify, and whether as Secured Party or agent of the Secured Party or otherwise, execute and deliver any necessary financing statements and take all such action and do or cause to be done all such things as shall, in the reasonable opinion of the Secured Party or as specified in such Lenders' Resolution, be necessary or proper in order that the items described in clauses (i) and (ii) above shall inure to the benefit of and be enforceable in favor of the Secured Party and the Lenders.

Section 8.    Attachment. Debtor and the Secured Party agree that it is their intention that the security interests hereby created shall attach immediately to the Collateral in which Debtor has any interest on the date hereof, and, with respect to any after-acquired property, forthwith at the time Debtor shall acquire an interest therein.

Section 9.    Release of Collateral; Substitution of Collateral; Grant of Senior Interests.  Secured Party, acting by and through the Collateral Agent in its sole but reasonable judgment, shall have the sole and exclusive authority to modify the security interest granted hereby including, but not limited to, the authority and power to (a) release all or any part of the Collateral from the lien created hereby; (b) substitute other collateral for the Collateral; and/or (c) subordinate the interests of the Lenders in the Collateral to third party lenders; provided, that any such release of all or any part of the Collateral shall be based upon the determination by the Collateral Agent as Secured Party, in its sole discretion, that such release of Collateral and/or subordination of interests is reasonably likely or reasonably necessary to increase Debtor's cash flow and as such, provide implicit benefits to the Lenders by contributing to the profitability and/or stability of Debtor's business or is reasonable in light of exigent business circumstances of the Debtor and so as to best protect and preserve the interests of the Lenders.

Section 10.    Application of Moneys Held by Secured Party.

(a)    Any moneys received by the Secured Party in respect of the Collateral and all other moneys at any time held by or on behalf of the Secured Party pursuant to any other

3

provisions hereof or of any other instruments or agreements in connection with the Collateral, the disposition of which is not otherwise provided for herein, shall be held by the Secured Party as part of the Collateral and applied by the Secured Party as determined by the Collateral Agent or as otherwise directed by a Lenders' Resolution. Pending such application, such moneys shall be held and dealt with by the Secured Party in accordance with Section 31.

(b)     In no case shall the receipt of moneys by the Secured Party from releases or other dealings with any Collateral be deemed to be a payment hereunder nor shall the lien hereof be affected by reason of such receipt except as herein expressly provided.

Section 11.     Protection of Purchasers. It is hereby declared and agreed that no purchaser or purchasers from, or other person having dealings with, Debtor or the Secured Party or their respective permitted successors or assigns shall be obliged to inquire into the necessity, expediency, authority or regularity of or for any action or concurrence on the part of the Collateral Agent as Secured Party or any release or other instrument taken or given under the provisions of this Section nor be obliged to inquire into the sufficiency of the performance by Debtor of any of the conditions upon which it is or may be entitled to any such action or concurrence or release or other instrument. For the avoidance of doubt it is made clear that the Collateral Agent shall have full authority to deal with the Collateral on behalf of the Lenders as the Secured Party without need of any third party to require or request any Lenders' Resolution.

Section 12.     Proceeds Held in Trust. Subject to the provision of Section 5, all proceeds of any disposition or transfer of the Collateral received or obtained by Debtor at any time shall be held in trust by Debtor for the benefit of the Lenders and forthwith delivered to the Secured Party.

Section 13.     Representations and Warranties. Debtor represents and warrants to Secured Party as set forth below.

(a)     Debtor is the legal and beneficial owner of the Collateral.  No effective financing statement or other instrument similar in effect covering all or any part of the Collateral is on file in any recording office, except such as may have been filed in favor of Secured Party relating to this Agreement.

(b)     Debtor has the exclusive right and claim to the Collateral.

(c)     This Agreement, together with (i) appropriate UCC-1 filings in the states identified in Exhibit "A" attached hereto creates a valid and perfected first-priority security interest in the Collateral, securing the payment of the Secured Obligations, and all filings and other actions necessary or desirable to perfect and protect such security interest have been duly taken or made.

(d)     No authorization, approval or other action by, or notice to or filing with, any governmental authority or regulatory body (other than appropriate UCC-1 filings) is required (i) for the grant by Debtor of the security interest granted hereby or for the execution, delivery or performance of this Agreement by Debtor or (ii) for the perfection of or the exercise by Secured Party of its rights and remedies hereunder.

4

(e)     The execution, delivery and performance by Debtor of this Agreement are within Debtor's company powers, have been duly authorized by all necessary corporate action and do not contravene (i) Debtor's articles of organization or regulations/operating agreement or (ii) any applicable law or contractual restriction binding on or affecting Debtor. This Agreement has been duly executed and delivered by Debtor and is the legal, valid and binding obligation of Debtor, enforceable against Debtor in accordance with its terms, except as the enforceability hereof may be limited by bankruptcy, insolvency, moratorium, reorganization or other similar laws affecting creditors, rights generally.

Section 14.    Further Assurances.

(a)     Debtor agrees that at any time and from time to time, at its own expense, it will promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that Secured Party may request, in order to perfect and protect the security interest granted or purported to be granted hereby or to enable Secured Party to exercise and enforce its rights and remedies hereunder with respect to any Collateral.

(b)     Debtor hereby authorizes Secured Party to file one or more financing or continuation statements, and amendments thereto, relating to all or any part of the Collateral without the signature of Debtor in any filing office in any UCC jurisdiction. A photographic or other reproduction of this Agreement or any financing statement covering the Collateral or any part thereof shall be sufficient as a financing statement where permitted by law.

(c)     Debtor will furnish to Secured Party from time to time such statements and schedules further identifying and describing the Collateral, and such other reports in connection with the Collateral, as Secured Party may reasonably request.

Section 15.    Conditions Precedent to Collateral Agent's Obligation to Act.

(a)     The Collateral Agent shall have the exclusive authority to initiate and continue to pursue any and all actions to enforce the security interest created hereby or otherwise proceed against the Collateral; provided however; that the Lenders, by resolution may require the Collateral Agent to take such actions as set forth in Sections 26 and 43 hereof. The obligation of the Collateral Agent to commence or continue any act, action or proceeding for the purpose of enforcing any rights of the Collateral Agent as Secured Party on behalf of any of the Lenders hereunder shall be conditional upon the Lenders or, if less than all the Lenders request that the Collateral Agent as Secured Party proceed to realize upon the lien hereof and to enforce its rights as contemplated by Sections 26 and 43, then, upon such requesting Lender or Lenders furnishing, when required by notice in writing by the Collateral Agent, sufficient funds to commence or continue such act, action or proceeding and an indemnity reasonably satisfactory to the Collateral Agent to protect and hold harmless the Collateral Agent against the costs, charges and expenses and liabilities to be incurred thereby and any loss and damage it may suffer by reason thereof. Without limiting the generality of the foregoing, such requesting Lender or Lenders shall ensure that the Collateral Agent is furnished with sufficient funds:

(i)     to pay all amounts it is required to pay pursuant to Section 26;

(ii)     to pay amounts necessary to discharge all liens, if any, on the Collateral ranking (or capable of ranking) in priority to the lien hereof or to keep any such prior lien in good standing; and

(iii)     to pay all costs and expenses incurred in connection with the repossession, holding, processing, preparing for disposition and remarketing of the Collateral.

(b)     None of the provisions contained in this Agreement shall require the Collateral Agent as Secured Party to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties or in the exercise of any of its rights or powers unless indemnified as aforesaid.

(c)     The Collateral Agent as Secured Party may, before commencing, or at any time during the continuance of, any such act, action or proceeding, require the Lenders at whose instance it is acting to deposit with the Collateral Agent the Promissory Notes held by it, for which Promissory Notes the Collateral Agent shall issue receipts.

Section 16.     Evidence.

(a)     Whenever it is provided in this Agreement with reference to any application to the Collateral Agent as Secured Party, for the certification and delivery of Promissory Notes, the release of property, the withdrawal of money or other action hereunder or thereunder, that Debtor shall deposit with the Collateral Agent resolutions, certificates or other documents, it is intended that the truth, accuracy and good faith at the time of granting of such application (or on the effective date of any such certificate or document, as the case may be) of the acts and opinions stated in all documents so deposited shall, in each and every such case, be conditions precedent to the right of Debtor to have such application granted.

(b)     The Collateral Agent as Secured Party may rely and shall be protected in acting upon any resolution, certificate or other document believed by it to be genuine and to have been signed, sent or presented by or on behalf of the proper party or parties.   However the Collateral Agent may in its discretion require reasonable evidence of the due execution thereof before acting or relying thereon.

Section 17.     Experts and Advisors. The Secured Party may act and shall be protected in acting in good faith on the opinion or advice of or information obtained from any counsel, accountant or other expert or advisor, whether retained or employed by Debtor or the Secured Party, in relation to any matters arising in the performance of the Secured Party's duties as Collateral Agent.

Section 18.     Documents, Cash, Etc. Held by the Secured Party.

(a)     Pending the application or withdrawal thereof under any of the provisions of this Agreement, all moneys that may at any time be deposited with or held by the Collateral Agent as Secured Party in accordance with the provisions hereof shall be held in an account maintained by the Collateral Agent or invested by the Collateral Agent (and reinvested) in Approved Securities in the same currency as the moneys so deposited and held by the Collateral

Agent for the exclusive benefit of the Lenders, provided that if the Collateral shall revert to Debtor in accordance with Section 6, any amounts to be discharged or any residual amounts shall be paid to Debtor, and the Collateral Agent may deposit the same or any part thereof in the name of the Collateral Agent in any Eligible Institution or for safekeeping with any Eligible Institution.

(b)     For the purposes of immediately applying the proceeds of any securities pursuant to any provision hereof the Collateral Agent as Secured Party may sell such securities from time to time in its discretion at the best prices in the Collateral Agent's opinion obtainable. Unless a Default or an Event of Default (as defined in Article V of the Master Credit Agreement) shall have occurred and be continuing, all interest or other income received by the Collateral Agent as Secured Party in respect of such investments and any profits realized by the Collateral Agent as Secured Party upon any such sale thereof shall belong to Debtor.

Section 19.     Action by Secured Party to Protect Security. After the occurrence of an Event of Default and so long as it is continuing, the Secured Party shall have power to institute and maintain such action and proceedings as it may consider necessary or expedient to prevent any impairment of the lien hereof by any acts of Debtor or of other persons or to preserve or protect its interests and the security and interests of the Lenders in respect of the Collateral or in respect of the income, earnings, rents, issues and profits thereof.

Section 20.     Secured Party Not Required to Give Security. The Collateral Agent shall not be required to give any security in respect of the appointment as Collateral Agent or as Secured Party under this Agreement or otherwise in respect of the Collateral.

Section 21.     Protection of the Lenders and Secured Party. By way of supplement to the provisions of any law for the time being relating to secured parties, it is expressly declared and agreed that, except as otherwise provided herein:

(a)     neither the Collateral Agent as Secured Party nor any Lender shall be liable for or by reason of any failure or defect of title to, or any lien upon, the Collateral;

(b)     neither the Collateral Agent as Secured Party nor any Lender shall be liable for or by reason of any statements of fact or recitals in this Agreement or in the Promissory Notes (except in the certificate of the Secured Party thereon) or be required to verify the same, but all such statements or recitals are and shall be deemed to be made by Debtor;

(c)     nothing herein contained shall cast any obligation on the Secured Party or any Lender to see to or to require evidence of the registration or filing or renewal of this Agreement or any other instrument ancillary or supplemental hereto or any other document or writing by way of mortgage, security interest or charge upon the Collateral or any part thereof or upon any other property of Debtor or to procure any further, other or additional instrument or to do any other act for the continuance of the lien hereof or for giving notice of the existence of such liens or for extending or supplementing the same;

(d)     neither the Secured Party nor any Lender shall be bound to give notice to any person or persons of the execution hereof or of the lien hereof or in any way to interfere with

the conduct of the business of Debtor unless and until the lien hereof shall have become enforceable and the Secured Party shall have become bound to enforce the same;

(e)      the Secured Party and each Lender, on their own behalf or in any other capacity, may buy, lend upon and deal in other securities of Debtor and in the Promissory Notes and generally may contract and enter into financial transactions with Debtor or any affiliate of Debtor without being liable to account for any profit made thereby.

Section 22.    Replacement of the Secured Party. The Secured Party may resign as collateral agent and be discharged from all further duties and liabilities hereunder by giving to Debtor and the Lenders two (2) months prior notice in writing or such shorter notice as Debtor and the Lenders may accept as sufficient. The Lenders shall have power at any time to remove the Collateral Agent as Secured Party from its position and to appoint a new collateral agent to act as secured party in accordance with the proceedings set forth in Section 38 hereof, the costs of which removal and appointment shall be at Debtor's expense. In the event of the Secured Party resigning or being removed as set forth above or being dissolved, becoming bankrupt, going into liquidation or otherwise becoming incapable of acting hereunder, Debtor shall forthwith appoint a new collateral agent to act as secured party unless a new collateral agent has already been appointed by the Lenders; failing such appointment by Debtor, the retiring Collateral Agent or any Lender may apply to a court of competent jurisdiction for the appointment of a new collateral agent to act as secured party; but any new collateral agent so appointed by Debtor or by the Court shall be subject to removal as aforesaid by the Lenders. Any new collateral agent appointed under any provision of this section shall be a corporation or other business entity authorized and qualified to carry on business in its jurisdiction of organization and in every other jurisdiction where such authorization or qualification is necessary to enable it to act as secured party and collateral agent hereunder. On any new appointment the new secured party and collateral agent shall, to the extent permitted by law, be vested with the same powers, rights, duties and responsibilities as if it had been originally named herein as secured party and collateral agent, without any further assurance, conveyance, act or authorization; but there shall be immediately executed, at the expense of Debtor, all such conveyances or other instruments as may, in the opinion of counsel, be necessary or advisable for the purpose of assuring to the new secured party a perfected security interest in the Collateral. Any corporation or business entity into which the Secured Party may be merged or with which it may be consolidated or amalgamated, or any corporation or business entity resulting from any merger, consolidation or amalgamation to which the Secured Party shall be a party, shall be the successor Secured Party under this Agreement without the execution of any instrument or any further act. Except as otherwise provided herein, the costs of resignation and appointment of Secured Parties hereunder shall be at the expense of Debtor.

Section 23.    Acceptance of Duties as Collateral Agent. The Secured Party hereby accepts the duties of Collateral Agent as set forth in this Agreement and agrees to perform the same upon the terms and conditions set forth herein and to hold the Collateral and the fixed and specific mortgages, assignments, pledges, charges and security interests and all the rights, privileges and benefits conferred hereby and by law as Collateral Agent, for the various persons who shall from time to time be Lenders, each of whom shall be owed the relevant legal duties as principals of such Collateral Agent, subject to all the terms and conditions set forth herein.

Section 24.    Legislation Relating to Agreements. The provisions of these Sections 14 through 24 are subject to the provisions of any legislation applicable from time to time relating to Agreements and to the rights, duties and obligations of Secured Parties acting as agents responsible for the safekeeping of property and of corporations or business entities serving as agents to certain principals.

Section 25.    General Liability of Collateral Agent as Secured Party. Notwithstanding anything herein to the contrary, Collateral Agent shall not be liable for any action taken or failure to act in the performance of its duties as Secured Party hereunder unless such action or failure of action shall have resulted from Collateral Agent's gross negligence or willful fraud.

Section 26.    Rights and Duties of Collateral Agent.

(a)    Rights and Duties Generally. The Collateral Agent as Secured Party shall have the rights to take any and all actions necessary or appropriate to fulfill its duties hereunder and/or to otherwise take any and all actions authorized hereby, including, but not limited to, the actions authorized in Section 9 hereof. The Collateral Agent as Secured Party shall have the duty to comply with the terms of any Lenders' Resolution.

(b)    Notice to Lenders. Upon the Collateral Agent becoming aware of the occurrence of any material Event of Default arising under this Agreement or the Master Credit Agreement, and which Event of Default remains uncured beyond any applicable cure period, it shall give notice to the Lenders and each Holder of a Promissory Note of the occurrence of the Event of Default unless the Collateral Agent in good faith determines and reasonably believes that the withholding of such notice is in the best interest of the Lenders and Holders of Promissory Notes and so advises Debtor in writing. Where notice of the occurrence of the Event of Default has been given to Lenders and Holders of Promissory Notes and the Event of Default is thereafter remedied or cured, notice that the Event of Default is no longer continuing shall be given by the Collateral Agent to the Lenders and Holders of Promissory Notes within a reasonable time after the Collateral Agent becomes aware that the Event of Default has been cured.

(b)    Enforcement by the Collateral Agent as Secured Party. Whenever the lien hereof shall have become and so long as it remains enforceable and the Collateral Agent has declared the Promissory Notes to be accelerated, the Collateral Agent as Secured Party may, in its discretion, and, upon the receipt of a Lenders' Resolution requesting it to do so shall, proceed to realize upon the lien hereof and to enforce its rights hereunder by any or all of: (a) proceedings in any court of competent jurisdiction for sale or other disposition of the Collateral or any part thereof; (b) generally any other action, suit, remedy or proceeding authorized or permitted by the Master Credit Agreement, the provisions of this Agreement, including, but not limited to, such remedies set forth in Section 43, or by law or by equity; or (c) any and all remedies allowed secured parties under the provisions of the Uniform Commercial Code of Florida, as amended, provided that in the event of any such acceleration or realization, Debtor shall have the right to pay to the Secured Party all amounts then owing by Debtor hereunder and under the Promissory Notes, and shall be entitled to the release and reconveyance of the Collateral in accordance with Section 6. Whenever the lien hereof shall have become and so long as it remains enforceable and the Collateral Agent has declared the Promissory Notes to be accelerated, the Collateral

9

Agent as Secured Party may file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Lenders and Holders of Promissory Notes lodged in any bankruptcy, winding-up or other judicial proceeding relative to Debtor or the Collateral; and none of the aforesaid remedies for the realization of the lien hereof or for the enforcement of the rights of the Lenders and Holders of Promissory Notes and the Collateral Agent as Secured Party shall be exclusive of or dependent on any other such remedy but any one or more of such remedies may from time to time be exercised independently or in combination. Further, no taking of any judgment or order in respect of any of the covenants contained in this Agreement shall operate as a merger of any of the said covenants or operate to prevent any further judgment or order in respect thereof or any further remedy for the enforcement of the lien hereof.

(c)     Waiver of Default.

(i)     In case the lien hereof shall have become enforceable, and the Collateral Agent as Secured Party shall have determined to realize upon the lien hereof and to enforce its rights hereunder, whether or not it shall have received a Lenders' Resolution in accordance with Section 39, the Lenders and Holders of Promissory Notes shall have the power exercisable by Lenders' Resolution to require the Collateral Agent as Secured Party to waive any default and/or cancel any declaration made by the Collateral Agent as Secured Party under Section 38 and the Collateral Agent shall thereupon waive such default and/or cancel such declaration upon such terms and conditions as such Lenders and Holders of Promissory Notes shall prescribe.  So long as the Secured Party has not become bound as provided in this Section 26 to declare the Promissory Notes accelerated, or to obtain and enforce payment of the Promissory Notes, the Collateral Agent shall have power to waive any default arising hereunder if, in the opinion of the Collateral Agent, the same shall have been cured or adequate satisfaction made therefor, and in such event cancel any declaration therefor made by the Collateral Agent pursuant to Section 26 upon such terms and conditions as the Collateral Agent may deem advisable.

(ii)     If as a result of any default herein, the Secured Party shall have taken any steps pursuant to the provisions of this Agreement to enforce the lien hereof and subsequently such default shall be waived by the Lenders as herein provided or such Event of Default shall be deemed to have been cured or remedied, the Secured Party shall at the request and at the cost of Debtor take such action as may be reasonably required to restore the position which prevailed immediately prior to the taking of such steps by the Secured Party, subject, however, to any condition or conditions imposed by the Lenders in such waiver, if applicable, and neither the Secured Party nor any receiver theretofore appointed by the Secured Party or by a court shall incur any liability by reason of the taking of such steps.

Section 27.     Proof of Promissory Notes. All rights of action hereunder may be enforced by the Secured Party without the possession of any of the Promissory Notes or the production thereof at the trial or other proceedings relative thereto.

Section 28.     Lenders May Direct Secured Party's Action. The Lenders may, by Lenders' Resolution and upon indemnifying the Secured Party to its satisfaction as provided in Section 15, from time to time direct and control the actions of the Secured Party with respect to matters set forth in Section 38. Any and all Lenders' Resolutions purporting to direct and/or

control the actions of the Secured Party shall be executed as set forth in Section 39 by at least sixty six and two thirds percent (66⅔ %) of all of the current Lenders as of the date of any such resolution (a "Lenders' Resolution").

Section 29.    Enforcement by Lenders.

(a)     No Lender shall have any right to institute any action or proceeding or to exercise any other remedy authorized by this Agreement or by law or by equity for the purpose of enforcing payment of the principal or interest on the Promissory Notes or of realizing on the lien hereof, or by reason of jeopardy of security, or for the execution of any power hereunder, unless the Lenders' Resolution referred to in Section 38 and the indemnity referred to in Section 15 shall have been tendered to the Secured Party and the Secured Party shall have failed to act on any such matter within a reasonable time.  In such case but not otherwise, any Lender acting on behalf of itself and all other Lenders shall be entitled to institute proceedings in any court of competent jurisdiction such as the Secured Party might have taken under Section 26, including, without limitation, applying for an order appointing a receiver to take possession of the Collateral or such part thereof as may be the subject matter of such proceedings with any or all of the powers and rights set forth in Section 26 and such additional powers and rights as the court may direct, and, in that event, all of the Lenders shall be deemed to have consented to such proceedings and to any such order; it being understood and intended that no one or more Lenders shall have any right in any manner whatsoever to affect, disturb or prejudice the lien hereof by its or their action, or to enforce any right hereunder or under any Promissory Note, except subject to the conditions and in the manner herein provided, and that all powers and trusts hereunder shall be exercised and all proceedings at law shall be instituted, had and maintained by the Secured Party, except only as herein provided, and in any event for the benefit of all Lenders.

(b)     Notwithstanding, however, any provision of this Agreement, if in any competent jurisdiction neither the Secured Party nor any Lender has the right under the laws of such jurisdiction to act on behalf of the Lenders in connection with the enforcement of any rights hereunder, then each Lender shall have the right to enforce its rights hereunder individually provided that the Lenders shall have first authorized such individual action by Lenders' Resolution.

Section 30.    Lenders May Bid.  The Lenders shall be entitled, at any sale pursuant to the provisions hereof, to credit against any purchase price bid at such sale by such Lender all or any part of the unpaid obligations owing to such Lender and secured by the lien hereof.

Section 31.    Application of Proceeds of Realization of Security.  Except as otherwise provided herein or by law or by the order of a court, the moneys arising from the enforcement of any remedy provided for herein or in any other instrument concerning the Collateral, including, without limitation, the sale or other realization of the whole or any part of the Collateral, whether under any sale by the Collateral Agent as Secured Party or by judicial process or otherwise, shall be held by the Secured Party and, together with any other moneys then or thereafter in the hands of the Collateral Agent as Secured Party available for the purpose, shall be applied by the Collateral Agent as Secured Party as follows:

---

11

(a)     first, to pay all amounts due to the Secured Party hereunder, including, without limitation, amounts in respect of remuneration, expenses, disbursements and advances, including the interest thereon, but not including any amounts in respect of such expenses, disbursements and advances to the extent that the funds used to incur or make such expenses, disbursements or advances were provided to the Secured Party by a Lender or Lenders pursuant to Section 15;

(b)     second, to repay in full all Lenders who provided funds to the Secured Party pursuant to Section 15;

(c)     third, to pay the amount due on the Promissory Notes outstanding first for principal and then for interest, including interest on amounts overdue, and then for premium, if any, and then for any other amounts secured hereunder unless otherwise directed by a Lenders' Resolution and in that case in such order of priority as between principal, interest and premium, if any, and such other amounts as may be directed by such Lenders' Resolution; and

(d)     fourth, the surplus, if any, of such moneys shall be paid to Debtor or its assigns or otherwise in accordance with applicable law.

Section 32.    Distribution of Proceeds. Payments to Lenders pursuant to Section 1.10 of the Master Credit Agreement, shall be made upon presentation thereby of Promissory Notes in the form of Promissory Note attached as Exhibits B-1 or B-2 to the Master Credit Agreement, as the case may be, and any such Promissory Note thereby paid in full shall be surrendered. The Secured Party may in its discretion dispense with presentation and surrender upon such indemnity being given as it shall deem sufficient or the Secured Party may endorse on such Promissory Note a memorandum of payment.

Section 33.    Maintenance of Records. The Secured Party shall create and maintain proper accounts and records showing, without limitation:

(a)     all amounts due to the Secured Party;

(b)     all expenditures made by the Secured Party pursuant to Section 15 or in connection with the repossession, holding, processing, preparing for disposition and remarketing of the Collateral or to pay Liens, if any, on the Collateral ranking (or capable of ranking) in priority to the lien hereof or to keep any such prior Lien in good standing;

(c)     all proceeds arising from the sale or other realization of the whole or any part of the Collateral; and

(d)     all amounts furnished to the Secured Party pursuant to Section 6;

Absent proof of manifest error, the accounts and records maintained by the Secured Party shall constitute prima facie evidence of such matters so recorded therein.

Section 34.    Person Dealing with the Secured Party. No person dealing with the Collateral Agent as Secured Party or any agents thereof shall be concerned to inquire whether the

---

lien hereof has become or remains enforceable or whether the powers which the Collateral Agent as Secured Party is purporting to exercise have become or remain exercisable, or whether any moneys remain due upon the security of this Agreement or under any Promissory Note, or as to the necessity or expediency of the stipulations and conditions subject to which any sale shall be made or otherwise as to the propriety or regularity of any sale or of any other dealing by the Secured Party with the Collateral or any part thereof, or to see to the application of any moneys paid to the Secured Party and, in the absence of fraud on the part of such person, such dealing shall be deemed so far as regards the safety and protection of such person, to be within the powers hereby conferred and to be valid and effective.

Section 35.   Cancellation and Destruction. Prior to the payment of any Promissory Note in full, such Promissory Note shall forthwith be delivered to the Secured Party and after payment thereof, such Promissory Note shall be canceled. All Promissory Notes so canceled or required to be canceled under this or any other provision of this Agreement shall be destroyed by the Secured Party, and if required by Debtor, the Secured Party shall furnish to it a destruction certificate setting forth the numbers and denominations of the Promissory Notes so destroyed.

Section 36.   Non-Presentation of Promissory Notes. In case the Holder of any Promissory Note shall fail to present the same for payment or shall otherwise not accept payment on account thereof as herein provided and give such receipt therefor, if any, as the Secured Party may require, Debtor shall be entitled to deposit with the Secured Party the amount due on such Promissory Note (including interest and interest on overdue interest, if any) in trust to be paid to such Holder upon due presentation for surrender thereof in accordance with the provisions of this Agreement or as otherwise provided herein and thereupon the principal amount of such Promissory Note and interest (including interest on overdue interest, if any) payable on or represented by such Promissory Note in respect whereof such amounts have been deposited shall be deemed to have been paid and such Holder thereof shall thereafter have no right in respect thereof except that of receiving payment of the amounts so deposited with the Secured Party upon due presentation and surrender thereof or as otherwise provided herein, subject always to the provisions of Section 35. Upon receipt of such funds Secured Party shall deposit such monies with a bank of its choosing.

Section 37.   Repayment of Unclaimed Moneys to Debtor. Any moneys deposited under Section 36 and not claimed by and paid to Holders of Promissory Notes as provided in Section 32 within six (6) years after the date of such deposit shall be repaid to Debtor by the Secured Party on demand and thereupon the Secured Party shall be released from all further liability with respect to such moneys and thereafter the Holders of the Promissory Notes in respect of which such moneys were so repaid to Debtor shall have no right in respect of such Promissory Notes except to obtain payment of such moneys from Debtor.

Section 38.   Powers of the Lenders. The Lenders shall have the following powers exercisable from time to time by Lenders' Resolution (as described more particularly in Section 39):

(a)   power to take such actions as are provided for in this Agreement to be taken upon the making of a Lenders' Resolution, or such other actions as may be necessary or desirable in furtherance thereof;

*Bankest Receivables USA LLC - Security Agreement*
*As of 3/11/03*
MIAMI 353562 3

(b)     power to require the Secured Party to refrain from enforcing any of the covenants on the part of Debtor herein contained or to refrain from exercising any of the powers hereby conferred upon the Secured Party or to direct the Secured Party to waive any Default or Event of Default on the part of Debtor on such terms as may be deemed advisable or to cancel any declaration or waiver previously made by the Secured Party hereunder;

(c)     power to remove the Collateral Agent from office and to appoint a new Collateral Agent to act as Secured Party, provided such new Collateral Agent is acceptable to Debtor, acting reasonably;

(d)     power to assent to any judgment, compromise or arrangement by Debtor with any creditor, creditors or class or classes of creditors or with the holders of any shares or securities of Debtor;

(e)     power to require the Secured Party to take any action or to do any other matter or thing which is consented to by Debtor and approved by a Lenders' Resolution;

(f)     power to direct the Secured Party, when the lien hereof shall have become enforceable, as to the manner of sale or disposition of any part of the Collateral;

(g)     power to authorize the Secured Party, in the event of Debtor making an authorized assignment to an assignee, Secured Party or liquidator under applicable bankruptcy or insolvency legislation or legislation relating to winding-up, for and on behalf of the Lenders, and in addition to any claim or debt proved or made for its own account as Secured Party hereunder, to file and prove a claim or debt against Debtor and its property for an amount equivalent to the aggregate amount which may be payable in respect of the Promissory Notes and other amounts payable hereunder, and vote such claim or debt at meetings of creditors and generally act for and on behalf of the Lenders in such proceedings as such resolution or requisition may provide; and

(h)     power to appoint a committee with power and authority (subject to such limitations, if any, as may be prescribed in the resolution of requisition) to exercise, and to direct the Collateral Agent as Secured Party to exercise, on behalf of the Lenders, such of the powers of the Lenders which are exercisable by resolution as shall be included in the resolution appointing the committee.  The resolution making such appointment may provide for payment of the expenses, disbursements and compensation of such committee.  Such committee shall consist of such number of persons as shall be prescribed in the resolution appointing it and the members need not be themselves Lenders.  Every such committee may elect its chairman and may make regulations respecting its quorum, the calling of its meetings, the filing of vacancies occurring in its number and its procedures generally. Such regulations may provide that the committee may act at a meeting at which a quorum is present or may act by minutes signed by the number of members thereof necessary to constitute a quorum.  All acts of any such committee within the authority delegated to it shall be binding upon the Lenders.  Neither the committee nor any member thereof shall be liable for any loss arising from or in connection with any action taken or omitted to be taken by them in good faith.

The grant of the foregoing powers to Lenders shall in no way create any requirement or duty of Secured Party or Debtor to obtain the consent of any Lender to take any actions which,

14

by the terms of this Agreement and/or the Master Credit Agreement, do not expressly require the consent of Lenders.

Section 39.    Execution of Lenders' Resolutions. Any instrument comprising a Lenders' Resolution, and any requisition or other instrument to be executed by Lenders under any provision of this Agreement, may be in any number of concurrent instruments of similar tenor and effect and any Lender may execute the same in person or by agent or attorney duly authorized in writing. The fact and date of execution by any Lender of any power of attorney may be proved by the certificate of any notary public that the person signing the same acknowledged to him the execution thereof or by the affidavit or statutory declaration of a witness to such execution, and such proof shall be conclusive in favor of the Secured Party with regard to any action taken or suffered by the Secured Party under such instrument. No such instrument shall be effective until delivery thereof to the Secured Party. The Secured Party shall give notice to all Lenders of each Lenders' Resolution delivered as aforesaid.

Section 40.    Effect of Lenders' Resolution. Any Lenders' Resolution which has been executed as required by Section 39 by at least sixty six and two thirds percent (66⅔ %) of all of the current Lenders as of the date of any such resolution shall be binding upon the Lenders and each of them, and the Secured Party (subject to the provisions for its indemnity herein contained) shall be bound to give effect thereto accordingly.

Section 41.    Secured Party Appointed Attorney-in-Fact. Debtor hereby irrevocably appoints Secured Party as Debtor's attorney-in-fact, with full authority in the place and stead of Debtor and in the name of Debtor or otherwise, from time to time in Secured Party's discretion upon the occurrence and during the continuation of any Event of Default, to take any action and to execute any instrument in the name of, or on behalf of Debtor, that Secured Party may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation, the following:

(a)    to ask for, demand, collect, sue for, recover, compromise, receive, and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral;

(b)    to file any claims, take any action and institute any proceedings that Secured Party may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of Secured Party with respect to any of the Collateral.

Section 42.    Secured Party's Duties. The powers conferred on Secured Party under this Agreement are solely to protect its interest in the Collateral as Collateral Agent and shall not impose any duty upon it to exercise any such powers, except as provided herein. Secured Party shall be deemed to have exercised reasonable care in the custody and presentation of any Collateral in its possession if such Collateral is accorded treatment substantially equal to the treatment that Secured Party accords its own property.

Section 43.    Remedies. If any Event of Default occurs and shall remain unpaid or uncured for a period of thirty (30) days, Secured Party shall be entitled to exercise the following remedies, in addition to those set forth in Section 26.

Bankest Receivables USA LLC - Security Agreement
As of 3/11/03
MIAMI 353562 3

(a)     Secured Party may exercise in respect of the Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all of the rights and remedies of a secured party in default under the UCC, as in effect at that time, (whether or not the UCC applies to the affected Collateral).

(b)     All cash held by Secured Party as Collateral, all payments received by Secured Party in connection with the Collateral and all cash proceeds received by Secured Party in respect of any sale of, collection from or other realization upon all or any part of the Collateral may, in the discretion of Secured Party, be held by Secured Party as collateral for, and/or then or at any time thereafter applied (after payment of any amounts payable to Secured Party) in whole or in part by Secured Party against, all or any part of the Secured Obligations (as set forth in Section 4 hereof) in such order as Secured Party may elect.  Any surplus of such cash or cash proceeds held by Secured Party and remaining after payment in full of the Secured Obligations shall be paid over to Debtor or to whoever may be lawfully entitled to receive such surplus.

Section 44.    Indemnity and Expenses.

(a)     Debtor agrees to indemnify Secured Party from and against any and all claims, losses and liabilities arising out of or resulting from this Agreement (including, without limitation, enforcement of this Agreement), except claims, losses or liabilities resulting from Secured Party's gross negligence or willful misconduct.

(b)     Debtor will upon demand pay to Secured Party the amount of any and all reasonable expenses, including, without limitation, the reasonable fees and disbursements of its counsel and of any experts and agents, that Secured Party may incur in connection with (i) the custody, preservation, use, operation or sale of, the collection from, or any other realization upon, any of the Collateral, (ii) the exercise or enforcement of any of the rights of Secured Party hereunder, whether in any insolvency or reorganization proceeding or otherwise, or (iii) the failure by Debtor to perform or observe any of the provisions hereof.

Section 45.    Amendments, Waivers, Etc.

(a)     No amendment or waiver of any provision of this Agreement or consent to any departure by Debtor therefrom shall in any event be effective unless the same is in writing and signed by Secured Party, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

(b)     The waiver (whether express or implied) by Secured Party of any breach of any term or condition of this Agreement shall not prejudice any remedy of Secured Party in respect of any continuing or other breach of the terms and conditions hereof and shall not be construed as a bar to any right or remedy that Secured Party would otherwise have on any future occasion under this Agreement.

(c)     No failure to exercise or delay in exercising, on the part of Secured Party, any right, power or privilege under this Agreement shall operate as a waiver thereof or the exercise of any other right, power or privilege.

16

<u>Section 46</u>.    <u>Notices, Etc</u>. All notices and other communications provided for hereunder shall be given in accordance with Section 8.03 of the Master Credit Agreement.

<u>Section 47</u>.    <u>Continuing Security Interest</u>. This Agreement creates a continuing security interest in the Collateral and shall (a) remain in full force and effect until payment in full of the Secured Obligations, (b) be binding upon Debtor and its successors and assigns and (c) inure, together with the rights and remedies of Secured Party hereunder, to the benefit of Secured Party and its successors, transferees and assigns.  Without limiting the generality of the foregoing clause (c), Secured Party may assign or otherwise transfer any or all of its rights and obligations under this Agreement to any other person, and such other person shall thereupon become vested with all of the benefits in respect thereof granted to Secured Party herein or otherwise.  Upon payment in full of the Secured Obligations, the security interest granted hereby shall terminate, and all rights to the Collateral shall revert to Debtor, as provided for in Section 6.  Upon any such termination, Secured Party will, at Debtor's expense, execute and deliver to Debtor such documents as Debtor may reasonably request to evidence such termination.

<u>Section 48</u>.    <u>Governing Law; Terms</u>. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF FLORIDA APPLICABLE TO CONTRACTS MADE AND PERFORMED IN THE STATE OF FLORIDA, EXCEPT TO THE EXTENT THAT THE VALIDITY OR PERFECTION OF THE SECURITY INTEREST HEREUNDER, OR REMEDIES HEREUNDER, IN RESPECT OF ANY PARTICULAR COLLATERAL ARE GOVERNED BY THE LAWS OF A JURISDICTION OTHER THAN THE STATE OF FLORIDA.

**SECURED PARTY AND**
**COLLATERAL AGENT:**

**B.F. SECURITY HOLDINGS LTD.,**
an Anguilla corporation

By: _____

Name: _____

Title: _____


**DEBTOR:**

**BANKEST RECEIVABLES USA LLC**, a
Florida limited liability company


By: _____

Name: _____

Title: _____

# EXHIBIT "A" TO MASTER SECURITY AGREEMENT

## AND APPOINTMENT OF COLLATERAL AGENT AGREEMENT

### <u>UCC FILINGS</u>

1.    Florida.

# STATE OF FLORIDA UNIFORM COMMERCIAL CODE FINANCING STATEMENT FORM

A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON
Mark J. Scheer, Esq.   305-376-6040

B. SEND ACKNOWLEDGEMENT TO:
Mark J. Scheer, Esq.
Gunster, Yoakley & Stewart, P.A.
One Biscayne Tower
2 South Biscayne Boulevard, Suite 3400
Miami, Florida 33131

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

DEBTOR'S EXACT FULL LEGAL NAME – INSERT ONLY ONE DEBTOR NAME (1a OR 1b) – Do Not Abbreviate or Combine Names

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| BANKEST RECEIVABLES USA LLC | | | | | |
| 1b. INDIVIDUAL'S LAST NAME | | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |
| 999 BRICKELL AVENUE, 11TH FLOOR | | MIAMI | FLORIDA | 33131 | USA |
| 1d. TAX ID# | REQUIRED ADD'L INFO RE: ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION LIMITED LIABILITY CO. | 1f. JURISDICTION OF ORGANIZATION FLORIDA | | 1g. ORGANIZATIONAL ID# ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME – INSERT ONLY ONE DEBTOR NAME (2a OR 2b) – Do Not Abbreviate or Combine Names

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 2b. INDIVIDUAL'S LAST NAME | | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | | CITY | STATE | POSTAL CODE | COUNTRY |
| 2d. TAX ID# | REQUIRED ADD'L INFO RE: ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | | 2g. ORGANIZATIONAL ID# ☐ NONE |

SECURED PARTY'S NAME (or Name of TOTAL ASSIGNEE of ASSIGNOR S/P) - INSERT ONLY ONE SECURED PARTY NAME (3a OR 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| B.F. SECURITY HOLDINGS LTD. | | | | |
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| C/O OVERSEAS MANAGEMENT COMPANY (ANGUILLA) LIMITED, VICTORIA HOUSE, P.O. BOX 58 | THE VALLEY | | | ANGUILLA, BRITISH WEST INDIES |

4. This FINANCING STATEMENT covers the following collateral:

Debtor hereby gives Secured Party an unconditional and continuing first priority security interest, lien and right of set-off and hereby assigns, transfers, pledges, conveys and sets over to the Secured Party an interest in the collateral described below, and in all proceeds and products thereof in any form, together with all documents, records and information relating thereto (collectively, the "Collateral"):

A pledge and security interest in all of Debtor's rights to the payment of money however evidenced or arising, including each existing and future account, contract right, general intangible, instrument and document, within the meaning of the Florida Uniform Commercial Code (the "Code"), and in all Debtor's right to the payment of money, including such goods in which Debtor has retained a security interest or which have been reclaimed, returned or repossessed, all documents of title and warehouse receipts, and all book entries, records and files relating to the foregoing, and the proceeds (cash and non-cash) of all the foregoing and any insurance policies relating thereto

5. ALTERNATE DESIGNATION (if applicable)

| LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR |
|---|---|---|
| AG. LIEN | NON-UCC FILING | SELLER/BUYER |

6. Florida DOCUMENTARY STAMP TAX – YOU ARE REQUIRED TO CHECK EXACTLY ONE BOX

☐ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.

☐ Florida Documentary Stamp Tax is not required.

7. OPTIONAL FILER REFERENCE DATA

STANDARD FORM - FORM UCC-1 (REV.12/2001)          Filing Office Copy          Approved by the Secretary of State, State of Florida

## AMENDMENT TO
## (i) MASTER CREDIT AGREEMENT AND
## (ii) MASTER SECURITY AGREEMENT AND APPOINTMENT
## OF COLLATERAL AGENT AGREEMENT

This AMENDMENT TO (i) MASTER CREDIT AGREEMENT AND (ii) MASTER SECURITY AGREEMENT AND APPOINTMENT OF COLLATERAL AGENT AGREEMENT ("Amendment"), is dated as of June 30, 2003, by and between **BANKEST RECEIVABLES USA LLC**, a Florida limited liability company with its principal business address at 999 Brickell Avenue, 11th Floor, Miami, Florida, USA 33131 (hereinafter, the "Borrower"), and **B.F. SECURITY HOLDINGS LTD.**, an Anguilla corporation, acting individually as Collateral Agent and as agent on behalf of the Lenders whose names appear on Exhibit A attached to the Credit Agreement (hereinafter, the "Collateral Agent").

### WITNESSETH:

WHEREAS, Borrower and Collateral Agent entered into both that certain Master Credit Agreement (the "Credit Agreement") and that certain Master Security Agreement and Appointment of Collateral Agent Agreement (the "Security Agreement"), each dated as of March 11, 2003 (collectively, the Credit Agreement and the Security Agreement are hereinafter referred to jointly as the "Master Agreements"); and

WHEREAS, the parties desire to amend the Master Agreements in order to clarify and confirm certain defined terms and to make certain modifications to the Master Agreements so as to facilitate lending transactions contemplated by the provisions of the Master Agreements.

NOW, THEREFORE, in consideration of the mutual agreements and covenants therein and herein contained, and for $10.00 and other good and valuable consideration, the receipt and sufficiency of which is herein established, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      <u>Capitalized Terms</u>.    Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Master Agreements, as applicable.

2.      <u>Amendments to Master Agreements.</u>  The Master Agreements are hereby amended as follows:

(a)      <u>Borrower's Ability to Use Master Promissory Note.</u>  Section 1.02 of the Credit Agreement is hereby amended to permit Borrower to issue one or more Master Promissory Notes, substantially in the form attached hereto as Exhibits B-3 (6-month) and B-4 (12-month) (each a "Master Promissory Note"), providing for one or more agents or representatives of several Lenders to hold such Master Promissory Note on behalf of a Lender Group. In such case, Borrower and the agent or representative of such Lender Group (hereinafter the "Lender Group Representative") shall agree upon the

-1-

mechanisms for maintaining reliable records relating to the identification of the name, address, loan advance amount, maturity date and interest rate relating to each advance due to a member of such Lender Group (such advance hereinafter being referred to as a "Note Participation" and the member of such group being referred to as a "Note Participant"). Such methods may include, but are not limited to, use of a master grid and/or facsimile confirmations. Notwithstanding the foregoing, in no event shall Borrower be required to recognize any Note Participation or entry upon any master grid if such loan or advance may, in Borrower's or Borrower's legal and tax counsel's opinion, be inconsistent with or otherwise jeopardize the qualification of all or any portion of the Loan under the exemption from United States withholding taxes on interest paid to foreign lenders pursuant to the Repeal of Tax on Interest of Non-Resident Alien Individuals and Foreign Corporations Received from Certain Portfolio Debt Investments provisions of Section 871(h) and 881(c) of the Internal Revenue Code of 1986, as amended (the "Code"). In the event Borrower and an agent for a Lender Group use one or more Master Promissory Notes to evidence more than one loan transaction, Borrower and such Lender Group Representative may further agree to such further terms and conditions as shall be necessary or permitted to assure continued qualification for Portfolio Indebtedness treatment under Article III of the Credit Agreement including, but not limited, to such procedures whereby the Lender Group Representative maintains the required certifications and provides to Borrower a master certification, to the extent permitted under applicable Internal Revenue Laws. Notwithstanding anything herein to the contrary, at any time a Note Participant may request the issuance of an individual promissory note in the form of Exhibit B-1 or B-2, as applicable. In such case, Borrower and the agent for the Lender Group Representative shall make a conforming change to any Grid of any Master Promissory Note and such issuance or re-issuance of a new separate note shall not be considered a new advance or loan by such Lender. In no event shall a Lender Group Representative be considered as an agent of the Borrower nor shall a Lender Group Representative have any duty or obligation to monitor or oversee the operations of Borrower except as may be expressly agreed to by and between such Lender Group Representative and the Lender Group Note Participants themselves.

(b)     Amendments if Defined Terms. "Exhibit A, Defined Terms" of the Credit Agreement is hereby amended as follows:

(i)     The term "Promissory Notes" shall be amended to specifically include such one or more Master Promissory Notes issued as provided for in the Credit Agreement and this Amendment.

(ii)     The term "Holder" or "Holders" shall mean, in addition to the Persons entered into the Registers as a holder of any of the Promissory Notes, such Note Participants as shall have advanced monies to Borrower in connection with any Note Participation under a Master Promissory Note.

-2-

(iii)     The term "Lender" or "Lenders" shall have the same meaning as the terms "Holder," "Holders", or "Holder(s) of Promissory Note(s)" as such terms are used throughout the Master Agreements.

(iv)     The term "Lenders Group" shall mean such one or more Note Participants who have loaned or advanced monies to Borrower and whose loan is evidenced by facsimile confirmation in connection with any Note Participations under a Master Promissory Note.

(v)     The term "Insured Receivable" shall mean Receivables for which Borrower has obtained Credit Insurance Protection or Receivables which are receivables due from a state or federal government department, agency or instrumentality.

(vi)     The term "Credit Insurance Protection" means (i) an insurance policy currently in full force and effect and obtained by Borrower which covers the Borrower against credit losses, or (ii) a similar product from a recognized financial services company or institution which, while not denominated as an insurance product, provides similar credit default protection in a manner consistent with credit insurance.   By way of example and not limitation, refactoring arrangements are intended to qualify as, and shall constitute, acceptable alternative credit indemnity products.

(c)     <u>Maturity Date Extension Provisions.</u>     Section 1.02(c) of the Credit Agreement is hereby amended to clarify the provisions relating to maturity date extension procedures consistent with the form of Notes and that a Lender shall provide notice to Borrower of its intention that a Note not be extended at least ten (10) days prior to the applicable Maturity Date rather than twenty (20) days as originally provided in the Credit Agreement.

(d)     <u>References to Separate Promissory Notes Amended.</u>   In connection with the amendment permitting Master Promissory Note transactions, any and all provisions of the Master Agreements which include references to separate Promissory Notes issued to each Lender individually, including Sections 1.02(a), 1.02(b), 1.05 and 1.07 of the Credit Agreement and Section 15(c), 26(b) and 32 of the Security Agreement, are hereby amended to include references to any Master Promissory Note or Notes which are executed by the Borrower pursuant to this Amendment and the Master Agreements.

(e)     <u>Approval of Lenders.</u>   For the purposes of determining whether the required percentage of Lenders have given their consent, approval or mandated any action of the Collateral Agent, in connection with any Lenders' Resolution or otherwise, in the case of any loans evidenced by a Master Promissory Note, the Borrower may rely upon the vote or action of a Lender Group Representative acting on behalf of all Note Participants in such Lenders Group.  Notwithstanding the foregoing, any individual Note Participant in a Lenders Group may notify Borrower of its decision to directly vote as

-3-

part of a Lenders' Resolution, and in which case the vote of the Lenders Group shall be proportionately reduced. Borrower may require confirmation of a Lenders Group Representative's authority to vote on any matters.

(f)     Standard of Care of Collateral Agent. Sections 6.02 and 6.04 of the Credit Agreement and Sections 25 and 44(a) of the Security Agreement are hereby amended to provide that the Collateral Agent in the exercise of its duties shall exercise reasonable good faith business judgment and that the Collateral Agent and its directors, officers, employees and other agents shall not be liable to the Lenders for any action taken or omitted to be taken by it or them under or in connection with this Master Credit Agreement provided that the Collateral Agent and its directors, officers, employees or agents, as applicable, act with what they believe in good faith to be in the reasonable best interests of the Lenders.

(g)     Authority of Collateral Agent to Modify Security Interest or Release Collateral. The authority granted to the Collateral Agent to modify the security interest granted to the Lenders including, but not limited to, the power to release all or any part of the Collateral from the lien created pursuant to the Security Agreement and/or subordinate the interests of the Lenders in the Collateral to third party lenders, is hereby modified and amended provide that Collateral Agent shall not (a) release all or any part of the Collateral from the lien created pursuant to the Master Security Agreement or (b) subordinate the interests of the Lenders in the Collateral to third party lenders, unless such action is undertaken by Collateral Agent with what it believes, in good faith, to be necessary and prudent to protect the overall interests of the Lenders with respect to ultimate repayment of the amounts owed to them and further provided that Collateral Agent shall not release all or any part of the Collateral in favor of another lender unless (1) such lender is an unrelated third party to the Borrower, (2) the loan is in connection with a loan by a recognized institutional lender in an amount not less than $10.0 million, and (3) such institutional lender either agrees to either (A) provide notice of any default under any corresponding loan documents to the Collateral Agent and grants the Collateral Agent an opportunity to cure any such default before taking any action against the Collateral, or (B) enters into an inter-creditor agreement with the Collateral Agent on behalf of the Lenders pursuant to which such lender agrees that notwithstanding any release or subordination, that such lender shall agree to share ratably in the Collateral with the Collateral Agent on behalf of the Lenders as though the lien against the Collateral was shared pari passu with between the parties. Nothing herein shall prevent or impair the Collateral Agent from agreeing to such releases and/or subordination agreements taken by Borrower in connection with arrangements which are structured and intended to mitigate various credit risks such as refactoring arrangements, which risk management techniques are considered by the Collateral Agent to be in the best interests of the Borrower and Lenders in connection with minimizing costs of such credit risks.

(h)     Collateral Ratio Maintenance Requirement. Section 4.01 of the Credit Agreement is amended to add the following new paragraph (d):

*Bankest Receivables USA LLC*
*Amendment to Master Credit and Master Security Agreements*
*6/30/03*
MIAMI 358809.6

"(d)    Insured Receivables Minimum Collateral Ratio.  Maintain Insured Receivables in an amount equal to or greater than the aggregate outstanding amount of the Loan under the Credit Agreement."

(i)    Collateral Agent's Receipt of Payments.  Section 7.02 of the Credit Agreement is amended to modify the first sentence of that Section to clarify the pro rata allocation of all payments amongst Lenders unless otherwise expressly provided in the Credit Agreement or as agreed to and in this regard, such sentence is hereby amended to read as follows:

"Except as expressly provided herein to the contrary and in the absence of receipt of written instructions from 66 2/3% of the Lenders, Collateral Agent shall promptly credit to each of the Lender's account or accounts at Collateral Agent each Lender's pro rata share of each repayment of principal, payment of interest or payment of expenses, taxes, fees or otherwise as of the date of payment."

(j)    Borrower Failure to Pay Expenses.  Section 7.03 of the Credit Agreement is amended to clarify the ability of the Collateral Agent to request advancement or reimbursement of costs and expenses from the Lenders and is hereby amended to read in its entirety as follows:

"In the event of any failure of Borrower to pay any expenses, fees, costs or additional amounts required to be paid under this Master Credit Agreement or the Credit Documents, and Collateral Agent reasonably believes that it is necessary or prudent for Collateral Agent to pay such expenses, fees, costs or additional amounts in order to protect the interests of the Lenders, Collateral Agent may request each of the Lenders to advance a proportionate share of such amounts as may be necessary to pay the same and the Lenders shall remit their applicable portion to the Collateral Agent within ten (10) days after notice and request thereof.  In the event any Lender shall fail or refuse to pay its proportionate share of such amounts or shall fail or refuse to reimburse the Collateral Agent upon request as provided, then the other Lenders may advance such additional sums as necessary and the Collateral Agent may apply any amounts paid by Borrower or held by Collateral Agent first to pay such advances or reimbursements to the other Lenders before any further distribution of monies to such Lender.  In no event shall Collateral Agent request funds from any Lender to pay either principal or interest on any loan or advance by any other Lender under the Master Credit Agreement."

3.  Effect of Amendment.  This Amendment amends the Master Agreements in accordance with their respective terms, and shall be deemed incorporated into the Master Agreements as if this Amendment were set forth in full in the Master Agreements.  The provisions of this Amendment shall govern and control over any conflicting or inconsistent provisions of the Master Agreements.  Except as amended hereunder, all terms and conditions of the Master Agreements shall remain unmodified and in full force

-5-

and effect, which terms and conditions the parties hereby ratify and affirm and the parties further affirm that the Master Agreements are free of any default.

      4.    <u>Notices</u>. All notices and other communications provided for hereunder shall be given in accordance with Section 8.03 of the Master Credit Agreement. Collateral Agent shall provide notice of this Amendment to all existing holders of Notes.

      5.    <u>Severability of Provisions</u>. Any provision of this Amendment which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective solely to the extent of such prohibition or unenforceability without affecting the validity or enforceability of the remainder of this Amendment or the enforceability of such provision in any other jurisdiction.

      6.    <u>Captions</u>. Section captions in this Amendment are included for convenience of reference only and shall not constitute a part of this Amendment for any other purpose.

      7.    <u>Applicable Law, Jurisdiction</u>. This Amendment shall be governed by and construed and enforced in accordance with the laws of the State of Florida. Any action brought in connection with this Amendment shall be brought exclusively in the State or Federal Courts of Miami-Dade County, Florida and all parties hereby submit to jurisdiction in such location.

      8.    <u>Binding Effect</u>. This Master Credit Agreement shall bind and inure to the benefit of Borrower, the Collateral Agent and the Lenders and their respective successors and assigns.

      9.    <u>Counterparts</u>. This Amendment may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Amendment and all of which, when taken together, will be deemed to constitute one and the same Amendment.

<center>[Signature Pages Follow]</center>

<center>-6-</center>

IN WITNESS WHEREOF, the parties hereto have each executed and delivered this Amendment as of the day and year first above written.

**COLLATERAL AGENT:**

**B.F. SECURITY HOLDINGS LTD.,**
an Anguilla corporation

By: _____

Name: _EDUARDO ORLANSKY_

Title: _PRESIDENT_

**BORROWER:**

**BANKEST RECEIVABLES USA LLC, a**
Florida limited liability company

By: _____

Name: _HECTOR ORLANSKY_

Title: _PRESIDENT_

-7-

## EXHIBIT "B"
## TO AMENDMENT


## EXHIBITS "B-3" and "B-4" TO MASTER CREDIT AGREEMENT

### MASTER PROMISSORY NOTES
### 6-Month
### 12-Month

*Bankest Receivables USA LLC*
*Amendment to Master Credit and Master Security Agreements*
*6/30/03*
MIAMI 358809.6

<div align="center">

**EXHIBIT "B-3"**
**SERIES A 6-MONTH**
**MASTER PROMISSORY NOTE**

</div>

---

Any United States person who holds interests evidencing Note Participations under this obligation may be subject to limitations under United States income tax laws, including the limitations provided in Sections 165(j) and 1287(a) of the Internal Revenue Code of 1986, as amended.

---

THIS MASTER PROMISSORY NOTE AND THE NOTE PARTICIPATIONS HEREUNDER HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, UNDER THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, NOR UNDER THE SECURITIES LAWS OF ANY OTHER JURISDICTION. THE MASTER PROMISSORY NOTE AND NOTE PARTICIPATIONS HAVE NOT BEEN AND ARE NOT BEING OFFERED FOR SALE IN THE UNITED STATES (OR ANY OF ITS TERRITORIES, POSSESSIONS OR AREAS SUBJECT TO ITS JURISDICTION), OR TO ANY PERSON WHO IS A U.S. PERSON (AS SUCH TERM IS DEFINED IN REGULATION S UNDER THE SECURITIES ACT OF 1933, AS AMENDED). THIS NOTE AND EACH NOTE PARTICIPATION IS SUBJECT TO SUBSTANTIAL RESTRICTIONS ON TRANSFER AND RESALE.

<div align="center">

**MASTER**
**PROMISSORY NOTE**

</div>

The capitalized and defined terms used in this Promissory Note shall have the following meanings:

HOLDER:     Each purchaser of a Note Participation as named and recorded on the records of Holders' Agent as provided herein

HOLDER'S
AGENT:      _____ with its mailing address at _____
            _____ (also sometimes referred to as "Lenders' Agent" in the Loan and Security Documents)

MAKER:      BANKEST RECEIVABLES USA LLC, a Florida limited liability company with its principal business address at 999 Brickell Avenue, 11th Floor, Miami, Florida 33131

DATE:       _____, 2003              PLACE OF EXECUTION:

MIAMI 358852.5

PRINCIPAL AMOUNT:      The Principal Amount shall be the principal amount outstanding from time to time pursuant to advances made and recorded in connection with the authenticated facsimile confirmation associated with each advance (each advance being referred to herein as a "Note Participation")

STATED INTEREST RATE: Each Note Participation shall bear interest corresponding to the Stated Interest Rate identified on the authenticated facsimile confirmation associated with each Note Participation, which Stated Interest Rate shall be equal to the Six-Month London Inter-Bank Offered Rate ("LIBOR") existing on the date immediately preceding the date on which each such Note Participation is recorded plus 1.50%.

GOVERNING LAW: The laws of the State of Florida without regard to its conflicts of law principles shall govern all matters hereunder.

LOAN AND SECURITY DOCUMENTS: Master Credit Agreement and Master Security Agreement each dated as of March 11, 2003, as amended.

MATURITY DATES: The Maturity Dates for each Note Participation shall be set forth on the Master Grid.

SECURITY: The property described in and conveyed or encumbered by the Security Documents.

**FOR VALUE RECEIVED**, Maker hereby promises to pay to each identified Holder, in lawful money of the United States of America, at the office of the Holders' Agent, or at such other place outside the United States as Holder may designate in writing, the principal amount of each Note Participation, with interest thereon at the Stated Interest Rate as set forth in connection with each such Note Participation as provided in this Note. Interest shall be calculated on each Note Participation on a daily basis and on the basis of a 360-day year.

Each Note Participation shall be evidenced by an authenticated facsimile confirmation message including the following information: Name of Holder, Principal Amount of each Note Participation, Issuance Date, initial Maturity Date and Stated Interest Rate and in the format attached hereto. The combination of a copy of this Note together with the individual facsimile confirmation shall constitute a promissory note which will be deemed to be held under the custody and control of Holders' Agent unless otherwise agreed to as provided herein or unless Holder shall request issuance of a separate note as provided herein.

Without limitation to the foregoing mechanism for authenticated facsimile confirmation of Note Participations under this Note, Maker shall maintain a grid recording for each such Note Participation under this Note (the "Master Grid") and on which Maker shall record (i) the date and principal amount of each Note Participation made , (ii) the name and address of the Holder extending such Note Participation (hereinafter sometimes referred to as an "Note Participant"); and (iii) the Stated Interest Rate for such Note Participation. Each Note Participation shall be

MIAMI 358852.5

assigned an Note Participation Identification Number and a Maturity Date which shall also be recorded on the Master Grid together with all repayments and prepayments, if any. Maker shall, upon request, provide copies of the Master Grid to Holders' Agent. In the absence of manifest error or other notice from Maker objecting to entries on the Master Grid, the entries on the Master Grid shall be presumed correct. In the event of any inconsistencies in the Master Grid and each facsimile confirmation for a specific Note Participation, the terms of each such facsimile confirmation shall control. Notwithstanding any such presumption, the failure to (i) record a Note Participation to Maker shall not relieve Maker of the obligation to repay such amounts or (ii) record a repayment shall not obligate Maker to continue to pay such repaid amount to Holder.

Accrued interest on each Note Participation shall be paid in a single lump sum on the applicable Maturity Date of such Note Participation.

This Note, and any and all Note Participations made hereunder, may be repaid at any time without penalty.

1.      Obligations Secured. This Note and each Note Participation hereunder is made pursuant to that certain Master Credit Agreement between BANKEST RECEIVABLES USA LLC, as Borrower, B.F. SECURITY HOLDINGS, LTD., an Anguilla corporation, as Collateral Agent and the Lenders (as defined therein) and the obligations of the Holder and Maker hereunder shall be subject to all the terms and conditions of the Loan and Security Documents, as amended. Each Holder acknowledges and agrees that this Note represents a Master Note evidencing multiple Note Participations by multiple Holders to Maker, all of which Note Participations are on substantially the same terms, except that the issue dates, principal amounts, interest rates and holders may differ. Further, under the terms of the Master Credit Agreement, Maker may borrow additional sums from other lenders evidenced by one or more other notes, all of which will be pari passu with all Holders in connection with any collateral.

2.      Payments made to Holders' Agent. Until otherwise notified in writing by an Note Participant, Maker shall make all payments in connection with each Note Participation directly to Holders' Agent. Holders' Agent shall promptly remit to each Note Participant upon its receipt of any payment from or on behalf of Maker relating to such Note Participation, the amount of such payment, in accordance with the provisions of this Note, the Master Credit Agreement and the other Security Documents. In the event of nonpayment of interest or principal by Maker, each Holder agrees to look solely to Maker for repayment of all interest and principal then due under this Note, it being the intent of the parties that each Holder is acquiring its interest under this Note without recourse to Holders' Agent.

3.      Maturity Date Extension. Subject to the provisions of this paragraph, each Note Participation, together with all accrued and unpaid interest hereon, shall be due and payable by Maker to the registered Holder on the initial Maturity Date of each Note Participation as noted on each Note Participation's facsimile confirmation and as further recorded on the Master Grid. Notwithstanding the foregoing, and subject to the terms of this paragraph, Maker may elect to extend the Maturity Date of any Note Participation for additional periods of six (6) months (each

MIAMI 358852.5

an "Extension Period"). During each such Extension Period the Stated Interest Rate payable under this Note shall be adjusted to reflect the applicable then current Stated Interest Rate as of the day immediately preceding the Maturity Date for such Note Participation which would otherwise have been applicable hereunder. Maker shall notify an Note Participant of the intention to exercise of the extension by providing a written notice of extension with respect to each Note Participation not later than twenty-five (25) days prior to the Maturity Date of such Note Participation and, unless such Note Participant shall request full repayment of the Note Participation on the Maturity Date in writing not later than ten (10) days prior to the Maturity Date, this Note shall be automatically extended for the Extension Period without further action by the Note Participant and Holders' Agent shall reflect such Extension Period on the Master Grid.

4.   Portfolio Debt Compliance. Notwithstanding anything herein to the contrary, this Note and each Note Participation hereunder is intended to qualify under the provisions of Sections 871 and 881 of the United States Internal Revenue Code of 1986, as amended, relating to the Repeal of Interest on Portfolio Debt Obligations of Certain Foreign Persons and, in accordance therewith, this Note and any rights of any Holder in connection with any Note Participation hereunder may only be transferred in accordance with the provisions of the Master Credit Agreement and the registration-required obligation provisions of Section 163(f) of the Internal Revenue Code of 1986, as amended, and accompanying regulations (the "Portfolio Debt Requirements"). By accepting this Note, each Holder agrees that all Note Participations made under this Note shall only be made and administered in a manner which is determined by the Maker's legal and tax counsel to be consistent with the requirements of the Portfolio Debt Requirements.

5.   Rights, Obligations and Liability of Holders' Agent. Holders' Agent shall have the right on behalf of all Holders to take any and all actions it shall deem necessary or appropriate in connection with this Note, including, but not limited to, consenting to any request by Maker or the Collateral Agent to any modification or amendment to the Loan and Security Documents or to the release or modification of any Collateral securing this Note. Holders' Agent approval of any such action, or the failure or refusal of Holders' Agent to take any such action, without having received the approval of one or more Holders shall not be cause for any action against Holders' Agent. In no event however shall Holders' Agent, without a Holder's prior consent to be given or confirmed in writing, exercise any rights which would (i) reduce the amount of or rate of principal or interest on such Holder's Note Participation or (ii) release any party liable on the Note Participation including any guarantor or surety except as may be explicitly provided in the Loan and Security Documents.

Holders' Agent shall, until each Note Participant's interest in each Note Participation has been paid in full (i) hold the Note and all other Loan and Security Documents for the benefit of each Holder (each party shall be deemed to have an interest in this Note), (ii) receive all payments of interest, principal and other sums on account of or with respect to each Note Participation, (iii) promptly remit to each Note Participant his share of interest, principal and other sums received by Holders' Agent on account of or with respect to each Note Participation, as determined in accordance with the provisions of the Master Credit Agreement, (iv) keep full and complete records and accounts of all Note Participations and of all payments on the Note

Participations and furnish each Holder with copies thereof relating solely to such Holder's Note Participation at no charge, with copies of credit information furnished by Maker including financial statements and collateral information, (v) use its best efforts to promptly notify Holders of the occurrences of any material event of default by Maker in the observance or performance of its obligations under the Loan and Security Documents of which the responsible officers of Holders' Agent have actual knowledge, provided that no failure to provide such notice shall result in any liability to Holders' Agent. Except as stated herein, Holders' Agent shall have no duty to obtain or to provide any Note Participant with any information concerning any Note Participation or the financial or other condition of Maker.

By making each Note Participation, each Holder hereby acknowledges that Holders' Agent has made no representations or warranties with respect to (i) any Note Participation, and collectibility of any Note Participation, (ii) the validity, enforceability or legal effect of any of the Loan and Security Documents, (iii) the financial condition of Maker or the accuracy of any information supplied or to be supplied by a Maker. Each Holder assumes all risk of loss in connection with its Note Participation as if Holder had negotiated each Note Participation directly with Maker and had made Note Participations on account thereof directly to Maker.

Neither Holders' Agent nor any of its officers, directors or employees shall be liable to any Holder for any error in judgment or for any action taken or omitted with respect to any Note Participation except to the extent of its gross negligence or willful misconduct. Without limiting the foregoing, Holders' Agent may rely upon the advice of counsel concerning legal matters or upon any written document believed by it to be genuine and correct and to have been sent by the proper person.

Holders' Agent shall not be required to take any collection action with respect to any Note Participation unless indemnified to its satisfaction by such Holder for its cost or share of the cost of such action.

6.  <u>Note Participants Right to Separate Note</u>. At any time an Note Participant may by written notice request the issuance by Maker to such Holder of a separate individual promissory note substantially in the form attached to the Master Credit Agreement. In such case, upon issuance of such separate note by Maker, Holders' Agent shall make appropriate entries in the Master Grid and such issuance or re-issuance of a new separate note shall not be considered a new advance or loan by such Holder. Maker and/or Holders' Agent may condition the issuance of a separate promissory note on the payment of any costs or expenses incurred by either in connection with the issuance of such note by Maker.

7.  <u>Default.</u> If default be made in the payment of any Note Participation under this Note or if the Maker violates any of the terms or breaches any of the conditions of the Master Credit Agreement or any other Security Document, and such payment default, other default or breach shall remain unpaid or uncured for a period of thirty (30) days, the entire principal sum and accrued interest of such Note Participation shall become due and payable after notice of default to Maker at the option of the Note Participant unless conflicting provisions with respect to notice appear in the Master Credit Agreement, in which case the provisions of the Master Credit Agreement shall control. Default declared by any one Note Participant shall not automatically constitute a declaration of Default under the entire Note and all other sums due under this Note with respect to other Note Participations shall not be accelerated. Failure to

MIAMI 358852.5

exercise this option by an Note Participant shall not constitute a waiver of the right to exercise the same at any other time. From and after notice of default and until such default is either cured or the Note Participation paid, the principal of Note Participation and any part thereof, shall bear interest at the Stated Interest Rate, plus five percent (5%), but in no event higher than eighteen percent (18%) per annum (the "Default Rate"). Notwithstanding anything to the contrary in this paragraph, Collateral Agent under the Master Credit Agreement or any other Security Document may, in the event of a default as provided therein, and in which case if such default or breach shall remain unpaid or uncured for a period of thirty (30) days, the entire principal sum and accrued interest of this Note and all Note Participations hereunder shall become due and payable after notice of default to Maker at the option of the Collateral Agent on behalf of all Holders unless conflicting provisions with respect to notice appear in the Master Credit Agreement, in which case the provisions of the Master Credit Agreement shall control.

8. <u>No Usury Violation Intended.</u> Notwithstanding anything herein to the contrary, the Holder does not intend to violate any applicable usury laws. Accordingly, all agreements between Maker, Holders' Agent and Holders are expressly limited so that in no contingency or event whatsoever, whether by reason of advancement of the proceeds hereof, acceleration of maturity of the unpaid principal balance hereof, or otherwise, shall the amount paid or agreed to be paid to the Holder for the use, forbearance or detention of the money to be advanced hereunder (including all interest on this Note, all Note Participations, all loan fees, and the aggregate of all other amounts taken, reserved or charged pursuant to this Note, the Master Credit Agreement or any Loan Documents, which, under applicable laws is or may be deemed to be interest) exceed the maximum rate allowed by applicable law. At the time performance of such obligation shall be due, if any circumstances whatsoever shall cause the effective rate of interest upon the sums evidenced hereby to exceed the maximum rate of interest allowed by applicable law, then, the obligation to be fulfilled shall be reduced automatically to the extent necessary to prevent that effective rate of interest from exceeding the maximum rate allowable under applicable law and to the extent that the Holder shall receive any sum which would constitute excessive interest, such sum shall be applied to the reduction of the unpaid principal balance due in connection with the corresponding Note Participation hereunder and not to the payment of interest or, if such excessive interest exceeds the unpaid balance of principal of any related Note Participation, the excess shall be refunded to the Maker. This provision shall control every other provision of all agreements between the Maker and the Holder.

9. **WAIVER OF JURY TRIAL. THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF, UNDER OR IN CONNECTION WITH THE LOAN EVIDENCED BY THIS NOTE, AND ANY INCREASES, AMENDMENTS, EXTENSIONS, MODIFICATIONS OR RENEWALS THEREOF, AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION THEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR HOLDER EXTENDING THIS LOAN, AND ANY INCREASES, AMENDMENTS, EXTENSIONS, MODIFICATIONS OR RENEWALS THERETO.**

IN WITNESS WHEREOF, Maker has executed this Note as of the date first herein above written.

MAKER:

**BANKEST RECEIVABLES USA LLC,**
a Florida limited liability company


By:_____
Print Name:_____
Title:_____

# EXHIBIT A

## Form of Facsimile Confirmation Notification

To:

Fax No.:

**Re:  Confirmation of Note Participation under Master Promissory Note**

Dear Sirs:

We herewith confirm the following Note Participation under that certain Master Promissory Note
dated _____ 2003:

Holder Name:                    _____

Principal Amount of Note Participation:    $_____

Note Participation Issue Date:    ____/____/_____

Note Participation Maturity Date:____/____/_____

Stated Interest Rate:            _____%

Bankest Receivables USA LLC

By:_____

Name:_____

Title:_____

MIAMI 358852.5

NOTE PARTICIPATIONS AND REPAYMENT OF PRINCIPAL AMOUNTS

6-Month
MASTER GRID

Holders' Agent: _____
Maker: Bankest Receivables USA LLC

Date: as of _____, 2003

| Note Participation Identification Number | Date of Note Participation | Name and Address of Holder | Note Participation Amount | Stated Interest Rate | Maturity Date | Repayments and Prepayments | Notation Made By |
|---|---|---|---|---|---|---|---|
| BR-03-A-00001 | | | | | | | |
| BR-03-A-00002 | | | | | | | |
| BR-03-A-00003 | | | | | | | |
| BR-03-A-00004 | | | | | | | |
| BR-03-A-00005 | | | | | | | |
| BR-03-A-00006 | | | | | | | |
| BR-03-A-00007 | | | | | | | |
| BR-03-A-00008 | | | | | | | |

MIAMI 358852.5

| BR-03-A-00009 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| BR-03-A-00010 | | | | | | | | | | |
| BR-03-A-00011 | | | | | | | | | | |
| BR-03-A-00012 | | | | | | | | | | |
| BR-03-A-00013 | | | | | | | | | | |
| BR-03-A-00014 | | | | | | | | | | |
| BR-03-A-00015 | | | | | | | | | | |
| BR-03-A-00016 | | | | | | | | | | |
| BR-03-A-00017 | | | | | | | | | | |
| BR-03-A-00018 | | | | | | | | | | |
| BR-03-A-00019 | | | | | | | | | | |
| BR-03-A-00020 | | | | | | | | | | |
| BR-03-A-00021 | | | | | | | | | | |
| BR-03-A-00022 | | | | | | | | | | |

-12-

MIAMI 358852.5

<div align="center">

**EXHIBIT "B-4"**
**SERIES B 12-MONTH**
**MASTER PROMISSORY NOTE**

</div>

> Any United States person who holds interests evidencing Note
> Participations under this obligation may be subject to limitations
> under United States income tax laws, including the limitations
> provided in Sections 165(j) and 1287(a) of the Internal Revenue Code
> of 1986, as amended.

THIS MASTER PROMISSORY NOTE AND THE NOTE PARTICIPATIONS
HEREUNDER HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE
UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, UNDER THE
SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, NOR UNDER THE
SECURITIES LAWS OF ANY OTHER JURISDICTION. THE MASTER
PROMISSORY NOTE AND NOTE PARTICIPATIONS HAVE NOT BEEN AND ARE
NOT BEING OFFERED FOR SALE IN THE UNITED STATES (OR ANY OF ITS
TERRITORIES, POSSESSIONS OR AREAS SUBJECT TO ITS JURISDICTION), OR
TO ANY PERSON WHO IS A U.S. PERSON (AS SUCH TERM IS DEFINED IN
REGULATION S UNDER THE SECURITIES ACT OF 1933, AS AMENDED). THIS
NOTE AND EACH NOTE PARTICIPATION IS SUBJECT TO SUBSTANTIAL
RESTRICTIONS ON TRANSFER AND RESALE.

<div align="center">

**MASTER**
**PROMISSORY NOTE**

</div>

The capitalized and defined terms used in this Promissory Note shall have the following meanings:

HOLDER:       Each purchaser of a Note Participation as named and recorded on the records of
              Holders' Agent as provided herein

HOLDER'S      _____ with its mailing address at _____
AGENT:        _____ (also sometimes referred to as "Lenders' Agent" in
              the Loan and Security Documents)

MAKER:        BANKEST RECEIVABLES USA LLC, a Florida limited liability company with
              its principal business address at 999 Brickell Avenue, 11th Floor, Miami, Florida
              33131

DATE:         _____, 2003              PLACE OF EXECUTION:

PRINCIPAL AMOUNT:   The Principal Amount shall be the principal amount outstanding from time to time pursuant to advances made and recorded in connection with the authenticated facsimile confirmation associated with each advance (each advance being referred to herein as a "Note Participation")

STATED INTEREST RATE: Each Note Participation shall bear interest corresponding to the Stated Interest Rate identified on the authenticated facsimile confirmation associated with each Note Participation, which Stated Interest Rate shall be equal to the Twleve-Month London Inter-Bank Offered Rate ("LIBOR") existing on the date immediately preceding the date on which each such Note Participation is recorded plus 1.75%.

GOVERNING LAW: The laws of the State of Florida without regard to its conflicts of law principles shall govern all matters hereunder.

LOAN AND SECURITY DOCUMENTS: Master Credit Agreement and Master Security Agreement each dated as of March 11, 2003, as amended.

MATURITY DATES: The Maturity Dates for each Note Participation shall be set forth on the Master Grid.

SECURITY: The property described in and conveyed or encumbered by the Security Documents.

**FOR VALUE RECEIVED**, Maker hereby promises to pay to each identified Holder, in lawful money of the United States of America, at the office of the Holders' Agent, or at such other place outside the United States as Holder may designate in writing, the principal amount of each Note Participation, with interest thereon at the Stated Interest Rate as set forth in connection with each such Note Participation as provided in this Note. Interest shall be calculated on each Note Participation on a daily basis and on the basis of a 360-day year.

Each Note Participation shall be evidenced by an authenticated facsimile confirmation message including the following information: Name of Holder, Principal Amount of each Note Participation, Issuance Date, initial Maturity Date and Stated Interest Rate and in the format attached hereto. The combination of a copy of this Note together with the individual facsimile confirmation shall constitute a promissory note which will be deemed to be held under the custody and control of Holders' Agent unless otherwise agreed to as provided herein or unless Holder shall request issuance of a separate note as provided herein.

Without limitation to the foregoing mechanism for authenticated facsimile confirmation of Note Participations under this Note, Maker shall maintain a grid recording for each such Note Participation under this Note (the "Master Grid") and on which Maker shall record (i) the date and principal amount of each Note Participation made , (ii) the name and address of the Holder extending such Note Participation (hereinafter sometimes referred to as an "Note Participant"); and (iii) the Stated Interest Rate for such Note Participation. Each Note Participation shall be assigned an Note Participation Identification Number and a Maturity Date which shall also be

MIAMI 363436.1

recorded on the Master Grid together with all repayments and prepayments, if any. Maker shall, upon request, provide copies of the Master Grid to Holders' Agent. In the absence of manifest error or other notice from Maker objecting to entries on the Master Grid, the entries on the Master Grid shall be presumed correct. In the event of any inconsistencies in the Master Grid and each facsimile confirmation for a specific Note Participation, the terms of each such facsimile confirmation shall control. Notwithstanding any such presumption, the failure to (i) record a Note Participation to Maker shall not relieve Maker of the obligation to repay such amounts or (ii) record a repayment shall not obligate Maker to continue to pay such repaid amount to Holder.

Accrued interest on each Note Participation shall be paid (i) on such date as is one hundred eighty five (185) days after the date of such Note Participation and (ii) on the applicable Maturity Date of such Note Participation.

This Note, and any and all Note Participations made hereunder, may be repaid at any time without penalty.

1.   <u>Obligations Secured</u>. This Note and each Note Participation hereunder is made pursuant to that certain Master Credit Agreement between BANKEST RECEIVABLES USA LLC, as Borrower, B.F. SECURITY HOLDINGS, LTD., an Anguilla corporation, as Collateral Agent and the Lenders (as defined therein) and the obligations of the Holder and Maker hereunder shall be subject to all the terms and conditions of the Loan and Security Documents, as amended. Each Holder acknowledges and agrees that this Note represents a Master Note evidencing multiple Note Participations by multiple Holders to Maker, all of which Note Participations are on substantially the same terms, except that the issue dates, principal amounts, interest rates and holders may differ. Further, under the terms of the Master Credit Agreement, Maker may borrow additional sums from other lenders evidenced by one or more other notes, all of which will be pari passu with all Holders in connection with any collateral.

2.   <u>Payments made to Holders' Agent</u>. Until otherwise notified in writing by an Note Participant, Maker shall make all payments in connection with each Note Participation directly to Holders' Agent. Holders' Agent shall promptly remit to each Note Participant upon its receipt of any payment from or on behalf of Maker relating to such Note Participation, the amount of such payment, in accordance with the provisions of this Note, the Master Credit Agreement and the other Security Documents. In the event of nonpayment of interest or principal by Maker, each Holder agrees to look solely to Maker for repayment of all interest and principal then due under this Note, it being the intent of the parties that each Holder is acquiring its interest under this Note without recourse to Holders' Agent.

3.   <u>Maturity Date Extension</u>. Subject to the provisions of this paragraph, each Note Participation, together with all accrued and unpaid interest hereon, shall be due and payable by Maker to the registered Holder on the initial Maturity Date of each Note Participation as noted on each Note Participation's facsimile confirmation and as further recorded on the Master Grid. Notwithstanding the foregoing, and subject to the terms of this paragraph, Maker may elect to extend the Maturity Date of any Note Participation for additional periods of twelve (12) months (each an "Extension Period"). During each such Extension Period the Stated Interest Rate

MIAMI 363436.1

payable under this Note shall be adjusted to reflect the applicable then current Stated Interest Rate as of the day immediately preceding the Maturity Date for such Note Participation which would otherwise have been applicable hereunder. Maker shall notify an Note Participant of the intention to exercise of the extension by providing a written notice of extension with respect to each Note Participation not later than twenty-five (25) days prior to the Maturity Date of such Note Participation and, unless such Note Participant shall request full repayment of the Note Participation on the Maturity Date in writing not later than ten (10) days prior to the Maturity Date, this Note shall be automatically extended for the Extension Period without further action by the Note Participant and Holders' Agent shall reflect such Extension Period on the Master Grid.

4.  Portfolio Debt Compliance. Notwithstanding anything herein to the contrary, this Note and each Note Participation hereunder is intended to qualify under the provisions of Sections 871 and 881 of the United States Internal Revenue Code of 1986, as amended, relating to the Repeal of Interest on Portfolio Debt Obligations of Certain Foreign Persons and, in accordance therewith, this Note and any rights of any Holder in connection with any Note Participation hereunder may only be transferred in accordance with the provisions of the Master Credit Agreement and the registration-required obligation provisions of Section 163(f) of the Internal Revenue Code of 1986, as amended, and accompanying regulations (the "Portfolio Debt Requirements"). By accepting this Note, each Holder agrees that all Note Participations made under this Note shall only be made and administered in a manner which is determined by the Maker's legal and tax counsel to be consistent with the requirements of the Portfolio Debt Requirements.

5.  Rights, Obligations and Liability of Holders' Agent. Holders' Agent shall have the right on behalf of all Holders to take any and all actions it shall deem necessary or appropriate in connection with this Note, including, but not limited to, consenting to any request by Maker or the Collateral Agent to any modification or amendment to the Loan and Security Documents or to the release or modification of any Collateral securing this Note. Holders' Agent approval of any such action, or the failure or refusal of Holders' Agent to take any such action, without having received the approval of one or more Holders shall not be cause for any action against Holders' Agent. In no event however shall Holders' Agent, without a Holder's prior consent to be given or confirmed in writing, exercise any rights which would (i) reduce the amount of or rate of principal or interest on such Holder's Note Participation or (ii) release any party liable on the Note Participation including any guarantor or surety except as may be explicitly provided in the Loan and Security Documents.

Holders' Agent shall, until each Note Participant's interest in each Note Participation has been paid in full (i) hold the Note and all other Loan and Security Documents for the benefit of each Holder (each party shall be deemed to have an interest in this Note), (ii) receive all payments of interest, principal and other sums on account of or with respect to each Note Participation, (iii) promptly remit to each Note Participant his share of interest, principal and other sums received by Holders' Agent on account of or with respect to each Note Participation, as determined in accordance with the provisions of the Master Credit Agreement, (iv) keep full and complete records and accounts of all Note Participations and of all payments on the Note Participations and furnish each Holder with copies thereof relating solely to such Holder's Note Participation at no charge, with copies of credit information furnished by Maker including

MIAMI 363436.1

financial statements and collateral information, (v) use its best efforts to promptly notify Holders of the occurrences of any material event of default by Maker in the observance or performance of its obligations under the Loan and Security Documents of which the responsible officers of Holders' Agent have actual knowledge, provided that no failure to provide such notice shall result in any liability to Holders' Agent.  Except as stated herein, Holders' Agent shall have no duty to obtain or to provide any Note Participant with any information concerning any Note Participation or the financial or other condition of Maker.

By making each Note Participation, each Holder hereby acknowledges that Holders' Agent has made no representations or warranties with respect to (i) any Note Participation, and collectibility of any Note Participation, (ii) the validity, enforceability or legal effect of any of the Loan and Security Documents, (iii) the financial condition of Maker or the accuracy of any information supplied or to be supplied by a Maker.  Each Holder assumes all risk of loss in connection with its Note Participation as if Holder had negotiated each Note Participation directly with Maker and had made Note Participations on account thereof directly to Maker.

Neither Holders' Agent nor any of its officers, directors or employees shall be liable to any Holder for any error in judgment or for any action taken or omitted with respect to any Note Participation except to the extent of its gross negligence or willful misconduct.  Without limiting the foregoing, Holders' Agent may rely upon the advice of counsel concerning legal matters or upon any written document believed by it to be genuine and correct and to have been sent by the proper person.

Holders' Agent shall not be required to take any collection action with respect to any Note Participation unless indemnified to its satisfaction by such Holder for its cost or share of the cost of such action.

6.     Note Participants Right to Separate Note.  At any time an Note Participant may by written notice request the issuance by Maker to such Holder of a separate individual promissory note substantially in the form attached to the Master Credit Agreement. In such case, upon issuance of such separate note by Maker, Holders' Agent shall make appropriate entries in the Master Grid and such issuance or re-issuance of a new separate note shall not be considered a new advance or loan by such Holder.  Maker and/or Holders' Agent may condition the issuance of a separate promissory note on the payment of any costs or expenses incurred by either in connection with the issuance of such note by Maker.

7.     Default.  If default be made in the payment of any Note Participation under this Note or if the Maker violates any of the terms or breaches any of the conditions of the Master Credit Agreement or any other Security Document, and such payment default, other default or breach shall remain unpaid or uncured for a period of thirty (30) days, the entire principal sum and accrued interest of such Note Participation shall become due and payable after notice of default to Maker at the option of the Note Participant unless conflicting provisions with respect to notice appear in the Master Credit Agreement, in which case the provisions of the Master Credit Agreement shall control.  Default declared by any one Note Participant shall not automatically constitute a declaration of Default under the entire Note and all other sums due under this Note with respect to other Note Participations shall not be accelerated.  Failure to exercise this option by an Note Participant shall not constitute a waiver of the right to exercise the same at any other time.  From and after notice of default and until such default is either cured or the Note Participation paid, the principal of Note Participation and any part thereof, shall bear

MIAMI 363436.1

interest at the Stated Interest Rate, plus five percent (5%), but in no event higher than eighteen percent (18%) per annum (the "Default Rate"). Notwithstanding anything to the contrary in this paragraph, Collateral Agent under the Master Credit Agreement or any other Security Document may, in the event of a default as provided therein, and in which case if such default or breach shall remain unpaid or uncured for a period of thirty (30) days, the entire principal sum and accrued interest of this Note and all Note Participations hereunder shall become due and payable after notice of default to Maker at the option of the Collateral Agent on behalf of all Holders unless conflicting provisions with respect to notice appear in the Master Credit Agreement, in which case the provisions of the Master Credit Agreement shall control.

8. <u>No Usury Violation Intended.</u> Notwithstanding anything herein to the contrary, the Holder does not intend to violate any applicable usury laws. Accordingly, all agreements between Maker, Holders' Agent and Holders are expressly limited so that in no contingency or event whatsoever, whether by reason of advancement of the proceeds hereof, acceleration of maturity of the unpaid principal balance hereof, or otherwise, shall the amount paid or agreed to be paid to the Holder for the use, forbearance or detention of the money to be advanced hereunder (including all interest on this Note, all Note Participations, all loan fees, and the aggregate of all other amounts taken, reserved or charged pursuant to this Note, the Master Credit Agreement or any Loan Documents, which, under applicable laws is or may be deemed to be interest) exceed the maximum rate allowed by applicable law. At the time performance of such obligation shall be due, if any circumstances whatsoever shall cause the effective rate of interest upon the sums evidenced hereby to exceed the maximum rate of interest allowed by applicable law, then, the obligation to be fulfilled shall be reduced automatically to the extent necessary to prevent that effective rate of interest from exceeding the maximum rate allowable under applicable law and to the extent that the Holder shall receive any sum which would constitute excessive interest, such sum shall be applied to the reduction of the unpaid principal balance due in connection with the corresponding Note Participation hereunder and not to the payment of interest or, if such excessive interest exceeds the unpaid balance of principal of any related Note Participation, the excess shall be refunded to the Maker. This provision shall control every other provision of all agreements between the Maker and the Holder.

9. **WAIVER OF JURY TRIAL. THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF, UNDER OR IN CONNECTION WITH THE LOAN EVIDENCED BY THIS NOTE, AND ANY INCREASES, AMENDMENTS, EXTENSIONS, MODIFICATIONS OR RENEWALS THEREOF, AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION THEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR HOLDER EXTENDING THIS LOAN, AND ANY INCREASES, AMENDMENTS, EXTENSIONS, MODIFICATIONS OR RENEWALS THERETO.**

IN WITNESS WHEREOF, Maker has executed this Note as of the date first herein above written.

MAKER:

**BANKEST RECEIVABLES USA LLC,**
a Florida limited liability company

By:_____
Print Name:_____
Title:_____

MIAMI 363436.1

# EXHIBIT A

## Form of Facsimile Confirmation Notification

To:

Fax No.:

**Re:  Confirmation of Note Participation under Master Promissory Note**

Dear Sirs:

We herewith confirm the following Note Participation under that certain Master Promissory Note dated _____ 2003:

Holder Name: _____

Principal Amount of Note Participation:     $_____

Note Participation Issue Date:     ____/____/_____

Note Participation Maturity Date:____/____/_____

Stated Interest Rate:     _____%

Bankest Receivables USA LLC

By:_____

Name:_____

Title:_____

MIAMI 363436.1

# NOTE PARTICIPATIONS AND REPAYMENT OF PRINCIPAL AMOUNTS

## 12-Month
## MASTER GRID

Holders' Agent:
Maker: Bankest Receivables USA LLC

Date: as of _____, 2003

| Note Participation Identification Number | Date of Note Participation | Name and Address of Holder | Note Participation Amount | Stated Interest Rate | Maturity Date | Repayments and Prepayments | Notation Made By |
|---|---|---|---|---|---|---|---|
| BR-03-B-00001 | | | | | | | |
| BR-03-B-00002 | | | | | | | |
| BR-03-B-00003 | | | | | | | |
| BR-03-B-00004 | | | | | | | |
| BR-03-B-00005 | | | | | | | |
| BR-03-B-00006 | | | | | | | |
| BR-03-B-00007 | | | | | | | |
| BR-03-B-00008 | | | | | | | |

MIAMI 363436.1

| | | | | | | |
|---|---|---|---|---|---|---|
| BR-03-B-00009 | | | | | | |
| BR-03-B-00010 | | | | | | |
| BR-03-B-00011 | | | | | | |
| BR-03-B-00012 | | | | | | |
| BR-03-B-00013 | | | | | | |
| BR-03-B-00014 | | | | | | |
| BR-03-B-00015 | | | | | | |
| BR-03-B-00016 | | | | | | |
| BR-03-B-00017 | | | | | | |
| BR-03-B-00018 | | | | | | |
| BR-03-B-00019 | | | | | | |
| BR-03-B-00020 | | | | | | |
| BR-03-B-00021 | | | | | | |
| BR-03-B-00022 | | | | | | |

-10-

## AMENDED EXHIBIT "D" TO MASTER CREDIT AGREEMENT

## JOINDER, APPOINTMENT OF COLLATERAL AGENT AND CONSENT

LENDER: _____       PRINCIPAL AMOUNT: _____

ADDRESS: _____      ISSUE DATE: _____

_____      NOTE SERIES: _____

The undersigned Lender hereby acknowledges that:

• Lender has received a copy of that certain Master Credit Agreement dated March 11, 2003 (the "Master Credit Agreement") by and among BANKEST RECEIVABLES USA LLC, a Florida limited liability company with its principal business address at 999 Brickell Avenue, 11th Floor, Miami, Florida, USA 33131 (herein "Borrower"); and B.F. SECURITY HOLDINGS LTD., an Anguilla corporation, as Collateral Agent ("Collateral Agent"), as amended by that certain Amendment to Master Security Agreement and Master Security Agreement and Appointment of Collateral Agent Agreement dated June 30, 2003 (the "Amendment to Master Agreements").

• Lender has received a copy of that certain Security Agreement dated March 11, 2003 by and between Borrower and Collateral Agent, and a copy of the Amendment to Master Agreements, including Collateral Agent's disclosure of its relation to and affiliation with Borrower.

• Lender acknowledges and understands that each Promissory Note and Note Participation issued by Borrower under the Master Credit Agreement, including the Promissory Note or Note Participation issued to Lender shall be treated pari passu with all other Promissory Notes and Note Participations issued by Borrower and all such Promissory Notes and Note Participations shall be secured by collateral equally and ratably according to the principal amount thereof and the interest from time to time owing thereon, regardless of the Issue Date or interest terms of each separate Promissory Notes and Note Participations.

• Lender acknowledges and agrees that as a condition to the extension of credit to Borrower under the Master Credit Agreement and the issuance of a Promissory Note or Note Participation to Lender, Borrower and the other lenders under the Master Credit Agreement require that Lender appoint B.F. Security Holdings Ltd. as the Collateral Agent to administer the Security Interests for the benefit of all lenders pursuant to all of the terms and conditions of the Loan Documents.

NOW THEREFORE, Lender agrees as follows:

By execution and delivery of this Joinder, Appointment of Collateral Agent and Consent Lender hereby:

1.    Joins in the execution and agrees to the terms of the Master Credit Agreement and each and every other Loan or Credit Document relating to the Loan (as defined in the Master Credit Agreement), including the Amendment to Master Agreements;

2.    Appoints the Collateral Agent to act as its agent in connection with the Loan and the Collateral thereof and acknowledges that Collateral Agent shall act as agent for all of the Lenders under the Master Credit Agreement with respect to the administration of the Collateral for the Loan including but not limited to taking such actions with respect to Collateral as set forth in the Master Credit Agreement and Master Security Agreement; and

3.    Expressly consents to the appointment of Collateral Agent as Lender's attorney-in-fact in connection with the Master Credit Agreement and all other loan documents related thereto.

IN WITNESS WHEREOF, Lender has executed this Joinder, Appointment of Collateral Agent and Consent this __ day of _____, 200__.


_____          _____

Witness                                                    Lender


_____

Witnesses

**Bankest Receivables USA LLC**

## STANDARD COLLECTION FACTORING AGREEMENT

Gentlemen:

The following shall constitute the terms upon which Bankest Receivables USA LLC ("Bankest" and "we" and/or "us") shall act as sole factor of _____ ("company" and "you" and/or "your") (see section 11 for the definition of certain capitalized terms):

### SECTION 1    Sales and Approval of Receivables

1.1      You hereby sell, assign and transfer to us and we hereby purchase from you all of your now outstanding and hereafter created or acquired Receivables with full power to collect and otherwise deal therewith as the sole exclusive owner thereof.  You further sell and assign to us all of your interest in the goods represented by the Receivables and in all goods that may be returned by customers, all rights as an unpaid vendor or lienor, all rights of stoppage in transit, replevin and reclamation relating thereto, all rights in and to all insurance or security therefor and guarantees thereof, and all rights against third parties with respect thereto.  Any goods so recovered or returned shall be set aside, marked with our name and held for our account as owner.  You shall notify us promptly of all such returned or recovered goods.

1.2      (a)      You will submit for our written approval the amount, terms of payment and delivery, and all other conditions of each prospective sale and each approved sale shall be made only in accordance with such approval, which may be withdrawn at any time before actual delivery of the merchandise or rendition of the services to the customer.  We may, in our sole judgment, and from time to time, establish credit lines for sales to some or all of your customers and, provided sales to such customers are on your normal selling terms which we have approved, all sales to such customers within the established credit lines will be Approved Receivables provided that delivery or performance is completed while the credit line remains in effect.  All of our credit approvals will be in writing.

(b)      We reserve the right to amend or withdraw a credit approval or credit line at any time by advice to you, which advice will be promptly confirmed in writing.  A credit line will be automatically suspended (i.e. withdrawn) during any period that the customer is 60 or more days past due.  We will reinstate any suspended credit line in accordance with, and subject to, our credit line approval guidelines.

(c)      Without limiting the foregoing, our approval shall automatically be withdrawn if any terms are changed or if delivery is made more than thirty days after the approved delivery date, or more than thirty days after the date of approval if no delivery date is specified.  If the amount of any sale is increased without our prior written consent, our approval shall apply only to the original amount approved.

(d)      We shall have no liability to you or to any customer for our refusal to credit approve a Receivable or establish a credit line or for our withdrawal of a credit approval or a credit line.

(e)      You shall provide us written schedules of all Receivables sold or assigned to us pursuant to this Agreement on forms provided by us to you, together with copies of all customer invoices or the equivalent and upon our request, conclusive evidence of delivery for all goods sold or rendition of services and all other information or documents we may require.  Your failure to execute and deliver such schedules shall not affect the assignment of your Receivables hereunder.

(f)      All invoices shall be marked indicating that the Receivable evidenced by the invoice is owned by and payable, in United States Dollars, to us in a manner satisfactory to us.  All remittances, checks, bills and other proceeds of sales shall be our property and you authorize us to endorse our name and your name on any and all checks or other forms of remittances received in payment of Receivables whenever such endorsement is deemed to be necessary by us to effect collection thereof.  If any remittances are made directly to you, you shall hold the same in trust for our benefit and you will immediately deliver to us the identical checks, documents, instruments or moneys received in the same form as received by you.  You have been advised that we may employ a lockbox account for the deposit of remittances received in payment of Receivables, and you consent thereto.

1.3      We shall assume the Credit Risk on all Approved Receivables.  We shall have full recourse to you for all other reasons (other than Credit Risk), which cause us not to collect Receivables sold by you to us. We shall have full recourse to you on all Non-Approved Receivables.

_____                                        _____
        Bankest                                                              Company

1.4     In the event that monies shall, at any time, be owing from one of your customers for both Approved Receivables and Non-Approved Receivables, we may, and you so authorize and approve us to, apply all payments received first in reduction of the outstanding Approved Receivables.

**SECTION 2      Purchase Price, Commissions, Advances, and Reserve**

2.1     We will purchase each Receivable at the Net Amount of thereof, less our commission thereon (hereinafter, the "Purchase Price"). "Net Amount" shall mean the face amount less all returns, discounts (which may, at our option, be calculated on the longest or shortest terms), credits or allowances of any nature at any time issued, owing, claimed by customers, granted or outstanding, and out-of-pocket expenses as set forth in the Reimbursable Out-of-Pocket Costs Schedule Attachment as Schedule A.

2.2     Upon the Payment Date (as defined in Section 11.8 hereof) with respect to any Receivable, the Purchase Price, less any debits or reserves, shall be credited to your account.  The credit balance of the account shall be available for distribution to you, at your request.  We may retain from sums payable to you a reserve, which reserve may be revised from time to time at our discretion, in order to provide for Customer Disputes, possible credit losses on Non-Approved Receivables, sums owing to us for goods/services purchased by you from any other firm or company factored or otherwise financed by us, and the Obligations.  Amounts in your account shall also be subject to reduction for payment of any charges or credits which may be charged to you pursuant to this Agreement, and shall be given as security for all of your Obligations hereunder or arising from any other agreement between you and us.

2.3     From time to time during the term of this Agreement and prior to the Payment Date, upon you request and in our sole discretion, we may advance funds ("Advance") to you up to _____ percent (__%) of the Purchase Price of a Receivable.  Any Advance in excess of the percentages set forth above shall be deemed to be an Overadvance, which Overadvance shall be made in our sole discretion and also subject to this Agreement.

2.4     All Advances, Overadvances and other credits, charges or payments specified herein, except for charges which reduce the Purchase Price pursuant to Section 2.2, shall be charged to your account.  You shall be charged interest in the amount as and at such times as herein provided on the outstanding balance of the account.  The account shall be reduced by all payments received with respect to a Receivable.

2.5     You will pay us a factoring commission, which commission shall be due and payable at the time of our acceptance of the purchase or assignment of each Receivable, in the form of a Discount in the amount of the Applicable Factoring Commission Percentage of each Receivable purchased by us (the "Applicable Factoring Commission Percentage").  The Applicable Factoring Commission Percentage is predicated upon the number of days the Receivables remain outstanding and shall be the percentage set forth on the Factoring Commission Schedule attached hereto as Schedule B.  The minimum factoring commission on each invoice shall be Five Dollars ($5.00).

2.6     During each contract year (the 12 months immediately following the date hereof or any anniversary thereof you agree to pay to us Factoring Commissions aggregating at least _____ thousand Dollars ($__,000), ("Minimum Annual Commission"). If during any month the aggregate factoring commissions paid by you is less than ___ thousand dollars ($__,000) ("Minimum Monthly Commission"), then you shall pay to us, or we may charge your account with an amount equal to the difference between the Minimum Monthly Commission and the factoring commission actually paid during that month (the "Deficiency Charge").  At such time as you exceed the Minimum Annual Commission, the Minimum Monthly Commission shall be waived for the remainder of the contract year and the Deficiency Charges paid during said contract year shall be applied against subsequent factoring commission charges incurred during said contract year.

2.7     We will charge you account our standard wire transfer fee on all wire transfers, and you will reimburse us for exchanges on checks, charges for returned items and all other back charges and other charges and costs as stipulated in the Reimbursable Out-of-Pocket Costs Schedule attached hereto. We may also, at our option, charge your account for all amounts owing by you to us under this Agreement and all other Obligations.

2.8     In the case of sales to customers located outside the continental United States, you shall pay to us and we may conclusively charge to your account (a) the amount of all fees, costs and commissions charged to us by our correspondent foreign factors to which we re-assign or through which we re-factor such sales, (b) all premiums on any credit insurance obtained by us in connection therewith, (c) all currency rate differentials, currency conversion

Bankest                                                                                                   Company

charges, transmittal charges and other costs and expenses relating thereto, and (d) any and all sums which we may be required to pay or assume under our arrangements with any foreign factors. All charge-backs of foreign sales by such foreign factors shall be binding on you and shall relieve us of the Credit Risk with respect thereto. You acknowledge that we have informed us of the terms of our arrangements with any and all such foreign factors, including, without limitation, the Code of International Factoring Customs (IFC76) and Master Agreement relating thereto; you consent thereto and agree to fulfill and to assist in fulfilling those customs as far as your part of the transactions in concerned; your failure to comply with any thereof shall immediately relieve us of the Credit Risk with respect to all affected Receivables. You shall affix to all invoices to foreign customers such legend regarding payment thereof to the foreign factor as we may from time to time require.

2.9     You shall pay us on demand any debit balance at any time existing in your account.

**SECTION 3     Interest**

3.1     You will pay interest on the daily balance of all monies remitted, paid or otherwise advanced to you or for your account net of all payments received from you or on your behalf including the Purchase Price of Receivables purchased by us hereunder which is credited to your account on the Collection Date. Interest will be calculated daily at a rate the greater of ten percent (10.0%) per annum or ___ hundred basis points (__.0%) plus the Base Rate (the "Interest Rate") and will be charged to your account monthly, in arrears. All other indebtedness due by you to us) under this Agreement and on all other Obligations, except those specifying a different rate, from the date incurred through the date paid will be charged interest calculated daily at the greater at that rate which is the maximum rate applicable by law, or rate of six hundred basis points (6.0%) plus the Base Rate and, at our option, may be charged to your account. Any publicly announced decrease or increase in the Base Rate shall result in an adjustment to the Interest Rate on the next business day. Interest shall be calculated on the basis of a 360-day year for the actual number of days elapsed. In no event shall the Interest Rate exceed the maximum rate permitted by applicable law and in the event excess interest is paid, it shall be considered a repayment of the principal.

3.2     If a Receivable or any payment is charged back to you after the Collection Date, you will pay us interest at the Interest Rate on such Net Receivable or such payment from the Collection Date to the chargeback date.

**SECTION 4     Representations, Warranties and Covenants**

4.1     You represent, warrant and covenant as to each Receivable sold and assigned hereunder that, at the time of its creation, the Receivable is a valid, bona fide account, representing an undisputed indebtedness incurred by the named account debtor for goods actually sold and delivered or for services completely rendered; there are no setoffs, offsets or counterclaims, genuine or otherwise, against the Receivable; the Receivable does not represent a sale to a parent, subsidiary or a consignment, sale or return or a bill and hold transaction; no agreement exists permitting any deduction or discount (other than the discount stated on the invoice); you are the lawful owner of the Receivable and have the right to sell and assign the same to us; the Receivable is free of all security interests, liens and encumbrances other than those in our favor, and the Receivable is due and payable in accordance with its terms.

4.2     You shall not grant or suffer to exist any lien upon or security interest in your inventory in favor of any party other than us without our written consent, or prior knowledge.

4.3     You are a solvent corporation; duly incorporated and in good standing under the laws of the state of your incorporation or formation and qualified in all States where such qualification is required; the execution, delivery and performance of this Agreement have been duly authorized and are not in contravention of any applicable law, your corporate charter or by-laws or any agreement or order by which you are bound.

4.4     You shall not change your corporate name or the location of your office or open any new offices without giving us at least thirty (30) days prior written notice. At the present time, you carry on business only at the above address and the addresses set forth below:

_____

4.5     All books and records pertaining to the Receivables or to any inventory owned by you shall be maintained solely and exclusively at the above addresses or the addresses listed in Section 4.4 and no such books and records shall be moved or transferred without giving us thirty (30) days prior written notice.

_____     _____
Bankest                                                              Company

4.6     You shall not sell, lease, transfer or otherwise dispose of all or substantially all of your property or assets, or consolidate with or merge into or with any corporation or entity without our prior written consent, which consent will not be unreasonable withheld.

4.7     After our request, you shall hold all returned, replevied or reclaimed goods coming into your possession in trust for us and all such goods shall be segregated and identified as held in trust for our benefit and you shall, at our request, and at your expense, deliver such goods to such place or places as we may designate.

4.8     Receivables sold to us hereunder and represented by invoices bearing the tradenames or styles set forth below are wholly owned by you and the undertakings, representations and warranties made in connection therewith shall be identical to and of the same force and effects as those made with respect to invoices bearing your corporate name. The tradenames or styles set forth below are the only tradenames or styles under which you transact business.

_____,_____

4.9     No discounts, credits or allowances will be issued, granted or allowed by you to customers and no returns will be accepted without our prior written consent; provided, however, that until we notify you to the contrary, you may presume our consent. Discounts, credits or allowances once issued may be claimed only by the customer; no third party beneficiary rights are created hereby.

## SECTION 5     Disputes, Chargebacks and Reserves

5.1     With respect to any Receivable, upon the occurrence of a breach of any of the representations or warranties contained in Section 4.1, or the assertion by a customer of a Dispute or other defense to payment, other than financial inability, an Approved Receivable shall automatically become a Non-Approved Receivable and we may charge back such Receivable to you.

5.2     You will notify us promptly of and settle all Disputes at your cost and expense, including attorneys' fees, and will pay us promptly the amount of the Receivables affected thereby. However, if any Dispute is not settled by you within thirty days after the maturity date of the invoice or within such shorter period as we may determine, we may settle, compromise or litigate such Dispute in our or your name upon such terms as we in our sole discretion deem advisable and for your account and risk. We may also in our discretion and without notice to you take possession of and sell any returned goods at such prices and upon such terms as we deem advisable. We may charge any deficiency, and all costs and expenses, including attorney's fees, to your account, In addition to all other rights to which we are entitled under this Agreement, if there is any Dispute as to any Receivable, or if any Receivable on which you have the Credit Risk or evidenced by an invoice for less than Fifty Dollars ($50.00) is unpaid at its maturity, we may at any time charge the amount of such Receivable back to your account. Immediately upon the occurrence of any Dispute and regardless of the date on which we charge back the affected Receivable, the Credit Risk on such Receivable, to the extent theretofore borne by us, shall automatically revert to you. We may also charge back the amount of any Receivable which is not paid to us at maturity due to acts of God, war, civil strife, currency restrictions, foreign political impediments or the like.

5.3     We may, at our option, charge back to you all amounts owing on Non-Approved Receivables which are not paid when due. We shall also have the right to charge back to you any payment which we receive with respect to a Non-Approved Receivable if such payment is subsequently disgorged by us or disgorged by our assigns, whether as a result of any proceeding in bankruptcy or otherwise.

5.4     A chargeback shall not constitute a resale to you of said Receivables; however, upon payment by you to us of all monies due with respect to such charge back Receivable, title thereto shall revert to you, subject, however, to our continuing security interest therein. You agree to indemnify and save us harmless from and against any and all loss, costs and expenses, caused by or arising out of disputed Receivables, including, but not limited to, collection expenses and attorney's fees incurred with respect thereto. We may charge our normal and standard late payment and/or delinquency charges to your customers.

## SECTION 6     Administration

6.1     You shall, from time to time, execute and deliver to us confirmatory schedules of Receivables sold to us, together with one copy of each invoice and acceptable evidence of shipment and such other documentation and proofs of delivery as we may require. Each invoice shall bear a notice, in form satisfactory to us, that it has been sold and assigned to and is payable United States dollars only to us. However, the issuance of invoices to customers

Page 4 of 11

_____                                         _____
Bankest                                                              Company

shall itself constitute the assignment to us of the Receivables represented thereby. You will keep all shipping and delivery receipts and copies of all invoices at your office available for our inspection, and will deliver them to us promptly at our request. The sale of your Receivables to us and our ownership thereof will be properly reflected on your books. You agree to prepare and mail all invoices or, at our option, you shall send all of the invoices to us ready for mailing to the customers, in which event the postage and clerical charges incurred by us in mailing the same will be paid by you.

6.2      You agree to execute and deliver to us such further instruments of assignments, financing statements and instruments of further assurance as we may reasonably require. You authorize us to execute on your behalf and file such Uniform Commercial Code ("UCC") financing statements without your signature as we may deem necessary in order to perfect and maintain the security interests granted by you in accordance with this and any other agreement between you and us, and you further agree that we may file this Agreement or a copy thereof as such UCC financing statement. You hereby irrevocably authorize us at any time and from time to time to file in any filing office in any UCC jurisdiction any initial financing statements and amendments thereto that (a) indicate that the collateral (i) includes all items set forth in Sections 7.1 and 7.2 hereof or as described by words of similar effect, regardless of whether any particular asset comprised in the collateral falls within the scope of Article 9 of the UCC of Florida or such jurisdiction, or (ii) is of an equal or lesser scope or with greater detail, and (b) provide any other information required by part 5 of Article 9 of the UCC of Florida (Section 679.5011-679.527, Florida Statutes 2002), or such other jurisdiction, for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether you are an organization, the type of organization and any organizational identification number issued to you and, (ii) in the case of a financing statement filed as a fixture filing or indicating collateral security as as-extracted collateral or timber to be cut, a sufficient description of real property to which the collateral security relates. You agree to furnish any such information to us promptly upon our request. You also ratify and authorize the filing of any UCC financing statement in any UCC jurisdiction any like initial financing statements or amendments thereto which may have been filed by us prior to the date hereof. You agree to bear the cost of all filing fees, filing taxes, search reports, legal fees and other charges incurred by us in the perfection, protection and preservation of the rights and collateral security herein granted to us.

6.3      If any remittances are made directly to you, your employees or agents, you shall act as trustee of an express trust for our benefit, hold the same as our property and deliver the same to us forthwith in kind. We and/or such designee as we may from time to time appoint, are hereby appointed your attorney-in-fact to endorse your name on any remittances received by us where such endorsement is required to effect collection; this power, being coupled with an interest is irrevocable.

6.4      We may, at all times, have access to, inspect and make extracts from all your records, files and books of accounts. We may, at any time after default by you hereunder, remove from your premises all such records, files and books relating to the Receivables. You agree to promptly furnish us within forty-five (45) days after the close of each quarter financial statements unaudited and in such form and detail as we may reasonably require. You also agree to prepare and furnish to us, within ninety (90) days after the close of your fiscal year, financial statements which have been audited and certified by an independent certified public accountant which is acceptable to us. You authorize us to communicate directly with your independent certified public accountants   and authorize such accountants to discuss your financial condition and statements directly with us.

6.5      Upon the occurrence of an Event of Default or if we, in good faith, believe we are insecure we may perform collateral monitoring, field examination, or other business analysis of you or any of your customers ("Monitoring") and upon our performing such Monitoring, there shall be charged to your account, an amount equal to $750 per day, per person, for each person employed by us during such Monitoring. In addition, you shall pay to us all costs, disbursements and expenses incurred by us during such Monitoring. In addition, you shall pay to us all costs, expenses and liabilities incurred, in connection with: (a) the execution and delivery of this Agreement and any agreement, instrument or document delivered pursuant hereto or in connection herewith (individually an "Other Agreement" or collectively, the "Other Agreements"), including a reasonable allowance for attorneys' fees; (b) any waiver, amendment, supplement, consent or modification hereof or thereof; and (c) the filing or perfecting of any security interest in any collateral securing the Obligations or any guaranty therefor. We shall also be entitled to charge your account for all costs and expenses incurred (including reasonable attorneys fees) in connection with: (i) obtaining or enforcing payment of any Obligation; (ii) the prosecution or defense of any action or proceeding concerning any matter arising out of or connected with this Agreement, any Other Agreement, or any of the

Company

Bankest

Receivables assigned hereunder, including, without limitation, effecting collection of Receivables whether by adjustments, litigation or otherwise, and realization upon recovered or returned merchandise and defending successfully in whole or in part any and all actions or proceedings brought by you; (iii) obtaining performance of the Obligations under this Agreement or any Other Agreement, including, but not limited to, the enforcement or defense of our security interests, assignments of rights and liens as valid perfected security interests; (iii) any attempt to inspect, verify, protect, collect, sell, liquidate or otherwise dispose of any collateral for the Obligations; and (iv) any consultations in connection with any of the foregoing.  In addition to the foregoing, we shall charge your account with fees relating to telecopying, wire transfers, special or additional reports and other services at such rates as shall be charged by us to our other clients from time to time.  All such costs and expenses together with all filing, recording and search fees, taxes owed by you to us shall be payable on demand may be charged to your account and shall constitute Obligations hereunder.

6.6     If we determine that the credit standing of a customer has deteriorated after we have assumed the Credit Risk on a Receivable, you shall, at our request, exercise such rights as you may have to reclaim or stop the goods in transit, and you hereby grant us the right to take such steps in your name or ours.

6.7     You authorize us to disclose such information as we deem appropriate to persons making credit inquiries about you.

6.8     We will send you a monthly statement of your account which shall constitute an account stated and be binding upon you with respect to the matters reflected therein and any matters previously reported to you which are incorporated therein, except to the extent that written exceptions thereto are served upon us within thirty (30) days after such statement is rendered.

6.9     You hereby agree to indemnify us for all costs and expenses incurred by us in connection with Receivables for which credit approval has not been given and in connection with Receivables which are unpaid at maturity for reasons other than financial inability.  Further, you hereby agree to indemnify us for any liability for duties, forwarder's fees, storage, shipping charges and other expense connected with the Receivables and any losses occasioned by claims of Customers under Receivables.

**SECTION 7     Collateral Security**

7.1     As collateral security for all Obligations, you hereby assign and grant to us a continuing security interest in: (a) all of your presently existing and hereafter created accounts (as the term "account" is defined in the Florida Uniform Commercial Code) and other present and future receivables and general intangibles and the proceeds thereof including, without limitation, any letter of credit through which any such account or other receivable is to be paid and any promissory note, bill of exchange or other instrument evidencing or issued in place of or in satisfaction of any such account or other receivable or pursuant to which any such account or other receivable is to be paid; (b) all monies, securities and other property now or hereafter held or received by, or in transit to us from or for you, whether for safekeeping, pledge, custody, transmission, collection or otherwise, and all of your deposits and credit balances in our possession; (c) all returned, reclaimed or repossessed goods and the documents evidencing or relating to such goods; (d) all books, records and other property at any time evidencing or relating to the Receivables; (e) any collateral securing any of the foregoing; (f) any other tangible and intangible personal property of whatsoever nature and kind and wheresoever situated, whether the property of you now or in the future (including, without limitation, "general intangibles", "goods" including, without limitation, "inventory" and "equipment", "chattel paper", "documents" and "instruments" as these terms are defined in the Florida Uniform Commercial Code); and (g) the proceeds from any of the foregoing including, without limitation, proceeds from any insurance insuring the same against risk of loss or non-payment.  Recourse to the collateral security herein provided shall not be required, and you shall at all times remain liable for the payment and performance of all of your Obligations upon demand by us.

7.2     To further the attachment, perfection and first priority of, and our ability to enforce, our security interest in the collateral security, and without limitation on your other obligations contained in this Agreement, including those set forth in Section 6.2, you agree, in each case at your expense, to take the following actions with respect to the following collateral security, as applicable:

| Bankest | Company |

(a)     Promissory Notes and Tangible Chattel Paper. If you shall at any time hold or acquire any promissory notes or tangible chattel paper, you shall forthwith endorse, assign and deliver the same to us, accompanied by such instruments of transfer or assignment duly executed in blank as we may from time to time specify.

(b)     Deposit Accounts. For each deposit account that you at any time open or maintain, you shall execute an agreement in form and substance satisfactory to us which either (i) causes the depositary bank to comply at any time with instructions from us to such depositary bank directing the disposition of funds from time to time credited to such deposit account, without your further consent or authorization , or (ii) arrange for us to become a customer of the depositary bank with respect to the deposit account, such that you shall only be permitted to exercise rights to withdraw funds from such deposit account upon our consent. The provisions of this paragraph shall not apply to (A) any deposit account for which you, the depositary bank and us have entered into a cash collateral agreement specially negotiated among you, the depositary bank and us for the specific purpose set forth therein; and (B) deposit accounts specially and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of your salaried employees. You have instructed, or you agree to instruct, all account debtors and obligors to make payments directly into the bank accounts or other deposit accounts listed on Schedule C attached hereto (the "Bank Accounts") and represent and warrant that you do not have any other bank or deposit accounts except as listed on such Schedule C. You agree to enter into a control agreement, and to cause the account debtors and obligors to enter into a control agreement with us as provided by UCC Section 9-314 (Section 679.3141 and other sections referenced therein, Florida Statutes, 2002), to be executed by any and all depository institutions which maintain any of the Bank Accounts and any bank accounts of account debtors or obligors ("Control Agreement"). The Control Agreement shall create a lien in favor of us which shall not be subject to a right of set off or any other lien.

(c)     Investment Property. If you shall at any time hold or acquire any certificated securities, you shall forthwith endorse, assign and deliver the same to us, accompanied by such instruments of transfer or assignment duly executed in blank as we may from time to time specify. If any securities now or hereafter acquired by you are uncertificated and are issued to you or your nominee directly by the issuer thereof, you shall immediately notify us and, at our request and option, pursuant to an agreement in form and substance satisfactory to us, either (i) cause the issuer to agree to comply with instructions from us as to such securities, without further authorization or consent from you or any nominee, or (ii) arrange for us to become the registered owner of the securities. If any securities, whether certificated or uncertificated, or other investment property now or hereafter acquired by you or your nominee are held through a securities intermediary or commodity intermediary, you shall immediately notify us and, at our request and option, pursuant to an agreement in form and substance satisfactory to us, either (A) cause such securities intermediary or (as the case may be) commodity intermediary to agree to comply with entitlement orders or other instructions from us to such securities intermediary as to such securities or other investment property, or (as the case may be) to apply any value distributed on account of any commodity contract as directed by us to such commodity intermediary, in each case without further authorization or consent from you or any such nominee, or (B) in the case of financial assets or other investment property held through a securities intermediary, arrange for us to become the entitlement holder with respect to such investment property, such that you will only be permitted to exercise rights to withdraw or otherwise deal with such investment property with our consent.

(d)     Collateral Security in the Possession of a Bailee. If any collateral security is at any time in the possession of a bailee, you shall promptly notify us and, at our request and option, shall promptly obtain an acknowledgement from the bailee, in form and substance satisfactory to us, that the bailee holds such collateral security for the benefit of us, and that such bailee agrees to comply, without further authorization or consent from you, with our instructions as to such collateral security.

(e)     Electronic Chattel Paper and Transferable Records. If you at any time holds or acquires an interest in any electronic chattel paper or any "transferable record," as that term is defined in Section 201 of the federal Electronic Signatures in Global and National Commerce Act, or in Section 16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction, you shall promptly notify us and, at our request and option, shall take such action as we may reasonably request to vest in us control, under Section 9-105 of the UCC (Section 679.1051 of the Florida Statues 2002), of such electronic chattel paper or control under Section 201 of the federal

---

Bankest                                    Page 7 of 11

Company

Electronic Signatures in Global and National Commerce Act or, as the case may be, Section 16 of the Uniform Electronic Transactions Act, as so in effect in such jurisdiction, of such transferable record.

(f)     Letter-of-Credit Rights. If you are at any time a beneficiary under a letter of credit, you shall promptly notify us and, at our request and option, shall, pursuant to an agreement in form and substance satisfactory to us, either (i) arrange for the issuer and any confirmer or other nominated person of such letter of credit to consent to an assignment of the proceeds of the letter of credit to us, or (ii) arrange for us to become the transferee beneficiary of the letter of credit, upon our agreement, in each case, that the proceeds of the letter of credit are to be applied to your account as set forth herein.

(g)     Commercial Tort Claims. If you shall at any time hold or acquire a commercial tort claim, you shall immediately notify us in a writing signed by you of the particulars thereof and grant to us in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing shall be to our satisfaction.

(h)     Other Actions as to Any and All Collateral. You further agree, at our request and option, to take any and all other actions we may determine to be necessary or useful for the attachment, perfection and first priority of, and our ability to enforce our security interest in any and all of the collateral security, including, without limitation, (a) executing, delivering and, where appropriate, filing financing statements and amendments relating thereto under the UCC of Florida or any jurisdiction, to the extent, if any, that your signature is required on or for any such documents, (b) causing our name to be noted as secured party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or priority of, or our ability to enforce our security interest in such collateral security, (c) complying with any provision of any statute, regulation or treaty of the United States as to any collateral security if compliance with such provision is a condition to attachment, perfection or priority of, or our ability to enforce our security interest in such collateral security, (d) obtaining governmental and other third party waivers, consents and approvals in form and substance satisfactory to us, including, without limitation, any consent of any licensor, lessor or other person obligated on the collateral security, (e) obtaining waivers from mortgagees and landlords in form and substance satisfactory to us and (f) taking all actions under any earlier versions of the UCC or under any other law, as reasonably determined by us to be applicable in any relevant UCC or other jurisdiction, including any foreign jurisdiction. .

7.3     By your execution of this Agreement, you also hereby grant to us the right and authority to set-off and debit payments and charges you owe us, which we are otherwise entitled to set-off and debit against the account as specified in this Agreement directly against your account, without prior notice or consent from you. We shall in good faith endeavor to provide you written notice of such set-off or debit within ten (10) days after same; provided however, that we shall have no liability to you in respect of our failure to give such notice; and further provided that our failure to give such notice shall have no effect on our rights to set-off or debit as provided above.

## SECTION 8     Events of Default

8.1     The occurrence of any of the following acts or events shall constitute an Event of Default: (a) if you fail to make payment of any of your Obligations when due, (b) if you fail to make any remittance required by this Agreement, (c) if you commit any breach of any of the terms, representations, warranties, covenants, conditions or provisions of this Agreement, or of any present or future supplement or amendment hereto or of any other agreement between us, (d) if you become insolvent or unable to meet your debts as they mature, (e) if you deliver to us a false financial statement, (f) if you call, or have called by a third party, a meeting of creditors, (g) if you have commenced by or against you any bankruptcy proceeding, insolvency, arrangement or similar proceeding, (h) if you suspend or discontinue doing business for any reason, (i) if a receiver or a trustee of any kind is appointed for you or any of your property, (j) if any guarantor of your Obligations shall become insolvent or have commenced by or against such guarantor any bankruptcy proceeding, insolvency, arrangement or similar proceeding, (k) if any guaranty of your Obligations is terminated, or (l) if any change of ownership occurs with respect to more than twenty (20%) percent of your capital stock.

8.2     Upon the occurrence of an Event of Default, we shall have the right to terminate this Agreement and all other arrangements existing between us forthwith and without notice, and all of your Obligations to us shall mature and become immediately due and payable and we shall have the right to withhold any further payment to you until all Obligations have been paid in full. In addition, we shall have all the rights of a secured party under the Uniform

Commercial Code, including, without limitation, the right to take possession of any collateral in which we have a security interest and to dispose of same at public or private sale and you will be liable for any deficiency. We shall not be required to proceed against any Collateral but may proceed against you directly. You agree to pay our costs and reasonable attorney's fees in connection with all enforcement actions under this agreement, or in the collection of any Receivables sold by you to and for which we have recourse against you, without regard to whether we institute suit against you or resolve such matter without suit being brought.

## SECTION 9      Terms and Termination

This Agreement shall continue in full force and effect for one (1) year or until terminated by either party hereto giving the other party not less than 90 days prior written notice thereof. Notice of termination shall be registered or certified mail; provided however, that you shall not terminate this Agreement so long as you are indebted or obligated to us in connection with any other financing arrangements. Notwithstanding such notice of termination, our respective rights and obligations arising out of transactions having their inception prior to the specified date of termination shall not be affected by such termination and all terms, provisions and conditions hereof, including but not limited to, the security interests herein above granted to us, shall continue in full force and effect until all Obligations have been paid in full. All of the representations, warranties and covenants made herein shall survive the termination of this Agreement.

## SECTION 10      Modifications

This Agreement cannot be changed or terminated orally; it constitutes the entire agreement between us and shall be binding upon respective successors and assigns, but may not be assigned by you without our prior written consent. No delay or failure on our part in exercising any right, privilege, or option hereunder shall operate as a waiver thereof or of any other right, privilege or option. No waiver whatsoever shall be valid unless in writing, signed by us, and then only to the extent therein set forth. If any term or provision of this Agreement is held invalid under any statute, rule or regulation of any jurisdiction competent to make such a decision, the remaining terms and provisions shall not be affected, but shall remain in full force and effect. You further acknowledge that during the course of the term of this Agreement, we shall make credit determinations with respect to your Receivables and shall refactor and otherwise assign such Receivables to a Third Party, notwithstanding any such assignment of refactoring you shall in no way rely on any credit determination relayed to us, or any action or inaction taken by such Third Party with respect to the Receivables, and that you shall look only to us as the party responsible for credit determinations and administration of your Receivables and this Agreement generally.

## SECTION 11      Definitions

11.1      "Approved Receivable" - Any Receivable with respect to which we have issued a credit approval which has not subsequently been withdrawn.

11.2      "Base Rate" - The rate of interest publicly announced from time to time by Citibank N. A., New York, New York as its prime or base rate (or equivalent).

11.3      "Credit Risk" - The risk that a customer will be financially unable to pay a Receivable at maturity, provided the customer has received and accepted the goods and/or services which gave rise to such Receivable, without any Dispute.

11.4      "Dispute" - Any dispute, deduction, claim, offset, defense or counterclaim of any kind, including, without limitation, any dispute relating to goods or services already paid for or relating to Receivables other than the Receivable on which payment is being withheld.

11.5      "Net Receivable" - The gross face amount of a Receivable less the discount offered by you and taken by us.

11.6      "Non-Approved Receivable" - Any Receivable with respect to which we have either not issued a credit approval or have subsequently withdrawn a credit approval as a result of a Dispute or otherwise.

11.7      "Obligations" - All loans, advances, debts, liabilities, obligations, covenants and duties owing by you to us, direct or indirect, absolute or contingent, due or to become due, now existing, or hereafter arising, including, without limitation, invoices for goods or services purchased by you from any company whose accounts are factored or financed by us and indebtedness arising under any guaranty made by you or issued by us on your behalf and the debit balance of your account.

Page 9 of 11

Bankest                                                                                          Company

11.8    "Payment Date" - The earlier of the Wednesday of the week following the week in which we receive payment of a Receivable or 120 days after the due date of a Receivable, provided that such Receivable remains unpaid solely because of the Customer's financial inability to pay.

11.9    "Receivables" - All presently existing and hereafter created accounts, contract rights and general intangibles relating thereto, and other forms of obligation for the payment of money arising out of the sale of goods or rendition of services together will all proceeds thereof, all guaranties and security therefor, and all goods and rights represented thereby or arising therefrom including, but not limited to, the right of stoppage in transit, replevin and reclamation.

## SECTION 12    Entire Agreement, Governing Law, and Waiver of Jury

This Agreement embodies our entire agreement as to the subject matter and supersedes all prior agreements as to the subject matter.  This shall be governed by and interpreted in accordance with the laws of the State of Florida. **EACH OF US HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY SUIT OR PROCEEDING ARISING UNDER OR RELATING TO TRANSACTIONS UNDER THIS AGREEMENT.  IN THE EVENT WE, BANKEST, COMMENCE ANY ACTION OR PROCEEDING AGAINST YOU, YOU WILL NOT ASSERT ANY OFFSET OR COUNTERCLAIM, OF WHATEVER NATURE OR DESCRIPTION, IN ANY SUCH ACTION OR PROCEEDING.**

## SECTION 13    Acceptance

This proposal is submitted to you unsigned and shall constitute an agreement between us only when signed by us.

Very truly yours,

Bankest Receivables USA LLC

By:_____

Title:_____

The foregoing Factoring Agreement is accepted and agreed this _____ day of _____, 20___.

By:_____     By:_____

Title:_____President_____     Title_____Secretary_____

Page 10 of 11

_____     _____
Bankest                                                       Company

Attachments:
      Reimbursable Out-of-Pocket Costs Schedule (Schedule A).
      Factoring Commission Schedule (Schedule B).
      Bank Accounts Schedule (Schedule C).
      Security Agreement
      Control Agreement
      Inventory Agreement

MIAMI 355449.3

11

# BANKEST RECEIVABLES USA LLC

## ACKNOWLEDGMENT OF RECEIPT OF CONFIDENTIAL MEMORANDUM
**Series A and Series B Notes**
**Including Series A and series B Master Promissory Note Participations**

The offering described in the Confidential Memorandum of Bankest Receivables USA LLC, a Florida limited liability company (the "Company"), dated March 17, 2003, as amended June 30, 2003 (the "Memorandum"), has not been registered with the United States Securities and Exchange Commission, the Florida Department of Financial Services, Office of Financial Institutions and Securities Regulation or any other state securities division or agency and is offered pursuant to exemptions and a safe harbor from the registration requirements of the United States Securities Act of 1933, as amended, applicable rules promulgated thereunder, and exemptions from the registration requirements of any applicable state securities laws.

I UNDERSTAND THAT THE MEMORANDUM IS FOR MY USE OR THAT OF MY ADVISORS OR DESIGNATED PURCHASER REPRESENTATIVES ONLY.

1. I hereby represent that:

(a) I have received the Memorandum;

(b) I will use the Memorandum only for my own purposes and I will not reproduce, duplicate, or distribute the Memorandum except to my designated advisors or purchaser representative, if any.

2. If I decide to participate in the Loan to Bankest Receivables USA LLC through the purchase Notes or Note Participations described in the Memorandum, I will also complete and execute the Subscription Agreement in the form appended to the Memorandum.

EXECUTION OF THIS DOCUMENT DOES NOT CREATE AN OBLIGATION TO PURCHASE THE NOTES OR NOTE PARTICIPATIONS DESCRIBED IN THE MEMORANDUM. THIS DOCUMENT MAY <u>NOT</u> BE EXECUTED IN THE UNITED STATES OF AMERICA OR ANY OF ITS TERRITORIES, POSSESSIONS OR AREAS SUBJECT TO ITS JURISDICTION.

______________________________
(Name) PLEASE PRINT

______________________________
(Street Address)

______________________________
(City) (Country)

______________________________
(Signature)

Date:______________, ______.

Executed in:

______________________________
City and Country

Home Tel.# (____) (_________)

Office Tel.# (____) (_________)

# BANKEST RECEIVABLES USA LLC

## SUBSCRIPTION AGREEMENT

_____

_____ Confidential Memorandum # 2003-IA-_____

Name of Subscriber
(please type or print)                    Subscription Amount $_____

To:    Management of BANKEST RECEIVABLES USA LLC

The undersigned ("Subscriber") hereby tenders this Subscription Agreement and hereby applies for the purchase, in the amounts and Series shown below, of (check one):

Notes ___

Note Participations ___

of Bankest Receivables USA LLC ("Company"), a Florida limited liability company, with the understanding that the purchase is subject to acceptance by the Management of the Company as described in the Confidential Memorandum of the Company dated March 17, 2003, as amended June 30, 2003 (the "Memorandum"). Terms used in the Memorandum shall have the same meaning when used herein.

Subscriber hereby warrants and represents that Subscriber, as well as Subscriber's Purchaser Representatives, if any, have had access to all relevant information and documents they desired, including all records and books pertaining to the Company and this subscription, all of which have been made available to Subscriber, Subscriber's Purchaser Representatives, if any, and Subscriber's accountants, attorneys, business advisors and tax advisors, and all of which will be available, upon reasonable notices, for inspection.

Subscriber hereby acknowledges that Subscriber, as well as Subscriber's Purchaser Representatives and other professional advisors, if any, are in receipt of the copy of the Memorandum with the number set forth above and represent that they have read, are familiar with and fully understand the Memorandum, including all familiar with and fully understand the Memorandum, including all documents referred to in the Memorandum. Subscriber represents that, after careful review of the Memorandum and the documents referred to therein, Subscriber is aware of the risks involved in an investment in the Company.

Subscriber hereby agrees that if this Subscription Agreement is accepted by the Management of the Company in accordance with the provisions of the Memorandum, Subscriber shall become a Noteholder or a holder of a Note Participation, as applicable, of the Company. Subscriber shall pay to the Company the funds enclosed herewith for the Notes or Note Participations purchased and otherwise be bound by the terms of this Subscription Agreement.

Subscriber is enclosing herewith a check or has wire transferred funds according to the instructions stated on page 2 of the Subscription Instructions Section of this Subscription Documents

booklet; in the amount identified above payable to "BANKEST RECEIVABLES USA LLC." This constitutes the purchase price of the Notes or Note Participations of the Company should this subscription be accepted.

In order to allow Management of the Company to determine, in accordance with any criteria established by the Company, whether or not to accept this Subscription Agreement, Subscriber hereby represents and warrants to the Company and the Management of the Company as follows:

(1)     Subscriber has acknowledged receipt of the Memorandum.

(2)     Subscriber represents that:

(i)     ☐     Subscriber is a Foreign Person/Non-Resident Alien Individual, not a United States citizen or resident.

☐     Subscriber has executed and provided the Company a Department of Treasury; Internal Revenue Service Form W-8 "Certificate of Foreign Status."

☐     Subscriber is a Foreign Corporation, Partnership, Estate or Trust, not a United States Corporation, Partnership, Estate or Trust.

(ii)     Subscriber is an "Accredited Investor" because (check which items apply):

☐     Subscriber is a natural person whose combined net worth with his or her spouse currently exceeds $1,000,000 and will exceed $1,000,000 at the time of the purchase of Notes.

☐     Subscriber is a natural person whose income exceeded $200,000 in each of the last two years and reasonably expects that his or her income will exceed $200,000 in the current year.

☐     Subscriber is a natural person whose individual income exceeded $200,000 in each of the last two years or joint income with his or her spouse exceeded $300,000 in each of those years and reasonably expects to reach the same income levels in the current year.

☐     Subscriber is a trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Notes offered in the Memorandum, whose purchase is being directed by the individual described in the Purchaser Representative Questionnaire attached hereto and by this reference made a part hereof.

☐    Subscriber is a corporation, not formed for the specific purpose of acquiring the Notes offered in the Memorandum, with total assets in excess of $5,000,000.

☐    Subscriber is a partnership, not formed for the specific purpose of acquiring the Notes offered in the Memorandum, with total assets in excess of $5,000,000.

☐    Subscriber is an investment company registered under the Investment Company Act of 1940.

☐    Subscriber is a broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended.

☐    Subscriber is an entity in which all of the equity owners meet one of the requirements of the above items.

(3)    Subscriber, if a natural person, is a resident of, or has its principal place of business in, the country set forth on the signature page hereof and, if a natural person, is at least twenty-one (21) years of age. Subscriber has no present intention of becoming a resident or domiciliary of, or moving its principal place of business to any other jurisdiction.

(4)    Subscriber has been advised that: (a) the Notes and Note Participations being offered as described in the Memorandum are, by their terms, not transferable; (b) the Notes and Note Participations are being offered are "restricted securities", as such term is defined in Rule 144 of the Securities and Exchange Commission, and have not been registered under any state or other jurisdiction's securities laws, including the Securities Act of 1933, as amended (collectively, the "Securities Laws"), and must be held indefinitely unless they are subsequently registered under applicable Securities Laws and/or an exemption from registration under the applicable Securities Laws is available to the Subscriber; (b) Subscriber has no right to require the Notes and Note Participations to be registered under any of the applicable Securities Laws; and it is not contemplated that either the Notes or the Note Participations will ever be registered under any applicable Securities Laws, nor is it contemplated that either the Notes or the Note Participations will ever be saleable under Rule 144 of the Securities and Exchange Commission; and (d) any sales of the Notes or the Note Participations by the Subscriber must be made in reliance upon any of the very limited exemptions (if any exemption is available) from registration generally available under applicable Securities Laws. Further, Subscriber is aware, notwithstanding the foregoing, that sales or other transfers are subject to the terms and conditions contained in this Agreement, including but not limited to, compliance with all applicable Securities Laws.

(5)    The Subscriber understands that (a) the Notes and the Note Participations may not be offered, sold, transferred, accepted or delivered, directly or indirectly, in the United States (or any of its territories, possessions or areas subject to its jurisdiction) or to U.S. Persons; (b) the Subscriber must qualify

9

as an "accredited investor" and must otherwise meet the qualifications contained in the Memorandum and this Subscription Agreement; (c) all offers and sales of Notes and Note Participations must be conducted pursuant to "offshore transactions" and without any "directed selling efforts" by any person in the United States (as such terms are defined in Regulation S under the United States Securities Act of 1933, as amended (the "Securities Act"). Subscriber represents and warrants to the Company that (a) Subscriber was not solicited to purchase the Notes or the Note Participations while present in the United States nor did the Subscriber receive the Memorandum (including the exhibits and annexes thereto), this Subscription Agreement nor any other offering material with respect to the Notes or the Note Participations in the United States; and (b) Subscriber is executing this Subscription Agreement outside of the United States and did not otherwise acquire the Notes or the Note Participations in the United States.

(6)     The Subscriber is not (a) (i) a natural person resident in the Untied States; (ii) a partnership, corporation or other entity organized or incorporated under the laws of the United States; (iii) an estate of which an executor or administrator is a U.S. person; (iv) a trust of which any trustee is a U.S. person; (v) an agency or branch of a foreign entity located in the United States; (vi) a non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a U.S. person; (vii) a discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident in the United States; or (viii) a partnership or corporation (A) organized or incorporated under the laws of any foreign jurisdiction and (B) formed by a U.S. person principally for the purpose of (1) investing in the Company or (2) investing in securities not registered under the Securities Act; and (b) is not acquiring Notes, Note Participations or any interest therein for the account or benefit of any U.S. Person described in paragraph 6(a), above (and Subscriber agrees to notify the Company immediately if the Subscriber should at any time become a U.S. Person);

(7)     To the best knowledge of the Subscriber, neither the subscription hereby made nor the purchase of the Notes or Note Participations hereunder by the Subscriber will violate any non-U.S. securities law of any jurisdiction to which such Subscriber may be subject.

(8)     The Subscriber will not sell or transfer directly or indirectly any of the Subscriber's Notes or Note Participations (or any participation or beneficial interest therein) to a U.S. Person referred to in paragraph 6(a) above or to any other person or entity (a) except as specifically permitted by the Memorandum and this Subscription Agreement, and (b) provided that (i) the proposed transferee has made representations and warranties similar to those contained herein; and (ii) Subscriber either registers the proposed transfer under the Securities Act and the applicable state and non-U.S. securities laws or furnishes the Company with an opinion or opinions of legal counsel(s) experienced in matters of U.S. securities laws and the securities laws of other applicable jurisdictions (which securities counsel(s) shall be satisfactory to the Company and its legal counsel(s)) confirming that the proposed transfer

10

(x) is exempt from the registration requirements of the Securities Act, any state securities laws and any non-U.S. securities laws, citing to the section of each such act upon which the exemption is based, and (y) will not otherwise violate any such securities laws.  Any attempted transfer without complying with the above requirements shall be null and void, and the Company shall refuse to register, confirm or recognize any such transfer.

(9)   The Subscriber will not transfer directly or indirectly any of the Subscriber's Notes or Note Participations (or any participation or beneficial interest therein) except in accordance with the provisions of Regulation S under the Securities Act, pursuant to registration under the Securities Act and applicable State securities laws and any non-U.S. securities laws, or pursuant to an available exemption from the registration provisions of the Securities Act and applicable State securities laws and non-U.S. securities laws. Subscribers are advised that they are subject to the same restrictions on offers and sales of Notes and Note Participations that apply under Regulation S to any "distributor" of such securities, as such term is defined in Regulation S.

(10)  The Notes or Note Participations for which Subscriber hereby tenders this Subscription will be acquired solely for the account of Subscriber and are not being purchased with a view to or for resale in connection with any distribution within the meaning of the Securities Act, or the securities laws of any state or other jurisdiction.  Subscriber represents that Subscriber has no agreement, understanding, commitment, or other arrangement with any person and has no present intention to sell, transfer or assign his or her Notes and/or Note Participations or any part or portion thereof.

(11)  Subscriber acknowledges that the attention of Subscriber and that of his or her purchaser representatives and other professional advisors, if any, has been specifically called to, and they have read and understand the Memorandum, and particularly the sections entitled "Description of Notes" and "Risk Factors" in the Memorandum and they are aware of the contents therein and consequences thereof.

(12)  Subscriber can bear the economic risk of the investment in the Notes and/or Note Participations without impairing his ability to provide for Subscriber and/or Subscriber's family in the same manner as Subscriber would have been able to provide prior to making this investment in the Notes and/or Note Participations.

(13)  The Notes and Note Participations have not been registered pursuant to the Florida Securities and Investor Protection Act or any other State securities laws.

(14)  Subscriber has not relied upon any information or documents provided by Management of the Company to any Subscriber prior to delivery of the Memorandum as a basis for entering into this Subscription Agreement,  Each Subscriber is aware of his unrestricted right to not enter into this Subscription Agreement and to receive back, without penalty or forfeiture of any kind, any sums previously paid or given to Management of the Company as an

11

indication of interest, or otherwise, in connection with the offering of the Notes and Note Participations.

(15)    Subscriber hereby agrees that the representations and warranties set forth in this Subscription Agreement shall survive the acceptance hereof by the Company.

(16)    At Management's request, Subscriber agrees to promptly execute such other instruments or documents as may be reasonably required by it in connection with the purchase of the Notes and/or Note Participations or any other matter contained in this Subscription Agreement and to promptly provide all personal and financial information which the Company may deem necessary or appropriate to submit to regulatory authorities.

(17)    Subscriber hereby acknowledges that the acceptance of this Subscription Agreement and the issuance of any Notes or Note Participations of the Company is made expressly: (i) subject to approval by applicable regulatory authorities; and (ii) on the condition that the Subscriber meets the Accredited Investor Standards described in the Memorandum and paragraph (2) hereof and on the condition that the Subscriber is not a U.S. Person, as described in the Memorandum and paragraph 6(a) hereof. If (i) in the opinion of Management, the ownership of securities issued by the Company by the Subscriber may cause the failure, refusal or denial of any required or necessary approval for a course of conduct approved by the Board of Managers; or (ii) the Subscriber fails to meet the Accredited Investor Standards described in the Memorandum and paragraph (2) hereof or the Subscriber is deemed to be a U.S. Person, as described in the Memorandum and paragraph (2) hereof; then, at the Company's option, the Subscription Agreement may be canceled and rescinded and (a) all or part of the Notes and/or Note Participations held by the Subscriber may be repurchased, at any time within six months from the date of acceptance of the Subscription, by the Company at the principal amount of each Note or Note Participation without further notice to Subscriber.

(18)    Subscriber agrees to all other terms and conditions of this investment as disclosed in the Memorandum.

(19)    **By the execution and delivery of this Subscription Agreement, and upon acceptance and issuance of the Notes and/or Note Participations by the Company, Subscriber hereby consents to, joins in and agrees to be bound by the terms of the Master Credit Agreement, the Master Security Agreement and Appointment of Collateral Agent Agreement and the Amendment to (i) Master Credit Agreement and (ii) Master Security Agreement and Appointment of Collateral Agent Agreement (all as defined in the Memorandum) as fully as if the Subscriber were a party thereto, including, if Subscriber is purchasing Note Participations, but not limited to, Section 41 of the Master Security Agreement granting a limited power of attorney to the Collateral Agent.**

*Bankest Receivables USA LLC - Subscription Agreement*
*Last Rev. 6/30/03*
MIAMI 360749.6

## Provisions Relating To Purchase Of Participations in Master Note

If Subscriber is purchasing a Note Participation, this subscription represents a request by Subscriber for the purchase of a participation represented by a Master Note. While Subscriber may, at any time after issuance, by written notice request to the Company request the issuance of a separate individual promissory note substantially in the form attached to the Master Credit Agreement, Subscriber's participation in the Master Note relating to this Subscription shall not be evidenced by a separate promissory note. Rather, each Master Note shall provide for acknowledgment of each participation purchased by either an authenticated facsimile confirmation message including the information (amount, rate, term etc. relating to the Subscriber's purchase) or by maintenance of a master grid including such information annexed to the Master Note, or both. Regardless of method of notation, each purchase of a Note Participation shall be assigned an Note Participation Identification Number.

Subscriber further acknowledges and agrees that in connection with the purchase of a Note Participation under a Master Note, specified provisions relating to administration of the Master Note and the rights and obligations of the Holders' Agent (as described in each Master Note and in the Memorandum) shall apply. Such rights of Holders' Agent include, but are not limited to, the following, all of which Subscriber acknowledges and agrees to by the execution and delivery of this Subscription Agreement:

(1)     Holders' Agent shall have the right on behalf of all holders under a particular Master Note to take any and all actions it shall deem necessary or appropriate in connection with the particular Master Note, including, but not limited to, consenting to any request by the Company or the Collateral Agent to any modification or amendment to the Loan and Security Documents or to the release or modification of any Collateral securing the Master Note. Holders' Agent approval of any such action, or the failure or refusal of Holders' Agent to take any such action, without having received the approval of one or more holders shall not be cause for any action against Holders' Agent.

(2)     Holders' Agent shall, until all advances under each particular Master Note have been paid in full (i) hold such Master Note and all other Loan and Security Documents for the benefit of all holder under the particular Master Note, (ii) receive all payments of interest, principal and other sums on account of or with respect to each advance under a particular Master Note, (iii) promptly remit to each holder his or her share of interest, principal and other sums received, as determined in accordance with the provisions of the Master Credit Agreement, (iv) keep full and complete records and accounts, (v) use its best efforts to promptly notify holders of the occurrences of any material event of default by the Company, provided that no failure to provide such notice shall result in any liability to Holders' Agent. Except as stated herein, Holders' Agent shall have no duty to obtain or to provide any information concerning any advance or the financial or other condition of Maker.

(3)     By the execution and delivery of this Subscription Agreement, and by making an advance, Subscriber acknowledges that Holders' Agent has made no representations or warranties with respect to (i) any Note Participation and collectibility of any Note Participation, (ii) the validity, enforceability or legal effect of any of the Documents, including the Master Credit Agreement, (iii) the

13

financial condition of the Company or the accuracy of any information supplied or to be supplied by the Company.

(4)    Neither Holders' Agent nor any of its officers, directors or employees shall be liable to Subscriber for any error in judgment or for any action taken or omitted with respect to any advance except to the extent of its gross negligence or willful misconduct. Without limiting the foregoing, Holders' Agent may rely upon the advice of counsel concerning legal matters or upon any written document believed by it to be genuine and correct and to have been sent by the proper person.

## Additional Terms and Conditions

The Subscriber hereby acknowledges and agrees that Subscriber is not entitled to cancel, terminate or revoke this Subscription Agreement, or any agreements of the Subscriber contained herein or the power of attorney granted hereby.

This Subscription Agreement shall be governed in accordance with the laws of the State of Florida, United States of America, and shall bind and inure to the benefit of the parties hereto, their respective heirs, executors, administrators, legal representatives, successors and assigns.

This Subscription Agreement, together with the Agreement, contains the entire agreement between the parties hereto. The provisions of this Subscription Agreement may not be modified or waived except in writing.

*Remainder of Page Intentionally Blank*

*Bankest Receivables USA LLC - Subscription Agreement*
*Last Rev. 6/30/03*
MIAMI 360749.6

Set forth below are the number of Notes being subscribed for and the total payment to the Company made hereby:

(Select One)

| NOTE PURCHASERS | MASTER PROMISSORY NOTE PARTICIPATION |
|---|---|
| SERIES A NOTES (185 Day Maturity)<br><br>_____ X \$_____ = \$\_\_\_\_\_<br>No. of<br>NOTES<br><br><br>SERIES B NOTES (365 Day Maturity)<br><br>_____ X \$_____ = \$\_\_\_\_\_<br>No. of<br>NOTES | MASTER NOTE<br>LENDERS'AGENT:_____<br><br>MASTER NOTE NO.:        _____<br><br>MASTER NOTE DATE:        _____<br><br><br>SERIES A NOTE PARTICIPATION (185 Day Maturity):<br><br>_____ X \$_____ = \$\_\_\_\_\_<br>No. of<br>Note Participations<br><br><br>SERIES B NOTE PARTICIPATION (365 Day Maturity):<br><br>_____ X \$_____ = \$\_\_\_\_\_<br>No. of<br>Note Participations |

***Signature Pages Follow***

15

IN WITNESS WHEREOF, the undersigned has executed this Subscription Agreement this _____ day of _____, 200__.

<p style="text-align:center">(IF NATURAL PERSON)</p>

WITNESSES:

_____        _____
                                                   Signature

_____        _____
                                         Signature (required for Joint Tenancy)

<p style="text-align:center">(IF CORPORATION, PARTNERSHIP OR TRUST)</p>

WITNESSES:                         Name of
                                   Subscriber:_____

_____        By:_____
                                   Name:_____
_____        Title:_____

                                   Executed in:

                                   _____
                                             City and County

<p style="text-align:center">(NOTE:  THIS SUBSCRIPTION AGREEMENT MAY <u>NOT</u><br>
BE EXECUTED IN THE UNITED STATES OF AMERICA<br>
OR ANY OF ITS TERRITORIES, POSSESSIONS OR<br>
AREAS SUBJECT TO ITS JURISDICTION)</p>

<p style="text-align:center">TITLE TO BE TAKEN (check one):</p>

_____        ☐   Individual Ownership

_____        ☐   Joint Tenants with Right of Survivorship
(Name as it should appear on the Note --
   two names for Joint Tenants)    ☐   Corporation

                                   ☐   Partnership

                                   ☐   Trust

                                   ☐   Other:_____

                                   _____
                                   (Registration and Mailing Address)

_____        _____
Principal Place of Residency                 (Telephone Number)
or Principal Place of Business

<p style="text-align:center">16</p>

This Subscription Agreement has been accepted by the Management of the Company this ___ day of _____, 200__.

BANKEST RECEIVABLES USA LLC

By:_____
                    Authorized Officer

## SUBSCRIPTION INSTRUCTIONS AND AUTHORIZATION TO COMPANY
### (Note Holders Only)*

Bankest Receivables USA LLC
999 Brickell Avenue
11th Floor
Miami, Florida 33131
United States of America

Re: _____, (Subscriber) Confidential Memorandum # 2003-I_____

Please consider this form my/our instructions to and authorization
of you, as follows:

Safekeeping of Note Certificate(s):

☐    Forward Note Certificate(s) to the Address indicated in my/our Subscription Agreement.

☐    Forward Note Certificate(s) to:_____.

☐    Retain my Note Certificate(s) until further notice.

Payment of Note Interest:

☐    Issue checks in payment of Interest, mailing same to address indicated in my/our Subscription
     Document.

☐    Issue checks in payment of Interest, mailing same to: _____.

☐    Wire funds as per the following instructions:
     _____
     _____.

Repayment of Note(s) Principal Amount:

☐    Issue checks in payment of Principal, mailing same to address indicated in my/our Subscription
     Document.

☐    Issue checks in payment of Principal, mailing same to:
     _____.

☐    Wire funds as per the following instructions:
     _____

(*    NOTE TO NOTE PARTICIPANTS:  Absent written instructions to the contrary, all payments of
principal and interest to Note Participants under a Master Promissory Notes will be paid by wire transfer
directly to the Master Note Lenders' Agent for further credit to the account of each participant maintained at
such Lenders' Agent.)
**FOR SUBSCRIBER:**

_____
**Signature**
**Name:**_____
**Title:**_____
**Date:**_____

18

CONFIDENTIAL                                                        CONFIDENTIAL

## BANKEST RECEIVABLES USA LLC

### PURCHASER REPRESENTATIVE QUESTIONNAIRE

### DESIGNATION OF PURCHASER REPRESENTATIVE

**(Complete, if Applicable)**

Subscriber has selected and appointed the person described below as his **Purchaser Representative** and has consulted with the Purchaser Representative with regard to the business, **tax**, or financial aspects of an investment in the Company and the evaluation of the merits and risks of an investment in Company.

Name and Address of Purchaser Representative:

_____

_____

_____

Purchaser Representative is:

_____ Lawyer _____ Securities Dealer

_____ Accountant _____ Businessperson

_____
Subscriber Signature

A Purchaser Representative Must Complete and
Submit a Purchaser Representative Questionnaire

_____

MIAMI 360872.1                                                        (6/03)

CONFIDENTIAL                                                    CONFIDENTIAL

## BANKEST RECEIVABLES USA LLC

## PURCHASER REPRESENTATIVE QUESTIONNAIRE

To:     Management of Bankest Receivables USA LLC (the "Company")

The information contained herein is being furnished to you to enable you to determine whether the undersigned may act as a Purchaser Representative, as such term is used in Rule 501 promulgated under the Securities Act of 1933, as amended (the "Securities Act"), in connection with the proposed offer and sale of Notes by the Company, each Notes consisting of fully registered Notes in the principal amount of $100,000 designated as either Series A or Series B, as described in a Confidential Memorandum dated March 17, 2003, amended June 30, 2003, of Bankest Receivables USA LLC, a Florida limited liability company.

I understand that (i) you will rely upon the information contained herein for purposes of such determination, and (ii) the interests will not be registered under the Securities Act in reliance upon, a safe harbor from the registration requirements of the Securities Act for offers and sales of securities which occur outside of the United States and among other exemptions, the exemptions from registration provided in Section 4(2) or other Sections of the Securities Act and Rules promulgated thereunder. I represent to you that (i) the information contained herein is complete and accurate and may be relied upon by you and (ii) I will notify you immediately of any material change in any of such information occurring prior to the closing of the purchase of any of the Notes.

All information furnished is for use only by you, and your counsel, and will be held in confidence, except that the Questionnaire may be furnished to such parties as you deem desirable to establish with federal or state securities laws.

Name of Purchaser: _____

## PLEASE PRINT OR TYPE

Name of Purchaser Representative: _____

Address: _____

City: _____ State: _____ Zip: _____ Phone: _____

Business
Address: _____

Occupation: _____

     1.    Occupation or position: _____

MIAMI 360872.1                                                          (6/03)

2.     Field of professional specialization, if any: _____

3.     Years in Practice: _____

4.     Business or professional education, including any degrees received: _____
_____
_____.

5.     Have you had prior experience in advising clients with respect to investments of this type? Yes _____ No _____

6.     List any professional licenses or registrations you hold, including bar admissions, accounting certifications, real estate brokerage licenses and SEC or State broker/dealer registrations:
_____
_____
_____.

7.     If you are an accountant or an attorney, please describe generally any business, financial or investment experience that would help you to evaluate the merits and risks of this investment: _____.

8.     How long you have known the Purchaser and in what capacity? _____
_____.

9.     Do you or any of your associates or affiliates have any relationship with the Company, its Management or any of their affiliates? Yes _____ No _____

If yes, please describe, including amount of any compensation received or to be received as a result of such relationship:
_____
_____.

The undersigned Purchaser Representative understands that the Company will be relying on the accuracy and completeness of my responses to the foregoing questions and represents and warrants to the Company as follows:

(a)     I am acting as Purchaser Representative for the Purchaser in connection with the Purchaser's prospective investment in the Notes;

(b)     I am familiar with, understand and am in full compliance with all my obligations under Rules 501 and 506 promulgated under the Act;

(c)     The answers to the above questions are complete and correct and may be relied upon by the Company and its Management in determining whether the offering in connection with which I have executed this questionnaire is exempt from registration under the Securities Act and any other applicable state securities laws;

(d)     I will notify the Company immediately of any material change in any statement made herein occurring prior to the closing of any purchase by the Purchaser of an interest in the Company;

(e)     I have disclosed to the Purchaser in writing prior to the Purchaser's appointment of me as his Purchaser Representative, any relationship which I may have or which is mutually contemplated with the Company, the Management, and their respective associates and affiliates disclosed in answer to question 9 above; and

(f)     I have such knowledge and experience in financial and business matters that I am capable of evaluating the merits and risks of the Purchaser's prospective investment in the Notes and I have in fact made such an evaluation and communicated the results of the same to the Purchaser.

IN WITNESS WHEREOF, I have executed this Purchaser Representative Questionnaire this _____ day of _____, 200__.

_____
_____
(Print name of witness)

_____
(Signature of Purchaser Representative)

_____
(Date)

_____
_____
(Print name of witness)

_____
(Signature of Purchaser)

_____
(Date)

MEMORANDUM NO.2003-IA-_____

## BANKEST RECEIVABLES USA LLC
### (a Florida Limited Liability Company)
### (Master Note Form)

**Series A Notes:**
Six (6) Month London Inter-Bank Offered Rate ("LIBOR")
plus One and One-Half Percent (1.5%), per annum* 185-Day Maturity Notes
**Series B Notes:**
Twelve (12) Month London Inter-Bank Offered Rate ("LIBOR")
plus One and Three-Quarters Percent (1.75%), per annum** 365-Day Maturity Notes

**Including Series A and Series B Master Promissory Note Participations**

**B.F. SECURITY HOLDINGS LTD., an Anguilla corporation (Collateral Agent)**

**Minimum Purchase - $ 100,000**

Stated Interest Rates:  Series A Notes:  Six (6) Month London Inter-Bank Offered Rate ("LIBOR") plus One and One-Half Percent (1.5%), per annum* 185-Day Maturity Notes.  Series B Notes: Twelve (12) Month London Inter-Bank Offered Rate ("LIBOR") plus One and Three-Quarters Percent (1.75%), per annum** 365-Day Maturity Notes.

---

## SUBSCRIPTION INSTRUCTIONS

---

In order to subscribe to purchase Notes or participations in Master Promissory Notes ("Note Participations") from Bankest Receivables USA LLC (the "Company"), a prospective lender must complete and execute the Subscription documents referred to below in accordance with the instructions set forth beginning on the next page.  The subscription documents, together with the appropriate payment, should then be delivered to the Company's present address at 999 Brickell Avenue, 11th Floor, Miami, Florida 33131.  The Company may terminate the Offering at any time in its sole discretion.

The subscription documents are a supplement to the Confidential Memorandum of the Company, dated March 17, 2003, as amended June 30, 2003 (the "Memorandum"), relating to the private offering of Notes and Note Participations of the Company.  Although copies of subscription documents are an integral part of the Memorandum, for your purposes and for purposes of complying with these Subscription Procedures, all subscription documents that are to be executed are printed on green safety paper.  NO PERSON IS AUTHORIZED TO RECEIVE THE MEMORANDUM UNLESS SUCH PERSON HAS PREVIOUSLY RECEIVED, OR SIMULTANEOUSLY RECEIVES, A COPY OF THE MEMORANDUM BEARING ON ITS COVER PAGE THE NUMBER SET FORTH ON THE COVER PAGE OF THIS SUBSCRIPTION DOCUMENT. Delivery of the Memorandum to anyone other than the person named on page A of this Subscription Document and the Memorandum is unauthorized, and any reproduction or circulation of the Memorandum, in whole or in part, is prohibited, except for delivery by the named offeree to the attorney, accountant, other professional advisor of Purchaser Representative, if any, of the named offeree.

*Bankest Receivables USA LLC - Subscription Agreement*
*Last Rev. 6/30/03*
MIAMI 360749.6

In order to subscribe for Notes and Note Participations, you must complete, execute and deliver the subscription documents accompanying the Memorandum in accordance with the instructions set forth below, together with the appropriate payment (as described below), to the Company. Please be sure that your name appears in exactly the same manner in each signature and in each place where it is inserted in the documents.

Subscriptions from suitable prospective investors will be accepted, subject to approval by the Company, after receipt of the subscription documents (properly completed and executed) with the appropriate payment.

| ITEM | INSTRUCTIONS |
|------|--------------|
| PAYMENT | Subscription payment(s) are payable in United States dollars via (i) check or (ii) bank to bank wire transfer of funds. Payments by check should be made payable to the order of the Company, as follows: BANKEST RECEIVABLES USA LLC. Subscription payments made by bank-to-bank wire transfer of funds should be sent as follows: |

**Mellon/UNB**

ABA NUMBER _____

For the Credit of: **Bankest Receivables USA LLC**

ACCOUNT NUMBER _____

| SUBSCRIPTION AGREEMENT | Complete, sign and date the original of the Subscription Agreement. See Note 1 below if two or more individuals jointly purchase Notes. Signatures must be witnessed. |
|------|------|
| PURCHASER REPRESENTATIVE QUESTIONNAIRE | If a prospective purchaser is relying on the advice of a Purchaser Representative to evaluate the merits and risks of an investment in the Notes, the Purchaser Representative must complete (including insertion of the name of the prospective investor at the top of page 1), and the prospective purchaser must acknowledge a Purchaser Representative Questionnaire, which will be provided by the Company. |
| TAX CERTIFICATION | Complete, sign and date IRS Form W-8BEN (Certificate of Foreign Status). |

**NOTE:  These Notes are being offered <u>solely</u> to non-United States investors.**

*Bankest Receivables USA LLC - Subscription Agreement*
*Last Rev. 6/30/03*
MIAMI 360749.6

MATTERS TO THE
ATTENTION OF THE
COMPANY:                    Subscriber must forward to the Company

    (i)      An original of the completed Subscription Agreement.
    (ii)     Check(s) in payment of the Note subscribed for; or
    (iii)    Bank to bank wire transfer of US funds in payment of the Note(s) subscribed for.
    (iv)    Completed originals IRS Form W-8BEN (Certificate of Foreign Status)

<u>Note 1:</u>

If two or more individuals jointly subscribe to purchase Notes, each individual must sign the Subscription Agreements.

    (i)     If the individuals are husband and wife, only one spouse need complete the Subscription Agreements. The name, age, and social security number, if any, of the other spouse should be indicated in the Subscription Agreements. Both spouses must sign the Subscription Agreements.

    (ii)    If the individuals are not married, each individual must separately complete and sign two Subscription Agreements.

6

## MEMORANDUM OF AGREEMENT

1.      This agreement ("Agreement") is made between EFG Private Bank ("Investors' Agent") and Bankest Receivables USA LLC (Bankest USA), B.F. Security Holdings, Ltd. ("Security Holdings"), and Eduardo Orlansky and Hector Orlansky (together the "Orlanskys") (Bankest USA, Security Holdings and the Orlanskys hereinafter collectively referred to as "Sellers and Affiliates") with respect to the $4 million that was invested by four investors (the "Holders") in promissory note participations issued by Bankest USA between July 31 and August 5, 2003 (the "Invested Funds"). The intent of this Agreement is to maintain the status quo of these assets to protect the interests of the Holders. In consideration of this Agreement, EFG Private Bank agrees to forebear from bringing an immediate legal action against Bankest USA, Security Holdings, Eduardo Orlansky and Hector Orlanksy, but EFG Private Bank is not waiving any of its rights or the rights of the Holders.

2.      Seller and Affiliates agree to maintain the status quo with respect to the Invested Funds (including but not limited to funds on deposit at Bankest USA's Mellon-United National Bank Account No. 005-114-7668), all accounts receivable that have been purchased with the Invested Funds, and any and all other assets or things of value that can be traced to the Invested Funds (such accounts receivable and other assets shall be referred to as "Invested Assets").

3.      Unless prevented by the Receiver of E.S. Bankest L.C. or the Court with jurisdiction over the receivership of E.S. Bankest L.C. , Seller and Affiliates agree to identify all Invested Funds and Invested Assets with specificity sufficient to ensure that they are transferred to EFG Private Bank or the Escrow Agent, as provided below. This identification shall include the amount and location (including bank location and account numbers) of the Invested Funds, and the specific accounts receivable that have been purchased with the Invested Funds and the identity of the obligors of each account receivable (the "Obligors"). This identification shall be made no later than the close of business, Thursday, August 21, 2003, subject to an extension by the mutual agreement of the parties hereto.

4.      Unless prevented by the Receiver of E.S. Bankest L.C. or the Court with jurisdiction over the receivership of E.S. Bankest L.C., Seller and Affiliates shall promptly transfer the Invested Funds and Invested Assets to EFG Private Bank and, if that for any reason such transfer(s) to EFG Private Bank cannot be promptly accomplished, Seller and Affiliates shall promptly transfer the Invested Funds and/or the Invested Assets to a mutually agreeable Escrow Agent, pursuant to an Escrow Agreement that will be drafted by EFG Private Bank. All payments under the Invested Assets are to be made directly to EFG Private Bank or the Escrow Agent, as the case may be, and Seller and Affiliates shall immediately notify the Obligors that payment shall be made to either EFG Private Bank or the Escrow Agent, and no payments shall be made to any of Seller and Affiliates. The Invested Funds shall be used to pay the Holders and the proceeds received in payment for the Invested Assets shall also be applied against the obligations owed to the Holders. Under no circumstances   shall any additional accounts

EXHIBIT

B

receivable be purchased with the Invested Funds or the proceeds from the Invested Assets, nor shall the Invested Funds or the proceeds from the Invested Assets be used for any purpose other than the repayment of the Holders. The parties hereto agree that Lewis B. Freeman is a mutually agreeable Escrow Agent, provided that he is willing to serve in this capacity. The Escrow Agent shall take possession of any Invested Funds and the Invested Assets transferred to him for the sole and exclusive benefit of EFG Private Bank, as agent of the Holders. The Escrow Agent will act only upon the instructions of EFG Private Bank.

5.    The failure of any of the Seller and Affiliates to fully comply with all of the terms of the preceding three paragraphs shall constitute an event of default under this agreement, and EFG Private Bank shall have the right to seek specific performance of the terms of this Agreement.

Entered into as of August 16, 2003

Counsel for EFG Private Bank

Eduardo Orlansky

Hector Orlansky

Bankest Receivables USA LLC
By:

B.F. Security Holdings, Ltd.
By:

JS 44
(Rev. 07/89)

**CIVIL COVER SHEET**

# 03 - 22283

The US-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required by the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I(a) PLAINTIFFS

EFG Private Bank, S.A., a bank organized under the laws of Switzerland

## DEFENDANTS

Bankest Receivables USA LLC, a Florida limited liability corporation, Bankest Capital Corporation, a Florida corporation, E.S. Bankest, L.C., a Florida limited liability corporation, Eduardo Orlansky, an individual, and Hector Orlansky, an individual

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF Non-U.S.
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
James D. Wing, Esq.
Mitchell E. Herr, Esq.
Holland & Knight, LLP
701 Brickell Avenue
Miami, FL 33131
305-374-8500

ATTORNEYS (IF KNOWN)
See attachment

*Dade County Atage / 03-22283-CIV-Altonaga / Bandstra*

## II. BASIS OF JURISDICTION (PLACE AN X IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. GOVERNMENT NOT A PARTY)
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

*Per Atty Mitchell E here*

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(FOR DIVERSITY CASES ONLY)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☒ 6 | ☐ 6 |

## IV. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

28 U.S.C. § 1332(a)

## V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— Med Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury— Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☒ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademarks | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ Exchange |
| ☒ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (823) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus: | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 530 General | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 540 Mandamus & Other | | ☐ 871 IRS - Third party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 550 Other | | | ☒ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | | | | |

*Per Atty: Mitchell*

Fla. Statute Sec. 517.211 & 517.301

## VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded From Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgement

$150.00    888183
08/27/03

| VII. | **REQUESTED IN** | CHECK IF THIS IS A CLASS ACTION | DEMAND million | Check YES only if demanded in complaint: |
|------|------------------|----------------------------------|----------------|-------------------------------------------|
| | **COMPLAINT:** | ☐ UNDER F.R.C.P. 23 | Plus attorney s fees | JURY DEMAND: ☐ YES ☒ NO |

| VIII. | **RELATED CASE(S)** (See instructions): | Judge Huck | Docket Number 03-22112-CIV-HUCK |
|-------|------------------------------------------|------------|----------------------------------|
| | **IF ANY** | | |

| Date | SIGNATURE OF ATTORNEY OF RECORD |
|------|--------------------------------|
| 27 August 2003 | |

*United States District Court*